1                IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF NEW MEXICO

3        UNITED STATES OF AMERICA,

4                      Plaintiff,

5            vs.                              CR-15-00212 MCA

6        JAMAICO TENNISON,

7                      Defendant.

8

9                  REDACTED TRANSCRIPT OF PROCEEDINGS
                  MOTION TO SUPPRESS STATEMENTS, VOLUME 3
10          BEFORE THE HONORABLE M. CHRISTINA ARMIJO
                   CHIEF UNITED STATES DISTRICT JUDGE
11          WEDNESDAY, FEBRUARY 3, 2016, 9:10 A.M.
                       ALBUQUERQUE, NEW MEXICO
12

13

14       FOR THE PLAINTIFF:

15            UNITED STATES ATTORNEY'S OFFICE
              District of New Mexico
16            201 Third Street, Northwest, Suite 900
              Albuquerque, New Mexico  87102
17            BY:  MR. KYLE T. NAYBACK
                   MS. SARAH JANE MEASE
18

19       FOR THE DEFENDANT:

20            COBERLY & MARTINEZ, LLLP
              Attorneys at Law
21            1322 Paseo de Peralta
              Santa Fe, New Mexico  87501
22            BY:  MR. TODD A. COBERLY

23

24            Proceedings recorded by mechanical stenography,
         transcript produced by computer.
25


                 JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                    FEDERAL OFFICIAL COURT REPORTER
                    333 Lomas Boulevard, Northwest
                    Albuquerque, New Mexico  87102

1     Reported by:

2          JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
           333 Lomas Boulevard, Northwest
3          Albuquerque, New Mexico  87102
           Phone:  (505)348-2209
4          Email:  Julie_Goehl@nmcourt.fed.us

5

6

7                         I N D E X

8                                                    PAGE

9     PRELIMINARY MATTERS                             3

10    WITNESSES FOR THE DEFENSE:

11      CHARLES ROBERT HONTS

12        Cross-Examination (Continued) by Mr. Nayback      5

13        Redirect Examination by Mr. Coberly         28

14      JAMAICO TENNISON

15        Direct Examination by Mr. Coberly           57

16        Cross-Examination by Ms. Mease              75

17        Redirect Examination by Mr. Coberly         97

18        Recross-Examination by Ms. Mease            110

19        Questions by the Court                      111

20

21                    EXHIBITS ADMITTED

22                                                    PAGE

23    Government's Exhibit 17                          19

24

25


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                    FEDERAL OFFICIAL COURT REPORTER
                    333 Lomas Boulevard, Northwest
                    Albuquerque, New Mexico  87102

```
 1              REDACTED MOTION TO SUPPRESS STATEMENTS, VOLUME 3

 2                   (Court in session at 9:10 a.m.)

 3              COURTROOM DEPUTY CAROL WALKER:  All rise.

 4              Hear ye, hear ye, hear ye.  The United States

 5    District Court for the District of New Mexico is now in

 6    session, the Honorable M. Christina Armijo, Chief United

 7    States District Judge, presiding.

 8              God save these United States and this

 9    Honorable Court.

10              THE COURT:  You good morning, counsel.

11              MR. NAYBACK:  Good morning.

12              MS. MEASE:  Good morning.

13              MR. COBERLY:  Good morning.

14              THE COURT:  You may be seated.

15              It's a cold morning out this morning, isn't

16    it?

17              MR. NAYBACK:  It is, indeed.

18              THE COURT:  Let us resume here in the case of

19    United States v. Jamaico Tennison.  This is on the

20    Court's criminal docket, 15-CR-212.

21              May I have appearances, please.

22              MR. NAYBACK:  Good morning, Chief Judge

23    Armijo.  The United States by Kyle Nayback and Sarah

24    Mease.

25              MS. MEASE:  Good morning, Your Honor.
```

```
 1                    THE COURT:  Good morning.

 2                    MR. COBERLY:  Good morning, Your Honor.  Todd

 3     Coberly on behalf of Jamaico Tennison, who is present

 4     here.

 5                    Along at counsel table is my paralegal, Lily

 6     Hofstra, and Dr. Honts appears.  Good morning.

 7                    THE COURT:  All right.  Good morning to you,

 8     Doctor.

 9                    DR. HONTS:  Good morning.

10                    THE COURT:  All right.  Let us resume here.

11                    Dr. Honts was previously testifying, and let

12     me look at my notes here.  Just a moment.  You may take

13     the witness stand there, Doctor.

14                    DR. HONTS:  Thank you, Your Honor.

15                    THE COURT:  Sure.  Just give me a moment.

16                    I've continued this matter several times, and

17     I think we were last in session on January 21; is that

18     correct?

19                    MR. COBERLY:  Yes, Your Honor.

20                    MR. NAYBACK:  I believe that's correct, Your

21     Honor.

22                    THE COURT:  Let us continue here.

23                    MR. NAYBACK:  Thank you, Your Honor.  May it

24     please the Court.

25                    THE COURT:  Go ahead.
```

```
 1                    CHARLES ROBERT HONTS,

 2          having been previously duly sworn under oath,

 3          was questioned and testified as follows:

 4                    CROSS-EXAMINATION (Continued)

 5     BY MR. NAYBACK:

 6     Q.   Dr. Honts, welcome back to New Mexico.

 7     A.   Thank you.

 8     Q.   Uh-huh.  I don't know if I heard on your direct

 9     examination.  When did you start administering

10     polygraphs?  I know it has been some years.

11     A.   1976.

12     Q.   Okay.  And in your career, how many would you say

13     you've done, administered?

14     A.   I don't know with certainty, but I believe it's

15     about 2500.

16     Q.   2500 polygraph exams.  Now, I assume some of those

17     are for criminal defendants or clients; and then are

18     others like when you do research studies or validation

19     studies, do you participate in those?  And then am I

20     missing some context in which you might administer

21     polygraphs?  Training, maybe?

22     A.   Complex question.

23     Q.   Okay.

24     A.   Yes, some of them are from research studies.

25     Q.   Okay.
```

1       A.    And a substantial number of them were when I was

2       first a polygraph examiner and I did screening work

3       for -- well, this was before the Polygraph Protection

4       Act of 1988, so I did polygraph screening work for

5       private companies.

6       Q.    I see.

7       A.    And occasionally for police departments, but not

8       that much.  Mostly it was private work, sometimes guard

9       companies and that sort of thing.

10      Q.    In recent years, you do perform polygraphs for

11      clients who are criminal defendants, correct?

12      A.    Yes.

13      Q.    Okay.  And sometimes when the defendant passes the

14      test, you advocate for the admissibility of that test in

15      court, correct?

16      A.    I have, yes.

17      Q.    And the reason you do that, or the argument you

18      may, anyway, is that it corroborates the defendant's

19      denials or alibi, something to that effect?

20      A.    Something to that effect.

21      Q.    Okay.  That the alibi corroborates the defendant's

22      position, whatever it is?

23      A.    It bolsters their credibility as a witness.

24      Q.    Thank you.  And you generally support the

25      admissibility of polygraphs to increase their

1    credibility, right?  Or corroborate their story?

2    A.   Yeah, I generally support the admissibility of

3    polygraph.

4    Q.   Now, do you support the admission of polygraphs for

5    purposes of supporting guilt of a defendant?

6    A.   I have.

7    Q.   Okay.  And have you ever advocated for that

8    position in a Federal Court, to your knowledge?

9    A.   No, I have not.

10   Q.   You were hired in this case to review the FBI's

11   work, correct?

12   A.   Yes.

13   Q.   And you came to Albuquerque to review the charts at

14   Special Agent Sullivan's office, correct?

15   A.   Correct.

16   Q.   So you testified earlier, I think on direct, that

17   you -- that there were cuff pressure problems at least

18   in a portion of the chart?

19   A.   Yes.

20   Q.   Do you recall that?

21   A.   Yes.

22   Q.   Okay.  And I think your testimony was that in that

23   third, bottom chart of the defendant's exhibit, the air

24   pressure seemed to have gone away and it was more of a

25   straight line as far as the air pressure cuff was

1    concerned?

2    A.   Yes.  It was -- the apparent leak appeared to have

3    been fixed or had disappeared because the cuff was being

4    run at a lower pressure.

5    Q.   Okay.  Thank you.  You testified also that the

6    charts were mediocre?

7    A.   I thought they were mediocre quality.

8    Q.   That the MSD was not working or --

9    A.   It was either missing or not working.  It's a

10   straight line.

11   Q.   Isn't it true that MSD really just monitors for

12   countermeasures?  Or do I have that right?

13   A.   No, it monitors for movements.  Not all movements

14   are countermeasures.

15   Q.   Okay.

16   A.   There are subjects that have a difficult time

17   sitting still, and it gives you a marker of when they

18   actually move, even though that may not be intentional.

19   Q.   But they're not a general concern as far as the

20   polygraph results are, are they?

21   A.   They can be, yes.

22   Q.   But you've testified in other courts that

23   countermeasures are not a general concern in determining

24   the accuracy of polygraph results, have you not?

25   A.   I don't believe I've ever given that testimony.  If

1    I have, it would only have been in regard to a specific

2    test where there was no evidence.

3    Q.   Okay.  So once you got the raw data from the FBI,

4    you used a different scoring method to score the charts,

5    correct?

6    A.   Might I elaborate on your previous question?

7    Q.   Did you have more to say about that?

8    A.   I did.

9    Q.   I didn't mean to cut you off.

10   A.   No, you didn't.  It's just more came to me while

11   you were --

12   Q.   Oh.

13   A.   One of the things that the research literature

14   shows is that countermeasures are ineffective unless the

15   person has received training.  And so unless there is a

16   possibility or reason to suspect the person has received

17   training, you're not concerned about spontaneous

18   countermeasures.

19        So I might have given testimony in that form

20   at some previous time.

21   Q.   Thank you, Doctor, for that addition.  So you have

22   the raw data from Special Agent Sullivan's polygraph

23   back on your big screens in Idaho, and you hand-scored

24   them, correct?

25   A.   I did, yes.

1    Q.   And then up used both the Utah and the ESS to score

2    the charts, correct?

3    A.   Yes.

4    Q.   And both of them, you found the results were

5    inconclusive, right?

6    A.   That's correct.

7    Q.   There's no testing that you've done that showed

8    that Mr. Tennison passed the polygraph, did you?

9    A.   No.

10   Q.   Okay.  And you're not making any claim here that

11   Mr. Tennison in fact passed the polygraph?

12   A.   I am not.

13   Q.   Okay.  Do you know what Mr. Tennison is charged

14   with?

15   A.   I know the general nature of the crime.  I don't

16   know the specific statute.  He's charged with sexually

17   touching an underage girl.

18   Q.   Do you recall her age?

19   A.   She was young.  I'm thinking six, but I --

20   Q.   Would it surprise you if it was four years old?

21   A.   It might not, no.

22   Q.   So inconclusive result, Doctor, if you have an

23   opinion on this, means he's neither lying nor telling

24   the truth, according to that one polygraph?

25   A.   It means that -- yes, it means you can't arrive at

1    a decision.

2    Q.   As to whether to interrogate?  Or whether the

3    defendant is telling the truth or lying?

4    A.   Well, I believe that you can't arrive at any

5    decision.  It doesn't provide you with any useful

6    information, although the data are that inconclusives

7    are more common with innocent people than with deceptive

8    people.

9         I published a paper on that with William

10   Schweinle a few years ago, 2009 I believe, that we

11   looked at that, and passed -- or inconclusives actually

12   give you some information that the person is innocent

13   because inconclusives occur more frequently with the

14   actually innocent.

15   Q.   So why not just administer another polygraph to Mr.

16   Tennison?

17   A.   Why not?

18   Q.   You didn't do that in this case?

19   A.   I did not, no.

20   Q.   Nor were you asked to, I take it?

21   A.   I was not asked to.

22   Q.   Wouldn't that be the best way to determine whether

23   he can pass a polygraph in this case?

24              MR. COBERLY:  Judge, this is irrelevant.

25              MR. NAYBACK:  Your Honor --

1          THE COURT:  Hold on.  Hold on.  Let me hear

2     the objection.

3          MR. COBERLY:  The objection is relevance.  The

4     issue before the Court is whether Mr. Tennison's

5     statements should be suppressed, and what happened on

6     June 11, 2014, to cause him to make this statement.

7     Theoreticals about after the fact taking a polygraph is

8     irrelevant.

9          MR. NAYBACK:  Your Honor, I think Dr. Honts is

10    an excellent physician to comment on hypotheticals, and

11    I thought that was part and parcel of what expert

12    witnesses can be asked.

13         THE COURT:  Overruled.

14         THE WITNESS:  Would you repeat your question?

15         MR. NAYBACK:  Could I have Ms. Goehl read it

16    back, Your Honor?

17         THE COURT:  Yes, you may.  I think the

18    question was:

19              *"QUESTION:  So why not just*

20         *administer another polygraph to Mr. Tennison?*

21              *"ANSWER:  Why not?*

22              *"QUESTION:  You didn't do that in*

23         *this case?*

24              *"ANSWER:  I did not, no.*

25              *"QUESTION:  Nor were you asked to, I*

1            *take it?*

2                      *"ANSWER:  I was not asked to.*

3                      *"QUESTION:  Wouldn't that be the best*

4            *way to determine whether he can pass a*

5            *polygraph in this case?"*

6                 THE COURT:  Is that correct?

7                 THE WITNESS:  Yes, Your Honor.

8                 THE COURT:  And that drew the objection.  And

9       the question next was:

10                     *"QUESTION:  Wouldn't that be the best*

11           *way to determine whether he can pass a*

12           *polygraph in this case?"*

13      A.   I believe it would, if a properly-conducted

14      polygraph was administered.

15      Q.   The National Research Council -- are you familiar

16      with the National Academy of Science?

17      A.   I am.

18      Q.   They've found that important unanswered questions

19      remain about polygraph accuracy, have they not?

20      A.   They did.

21      Q.   Okay.  I take it you take exception to the National

22      Academy of Sciences' position?

23      A.   Yes, I did at the time.  That was in the early

24      2000s, and certainly now, because so much more research

25      has been done.

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1     Q.   Okay.  Now, you're familiar with the Federal

2     Three-Position and the Federal Seven-Position scoring

3     methods, correct?

4     A.   I am.

5     Q.   You didn't run Mr. Tennison's data through those?

6     Or did you?

7     A.   No.

8     Q.   And can I ask why not?

9     A.   Because the research is that the methods that I

10    used are more accurate.

11    Q.   Okay.

12    A.   And I'm not formally trained in either the Federal

13    Seven or Federal Three.

14    Q.   Okay.

15    A.   I could do that.  I'm familiar with them.  I was at

16    the Polygraph Institute for a number of years and

17    certainly know of the Seven-Position Scale, but I didn't

18    feel there was any need for me to do that.

19    Q.   But you knew that that is what the FBI had used to

20    score -- that Chase Foster and Special Agent Sullivan

21    used those methods to score their hand-scores, right?

22    A.   Yes.

23    Q.   Can I ask you just -- it came up at some point in

24    the last three sessions we've had.  How were you

25    involved in that algorithm that Lafayette has?  Did they

```
 1    just base it on a study and appropriating your name

 2    without your consent?  Or did you help them draft the

 3    algorithm, if I can ask?

 4    A.   I had no involvement at all in drafting their

 5    algorithm.  And, in fact, one of the studies they cite,

 6    I don't even see how it's related.

 7    Q.   So they have this algorithm and they've put "Honts"

 8    on the algorithm, and you didn't give Lafayette

 9    permission to do that?

10    A.   No, but they can certainly cite the research my

11    name was on, but I had nothing to do with the

12    development of that algorithm.

13    Q.   And you didn't run Mr. Tennison's raw data through

14    any algorithms for this case, did you?

15    A.   I did not.

16    Q.   Do you think those algorithms are accurate if used

17    properly?

18    A.   They are accurate if they are applied to the test

19    upon which they were built.

20    Q.   Okay.

21    A.   And they were not built upon two relevant, two

22    comparison question tests.

23    Q.   You have already agreed, I think, that there is

24    room for human interpretation of raw data; is that

25    right?
```

```
 1    A.   I'm not sure what you mean by that question.

 2    Q.   I don't know if you were here -- well, I think you

 3    were here for all of this hearing.  Mr. Foster testified

 4    that if, you know, he and Special Agent Sullivan and you

 5    all hand-scored one criminal defendant's charts you may

 6    very well come up with different results?

 7    A.   He said that, yes.

 8    Q.   Okay.  Is that -- do you share that opinion, that

 9    there is room for interpretation when hand-scoring

10    polygraph charts?

11    A.   I think in the Utah System and ESS there is much

12    less subjectivity.

13    Q.   But we couldn't just plug it into a computer?  I

14    mean, a trained polygrapher has to interpret the charts

15    before you run it through the Utah Scoring Method,

16    correct?  Do I have that right?

17    A.   Well, I mean, the trained interpreter does the Utah

18    Scoring Method.

19    Q.   Okay.

20    A.   It's not an algorithm, although there is an

21    algorithm now for ESS, although it's not commercially

22    available.

23    Q.   Okay.  A brief moment?  Would I be wrong if I

24    concluded from -- well, let me ask you a different way,

25    Doctor.
```

1              Is the bar raised for determining deception in

2       both the Utah and the ESS?  If that's a fair question.

3       A.   No, I don't believe that's a fair way to describe

4       it.

5       Q.   Okay.  Can you help me understand it?

6       A.   I can try.  The difference is that the Utah System

7       was designed to -- was designed to statistically produce

8       the highest estimates of accuracy, and so the goal was

9       to -- well, statistically, you need both kinds of errors

10      count.  So false negative errors, where guilty people

11      pass, have a weight; and false positive errors, where

12      innocent people fail, have a weight.

13             And the Utah System is more balanced in the

14      errors that is produced; whereas, the particular

15      techniques that were used in this case, where you used

16      spot scoring and Three-Position, create a bias, and the

17      bias is against the innocent person.

18      Q.   Thank you.  So we were talking about the two -- the

19      Air Force Modified General Question Test when we last

20      met, and you had sent us a number of articles, or

21      through Mr. Coberly graciously sent them over to us.

22             Are you familiar with the validation studies

23      -- it seems like you must be -- for the MGQT?

24      A.   Yes.

25      Q.   Okay.

1     A.   Although there are various versions of the MGQT,

2     and the version here, the FBI MGQT, was two relevants

3     and two comparisons.  There are no studies on that.

4     Q.   Okay.  That's where maybe I was misunderstanding.

5     I thought you said there were studies critical of the

6     two-question test, but it's just that there are no

7     studies?

8     A.   There are no studies of the two-question test.

9     There are a number of studies that are critical of the

10    MGQT in general.

11    Q.   Okay.  And you know Dr. Senter, right?

12    A.   I have met him, yes.

13    Q.   Okay.

14          MR. NAYBACK:  Approach the witness, Your

15    Honor?

16          THE COURT:  You may.

17    Q.   Dr. Honts, will you look at what has been marked

18    for identification as Government's Exhibit 17 and tell

19    me if you recognize that study that you sent us?

20    A.   I do.

21    Q.   Do you recognize this as a validation study, and

22    indeed is that in the title?

23    A.   Yes, it is.

24          MR. NAYBACK:  Your Honor, I move Government's

25    Exhibit 17.

```
1              THE COURT:  Any objection to the tender of

2    Exhibit 17?

3              MR. COBERLY:  I don't think it should be

4    tendered and admitted as evidence.  I mean, I think he

5    can talk about it, if he relied on it.  But as far as

6    evidence, itself, I object.

7              THE COURT:  It will be admitted.

8              (Government's Exhibit 17 admitted into

9              evidence.)

10   Q.   Dr. Honts, will you turn to Page 182 of that

11   validation study?

12   A.   Yes.

13   Q.   Under "Discussion" it says, "The results of this

14   study showed a high level of reliability and decision

15   accuracy."  Did I read that right?

16   A.   Yes.

17   Q.   Now, when we last met, Dr. Honts, you were saying

18   that -- I think you testified to this before, that NCCA,

19   the NCCA, is one of -- is the premiere training grounds

20   for polygraphers in the country, correct?

21   A.   Yes.

22   Q.   And in that same hearing, you ended it by saying:

23   Anyone that gives a two-question test is -- I think you

24   said "grossly incompetent"?

25   A.   Yes.
```

1    Q.   And you also know now that the FBI is teaching,

2    through Mr. Foster and others, the two-question test to

3    the FBI polygraphers around the country?

4    A.   Yes.

5    Q.   Okay.  Now, you've testified over 100 times?  More?

6    A.   Well, if you consider this one testimony, 118.

7    Q.   118?  Oh, you're keeping track of those.  Now, you

8    have had credibility findings made against you by other

9    federal judges, haven't you?

10   A.   One.

11   Q.   That court --

12            MR. NAYBACK:  Approach the witness, Your

13   Honor?

14            THE COURT:  You may.

15            MR. NAYBACK:  Your Honor, may I tender a copy

16   of Government's Exhibit 14 to the Court?

17            THE COURT:  You may.

18   Q.   Dr. Honts, Government's Exhibit 14, do you

19   recognize that opinion?

20   A.   I do.

21   Q.   You were testifying in Federal Court in the United

22   States District Court for the Northern District of

23   Georgia Atlanta Division, correct?

24   A.   That's correct.

25   Q.   And you have read this opinion before, have you

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1      not?

2      A.    I have.

3      Q.    And the Court did make, as you admitted, some

4      credibility findings against you, correct?

5      A.    They did.

6              MR. NAYBACK:  Your Honor, may I tender a copy

7      of Government's Exhibit 14?

8              THE COURT:  You may.  What's the name of the

9      case?

10              MR. NAYBACK:  I'm sorry.  United States v.

11      Ricardo C. Williams, 03-CR-636-JEC-JFK.

12              THE COURT:  You may.  Thank you.

13      Q.    (By Mr. Nayback)  Dr. Honts, in this case --

14      correct me if I'm wrong; I'm trying to summarize it --

15      but there was a criminal defendant charged with bank

16      robbery.  He had passed a polygraph exam administered by

17      a private polygrapher, and you were advocating for the

18      admissibility of his polygraph results in order to

19      corroborate his defense?

20      A.    Yes.  The private polygrapher was a retired FBI

21      agent.

22      Q.    Yes.  And did you oversee the administration of the

23      polygraph, or were you brought in as a consultant

24      afterwards?

25      A.    I was brought in as a consultant afterwards.

1     Q.    Okay.  And the Court found or the Court had serious

2     concerns about the credibility of you, in your testimony

3     before the Court; is that true?  Or is that what the

4     Court found?

5     A.    They raised -- the Court raised issues about --

6     particularly about my written report.

7     Q.    Can you turn to Page 14 of this opinion, Doctor?

8     A.    Yes.

9     Q.    Right before the first full paragraph, the Court

10    states, "However, the court has serious concerns about

11    the credibility of Dr. Honts' testimony on the issue

12    before the Court."

13              Did I read that right?

14    A.    Yes, you did.

15    Q.    Now, this National Academy of Science issue came up

16    in this case; in other words, the National Academy of

17    Science's position that questions the quality of all the

18    available studies regarding polygraph accuracy?

19    A.    Yes.

20    Q.    And it included those in which you participated in

21    or on which you relied in the Ricardo Williams case,

22    correct?

23    A.    Both.

24    Q.    Okay.  And you took quotes, Dr. Honts, out of

25    context in order to support the arguments that you made

```
 1    as a proponent of the admissibility of the polygraph

 2    evidence, did you not?

 3    A.    They were described that way.  I do not agree.

 4    Q.    You take exception with the findings that the

 5    federal judge made, correct?

 6    A.    I do.

 7    Q.    Okay.

 8    A.    I --

 9    Q.    Even though the Court gave an example of the quote

10    that you took out of context?

11    A.    Yes.

12    Q.    Okay.  The Court went on to say, "If not intending

13    to intentionally mislead the court, this omission at

14    least exemplifies Dr. Honts' bias."

15               Does it say that?

16    A.    It does.

17    Q.    Now, remember when we were talking about the MSD

18    just a minute ago, Dr. Honts, and you were -- well, you

19    wanted to add something about your positions that you've

20    taken in the past about the MSD device and whether they

21    even have any effect on the accuracy of polygraph

22    examinations.

23               In this case, you took the position -- when I

24    say "this case," I mean in U.S. v. Ricardo Williams --

25    that countermeasures are not a general concern in
```

1    determining the accuracy of polygraph examinations;

2    isn't that right?

3    A.   I would have to look that up and see the context it

4    was in.

5    Q.   Will you turn to Page 21 and go to Footnote 13.

6    And tell me when you're there.

7    A.   I'm there.

8    Q.   Middle through that footnote, the Court says,

9    "However, he" -- and it's referring to you, Dr. Honts --

10   "gave little credence to the idea that countermeasures

11   are a general concern in determining the accuracy of

12   polygraph examinations."

13           Did I read that right?

14   A.   Yes.  And then the next sentence says, "It seems to

15   be Dr. Honts' opinion that only with his training on

16   countermeasures can they be successfully employed and

17   impact the accuracy of a polygraph examination's

18   results."

19           And that is exactly what the science says.

20   That was not my opinion.  That's based on data.  No one

21   has ever shown that untrained countermeasures have an

22   impact on the accuracy of polygraph.  And in fact, there

23   are at least four published studies that show exactly

24   the opposite.

25   Q.   Will you read the sentence right after that,

1    Doctor?

2    A.   "This self-centered reasoning is another example of

3    why the court attributes little weight to Dr. Honts'

4    opinions."

5              But it's self-centered because it's based on

6    data.

7    Q.   So do you teach criminal defendants countermeasures

8    before you give them a polygraph examination?

9    A.   Never.

10   Q.   That would be unethical, wouldn't it?

11   A.   It would also be illegal.  I believe it would be

12   illegal.  In fact, the Justice Department has indicted

13   more than one person for doing that.

14   Q.   And then you were questioned about the way you put

15   the -- the way you structured the questions in this

16   polygraph examination, right?  In other words, you

17   testified that a properly structured ZCT/CQT consisted

18   of relevant and comparison questions formatted in a

19   certain way.

20             Do you remember that part of the case?

21   A.   I don't.  Could you give me a page reference?

22   Q.   Page 26, Footnote 15.  I'll give you a moment,

23   Doctor.

24   A.   Well, I mean, this isn't accurate because I was

25   never trained to conduct tests at the Department of

1      Defense Polygraph Institute, so the tests that I conduct

2      would all have been in the Utah format.

3      Q.   Okay.

4      A.   So that I did not say that, because it's absolutely

5      not true.

6      Q.   The Court got it wrong, Doctor?

7      A.   The Court got that part wrong.

8      Q.   Okay.  The other parts were, that I just

9      referenced, the last three examples and the opinions,

10     those were accurate, correct?

11     A.   They are accurate.  I don't remember exactly what

12     the deviation from format was.  It was in the -- I'm

13     sure it was in the order of the questions, but I don't

14     recall specifically.

15     Q.   The Court said that, "It constitutes another

16     example of Dr. Honts offering up any explanation

17     available to avoid invalidating the examination of

18     Defendant Williams, and second, if believed, the

19     testimony supports the finding that there are no uniform

20     standards that govern the conduct of polygraph

21     examinations."

22              Did I read that right?

23     A.   You did.

24     Q.   Dr. Honts, is it safe to say that if you had found

25     that Jamaico Tennison had actually failed the polygraph

1    in this test, like Special Agent Sullivan found, like

2    Special Agent Foster found, that you probably wouldn't

3    be testifying here today, correct?

4    A.   Possibly, although there are other problems beyond

5    the scoring.

6    Q.   Okay.  You've been doing this for 30 years almost?

7    A.   We'll, I've been doing polygraph tests longer than

8    that now; I believe '76.

9    Q.   I mean, you can look at a polygraph chart and the

10   context in which a polygraph was given, and find a

11   problem with it, can't you, with that many years of

12   experience, whether it's cuff pressure, MSD, the length

13   of the question?  Couldn't you look at any polygraph

14   examination and find a problem with it?

15   A.   I don't think there are any perfect tests, no.

16   Q.   Okay.

17   A.   Mine included.

18   Q.   But you think you could have gotten better chart

19   results than Special Agent Sullivan, don't you?

20   A.   I believe I could have used a more accurate

21   technique.

22   Q.   And even though those charts were mediocre, you

23   went ahead and scored them?

24   A.   I did.

25   Q.   Right?

1    A.   And occasionally I've produced mediocre charts, as

2    well, because it's not the examiner's fault; it's the

3    subject's fault or the setting's fault.

4         And so I believe that they were scoreable.

5    Q.   Thank you, Dr. Honts.

6         MR. NAYBACK:  Your Honor, I'll pass the

7    witness.

8                     REDIRECT EXAMINATION

9    BY MR. COBERLY:

10   Q.   Dr. Honts, Mr. Nayback asked you about whether you

11   had advocated in support of a guilty verdict, if you

12   will, in Federal Court.  Do you recall that?

13   A.   I do.

14   Q.   What about in State Court?  You mentioned, last

15   time you testified, that you had testified for Kari

16   Brandenburg?

17   A.   I did.

18   Q.   Can you expound on that?

19   A.   I had been actually retained under stipulation.

20   There was a defendant in a homicide case.  He had been

21   given two private polygraph exams.  I was asked to

22   review those by the District Attorney.  I reviewed them.

23   I thought that they produced deceptive results, not

24   truthful results, but I thought that they were poorly

25   conducted and had very weak comparison questions, and so

 1    I was concerned that they might be false positive

 2    errors, from my scoring.

 3            And so in negotiations that I was not involved

 4    in between Ms. Brandenburg and defense counsel, they

 5    agreed to have me retest the defendant, Mario Chavez.

 6    And I retested him and produced a deceptive result and

 7    then testified at trial to the outcome of the test that

 8    I ran.

 9    Q.   Regarding the motion sensor device, how would a

10    motion sensor device affect how a polygrapher scores a

11    question?

12    A.   Well, it would affect the way you score the charts

13    if you see -- you have several tasks that go on

14    simultaneously while you're running the polygraph.  One

15    is, you're asking the question and you're also

16    maintaining the instrument, so that you make sure

17    everything remains adjusted and within the bounds of the

18    channels that are there.

19            You're also observing the person being tested,

20    and one of the things you're doing when you're observing

21    the person being tested is to look for movement.  And

22    we're concerned about movement because movements can

23    cause mechanical artifacts, because they move the

24    sensors.  So the one that's most obvious would be the

25    cuff on the upper arm.  If you move the arm underneath

1     that cuff, the mechanical manipulation of the arm will

2     cause artifacts in the tracing.

3              But there are more subtle -- and normally you

4     can see those and those are very obvious -- but you can

5     make more subtle movements, subtle movements in the

6     chair, or subtle movements of fingers, even movements of

7     the eyes.  If you cross your eyes, that can cause

8     responses.

9              THE COURT:  Let me ask you about that.  This

10    is the device the person is sitting on?

11             THE WITNESS:  Yes, Your Honor.

12             THE COURT:  And it can document movement of

13    the eye?

14             THE WITNESS:  Actually, it will not document

15    movement of the eyes.

16             THE COURT:  So let's clarify that.

17             THE WITNESS:  We would want a video for that.

18             THE COURT:  But the question, I think, was on

19    the motion sensor device.

20             THE WITNESS:  Yes.

21             THE COURT:  So limit your responses at this

22    point to that so I understand what you're trying to say.

23             THE WITNESS:  Yes, Your Honor.

24    A.   But even very subtle movements that you might not

25    see.  And so from -- usually the polygraph examiner is

```
1     behind a desk.  There's parts of the subject's body you
2     can't see directly.  And if there should be a subtle
3     movement that you don't see, the movement sensor will
4     pick that up.
5              And the sensors that we have now are extremely
6     sensitive.  If you turn the gain up on them, you can
7     easily see the breathing pattern and you can also read a
8     heart -- the beat of the heart is -- the movement in
9     your bottom is enough to deform that sensor enough that
10    you can see the beat of the heart in it if you turn the
11    sensitivity up.
12    Q.  So is there a point where a polygrapher could see a
13    movement and say, "Well, I'm not going to score this
14    question because there was a movement"?
15    A.   If there was a movement during the period of time
16    you're asking the question and then for a few seconds
17    after the answer, you're going to question that
18    response.  You may or may not score it, depending on --
19    you know, that is one of the judgment calls an examiner
20    has to make.  But at least having the sensor, movement
21    sensor there alerts you to that.
22             THE COURT:  Let me ask a question here since
23    we're on this topic.  Well, the movement of a foot or a
24    leg or the extreme tension of a muscle, I understand
25    that.  But how subtle, in your opinion, would it detect
```

1      movement?

2                THE WITNESS:  It will --

3                THE COURT:  It isn't as subtle as what I'm

4      suggesting, the movement of the foot, the ankle, the

5      toes, or a cramping of the muscle, let's say.

6                THE WITNESS:  Contracting the anal sphincter;

7      that will show up on the sensors.

8                THE COURT:  Any other parts of the body?

9                THE WITNESS:  Other parts of the body, yes,

10     because anything that would be sufficient to just even

11     slightly shift your posture or how you're sitting in the

12     chair, your balance.  They are extremely sensitive, Your

13     Honor.

14               THE COURT:  What does breathing have to do

15     with that?

16               THE WITNESS:  Well, breathing -- every time

17     you breathe, you change the shape of your body and your

18     posture in the chair, and you can pick that up through

19     the sensor.  That's how subtle the movement that can be

20     picked up.

21               THE COURT:  And is that being read during the

22     examination?

23               THE WITNESS:  It depends upon how much

24     amplitude is set for the signal, but you can -- if the

25     sensor is there, you can come back later and turn the

1    amplitude up through the software, and then see that in

2    the background.  Normally you would turn the sensor down

3    so you don't see that.  But it's possible to see

4    movements that small.

5              THE COURT:  So it's read at a later time?

6              THE WITNESS:  Yes, Your Honor.

7              THE COURT:  Okay.  All right.

8    Q.    (By Mr. Coberly)  Regarding scoring, I've heard

9    terminology like:  Did you run the charts through a

10   scoring method?  Is that accurate?

11   A.    Well, if you would run -- you would run the

12   algorithms.

13   Q.    Let's talk about the Utah.  Mr. Nayback just asked

14   you, did you -- you ran the charts through the Utah

15   Method and the ESS Method.  Is that an accurate way of

16   describing it?

17   A.    No.  I would say I applied those methods.  Because

18   what I did was look at the recordings and make

19   measurements.  So in the Utah System, we actually make

20   measurements.  We measure how large the electrodermal

21   responses are, and then there are rules for how we

22   assign the points.  So we require ratios of difference.

23             So if we look at a relevant and a comparison

24   question, we make a measurement.  And to assign a score

25   of 1, there has to be a difference of two to one.  So

1    one response would have to be, say, twenty millimeters

2    in height, and the other one ten.  In that, you would

3    achieve a score of 1.

4           And then the direction depends on which

5    question is bigger.  Is it the relevant question?  That

6    would be a minus 1.  If it's the comparison question,

7    that would be a plus 1.  So to get a score of 2, we

8    would need three to one; and a score of 3, we would need

9    four to one.

10          So we have rules that we have to apply, and I

11   make measurements.

12   Q.   So as opposed to running it through a system,

13   you're applying the methodology?

14   A.   I'm applying methodology, yes.

15   Q.   And Mr. Nayback just asked you whether you applied

16   the Three-Position Federal or the Seven-Position

17   Federal.  Do you recall that?

18   A.   Yes.

19   Q.   Let me show you what's -- I'm going to show you

20   this, put it here on the ELMO in a minute, what has

21   previously been admitted as Defense Exhibit Y, which is

22   a copy of your ESS score sheet?

23   A.   Yes.

24          MR. COBERLY:  May I approach the witness, Your

25   Honor?  I can do it without the ELMO.


               JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                    FEDERAL OFFICIAL COURT REPORTER
                    333 Lomas Boulevard, Northwest
                    Albuquerque, New Mexico  87102

1              THE COURT:  You may.

2      Q.   I'm handing you Defense Exhibit Y.  We all have a

3      copy of it.  So can you explain -- I believe on your

4      direct examination, you talked about converting scores

5      to a Three-Position and how that works?

6      A.   Yes.  You could -- ESS is similar to the Federal

7      Three-Position scoring, in that it's scored -- it

8      doesn't have the same kind of rules that the Utah System

9      has for making measurements.  It's just a noticeable

10     difference standard.

11             So if you can see that one is noticeably

12     different, noticeably larger than the other -- that is,

13     more relevant compared to a comparison question -- you

14     assign the score.  The difference between ESS and the

15     Federal Three-Position Scale is that it gives 2s to

16     noticeable differences in the electrodermal response,

17     and it does that because it's trying to follow the

18     scientific research which says that approximately twice

19     -- that the electrodermal system has approximately twice

20     the discriminative power of the other two channels.

21             So if you look at the statistical research

22     that has been done and the algorithms that are

23     available, they give electrodermal weight of about 2, as

24     compared to a weight of 1 for the other channel.

25     Q.   So how would one go about converting the ESS to a

1     Federal Three-Position?

2     A.   Well, I believe, you know, the simple way to do it

3     would be to convert all of the 2s in the ESS to 1s, and

4     you would be very close to the Federal Three-Position

5     Scale.

6     Q.   And if you did that with how you scored the ESS,

7     what would the result be?

8     A.   Well, if I did that, there are two plus 2s and two

9     minus 2s, so if those were converted to 1s it actually

10    wouldn't change the total score at all.

11    Q.   And what would the results be?

12    A.   It would still be plus 1.

13    Q.   Which means deception, inconclusive, or --

14    A.   Inconclusive.

15    Q.   I'm sorry?

16    A.   Inconclusive.

17    Q.   Let's talk about the article that you were

18    provided, the Exhibit 17.  Counsel asked you, I believe

19    on Page 182, "Discussion."  Can you explain what is this

20    study, what is this article, and what other articles --

21    well, let's start with that.

22    A.   Well, it's an article about the Air Force Modified

23    General Question Test, which is a three relevant, three

24    comparison question test.  And this is the single study

25    of the MGQT.  Of all the different forms of the MGQT,

1    this is the highest accuracy study.  We -- I provided to

2    you nine studies, and this one is an outlier among those

3    nine in having high accuracy.

4    Q.   Did you also provide to me another article by

5    Senter?

6    A.   I did.

7    Q.   And what do you recall about that article?

8    A.   It also looked at the MGQT and had far lower

9    accuracy rates, particularly when the techniques that

10   were used here were used, which was spot scoring, at

11   least spot scoring.  And also if you look through that

12   literature, when you use the Three-Point Scale you get

13   much lower accuracy.

14   Q.   You've testified as an expert 118 times, correct?

15   A.   Yes.

16   Q.   And counsel pointed out one time when your

17   credibility was, I guess, questioned by a court?

18   A.   Yes.

19   Q.   Do you recall that?  Have there been other

20   instances where a court has questioned your credibility?

21   A.   No.

22   Q.   Let's turn to Government's Exhibit 14, Page 21,

23   Footnote 13.  I'm a little confused by the terminology

24   here, "this self-centered reasoning."  Do you have any

25   idea what the Court was referring to, "self-centered

1    reasoning"?

2    A.    I don't.  I mean, the reasoning was based

3    completely upon data and studies that were cited at the

4    hearing.  This was a Daubert hearing.

5    Q.    And what was the topic that was being discussed?  I

6    know it was countermeasures, but what was the context of

7    the studies that you did?

8    A.    Well, the context of the studies, there are two

9    kinds of studies that are referenced.  One of the areas

10   within polygraph research that I am extremely well known

11   in is in the area of countermeasures.  And so my

12   master's thesis and my doctoral dissertation were both

13   experiments looking at training people to use

14   countermeasures.  It was a major issue.

15           This was in the early 1980s, and there was a

16   major issue in the national security world about foreign

17   agents being trained by foreign governments to beat our

18   polygraph screening test, and no one had done research

19   on that and nor had there been any research in a

20   criminal setting, either, about people trying to beat

21   the test.

22           And so I did three studies, actually four

23   studies in a series in the 1980s on bringing people into

24   laboratory and setting up mock crimes, and then we'd

25   take a certain percentage of the people who committed

1          the mock crime and then train them in countermeasures.

2                    And we trained them to do a variety of things.

3          We trained them how the polygraph test worked, so that

4          they could recognize relevant and comparison questions,

5          and then instructed them to do things during the

6          comparison questions to augment or to make a response.

7          So we had people press their toes to the floor.  We had

8          them bite their tongue.  We had other people count

9          backward by seven from a random number larger than 200.

10                   And all of those things, with the training

11         that we gave them, increased the false negative rate,

12         and the high, it says here, the high is 40 percent.

13                   But at the same time, we were also collecting

14         data -- and we have continued to do this to this day --

15         we have collected data from people who come in who don't

16         receive training.  And a large percentage of people in

17         the guilty condition in these studies, and a noticeable

18         percentage in the innocent condition, do things to try

19         to help themselves pass the test.

20                   And what we have consistently found -- and to

21         my knowledge, there is absolutely no data to dispute

22         this -- is that without training, they're completely

23         unsuccessful.  They're even unsuccessful in producing

24         inconclusive outcomes.

25                   And I published a number of studies on this,

1    and they are all consistent, and that's what was talked

2    about in this hearing.  So yes, there is a potential for

3    countermeasures to be effective if people have training.

4    But when they come in and they spontaneously use

5    countermeasures, they're not successful.

6    Q.   Was your testimony in that case that only you could

7    do that particular training?

8    A.   No, just that they had to have hands-on training.

9    Q.   So in this case, you were testifying at a Daubert

10   hearing, right?

11   A.   That's correct.

12   Q.   Wherein the underlying impetus was to admit the

13   examination results of a defendant, right?

14   A.   Yes.

15   Q.   And the government was challenging the credibility,

16   essentially, of polygraphs in general?

17   A.   Yes.

18   Q.   But in your experience with the training that

19   you've done at NCCA, DODPI, and in your review over the

20   years, does the FBI and the federal government believe

21   in the validity of properly-conducted polygraph

22   examinations?  That's a very lengthy question.  If I

23   need to ask it again, let me know.

24   A.   I'm -- yes, you should ask it again.

25   Q.   Okay.

1            THE COURT:  Before you do that, let me have my

2       IT person check the doc cam, Mr. Coberly, just to get it

3       working.

4            MR. COBERLY:  Okay.

5            THE COURT:  Let's take a 15-minute recess here

6       while we try to adjust that.

7            (Recess from 10:11 a.m. until 10:22 a.m.)

8            THE COURT:  You may be seated.  Let us

9       continue.  And we're going to use hard copies, I guess

10      is what we're doing, because the equipment isn't

11      working.

12           MR. COBERLY:  Yes, Your Honor.

13           THE COURT:  All right.  We had a vendor in

14      here over the weekend to fix and improve things, but

15      sometimes the result isn't what you'd expect.  I

16      apologize.

17           MR. COBERLY:  That's all right.  Thank you.

18           THE COURT:  All right. Let's continue.

19      Q.   (By Mr. Coberly)  We were talking about the Ricardo

20      Williams case, and my last question to you was pretty

21      drawn out and extended, but essentially the question is:

22      In your experience, does the federal government believe

23      in the use of polygraphs?

24           MR. NAYBACK:  Objection; calls for

25      speculation, Your Honor.  This witness isn't qualified

1      to comment on FBI policy or government policy.

2                  MR. COBERLY:  I'm not asking him to comment on

3      -- he has trained FBI examiners.  He has trained CIA

4      examiners.

5                  THE COURT:  Well, it is calling for

6      speculation.  What are you trying to get at here?

7                  MR. COBERLY:  The fact that the federal -- the

8      government has just -- my perception of the government's

9      attempt on cross was to undermine the science of

10     polygraphy.  The fact is, the federal government relies

11     on polygraphy.  They rely on it for national security

12     issues for agent screening.

13                 THE COURT:  You've made that point, I think,

14     through the testimony.  I'm going to sustain the

15     objection.  If you want to rephrase it within his

16     knowledge, does he know whether or not the government

17     relies -- or uses; I don't want to say relies -- but

18     uses these tests, you can ask that.

19                 MR. COBERLY:  Sure.

20                 THE COURT:  But in terms of the extent of

21     their belief, that's sustained.

22     Q.   (By Mr. Coberly)  Dr. Honts, in your experience, do

23     you know whether the CIA uses polygraphs?

24     A.   Yes.

25     Q.   And in your experience, does the FBI use

1    polygraphs?

2    A.   Yes.

3    Q.   The Ricardo Williams case.  Tell us a little bit

4    about the background.  What were the facts in that case,

5    just very briefly?  What type of case was it?

6    A.   The case was an armed robbery of an armored car

7    that was carrying funds from one Federal Reserve Bank to

8    another.  A group of people stopped the armored car,

9    forced the guards out, and in some way one of the guards

10   was killed, so there was also a homicide, and the monies

11   were stolen.

12   Q.   How many defendants were there in that case?

13   A.   Six.

14   Q.   And you were working for one of the six; is that

15   correct?

16   A.   Yes.

17   Q.   And ultimately, the result of the polygraph you

18   conducted was not admitted, correct?

19   A.   That's correct.

20   Q.   How many individuals in that case ended up going to

21   trial?

22   A.   I believe it was three.

23   Q.   Was one of the defendants -- was Ricardo Williams

24   one of the three?

25   A.   Yes.

1    Q.   Do you know the outcome of the trial?

2    A.   I do.

3    Q.   What was that?

4    A.   Mr. Williams was acquitted.  The other two were

5    not.

6    Q.   Sir, I'm going to hand you --

7              MR. COBERLY:  May I approach, Your Honor?

8              THE COURT:  You may.

9    Q.   I've just handed you, sir, what was admitted in

10   evidence at the last hearing, Government's Exhibits 15

11   and 16.

12             MR. COBERLY:  Your Honor, I believe -- does

13   Your Honor have a copy of those?

14             THE COURT:  I do.  These were tendered?  Have

15   they been tendered?

16             COURTROOM DEPUTY CAROL WALKER:  Yes, Your

17   Honor, they were tendered during the other hearing.

18             THE COURT:  Yes.  I think I've got them.  Let

19   me see here.  Oh, there they are in the wrong folder.

20   Yes, we have them here.

21             MR. COBERLY:  Okay.

22             THE COURT:  These are the probability analysis

23   documents?

24             MR. COBERLY:  Yes, Your Honor.

25             THE COURT:  Yes, I have them here.

1   Q.   (By Mr. Coberly)  And counsel for the government

2   asked you about this on cross-examination, the fact that

3   your name appears on these screen shots, right?

4   A.   Yes.

5   Q.   Again, do you have any reason to know why your name

6   is on that?

7   A.   I don't.  And interestingly, one of the author's

8   names, Horowitz, they spelled his name wrong.

9   Q.   So the Raskin, Kircher, Honts, and Horowitz in

10  1988, is that an article that you published?

11  A.   There were actually two.  There were two articles

12  that year with that list of authors, so I don't know

13  which one it's referring to.  There was a report that we

14  did for a grant from the Department of Justice on the

15  validity of polygraphs at the U.S. Secret Service; and

16  there was a paper that we gave at the psychophysiology

17  meetings that the abstract was published, that I believe

18  was data from the same study.

19        So it could be either one, or either or both,

20  I suppose.

21  Q.   But you did not have any input on the creation of

22  this probability analysis program?

23  A.   The probability analysis program was already in

24  existence before Raskin, Kircher, Honts, and Horowitz

25  was done.  It was applied in that study, but it wasn't

1    developed there.  It was developed by Kircher and

2    Raskin.

3    Q.   In your experience -- well, take a look at the

4    scroll bar on the right-hand side.  Am I correct in

5    assuming that if one were to take that scroll bar and

6    scroll down, that more information is beneath this, that

7    the government did not admit into evidence?

8    A.   It looks that way.

9    Q.   And what might that additional documentation show

10   below there?

11   A.   I don't know.  I have not run these particular

12   analyses.  I've never seen these before.

13   Q.   Is it significant to you, if you compare Exhibit 15

14   to Exhibit 16, and you look in the far right-hand column

15   components, and there's numbers associated with the

16   different physiological components, if you look at that,

17   can you tell us if there's anything significant between

18   15 and 16?

19   A.   Well, the significant thing between it is that

20   they're not different.

21   Q.   Why is that significant?

22   A.   Well, it's significant because supposedly these are

23   different models; that is, one is for the MGQT and the

24   other one is for an event specific/single issue zone.

25   And the chance that the models that were developed on

1      those two data sets, if such models were ever developed,

2      the chance that they would have exactly the same weights

3      to three decimal points is not reasonable.

4      Q.   Do you recall, at the last hearing, Agent Foster

5      testifying about using the two algorithms on Mr.

6      Tennison's charts?

7      A.   I do.

8      Q.   Do you recall Agent Foster testifying ultimately

9      that he was not using those results to support his

10     conclusion, but he was just submitting them; he did that

11     out of curiosity's sake?

12     A.   Yes.

13     Q.   Have you, as an expert witness, ever provided a

14     report and included information on a test that you

15     conducted out of curiosity's sake?

16     A.   No.

17     Q.   Regarding the blood pressure cuff, is it standard

18     practice to run the cuff pressure at 65 milligrams or

19     lower?

20     A.   Yes.

21     Q.   And is that true for every person, no matter their

22     physiology?

23     A.   Yes.

24     Q.   Have you ever had an issue getting a clean reading

25     at a pressure of 65 or lower?

```
 1     A.   No.

 2     Q.   On any person you've tested?

 3     A.   Well, the issue of getting a clean reading

 4     occasionally, particularly with people that are very

 5     much overweight, it's difficult to get a reading, but

 6     raising the pressure doesn't help.

 7              MR. COBERLY:  I'm going to put up Exhibit T,

 8     and if the Court would like, I've got another copy.

 9              THE COURT:  That would help.  My eyesight is

10     not that good.

11              MR. COBERLY:  Yeah.

12     Q.   You were just asked by -- let me wait.

13              THE COURT:  We're fine.

14     Q.   You were asked about the time to ask issue that you

15     testified about last time we were here.  And briefly,

16     can you explain the analysis you did on the time to ask

17     the questions?

18     A.   Yes.  It might be easier if I would go up so I

19     can --

20     Q.   Please.

21              THE COURT:  You may do so.

22              THE WITNESS:  Thank you.

23     A.   The issue that I have here is with how long it took

24     to ask the questions.  And if we look, here's the

25     clearest example.
```

1    Q.   And what are you pointing to?

2    A.   Chart 3.

3    Q.   Chart 3?

4    A.   Chart 3, question 4C.  And you can just look at

5    that and look at how long, what the width of the gray

6    bar is.

7              And then look at 7R and 5R, which are the two

8    relevant questions that surround it, and it looks

9    obvious to me that the length of time it took to ask

10   question 4C is much less.

11             And if you actually measured the seconds,

12   there's about two seconds difference in comparison to

13   7R.  And yet, phonetically, in terms of the word counts,

14   4C is longer in terms of word count.  And in terms of

15   syllables, they're about the same.

16             So that was the issue that I raised and

17   collected data from each location.

18   Q.   And my recollection is that your testimony was that

19   you could only think of two reasons that that could

20   happen?

21   A.   Yes.

22   Q.   What were those reasons?

23   A.   One was that the questions are deliberately

24   mis-marked.  Because it's not an accidental mis-marking,

25   because it's consistent and it goes in one direction so

```
1     that the length of time for the comparison questions

2     looks underestimated.

3              And the other would be that there was some

4     systematic difference in the way the questions were

5     asked, in terms of question pacing or enunciation.  In

6     the profession, they talk about stomping on one kind of

7     question to make it appear more important by the way you

8     ask it.

9     Q.   Sir, I'm going to hand you Defendant's Exhibit N,

10    which is the score sheet of Agent Foster.

11    A.   Yes.

12    Q.   Now, we had talked in the previous hearing on the

13    first chart, if you look at relevant question 6C, do you

14    recall discussing that issue?

15    A.   Yes.

16    Q.   Okay.  And what do you recall about Agent Foster's

17    testimony about that particular question and how it

18    affected its scoring on relevant question 5?

19             MR. NAYBACK:  Your Honor, I'm going to object

20    to the question because it has been covered in direct

21    examination.  I didn't ask about this area at all on

22    cross-examination.  It seems like we're rehashing,

23    either rehashing stuff from direct or we're creating new

24    stuff on redirect, Your Honor.

25             THE COURT:  Overruled.
```

1    A.   Yes.  My recollection is that Special Agent Foster

2    had two problems with the area -- may I rise?  Because

3    it would be easier to point.  With this area that's

4    circled in red, he had two problems.  One, he said that

5    the question shouldn't have been asked then because the

6    response at 7R is in recovery.  And that he believed

7    that this response was too early to score.

8    Q.   So the result of it being too early to score, what

9    did that do to his score for 7R?

10   A.   Actually, it's to 5R.

11   Q.   I'm sorry.  5R.

12   A.   Yes, because they're reversed on the two score

13   sheets.  He nulled this out because he didn't have a

14   comparison to compare it to.

15   Q.   Okay.  In nulling -- Agent Foster, in deciding that

16   he was not going to use comparison question 6, did that

17   also affect his score on 7R?

18   A.   Yes, it did.  Because normally with 7R, you would

19   compare to the stronger of two controls.  If 6 is out of

20   play, and he took it out of the play, you can't compare

21   to 6C.  But if he did compare it to 6C, 6C is bigger

22   than 7R, so that would earn a plus score.  Instead, he

23   compared it to 4C and gave it a minus score.

24   Q.   So in your scoring, you believe 6C should be in

25   play?

```
 1      A.   Yes.

 2      Q.   Right?  And by it being in play, how did you score

 3      5R?

 4      A.   I scored 5R at zero with the Utah.  And 5R would

 5      have been a plus 2 on the ESS because 6C is bigger than

 6      5R, and so on ESS it's just noticeably bigger.

 7      Q.   So by taking 6C out of play, the result for Foster

 8      was 7R was a negative 1, and 5R was null?

 9      A.   Correct.

10      Q.   And if it was in play, it should have been, for 7R

11      a positive 1, and for 5R a positive 1?

12      A.   That's correct.

13      Q.   Sir, if you could take a look at the bottom chart,

14      chart 3, and go back to question 4C, the question you

15      were first referencing.  Take a look at that.

16      A.   Yes.

17      Q.   Compare that question to the 6C in chart 1, and

18      what do you see there?  What is significant?

19      A.   Well, what I see there is that it's exactly the

20      same type of response that we see on the first chart,

21      where the red circle is.

22      Q.   Okay.

23      A.   You have a larger response, a relatively large

24      response at 5R that is still in recovery, and this

25      response actually to me looks even -- it's -- I don't
```

1    think there's any question about this one being early.

2              And so by the reasoning that Agent Foster used

3    for 6C, he should have also nulled out 7R on the last

4    chart.

5    Q.   And did Agent Foster apply that same reasoning to

6    chart 3, 4C?

7    A.   No.

8    Q.   And by not doing that, what was the result of 7R

9    according to Agent Foster?

10   A.   According to Agent Foster, he scored that a minus

11   1.

12   Q.   In your analysis, were you consistent in how you

13   treated 4C in chart 1 -- I'm sorry -- 6C in chart 1 and

14   4C in chart 3?

15   A.   Well, in my judgment, this particular response is a

16   bit early, and this is a much smaller response, so I

17   ended up assigning minus scores here to 7R.

18   Q.   So you did use -- you did as Agent Foster did?  You

19   used 4C, a score negative for 7R, right?

20   A.   I did.

21   Q.   Thank you.  So ultimately, Dr. Honts, what was your

22   conclusion using the Utah and the ESS Scoring Method?

23   A.   Both of those methods produced inconclusive

24   results.

25   Q.   And if you were to convert the ESS to a Federal

1      Three-Position, what would the result be?

2      A.    Inconclusive.

3      Q.    And what does that mean in the world of polygraphy,

4      "inconclusive"?

5      A.    It should mean that you have no information to do

6      anything.

7      Q.    And ultimately, I think the government asked you

8      questions:  So that means that maybe he's lying, and

9      maybe he's not lying?  Or maybe he's telling the truth,

10     and maybe he's not telling the truth?

11     A.    Yes.  I mean, by analogy, if you think about a

12     medical diagnosis, an inconclusive medically diagnostic

13     test doesn't mean you go do surgery.  It means you run

14     additional tests.

15     Q.    And what does the data show regarding the

16     percentage of inconclusives being more likely to be from

17     a deceptive, ultimately a deceptive or non-deceptive

18     person?

19     A.    Inconclusives are more likely from actually

20     innocent people.

21     Q.    And have you authored studies or presented papers

22     regarding the FBI technique of interrogating individuals

23     who have inconclusive results?

24     A.    I have.

25     Q.    What were the results of that study and that paper?

1    A.   Well, that paper was given at the American

2    Psychology and Law Society, and it indicates that it

3    puts a substantial number of actually innocent people at

4    risk of being interrogated, and thus giving false

5    confessions, for a tiny gain in the number of actually

6    guilty people you interrogate.

7              MR. COBERLY:  May I have one moment, Your

8    Honor?

9              THE COURT:  You may.

10   Q.   Sir, let me have you go back to Exhibit Number 17,

11   which was the study provided to you earlier today.  And

12   if you could turn to Page 178, sir, "Table 1.  Polygraph

13   Test Questions."  What sort of -- what type of test was

14   used in this study by Senter?

15   A.   It was an MGQT format.  It had two relevant and

16   three comparison questions.

17   Q.   And does that differ from the test that was used in

18   this case?

19   A.   Yes.

20   Q.   How so?

21   A.   The test used in this case had two relevant and two

22   comparison questions.

23   Q.   Of the other -- this was one of the nine studies

24   provided to the government.  What do the other eight --

25   how does this study compare to the other eight studies

1    that you've reviewed?

2    A.    This study by far is an outlier in terms of how

3    accurate it was with actually innocent people.  And it's

4    also an outlier on the deceptive, the actually guilty

5    people, because it produces the lowest level of accuracy

6    with them.

7                 MR. COBERLY:  Thank you, Your Honor.  I have

8    no further questions.

9                 THE COURT:  Dr. Honts, let me ask you.  You

10   said a moment ago that inconclusive results are more

11   likely for actually innocent people?

12                THE WITNESS:  Yes, Your Honor.

13                THE COURT:  By what ratio?

14                THE WITNESS:  About five to one, as I recall;

15   four or five to one.  I'd have to pull the study to give

16   you an exact number.

17                THE COURT:  All right.  Thank you.  Is there

18   any further need of the witness here?

19                MR. NAYBACK:  No, Your Honor.

20                MR. COBERLY:  No, Your Honor.

21                THE COURT:  All right.  Sir, I do excuse you

22   at this time.

23                THE WITNESS:  Thank you, Your Honor.

24                THE COURT:  Let me have counsel approach here

25   for just a moment.

```
 1                    (A discussion was held off the record between
 2                    the Court and counsel.)
 3                    THE COURT:  We'll be in recess for ten
 4        minutes.
 5                    COURTROOM DEPUTY CAROL WALKER:  All rise.
 6                    (Recess from 10:45 a.m. until 11:02 a.m.)
 7                    THE COURT:  All right.  Let us continue here.
 8        You may call your next witness.
 9                    MR. COBERLY:  Your Honor, defense calls
10        Jamaico Tennison.
11                    COURTROOM DEPUTY CAROL WALKER:  Please raise
12        your right hand.  You do solemnly swear that your
13        testimony in this matter shall be the truth, the whole
14        truth, and nothing but the truth, so help you God?
15                    THE WITNESS:  Yes, ma'am.
16                    COURTROOM DEPUTY CAROL WALKER:  Please be
17        seated.  Please state your name and spell your last name
18        for the record.
19                    THE WITNESS:  My name is Jamaico Tennison.
20        J-A-M-A-I-C-O; Tennison, T-E-N-N-I-S-O-N.
21                           JAMAICO TENNISON,
22            after having been first duly sworn under oath,
23            was questioned and testified as follows:
24                           DIRECT EXAMINATION
25        BY MR. COBERLY:
```

```
 1    Q.   Good morning, sir.

 2    A.   Good morning.

 3    Q.   Jamaico, let me ask you to pull the mic a little

 4    closer to you.  Have you ever testified in any type of

 5    court proceedings before?

 6    A.   No.

 7              THE COURT:  Sir, can you move your chair just

 8    a little closer?  There we go.  Thank you.

 9    Q.   Mr. Tennison, where did you grow up?

10    A.   I grew up in Gallup, New Mexico.

11    Q.   Are you married?

12    A.   No, but I have a common wife, Dorothea Spencer.

13    Q.   I'm going to ask you to again -- just you're going

14    to have to speak up.  I know it's your first time.

15              So you have a common-law wife?

16    A.   Yeah.

17              THE COURT:  What's her name, again?

18              THE WITNESS:  Dorothea Spencer.

19              THE COURT:  Okay.  Thank you.

20    Q.   How do you spell that?

21    A.   D-O-R-O-T-H-E-A.  Spencer is S-P-E-N-C-E-R.

22    Q.   Do you have any children?

23    A.   Yes, I've got -- I have five children.

24    Q.   How old are your five children?

25    A.   I have two boys.  My oldest son, he's nine.  My
```

1    youngest son, he's two years.  And then I have three

2    daughters.  My oldest daughter, she's eight years old.

3    The second is six years old.  And my youngest daughter,

4    she's five.

5    Q.   And are all of these children born to you and

6    Dorothea?

7    A.   Yes, they're all my kids.

8    Q.   Mr. Tennison, when did you first come in contact

9    with Agent Matt Schaeffer of the FBI?

10   A.   He contacted my -- well, he stopped at my house out

11   in Red Rock, five miles south of Gallup, and he left a

12   business card with my brother, Jonah Tennison.

13   Q.   And do you recall approximately the month and year

14   that this happened?

15   A.   This was like in May of 2014.

16   Q.   What did you do when you received the card from

17   Agent Schaeffer?

18   A.   I contacted him later that day.

19   Q.   What did Agent Schaeffer tell you that he --

20   A.   He just asked me to come in, to ask me some

21   questions.  And I asked him if I needed a lawyer

22   present.  He said, "No."

23   Q.   So when did you then actually see Agent Schaeffer?

24   A.   I seen him that same day.  He came out to my house

25   probably around -- probably around 3:00.  3:00.

1    Q.   And when you met with Agent Schaeffer, did you know

2    why he wanted to speak with you when you first met with

3    him?

4    A.   Not at the time.

5    Q.   When did you -- how did the conversation start off

6    with Agent Schaeffer?

7    A.   He asked me where I -- where I lived, and if my

8    Social Security matched who I was, and what my name was.

9    Q.   He was verifying your identity?

10    A.   Yeah.  Yes.

11    Q.   And how did -- when was it that you learned why he

12    wanted to talk to you?

13    A.   He told me that -- well, he said, "Well, the reason

14    why I called you in here was for K., the K.C.

15    incident."  So right off right then, I knew why I was

16    there.

17    Q.   So you knew what that meant, "the K.C.

18    incident"?

19    A.   Yeah.

20    Q.   How did you learn about an accusation that "K.C."

21    had made against you?

22    A.   The day that -- well, a couple days after the

23    incident, I guess my -- my mother-in-law came and picked

24    up "K.'s" brother, "J.," and told my wife that "K." had

25    accused me.

1    Q.   How did you learn that?  Did you learn from your

2    wife, or did you learn from your mother-in-law?

3    A.   I learned from my wife.

4    Q.   All right.  So back to your time with Agent

5    Schaeffer.  Just talk about the beginning, the first

6    part of the interview or your meeting with him.  How did

7    that go?

8    A.   He was -- he was polite at first.  He asked me what

9    happened that night, and I told him what happened.  And

10   he started accusing me, like saying that I touched

11   "K.," and that if I was -- like if I told him something,

12   you know, it would go smoothly; and if I did not tell,

13   like if I would say -- like if I did not tell him

14   anything, he said this would be a long drawn-out process

15   and he wouldn't leave me alone.

16   Q.   Did you feel like -- well, did you start getting

17   upset?

18   A.   Yes, I started getting upset when he started

19   accusing me of me touching her.

20   Q.   And did he say anything about an alibi?

21   A.   Yeah.  Well, he asked me what was going on that

22   whole night, and I told him what happened.

23          And then he said, "Oh, so you have an alibi?"

24          And I was all, "What are you talking about?

25   What's the alibi?"

1              And he was all, "Your wife was up all night?"

2              And I said, "Yes.  She was cooking all night.

3    We were having an Easter party, you know, the next day,

4    so, you know, the kids were out coloring eggs."

5    Q.   So I take it that -- did you start to feel like

6    Agent Schaeffer wasn't believing what you were telling

7    him?

8              MS. MEASE:  Your Honor, I object to the

9    leading nature of the question.

10             THE COURT:  Rephrase your question.

11   Q.   Did you believe that Agent Schaeffer believed what

12   you were telling him?

13   A.   No.

14             THE COURT:  Same thing, counsel.  Rephrase the

15   question.

16             MR. COBERLY:  I'm sorry.  I'm thinking on how

17   to rephrase this.

18   Q.   Why did you start getting upset?

19   A.   Well, because he started saying that, "Why would K.

20   say this?"  And he kept saying that I had an alibi and

21   that he -- he literally like said that he'd put me in

22   his crosshairs and whatnot.

23   Q.   How did it come about that you ended up leaving

24   that interview?

25   A.   I told -- I kept telling him that I didn't touch

```
 1     "K." and that she -- well, he said that she got -- they
 2     got evidence that I touched her.
 3              And I told him, "Well, that wasn't my
 4     evidence."
 5              And he said, "You touched her."
 6              He just kept really getting at me about like
 7     touching her, and I told him, you know, "I don't know
 8     what you're talking about.  You know, I don't know -- I
 9     don't know why you're saying that I touched her."
10     Q.   What did --
11     A.   And I got up and I left.
12     Q.   Okay.  When you left, was there ever any -- did
13     Agent Schaeffer ever mention anything about a polygraph?
14     A.   Yeah.  He told me to take a polygraph test, and I
15     said, "Yeah, I'll take one."
16              Because, you know, I didn't touch her, and I
17     was confident that I would pass it.
18     Q.   And then when you left the room, how did you get
19     back outside?
20     A.   Agent Schaeffer was still harassing me downstairs
21     or down the hallway when, you know, he told me that,
22     "I'm going to close the door so we won't air out your
23     mess."
24              And here he was, chasing me down the hallway,
25     telling me about my whole case.
```

1    Q.   And then did anything happen when you got to the

2    lobby?

3    A.   My wife, Dorothea, was waiting at the door, and she

4    was -- I told her what was going on, and her and Matt

5    Schaeffer started yelling at each other at the doorway.

6    Q.   Did you say anything else about wanting to talk or

7    talking to Agent Schaeffer again?

8    A.   I just told him that, "Next time that you contact

9    me, I want a lawyer present, and I plead the Fifth."

10   Q.   So after you left the FBI office, did something

11   happen to your brother?  Well, first of all, who is your

12   brother?

13   A.   My brother is Jonah Tennison.

14   Q.   Where was Jonah Tennison living at that time?

15   A.   Well, I live with my mom, Virginia Tennison; my

16   brother, Jonah Tennison; my wife, Dorothea; and my five

17   kids.

18   Q.   Did something happen to Jonah shortly after your

19   meeting with Agent Schaeffer?

20   A.   Yeah.  He started getting stomach pains, and he

21   went to the hospital sometime in May, and they gave him

22   a medication that he was allergic to, so he swelled up

23   and he fell into a coma.

24   Q.   And so then what happened after he fell into a

25   coma?

```
 1   A.    They flew him up here to Albuquerque, and I was
 2   worried the whole time, so I came up here that night
 3   that he was flown out of here.
 4   Q.    And how long did you stay in Albuquerque?
 5   A.    I was here for a couple of weeks.  I'm not too
 6   sure.  He was in a coma for a couple of weeks.
 7   Q.    Were you up here in Albuquerque the entire time
 8   that your brother was in a coma?
 9   A.    Yes.
10   Q.    Where were you staying at?
11   A.    I was staying at the hospital and at the Best
12   Western on Coors.
13   Q.    Who was staying with you at the Best Western?
14   A.    My wife, my kids, my mom, and my sister.
15   Q.    After you left Agent Schaeffer's office in May,
16   when did you next hear from Agent Schaeffer?
17   A.    When I was at the hospital watching my brother, he
18   contacted me, and he wanted me to come in for a
19   polygraph, saying Ms. Sullivan was in from Denver and
20   that she could only be there for just a -- just a --
21   just quite a time, so he needed me to be there to take
22   that polygraph.
23   Q.    Okay.  So how did he contact you?
24   A.    He contacted me on my cellphone.
25   Q.    Did he contact you -- how many times did he contact
```

```
 1     you?

 2     A.   Well, then when he contacted me the first time, I

 3     told him it wasn't a good time because, you know, I was

 4     watching my brother and he was in a coma and I was

 5     worried about my brother the whole time.

 6     Q.   And --

 7     A.   And he kept calling and saying stuff, you know,

 8     like, "You know, you need to come in.  You know, it's

 9     not going to go away."

10             And I asked him if I needed a lawyer at that

11     time, and he said, "No.  It's just only going to be a

12     polygraph."

13     Q.   Did he ever offer to talk about a mutual time that

14     was convenient for both of you to come in?

15     A.   No.  He just said that Sullivan was in at that time

16     and that she came from Denver, she was a specialist, and

17     I needed to come in at that -- at that time.

18     Q.   So when did -- did you ultimately agree to go take

19     the polygraph?

20     A.   Yeah.  I -- I agreed to Matt Schaeffer.  I told him

21     that, "All right, I'll go down there and take a

22     polygraph."

23             Because I was -- I knew I was going to pass

24     it.  I did nothing wrong.

25     Q.   So at the time that you went to take the polygraph,
```

1    was your brother still in the hospital?

2    A.   Yes.

3    Q.   Where was the polygraph?  Where were you supposed

4    to meet Agent Schaeffer and Agent Sullivan?

5    A.   I met him at the FBI building down in downtown

6    Gallup.

7    Q.   And then so when you first arrived there, what

8    happened?

9    A.   I -- I went to the desk.  Matt Schaeffer came out.

10   He told me to leave my cellphone and anything that -- by

11   the desk.  I walked to the -- he took me to the

12   restroom.  I washed my hands.  He told me to use the

13   restroom.

14           He told me it was going to be only like 30

15   minutes or so.

16   Q.   And so how did you first get -- how did you first

17   meet Agent Sullivan?

18   A.   Well, she was sitting in Matt Schaeffer's office,

19   and we went into his office, and he said that -- he

20   introduced me to Sullivan, and he left me with Sullivan

21   and he exited the door.

22   Q.   Okay.  And then what was the next sort of

23   significant thing that happened with Agent Sullivan?

24   A.   Well, we started talking, and she showed me some

25   papers about my rights.

```
 1              MR. COBERLY:  May I approach, Your Honor?

 2              THE COURT:  You may.

 3   Q.   Sir, I've handed you what has been admitted into

 4   evidence as Defendant's Exhibit J.  Do you recognize

 5   that piece of paper?

 6   A.   Yes, sir.

 7   Q.   Okay.  And what is it?

 8   A.   It's an Advice of Rights.

 9   Q.   Okay.  Is this the form that you just -- one of the

10   forms that you just talked about, that you went over

11   with Agent Sullivan?

12   A.   Yes, sir.

13   Q.   Did you go over this form with Agent Sullivan?

14   A.   Well, she told me to read it first, and then we

15   went over it.

16   Q.   Okay.  Sir, if you can take a look there at the top

17   where it says "Your Rights."  Do you see that?

18   A.   Yes.

19   Q.   And then there's a number of rights below that,

20   right?

21   A.   Yes.

22   Q.   If you can go to the second-to-the-last one, can

23   you read that sentence, please?

24   A.   "If you cannot afford a lawyer, one will be

25   appointed for you before any questioning if you wish."
```

```
 1      Q.   Do you recall going over that right with Agent

 2      Sullivan?

 3      A.   Yes.  I asked her if -- I asked her if I can get a

 4      lawyer, that she can appoint me a lawyer, and she said,

 5      "No."

 6      Q.   And why?  Did she give any reason why she would not

 7      appoint a lawyer?

 8      A.   She said that they don't do that.

 9      Q.   Is it fair to say, though, that you then went ahead

10      and took a polygraph, right?

11      A.   Yeah.  Because I didn't -- I knew I didn't do

12      anything wrong.

13      Q.   So before you actually took the polygraph -- after

14      you went over these forms, after Agent Sullivan said

15      that she was not going to appoint you an attorney,

16      before you took the polygraph, what happened next?

17      A.   She was showing me graphs of an agent that had

18      taken a polygraph, and she showed me where he failed

19      and --

20      Q.   So she was showing you someone else's polygraph?

21      A.   Yeah, she showed me someone else's polygraph.

22      Q.   Okay.  And what did she say about that, if you

23      recall?

24      A.   She showed me where he failed, where he failed

25      miserably, and where he -- where he didn't pass it.
```

1    Q.   Okay.  Did you then -- did you at some point talk

2    about generally what happened on the night that --

3    A.   She -- she told me about the -- about the

4    accusation that was going on, and I think -- I remember

5    she showed me a little clip of what "K." -- a little

6    clip of "K."

7    Q.   You say "a little clip."  Like a --

8    A.   Like on a computer.  She showed me like --

9    Q.   Like a video?

10   A.   Yeah, like a video of "K."

11   Q.   And when you got hooked up to the -- how did you

12   get hooked up to the polygraph equipment?  What do you

13   remember about that?

14   A.   She put this wire around my chest.  She had these

15   clips for my fingers, and she had the blood pressure

16   thing on my arm.

17   Q.   Do you remember where on your arm the blood

18   pressure was?

19   A.   It was here on my arm.

20   Q.   So your upper arm?

21   A.   Yeah, my upper arm.

22   Q.   And how did the equipment feel?

23   A.   Well, the pressure -- the arm thing was pretty

24   tight, and it made my whole arm numb, and it was kind of

25   uncomfortable.

1    Q.    So you took the polygraph, right?

2    A.    Yes, I took the polygraph.

3    Q.    What happened at the conclusion of the polygraph?

4    A.    She -- she -- she unhooked me, and she showed me my

5    results, and she showed me on the graph where I failed

6    miserably.

7    Q.    How long -- before she showed you on the graph

8    where you failed miserably, according to Agent Sullivan,

9    how long were you sitting there?  And what was Agent

10   Sullivan doing?

11   A.    I was probably sitting there probably for maybe

12   five minutes, ten minutes.

13   Q.    And what was Agent Sullivan doing during that time?

14   A.    She was looking at her computer, the graph.

15   Q.    Let me show you Exhibit T.

16          MR. COBERLY:  Your Honor, if I may have Mr.

17   Tennison come up to the chart?

18   Q.    Well, sir, first of all, do you recognize -- does

19   this stuff look familiar to you?

20   A.    Yeah.

21   Q.    Do you recall where Agent Sullivan pointed out,

22   telling you that you failed miserably?

23   A.    Yeah.

24   Q.    Okay.  Can you please get up and come show the

25   Court where that was?

1      A.    Right here.

2      Q.    You're going to have to speak up.

3      A.    She showed me this huge bump right here, is where I

4      failed miserably.  And she said the spike was really

5      high, that it said that I was lying right here at this

6      spike, that I failed miserably.

7      Q.    Thank you.  You can sit down.

8            THE COURT:  Just for the record, the witness

9      is pointing to the area that has been circled in red?

10           MR. COBERLY:  Yes, Your Honor.

11           THE COURT:  The middle chart, for the record?

12     If you would identify that.

13           MR. COBERLY:  Sure.  For the record, it's

14     chart 2, the point right after control question 4C,

15     that's circled in the pink highlight.

16           THE COURT:  On the middle chart?

17           MR. COBERLY:  On the middle chart.

18           THE COURT:  Go ahead.

19     Q.    (By Mr. Coberly)  Did Agent Sullivan go over any

20     other parts of the chart to show you where you, in her

21     words, failed miserably?

22     A.    Just that one spike, and I seen, you know, just the

23     spike that she showed me that where I had failed

24     miserably.

25     Q.    How many times -- well, do you remember how many

 1    times Agent Sullivan said those words, "failed

 2    miserably"?

 3    A.   She used it through the whole -- the whole

 4    interview.

 5    Q.   Did she say -- what did she tell you about the fact

 6    that you had, in her opinion, had failed miserably?

 7    A.   She said that I was lying and that this polygraph

 8    was --

 9    Q.   Did she say anything about what could happen to

10    you?

11    A.   She just said that I can go to jail for lying on a

12    polygraph and I can go to jail for a long time.

13    Q.   And when she was saying that, was she pointing at

14    anything?

15    A.   At that failed miserably, that spike.

16    Q.   Well, then what happened, basically, after the next

17    few minutes here?

18    A.   We sat down and we talked, and she was asking me,

19    "Well, what happened that night?"

20         And I kept telling her, "Nothing happened."  I

21    kept telling her that I didn't do anything.

22         And she kept saying, "No, no, no, that's not

23    what I want to hear.  That's not what I want to hear."

24    And she kept going on and on, that she didn't want to

25    hear nothing like that.

1              And I told her if she wants to hear bullshit,

2    I'll give her bullshit.

3    Q.   How were you feeling at the time?

4    A.   I was really down at the time, and I wasn't really

5    up to taking a polygraph, but I still came in and did

6    it.

7    Q.   Did --

8    A.   And I was thinking about my brother the whole time

9    because he was in a coma and --

10   Q.   Were you scared?

11   A.   And I wanted to be there for him.  Yeah, I was

12   scared.

13   Q.   Did Agent Sullivan say anything about helping you

14   out somehow?

15   A.   She told me that if I barely touched her or I

16   accidentally touched her, she'll help me; and if it was

17   an accident, you know, it's okay; and if I just like

18   barely touched her, you know, she could help me, and I

19   won't go to jail.

20             MR. COBERLY:  May I have a moment, Your Honor?

21             THE COURT:  You may.

22             MR. COBERLY:  Your Honor, I have no more

23   questions.

24             THE COURT:  You may proceed.

25             MS. MEASE:  Thank you, Your Honor.

```
 1                        CROSS-EXAMINATION
 2   BY MS. MEASE:
 3   Q.   Good morning, Mr. Tennison.
 4   A.   Good morning.
 5   Q.   I want to talk to you first about your interview
 6   with Agent Schaeffer on May 15th of 2014.  I think your
 7   attorney just asked you a few questions about that.  And
 8   I think in your own words, Agent Schaeffer was friendly
 9   with you, correct?
10   A.   Yeah, at the beginning of when he first introduced
11   himself.
12   Q.   Okay.  And throughout the beginning of the
13   interview, he told you that you're not in custody;
14   you're not under arrest; he's here to find out the truth
15   about what happened.  Is that a fair characterization?
16   A.   Yeah.
17   Q.   Okay.  And the testimony you provided about Agent
18   Schaeffer's statements, that's from your memory,
19   correct?  Because there was a recording of this, wasn't
20   there?
21   A.   Yes.
22   Q.   So these things that you're saying, that's just
23   your memory; but there's an actual recording which will
24   truly reflect what was said during that interview?
25   A.   Yes.
```

1    Q.   And you said that Agent Schaeffer said that towards

2    the end of the interview that --

3              MR. COBERLY:  Can you direct me to a --

4              MS. MEASE:  Sure.  I'm looking now at

5    Government's Exhibit 2.  I'm not quite there yet,

6    though.

7    Q.   Towards the end of the interview you stated that

8    Agent Schaeffer said, "I've got you in my crosshairs"?

9    A.   Yeah.

10   Q.   That was your testimony on direct?

11   A.   Yes.

12   Q.   But, in fact, in Government's Exhibit 2, Page 16,

13   Agent Schaeffer actually said, "I'm not, like, putting

14   you in my cross hairs, you know what I mean."

15             So it's actually the opposite of what you

16   said; is that correct?

17   A.   Yeah, but you know, it was kind of a threat to me.

18   Q.   You took that as a threat?

19   A.   Yes.

20   Q.   Even though he said, which is different than what

21   you said on direct, that he was not putting you in his

22   crosshairs?

23   A.   Yes.

24   Q.   And you agreed to come back in for a polygraph?

25   A.   Yes.  Because I knew I did nothing wrong.

1    Q.   Okay.  So but my question is:  You agreed to come

2    back in?

3    A.   Yes.

4    Q.   And Agent Schaeffer said, "Are you willing to come

5    in on another day?"  And you said, "Yes"?

6    A.   Yes.

7    Q.   And just shortly after that, you decided to end the

8    interview, and you walked out?

9    A.   Yeah, when he started accusing me of something I

10   didn't do, I got mad and I left.

11   Q.   Are you saying that after you agreed to take a

12   polygraph, prior to ending the interview, he accused you

13   of doing something that you didn't do?

14   A.   He was -- yes, he was accusing.  Like he was

15   putting words in my mouth.  He was saying that --

16   Q.   But the accusations came before he asked you to

17   take the polygraph?

18   A.   Yeah.

19   Q.   And you started getting upset at that point?

20   A.   Yes.

21   Q.   But you still agreed to come in and take a

22   polygraph?

23   A.   Yes, ma'am.

24   Q.   And that's when you say you walked out and there

25   was that kind of confrontation where your wife was

 1    present, correct?

 2    A.    Yes, ma'am.

 3    Q.    So after that day on May 15th, there was about a

 4    little less than a month before June 11th when you

 5    actually came back in for the polygraph, right?

 6    A.    Yes.

 7    Q.    And I don't think you ever actually answered your

 8    lawyer's question.  How many times did Agent Schaeffer

 9    call you?  How many times did you talk to him, actually

10    talk to him on the phone during that almost one-month

11    period?

12    A.    Well, he called me like probably -- I don't

13    remember -- a couple of times that first, that first

14    day.  And then the second day, he called me another

15    couple of times.

16    Q.    Now, I'm not asking about calls that you didn't

17    answer.  I'm asking about times you actually talked to

18    him.  Is it your testimony that you talked to him?

19    A.    Yes, I --

20    Q.    Four times?

21    A.    I talked to him.

22    Q.    Okay.

23    A.    I told him that it wasn't a good time.

24    Q.    Eventually, closer to the date when you actually

25    came in, at some point you agreed to come in?

```
 1     A.    Yes.

 2     Q.    Okay.  Do you know, was that pretty close to the

 3     date you actually came in?

 4     A.    Well, he called me that Wednesday before that.

 5     Q.    Okay.

 6     A.    Before that polygraph.  And from Wednesday, then on

 7     Friday is when I agreed.  And I asked him if I needed my

 8     lawyer present, and he said no, that it was only going

 9     to be a polygraph and it's only going to be 30 minutes

10     or so.

11     Q.    Okay.  You asked something to the effect of, "Is a

12     lawyer required?  Do I need a lawyer?"

13     A.    Yes.

14     Q.    And did you have a lawyer?

15     A.    Well, I was looking for one at the time.

16     Q.    Did you actually retain a lawyer?

17     A.    They said if I was actually charged, that they

18     would give me a lawyer, but other than that --

19     Q.    Who is "they"?

20     A.    The people that I contacted, like the law firms.

21     Q.    But you didn't actually retain a lawyer?

22     A.    No.

23     Q.    So you brought yourself in to the FBI building on

24     June 11th, right?  You drove yourself there?

25     A.    No, my wife did.
```

1     Q.   Well, you came in on your own?

2     A.   Yes.

3     Q.   Agent Schaeffer didn't go pick you up and bring you

4     down, right?  You got there on your own?

5     A.   Yes.

6     Q.   And when you first got there and met with Agent

7     Schaeffer and Agent Sullivan, everyone was cordial and

8     friendly, correct?

9     A.   Matt Schaeffer was.

10    Q.   Okay.  Well, he is who you initially met, right?

11    A.   Yes.

12    Q.   And you were allowed to use the bathroom, wash your

13    hands, things like that?

14    A.   Yes.

15    Q.   Okay.  And eventually you went up and you met Agent

16    Sullivan?

17    A.   Yes.

18    Q.   And you were not under arrest, right?

19    A.   Yes.

20    Q.   You were not in custody?

21              MR. COBERLY:  Objection, Your Honor; calls for

22    a legal conclusion.

23              THE COURT:  Let me ask the witness what he

24    believed.

25    Q.   At any time did either of the agents say, "You are

```
 1    under arrest," prior to taking the polygraph?
 2    A.   No.
 3    Q.   Did you believe that you were under arrest?
 4    A.   I --
 5    Q.   You thought you were there to clear your name,
 6    didn't you?
 7    A.   Yeah.
 8    Q.   So you went -- I think you went over this with your
 9    attorney a little bit.  You talked with Agent Schaeffer
10    (sic) about your Advice of Rights and a consent to take
11    a polygraph.  Do you remember doing some forms with her
12    on the computer?
13    A.   Just the two -- the two I signed.
14    Q.   Okay.  And specifically, the first one you did was
15    called Consent to Interview with Polygraph.  Do you
16    recall going over that?
17    A.   Yeah.
18    Q.   Okay.  And it said, "You have the right to refuse
19    to take the polygraph."  Did you read that right?
20    A.   Yes.
21    Q.   And you have some college education, don't you, Mr.
22    Tennison?
23    A.   Yes.
24    Q.   So, I mean, you can read that and understand that?
25    That means you don't have to take that test?
```

```
1    A.   Yes, but I was -- I was confident.

2    Q.   You wanted to clear your name?

3    A.   I was confident I would pass it.

4    Q.   And you read that, and you understood that to mean

5    you don't have to take the test if you don't want to?

6    A.   Yes.

7    Q.   The second right said if you agree to take the

8    test, you have the right to stop at any time.  And you

9    understood what that meant, didn't you?

10   A.   Yes.

11   Q.   But you wanted to clear your name?

12   A.   Yes.  And at the same time, I wanted Matt Schaeffer

13   to stop harassing me with phone calls.

14   Q.   But this is dealing with your conversation with

15   Agent Sullivan prior to taking the test, correct?

16   A.   Yes.

17   Q.   And you understood that your right was to stop the

18   test if you decided during the test that you didn't want

19   to take it anymore?  Did you understand that right?

20   A.   Yes.

21   Q.   And you also agreed that you could refuse to answer

22   any of the individual questions during the polygraph?

23   A.   Yes.

24   Q.   Okay.  And your signature is on this form, correct?

25   A.   Yep.  Yes.
```

1     Q.   After that, you went over the Advice of Rights form

2     which your lawyer talked to you about.  But, again, was

3     there any confusion about the rights that were detailed

4     on this form?

5     A.   Well, when I -- when we got to the lawyer part, if

6     I can't afford one, one will be appointed to you, that's

7     when I thought that I could get a lawyer.

8     Q.   Okay.

9     A.   And the whole thing will -- the whole polygraph

10    will stop then, and --

11    Q.   And you testified --

12    A.   -- continue at a different time.

13    Q.   I'm sorry.  I didn't mean to interrupt you.

14    A.   I was saying that I thought they would appoint me a

15    lawyer so I could take the test at a different time with

16    the lawyer present.

17    Q.   Okay.  So you testified that you asked Agent

18    Sullivan if she could appoint you a lawyer, or something

19    to that effect?

20    A.   Yeah.

21    Q.   And she said, "I can't appoint a lawyer," because

22    she's an FBI agent?

23              MR. COBERLY:  Objection; misstates prior

24    testimony.

25              THE COURT:  Rephrase your question.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    Q.   Did you ask -- your testimony is that you asked

2    Agent Sullivan if she could appoint you an attorney,

3    correct?

4    A.   I asked if they could appoint me an attorney.

5    Q.   Okay.  And was Ms. -- I'm sorry -- Agent Sullivan's

6    response to you that she does not have the ability to

7    appoint an attorney, something like that?

8           MR. COBERLY:  Objection; that misstates the

9    prior testimony.

10           MS. MEASE:  I don't believe it does, Your

11    Honor.

12           THE COURT:  Let me review the question again

13    here.  I think that's consistent.  Answer the question

14    if you can.

15    A.   What was the --

16    Q.   I'm asking if Agent Sullivan responded to you that

17    she does not appoint lawyers?

18    A.   Oh.  Yeah.

19    Q.   Okay.  The next right listed on that form after the

20    right regarding an attorney says, "If you decide to

21    answer questions now without a lawyer present, you have

22    the right to stop answering at any time."

23           Did you decide at that point that you were

24    going to go ahead and go forward with this polygraph

25    without a lawyer present?

1    A.    Yeah.  Because I was -- like I said, I was

2    confident that I would pass it, and I did nothing wrong.

3    Q.    Okay.  So you went ahead and did the polygraph.  I

4    think there has been plenty of testimony about the

5    actual polygraph, correct?

6    A.    Yes.

7    Q.    Afterwards, after waiting a few minutes, you had

8    some discussion with Agent Sullivan, correct?

9    A.    Yes.

10              MS. MEASE:  And, Your Honor, may I put up

11   Defense Exhibit T-1, the chart?

12              THE COURT:  You may.

13   Q.    Mr. Tennison, you were looking at these charts with

14   Agent Sullivan on a computer screen, correct?

15   A.    Yes.

16   Q.    So you weren't able to see, like we're looking at

17   this exhibit, everything together?

18   A.    Well, it was all on a whole layout on a --

19   Q.    But you would have gone through chart 1, chart 2,

20   chart 3?  You can't see -- the computer screen would not

21   allow you to look at everything like that all at once?

22   You'd have to scroll through it, correct?

23   A.    I'm not too sure about that.

24   Q.    Okay.  Well, I guess it doesn't really matter.  My

25   question is:  Today, as you sit here, your testimony is

1      that you remember this one particular spike as being the

2      one that Agent Sullivan directed you to when she said

3      that you failed?

4      A.   Yeah.

5      Q.   And would you agree that there's lots of spikes in

6      all of the different graphs on all three charts?

7      A.   Yes.

8      Q.   But today, you remember it was this particular one?

9      A.   Yes, the one, the big spike.

10     Q.   Well, would you agree there's lots of big spikes?

11     There's one right next to it, correct?

12     A.   Well, I know because that spike was really sharp

13     and narrow.

14     Q.   Okay.  And there's another sharp and narrow spike

15     in chart 3, correct?

16     A.   Yeah.

17     Q.   But you remember it was this one in chart 2?

18     A.   Yes.

19     Q.   While you were speaking with Agent Sullivan, you

20     started providing some more detailed information about

21     sort of what happened that night when "K." was spending

22     the night, right?  Like in terms of where everyone was

23     sleeping, the kids were on the floor in the bedroom,

24     stuff like that?

25     A.   Yes.

1    Q.   Okay.  And, in fact, you drew sort of a diagram

2    with Agent Sullivan, to help understand and explain the

3    layout?

4    A.   Yes.

5    Q.   Okay.  And you had described that yourself, you and

6    your wife, were sleeping on the bed, and there were six

7    children on the floor at the foot of the bed?

8    A.   Yes.

9    Q.   Okay.  Eventually during this interview, which

10   actually was not very long, you actually confessed to

11   touching "K.," didn't you?

12   A.   Well, at the time that Sullivan was --

13   Q.   Well, I'm not asking -- I'm asking:  Did you admit

14   during that interview to touching "K."?  Yes or no?

15   A.   Not -- not to what they're saying, where I touched

16   her at.  But yeah, I admitted.

17   Q.   Did you say that you touched "K." on her vagina

18   during the interview with Agent Sullivan?  Yes or no?

19           MR. COBERLY:  I object.  This is beyond the

20   scope of direct.  And second of all, it's irrelevant.

21           And I would refer the Court to Supreme Court

22   case Lego v. Twomey, T-W-O-M-E-Y, 404 U.S. 477, cite

23   485, Footnote 12, that says, quote, "The sole issue in

24   such a hearing" -- on a motion to suppress a statement

25   -- "is whether a confession was coerced.  Whether it be

1      true or false is irrelevant; indeed, such an inquiry is

2      forbidden.  The judge may not take into consideration

3      evidence that would indicate that the confession, though

4      compelled, is reliable, even highly so.  As difficult as

5      such tasks may be to accomplish, the judge is also

6      duty-bound to ignore implications of reliability in

7      facts relevant to coercion and to shut from his mind any

8      internal evidence of authenticity that a confession

9      itself may bear."

10             The point is, that I'm making, the actual

11     contents of the statement is irrelevant under Supreme

12     Court precedent.  And I did not get into this on direct

13     examination.

14             THE COURT:  Counsel?

15             MS. MEASE:  Your Honor, the defense is arguing

16     that this was a coerced confession, and I think I'm

17     entitled to elicit some of the details because, one, he

18     went beyond what he told Agent Sullivan, which he said

19     if he barely touched her, then she would help him out.

20     He went beyond that.  And he also added new information.

21             I think it's relevant to whether or not this

22     was coerced.

23             THE COURT:  I'm going to require the witness

24     to answer the question, but I will take it under

25     advisement whether the Court will ultimately consider

```
1    this.
2               All right.  You need to answer the question.
3    You may ask it again if you wish.
4               MS. MEASE:  Sure.
5    Q.   (By Ms. Mease)  Mr. Tennison, what I'm asking is:
6    During your interview with Agent Sullivan immediately
7    after your polygraph, did you, during that interview,
8    admit to touching "K." on her vagina?
9    A.   Yes.
10   Q.   Now, we stated earlier that you do have some -- you
11   completed high school, you have your GED, and you have
12   some college education, right?
13   A.   Yeah.
14   Q.   So you know that if you admit to something like
15   that, there could be some consequences, don't you?
16   A.   No.
17   Q.   You don't think it's a problem or that there can be
18   trouble for you if you admit to touching a child on her
19   vagina?
20   A.   Well, what they told me was that they'll help me;
21   and that if I admit something, you know, that they'll
22   help me.
23   Q.   Okay.  So that brings me to my next point.  You
24   stated earlier, and just now, that Agent Schaeffer said,
25   "If you barely touched her or if it was an accident,
```

1      we're going to help you out"?

2      A.    Yeah.

3      Q.    Right?  But you didn't say that you barely touched

4      her or it was an accident, did you?

5      A.    Well, every time I said it, they didn't want to

6      hear it.

7      Q.    Well, there's a recorded statement with Agent

8      Schaeffer, correct?

9      A.    Yes.

10     Q.    And you said that you slid down onto the floor and

11     called "K." over and intentionally rubbed her vagina,

12     didn't you?

13     A.    Yes, at that time.

14     Q.    And you didn't characterize it as an accident, did

15     you?

16     A.    Well, I was scared at the time.

17     Q.    But did you characterize it as an accident?  Did

18     you say, "I accidentally touched her vagina"?

19     A.    No.

20     Q.    You said you did it intentionally, didn't you?

21     A.    Yes.

22     Q.    And you said that it aroused you, didn't you?

23            MR. COBERLY:  Objection.  Again, this is two

24     things, Your Honor.  One, I'm going to renew the

25     objection about the specific contents of it.

1          If we're going to get into it, I would ask

2     that counsel refer him to specific -- if she's claiming

3     that he made specific statements, it's a recorded

4     statement, she can point it out in the recording.

5          THE COURT:  I'm going to sustain that part of

6     your objection.  I take under advisement the objection

7     portion relating to whether or not the question can be

8     asked.

9          Go ahead, counsel.

10         MS. MEASE:  Thank you.

11    Q.  (By Ms. Mease)  Without the ELMO it's a little

12    tricky.  But, Mr. Tennison, if I directed you to your

13    specific statement in the recorded portion of your

14    confession with Agent Schaeffer, would you recall what

15    you said?

16    A.  No.

17    Q.  You would not recall?  Do you need to see the copy?

18    A.  Yes.

19    Q.  Okay.

20         THE COURT:  Let me confer with my CRD for just

21    a minute here.

22         (A discussion was held off the record between

23         the Court and CRD Carol Walker.)

24         MS. MEASE:  I apologize, Your Honor.  I'm

25    trying to use two different exhibits here, and I want to

1       make sure that I'm directing the defendant to the right

2       page.

3                    THE COURT:  Do you need a moment?

4                    MS. MEASE:  I do need a moment.

5                    THE COURT:  Go ahead.

6                    MS. MEASE:  Okay.  May I proceed, Your Honor?

7                    THE COURT:  You may.

8       Q.   (By Ms. Mease)  Mr. Tennison, I'm showing you

9       actually Defendant's Exhibit B.  This is going to be

10      Pages 6 and 7 of the transcript.

11                   THE COURT:  You said B?

12                   MS. MEASE:  B.

13                   THE COURT:  B.  All right.

14      Q.   (By Ms. Mease)  Are you on Page 6, Mr. Tennison?

15      A.   Yes.

16      Q.   Towards the top, Line 6, Agent Sullivan said,

17      quote, "And you told me that you reached around.  And

18      you didn't go in under her clothes, but you did go on

19      top of her vaginal area.  And you were rubbing her.

20      That's what you told me; is that true?"

21                   And your answer was --

22      A.   "Yes."

23      Q.   Then on Page 6, at the bottom of Page 6, into

24      Page 7, Agent Schaeffer said, "Okay.  And so you said --

25      so obviously, you know, while this was going on, you

1        were getting aroused, right, because you just said you

2        had an erection.  Did you -- did you take care of

3        yourself after that or --"

4                    And you said --

5        A.   "Yeah."

6        Q.   And then Agent Schaeffer asked, "And what happened

7        there?"

8                    And you said you woke up your girlfriend,

9        Dorothea, went to the restroom, and had sex, correct?

10       A.   Yes.

11       Q.   And that was not information that anybody knew

12       about prior to this confession, did they?  That was new

13       information that you provided?

14       A.   About --

15       Q.   That information, that you became aroused and had

16       sex with your wife, that you became aroused after

17       touching "K.," that was information that you provided to

18       the agents, correct?

19       A.   Well, the whole time when I was being interviewed

20       by Sullivan, she kept using that word.

21       Q.   Which word are you talking about?  "Aroused"?

22       A.   Yes.

23       Q.   Well, the information that you provided, that you

24       woke up your wife and went to the bathroom, that was

25       information that you provided to them, correct?

```
1    A.   Yes.

2    Q.   Towards the very end of this interview -- so I'm

3    backing up a little bit to your interview with Agent

4    Sullivan prior to going in to speak with Agent Schaeffer

5    again -- you drafted, with the help of Agent Sullivan, a

6    letter to "K."?

7    A.   Yes.

8    Q.   And Agent Sullivan wrote it, but you dictated it?

9    You told her what to write?

10   A.   No.

11   Q.   Are these not your own words?

12   A.   No.

13   Q.   Did you say you're sorry for what you did when you

14   were intoxicated?

15   A.   No.

16   Q.   Well, at this point you'd confessed, correct?

17   A.   Yes.

18   Q.   And you weren't sorry to "K." for doing that?

19            MR. COBERLY:  Objection, Your Honor.  I mean,

20   this is going far afield of the issue before the Court.

21            THE COURT:  Sustained.

22            MS. MEASE:  Your Honor, may I inquire about

23   one line in this letter that I do believe is relevant to

24   the issue of truth or lying during the polygraph?

25            THE COURT:  You may.
```

1       Q.   (By Ms. Mease)  Mr. Tennison, at the very end of
2    this letter you stated, through Agent Sullivan:  I want
3    to make sure the truth comes out?
4    A.   Uh-huh.
5       Q.   Did you feel that way?  You wanted to make sure
6    that the truth came out?
7    A.   I --
8       Q.   In fact, that's why you went there, isn't it?
9    A.   Yes.
10      Q.   And you wanted the truth to come out because you
11   wanted to have that burden lifted from you, correct?
12   A.   Well, I wanted them to find out the real truth,
13   which Sullivan didn't want to hear.
14      Q.   You wanted -- you stated you wanted the truth to
15   come out.  Are you disputing that you said that in the
16   letter?
17   A.   Like I said, I didn't write that letter.
18      Q.   I know.  Agent Sullivan wrote it.  I'm saying, did
19   you tell her to write:  I want to make sure the truth
20   comes out?
21           You just said that you wanted the truth to
22   come out.
23   A.   While she was writing that letter, she was just
24   blurting out words to me, writing it, and saying, "Well,
25   is this the way you feel?  Is this how it is?  Is this

1     the way everything went down?"

2            And I was saying "Yes" at the time because I

3     was scared.

4     Q.   Okay.  Let me ask you very specifically.  Earlier,

5     I asked you if you wanted to make sure the truth came

6     out, and you said "Yes."  Is that true?

7     A.   Yes.

8     Q.   Now, do you think that -- my next question is:  The

9     bottom of this letter says, "I will make sure the truth

10    comes out."

11           Do you disagree that that is something that

12    you felt that day?

13    A.   Not really.

14    Q.   You wanted the truth to come out, didn't you?

15    A.   Yes.

16    Q.   And that is marked at 11:17 a.m.  That was the last

17    thing you did with Agent Sullivan, correct?

18    A.   No.

19    Q.   Prior to going to talk to Agent Schaeffer?

20    A.   Oh, yeah.

21    Q.   Okay.  So then, starting at 11:26, just less than

22    ten minutes later, you sat down and gave a more detailed

23    confession to Agent Schaeffer, correct?

24    A.   Yes.

25    Q.   Okay.

```
 1                 MS. MEASE:  Nothing further, Your Honor.

 2                 THE COURT:  Is there any further need of the

 3      witness here?

 4                 MR. COBERLY:  I'm sorry, Your Honor?  I didn't

 5      hear you.

 6                 THE COURT:  We have some problems up here with

 7      our equipment.  I apologize.  It feels like a Monday.  I

 8      would expect this on a Monday.

 9                 MR. COBERLY:  May I approach the witness, Your

10      Honor?

11                 THE COURT:  You may.

12                      REDIRECT EXAMINATION

13      BY MR. COBERLY:

14      Q.    Handing you what has been admitted as Exhibit A,

15      which is a transcript of the meeting you had with Agent

16      Schaeffer in May of 2014, have you reviewed this?

17      A.    Yes.

18      Q.    And do you recall being asked about -- well, isn't

19      it true, Mr. Tennison, that Agent Schaeffer really said

20      he was not putting you in his crosshairs?  Do you recall

21      those questions, the questions asked by counsel just

22      now?

23      A.    Well, the word "crosshairs" only meant one thing.

24      Q.    What does that word mean to you?

25      A.    It's like, you know, crosshairs are only on a
```

1    weapon.

2    Q.   Okay.

3    A.   And, you know, for somebody with the law

4    enforcement to say that to me is kind of scary.

5    Q.   So did you feel like even though Agent Schaeffer

6    said, "I'm not, like, putting you in my cross hairs,"

7    that you were in his crosshairs?

8              MS. MEASE:   Your Honor, I'm going to object to

9    leading.

10             THE COURT:   I'm going to overrule that

11   objection.  You may ask that.

12   Q.   So did you feel like even though Agent Schaeffer

13   said, "I'm not, like, putting you in my cross hairs,"

14   did you feel like you were being put in his crosshairs?

15   A.   Yes.

16   Q.   Okay.  Sir, if you could turn to Page 22 of the

17   transcript, starting at Line 11 there on the left side,

18   you'll see the line numbers.  Do you see that?

19             I'm going to read along here, and it says:

20             "*MR. SCHAEFFER:  I know you didn't.*

21   *You're covering yourself already.*

22             *MR. TENNISON:  -- all in the bedroom.*

23             *MR. SCHAEFFER:  You're covering*

24   *yourself already.*

25             *MR. TENNISON:  I'm not covering*

1          *anything, sir.  I'm -- I'm just telling you*

2          *like it is that what --*

3                    *MR. SCHAEFFER:  No, you're not*

4          *telling me like it is because if you were*

5          *telling me like it is, we'd be farther along*

6          *right now, okay?*

7                    *MR. TENNISON:  Uh-huh.*

8                    *MR. SCHAEFFER:  Now, something*

9          *happened.  I'm positive something happened.*

10         *Whether it was an intentional incident, an*

11         *accidental incident, you know what I mean?*

12         *That's what I'm trying to figure out now."*

13              How did that make you feel in regards to being

14    put in the crosshairs?

15    A.   That he was already accusing me of doing something

16    wrong.

17    Q.   Okay.  And I want you to turn to Page 24 on the

18    transcript.  I'm going to read here starting at the top:

19                   *"MR. TENNISON:  Because I don't*

20         *understand how all that happened, you know, and*

21         *I don't know why she's saying stuff like this*

22         *in the first place, you know.  It's just*

23         *mind-blowing to me.  It's -- man, I don't --"*

24              And then Agent Schaeffer says, interrupts and

25    says:

1            *"MR. SCHAEFFER:  Look, dude, I don't*

2       *think that, you know, you're a pedophile.  You*

3       *know what I mean?  I don't think that you*

4       *intentionally, you know, tried to have sex with*

5       *her or anything like that.  But I do think that*

6       *you touched her."*

7            And then you start saying:

8            *"MR. TENNISON:  I --"*

9            And then he keeps going:

10           *"MR. SCHAEFFER:  It may have been an*

11      *accident, and if it was an accident, that's*

12      *fine.  If you screwed up, that's fine; you know*

13      *what do I mean?  But I need to hear that."*

14           And hearing those words again in relation to

15      that, how in relation to that did that make you feel in

16      regards to being put in the crosshairs?

17      A.   That if I admit to something, that he would like --

18      that -- that it's okay to admit to something that you

19      didn't do.

20      Q.   Did you believe that Agent Schaeffer wanted to get

21      your truth, the truth?

22      A.   No.

23      Q.   You were asked questions about whether you had

24      retained a lawyer, and you had said something about you

25      were told that you couldn't get one until you were

1     criminally charged.  Did I get that right?

2     A.    Yes.

3     Q.    Do you recall who you contacted -- first of all, do

4     you understand the difference between a public defender

5     and a retained attorney?

6     A.    No.

7     Q.    Okay.  Do you recall who you contacted that said,

8     "You have to be charged before we can give you an

9     attorney"?

10    A.    I contacted Navajo P.D. from Crownpoint.

11    Q.    Did you at any point attempt to retain -- that is,

12    hire with your own money -- an attorney?

13    A.    Yeah.  And I drove around here in Albuquerque and

14    we seen a federal attorney, and she cost six grand just

15    for looking at my case, so I didn't have -- I don't have

16    that kind of money.

17    Q.    And at this time you were in Albuquerque, taking

18    care of your brother?

19    A.    Yes.

20    Q.    And before this incident happened with your

21    brother, essentially how much money were you making for

22    your family to take care of your wife and five children?

23    A.    I was just making just minimum wage.

24    Q.    Now, counsel for the government went over some

25    other parts of the forms that you and Agent Sullivan

```
1     went over, right?

2     A.    Yes.

3     Q.    And she pointed out that even though you asked for

4     an attorney and you were not given an attorney, you went

5     ahead and took the polygraph, right?

6     A.    Yes.

7     Q.    Based on Agent Schaeffer's interactions with you,

8     did you think that this was going to -- if you refused a

9     polygraph, did you think this would just go away?

10    A.    No.

11    Q.    I'm going to show you, and I'm just going to hold

12    it here, Exhibit T.  You were questioned about the

13    spike, and counsel for the government said, "Well,

14    there's many other spikes here."  Right?

15    A.    Yes.

16    Q.    Now, is there anything -- in reviewing this, is

17    there anything in your mind that is as significant or as

18    large of a spike as the spike that you pointed out?

19    A.    No, just that big sharp spike.

20    Q.    And how positive are you that that is what Agent

21    Sullivan showed you when she said that you failed

22    miserably?

23    A.    I remember the bottom.  It was on the bottom of the

24    graph, and the scribbly things on the bottom were so

25    close, and the way I spiked is really -- was up there.
```

1   Q.   So how confident are you that that's the spike that

2   you saw?

3   A.   I'm 100 percent.

4   Q.   Sir, I think you have -- I believe it's Defendant's

5   Exhibit B, which is the recording, a transcript of the

6   recording that was taken after the polygraph with Agent

7   Schaeffer and Sullivan, and you were asked questions

8   about that, right?

9   A.   Yes.

10  Q.   Okay.  And specifically --

11           THE COURT:  And let me -- do you mind, Mr.

12  Coberly, if I talk to the IT person here for just a

13  couple of minutes?

14           MR. COBERLY:  Sure.

15           (A discussion was held off the record.)

16           THE COURT:  My apologies again, counsel.  Let

17  us continue here.

18  Q.   (By Mr. Coberly)  Sir, so looking at Exhibit B,

19  which is the transcript, do you have that there?  I'm

20  sorry.  Mr. Tennison, do you have that transcript there,

21  Exhibit B?

22  A.   Yeah.

23  Q.   Okay.  So you were asked specifically -- turn to

24  Page 6, sir, if you will, starting at Line 6 through 10.

25  You were asked about that sequence, right?

 1     A.   Yes.

 2     Q.   I want you, sir, to turn back a page, Page 5,

 3     starting at Line 10.  Now, I'm going to point out --

 4     well, I'll just start reading.  Starting on Line 10,

 5     Agent Sullivan says:

 6               *"MS. SULLIVAN:  And sleeping, uh-huh.*

 7          *And what he told me --"*

 8               And then she's telling Agent Schaeffer what

 9     supposedly you told her, right?

10     A.   Yes.

11     Q.   And then the next -- you don't say anything, but

12     then Agent Schaeffer says:

13               *"MR. SCHAEFFER:  Uh-huh."*

14               And then Agent Sullivan says:

15               *"MS. SULLIVAN:  And then he said"* --

16               And then she talks about what, according to

17     Agent Sullivan, you said.

18               And you say:

19               *"MR. TENNISON:  Yeah."*

20               And then Agent Sullivan says:

21               *"MS. SULLIVAN:  And initially --*

22          *let's be honest, you said"* --

23               And it goes on now, and it continues that way.

24               My question is:  Were you volunteering

25     information in this series of questions?

1    A.   I was scared.  At the time that they were actually

2    doing this and they were -- they were just going on

3    about me being erected and horny and whatnot.

4    Q.   Okay.

5    A.   I was just saying "Yeah" because I was scared.

6    Q.   So let's go ahead and take a look at Page 6, and

7    then start at Line 11, where Agent Sullivan says:

8              *"MS. SULLIVAN:  Okay.  And then you*

9         *told me, while you were doing that, what was*

10        *happening with your body?"*

11             And your answer was:

12             *"MR. TENNISON:  I was getting an*

13        *erection."*

14             Can you tell the Court how, prior to this

15    recording, how the topic of an erection came up?

16    A.   When -- when -- when Sullivan was questioning me

17    before that, she was talking about being erected and

18    everything, and if a normal guy that would get erected

19    would just whack off in a shed to porno magazines.

20             Which, you know, that's the whole point of me

21    saying that I got erected, you know.  And she -- she

22    didn't -- she didn't feel like that I was telling the

23    truth the whole time, so I -- I -- I just gave her

24    bullshit.  And I was scared of what, you know, she was

25    saying, that I was going to go to jail.

1    Q.   So the issue of you getting erect and then having

2    sex with your wife, did that come up in the initial

3    conversation that was not recorded with Agent Sullivan?

4    A.   Say that again.

5    Q.   I'm sorry.

6         THE COURT:  Don't lead your client.  Rephrase

7    your question.

8    Q.   How did the topic -- how did the statement that you

9    made about having sex with your wife, how did that come

10   up?  Or how did that -- yeah.

11   A.   Well, I was -- like I said, I was trying to tell

12   her the truth, but she didn't want to hear it, so I just

13   told her anything.  And when -- what I told -- what I

14   had told her, I guess she remembered, you know, that,

15   you know -- I don't remember that much about what I told

16   her because it was all bullshit.

17   Q.   And did you tell Agent Sullivan the word you just

18   used, "bullshit?"

19   A.   Yes.

20   Q.   So I'm going to hand you --

21        MR. COBERLY:  May I approach, Your Honor?

22        THE COURT:  You may.

23   Q.   Sir, I'm handing you what has been admitted as

24   Defendant's Exhibit L, which is the letter you were

25   questioned about.  So to be clear, is any of your

1     handwriting on this letter?

2     A.    Yes.

3     Q.    Okay.  What portion of this letter is your

4     handwriting?

5     A.    My name, and on the top where they told me to

6     write, "I have ask the agent to write this for me."

7     Q.    Okay.  Now, you were present when Agent Sullivan

8     testified, and she said that you wanted Agent Sullivan

9     to write a letter because you were ashamed of your

10    writing.  Do you remember that?

11    A.    Yeah.

12    Q.    Are you able to write?

13    A.    Yes.

14    Q.    Are you ashamed of your writing?

15    A.    No.

16    Q.    So how is it that this letter came about?

17    A.    Well, she was like, "Are you ashamed of what you

18    did?  What do you think -- what do you think you should

19    say to K.?"  And she took out a paper and she started

20    writing.  "Are you sorry for what you did?"

21          You know, and she just started going on,

22    writing this letter out, you know, and I was just

23    sitting there agreeing.

24    Q.    Okay.  So let's talk about the first line, "Sorry

25    for what I did."

 1              The second line is, "I was intoxicated when I

 2      touched you.  I'm so sorry for what I did."

 3              MS. MEASE:  Your Honor, I object.  I was not

 4      allowed to go into the contents of this letter, other

 5      than the last line.

 6              THE COURT:  Counsel?

 7              MR. COBERLY:  Your Honor, I objected about

 8      this whole --

 9              THE COURT:  Well, if you're opening the door,

10      you may proceed.

11              MR. COBERLY:  Okay.

12              THE COURT:  If that's your intention.

13      Q.   (By Mr. Coberly)  So this letter, let's keep it at,

14      is anything that -- the writing that's not your writing,

15      whose writing is that?

16      A.   That's Sullivan's.

17      Q.   Okay.  Did you tell Sullivan to write this letter?

18      A.   No.

19      Q.   Is anything in here that Agent Sullivan wrote down,

20      were those words from your mouth?

21      A.   No.  "Sorry.  I was intoxicated when I touched you.

22      I'm so sorry for what I did."

23              I would have put, "I was drunk."  I wouldn't

24      use "intoxicated."

25      Q.   Well, did any other -- I mean, just the general

1    content of this letter, did you tell her to write this

2    letter?  Or did you tell her what to put in there?

3    A.   No.

4    Q.   How is it that your -- that the part that you said

5    was your writing at the top, how is it that that came

6    about to be in the letter?

7    A.   She told me to sign it, and she had me write, "I

8    have ask the agent to write this for me."

9            MR. COBERLY:  May I have one moment, Your

10   Honor?

11           THE COURT:  You may.

12   Q.   Mr. Tennison, I believe you had testified earlier

13   about Agent Sullivan saying you could go to jail for a

14   long time?

15   A.   Uh-huh.

16   Q.   In what context was she saying that?  In regards to

17   what was she saying that about?

18   A.   For lying.

19           MR. COBERLY:  Thank you, Your Honor.  I have

20   no further questions.

21           THE COURT:  Is there any further need of the

22   witness here?

23           MS. MEASE:  May I inquire briefly?

24           THE COURT:  You may.

25

```
 1                         RECROSS-EXAMINATION

 2     BY MS. MEASE:

 3     Q.   Mr. Tennison, I don't know which exhibit you have

 4     in front of you, but I'm referring to Government's

 5     Exhibit 7, which is the letter that was just discussed.

 6     A.   Yes.

 7     Q.   I think you've said a few conflicting things here

 8     today about this letter, and I want to just clarify it.

 9     Your testimony is that Agent Schaeffer (sic) was asking

10     you questions while she was writing this letter:  "Are

11     you sorry for what you did?"  And she would write,

12     "Sorry for what I did."

13               You just said that on the examination with

14     your attorney, correct?

15     A.   No.  I -- I told her that -- Sullivan was saying it

16     while she was writing it.

17     Q.   Okay.  That's what I'm asking.  But you have said,

18     just a moment ago with your attorney, that as she was

19     asking you those things, "Are you sorry for what you

20     did?" and "You're sorry for calling her a liar?" and

21     things like that, that you were agreeing?  They were not

22     your words, but you were agreeing to what she was

23     saying?

24     A.   Yes.

25     Q.   Okay.
```

1           MS. MEASE:  Nothing further, Your Honor.

2           THE COURT:  I have a question here, Mr.

3    Tennison.  You said that your brother fell ill and was

4    in a coma?

5           THE WITNESS:  Uh-huh.

6           THE COURT:  Was that in Albuquerque?

7           THE WITNESS:  Yes, it was here at Lovelace

8    Hospital.

9           THE COURT:  Okay.  You also said that you were

10   contacted by Agent Schaeffer when you were at the

11   hospital; is that correct?

12          THE WITNESS:  Yes.

13          THE COURT:  All right.  And then you said that

14   you were told that Agent Sullivan was available to do a

15   polygraph?

16          THE WITNESS:  At that time, yeah, she said --

17   well, he told me that she's from Denver and she's a

18   specialist and she can only be here at that time.

19          THE COURT:  Right.  And the only thing I want

20   to clarify was, I take it you met with Agent Schaeffer

21   and Agent Sullivan not in Albuquerque, but in Gallup?

22          THE WITNESS:  Yeah, in Gallup.

23          THE COURT:  And how did that get arranged?

24          THE WITNESS:  He called me and he told me that

25   it's going to be -- that it has to be in Gallup and I

1    had to drive down there, drive back to Gallup.

2                THE COURT:  Okay.  So you were told to be in

3    Gallup?

4                THE WITNESS:  Yeah.

5                THE COURT:  Okay.  That's the only thing I

6    needed clarifying.  All right.  Anything further here?

7    Any further need of the witness?

8                MS. MEASE:  No, Your Honor.

9                MR. COBERLY:  No, not of the witness, Your

10   Honor.

11               THE COURT:  All right.  Mr. Tennison, I do

12   excuse you.  You can resume your seat at counsel table.

13   All right.

14               Any other witnesses?

15               MR. COBERLY:  No, Your Honor.

16               THE COURT:  Any witnesses for the government

17   here?

18               MR. NAYBACK:  Not on behalf of the United

19   States, Your Honor.  Thank you.

20               THE COURT:  Anything further to proffer here

21   for purposes of what is before the Court?

22               MR. NAYBACK:  Not on behalf of the United

23   States, Your Honor.

24               MR. COBERLY:  Your Honor, there is for -- I

25   don't have anything at the moment.  There is outstanding

1        the motion regarding the Rule 26.2, the statements.  I

2        just, if the Court has yet to rule on that, I would ask

3        that the Court keep the hearing open until it does so I

4        can re-call Sullivan or Schaeffer if necessary,

5        depending on the outcome of the Court's ruling.

6                THE COURT:  All right.  Let me ask counsel how

7        they want to handle the closing arguments here.  Given

8        the nature of the evidence that is before the Court, the

9        testimony, I would assume that the most reasonable

10       manner is to have them or invite them to be in written

11       form.

12               Do counsel agree?

13               MR. NAYBACK:  The Court's preference, Your

14       Honor.

15               THE COURT:  Mr. Coberly?

16               MR. COBERLY:  I would agree, Your Honor.  I

17       mean, I don't think it should be that long or that

18       detailed.

19               THE COURT:  Let's look at the time.  How much

20       time do you need?  Do you want to meet and confer with

21       your respective colleagues, take a minute to do that to

22       arrive at a date?

23               What's your pleasure?

24               MR. NAYBACK:  Your Honor, the United States

25       would ask that the briefs be due on or about March 25th.

1          Ms. Mease has a Tenth Circuit brief due on

2    March 7th.  We have had three days of transcripts here.

3    Ms. Goehl was kind enough to get us a single day.  I

4    know it took her a tremendous amount of time to turn

5    that around, almost hour for hour in court time to

6    turning into transcripts, and I think she deserves

7    adequate amount of time to turn these transcripts

8    around.

9          So the United States requests on or about

10   March 25th.  That would give us sufficient time to get

11   the briefs and prepare summaries of this hearing for the

12   Court.

13          THE COURT:  Mr. Coberly?

14          MR. COBERLY:  Your Honor, I understand that

15   Ms. Goehl has done a tremendous job.  I agree.

16          But that's too late for me, given the

17   circumstances, my client, his position -- yes, he's not

18   technically in custody in a jail anywhere, but the Court

19   is very well aware he's on very strict conditions.  This

20   has been a long process.  He was indicted over a year

21   ago.

22          I would ask for sometime the end of February.

23          THE COURT:  All right.  Counsel, I'm looking

24   to set the date for the closing arguments March 16th.

25   Will that work for counsel?


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1           MR. NAYBACK:  It's not ideal, Your Honor, but

2      from the United States, obviously we're going to comply

3      with anything the Court orders.  Alternatively, we had

4      discussions while the Court was off record, and another

5      option would be to set a date for oral argument for

6      closing arguments.

7           THE COURT:  I think I would prefer, given the

8      nature of this case and the evidence --

9           MR. NAYBACK:  That's fine.

10          THE COURT:  -- that they be in writing.

11          MR. NAYBACK:  Okay.

12          THE COURT:  With accurate citation to the

13     record.

14          MR. NAYBACK:  Sure.

15          THE COURT:  That's important here.  Mr.

16     Coberly?

17          MR. COBERLY:  March 16th is fine, Your Honor.

18     One thing counsel and I discussed also, as well, is

19     perhaps the Court setting a page limit, I think for

20     everybody's benefit.  I would suggest 15 pages.

21          THE COURT:  Well, I'll let the government

22     respond to that.  What is your sense?  We certainly can.

23     The more concise, the better.

24          MR. NAYBACK:  Yeah, I don't think I would have

25     submitted anything longer than 15 pages, Your Honor.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    While we have spent three days here in the courtroom, I

2    don't think it's a particularly complicated case.  I

3    think it's straightforward.  And if it's of benefit to

4    the Court to have appropriate citations to the

5    transcripts, we'll do that on key points, and I'm sure

6    we can do that within 15 pages, probably less.

7              Thank you.

8              THE COURT:  That's fine.  No more than 15

9    pages.  All right.  March 16th, closing arguments due,

10   no more than 15 pages.

11             Anything further to come before the Court at

12   this time?

13             MR. NAYBACK:  Not on behalf of the United

14   States.  Thank you so much for your time, Your Honor.

15             THE COURT:  Are you going to let me hang on to

16   one of these charts here, Mr. Coberly?

17             MR. COBERLY:  Yes, Your Honor.  Please keep

18   the one that's up there.  Or maybe the Court would

19   like -- it would be best to have the one with the

20   markings on it.

21             THE COURT:  I'm thinking unless it's needed by

22   the parties.

23             MR. COBERLY:  No.

24             THE COURT:  Okay.  Let's switch them out,

25   then.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1              Probation Officer Valdez, Mr. Tennison, wants

2       you to check in with him today, so maybe as soon as

3       we're done here.  I know it's the noon hour, but you may

4       have to wait a little bit.

5              They may want to make an adjustment on your

6       ankle bracelet so we don't have that issue come up

7       again.  All right?

8              So do check in with him today as soon as you

9       are able to.  It may have to be at 1:00.  I don't know.

10             THE DEFENDANT:  Yes, ma'am.

11             THE COURT:  So you might check in to Probation

12      as soon as we're done.

13             MR. COBERLY:  Okay.  Thank you.

14             THE COURT:  Anything further, counsel, to come

15      before the Court at this time with respect to this

16      matter?

17             MS. MEASE:  No, Your Honor.

18             MR. NAYBACK:  No, Your Honor.  Thank you.

19             THE COURT:  Mr. Coberly?

20             MR. COBERLY:  No, Your Honor.

21             THE COURT:  All right.  We'll stand in recess

22      here.  I'm going to have the need of the bench for a few

23      minutes.  I need to bring my IT person back up here to

24      do a little work.

25             MR. NAYBACK:  Thank you.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1                    THE COURT:  So you are excused and free to

2         leave the courtroom.

3                    Thank you, counsel.

4                    MR. NAYBACK:  Thank you.

5                    THE COURT:  We stand in recess officially

6         here.

7                    (Proceedings concluded at 12:28 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    UNITED STATES OF AMERICA

2    DISTRICT OF NEW MEXICO

3

4              CERTIFICATE OF OFFICIAL REPORTER

5                    I, Julie Goehl, RDR, CRR, RPR, RMR,

6    New Mexico CCR #95, Federal Official Realtime Court

7    Reporter, in and for the United States District Court

8    for the District of New Mexico, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code,

10   that the foregoing is a true and correct transcript of

11   the stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15                    Dated this 8th day of February, 2016.

16

17              _____

                JULIE GOEHL
18              FEDERAL OFFICIAL COURT REPORTER
                Registered Diplomate Reporter
19              Registered Professional Reporter
                Registered Merit Reporter
20              Certified Realtime Reporter
                NM Certified Court Reporter #95
21              333 Lomas Boulevard, Northwest
                Albuquerque, New Mexico  87102
22              Phone:  (505)348-2209
                Fax:    (505)348-2215
23              Email:  Julie_Goehl@nmcourt.fed.us

24

25


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                FEDERAL OFFICIAL COURT REPORTER
                333 Lomas Boulevard, Northwest
                Albuquerque, New Mexico  87102