1                     IN THE UNITED STATES DISTRICT COURT

2                       FOR THE DISTRICT OF NEW MEXICO

3        UNITED STATES OF AMERICA,

4                       Plaintiff,

5              vs.                                CR-15-00212 MCA

6        JAMAICO TENNISON,

7                       Defendant.

8

9                    REDACTED TRANSCRIPT OF PROCEEDINGS
                 MOTION TO SUPPRESS STATEMENTS, VOLUME 2
10               BEFORE THE HONORABLE M. CHRISTINA ARMIJO
                     CHIEF UNITED STATES DISTRICT JUDGE
11                THURSDAY, JANUARY 21, 2016, 9:05 A.M.
                        ALBUQUERQUE, NEW MEXICO
12

13

14       FOR THE PLAINTIFF:

15              UNITED STATES ATTORNEY'S OFFICE
                District of New Mexico
16              201 Third Street, Northwest
                Suite 900
17              Albuquerque, New Mexico  87102
                BY:  MR. KYLE T. NAYBACK
18                   MS. SARAH JANE MEASE

19       FOR THE DEFENDANT:

20              COBERLY & MARTINEZ, LLLP
                Attorneys at Law
21              1322 Paseo de Peralta
                Santa Fe, New Mexico  87501
22              BY:  MR. TODD A. COBERLY

23

24              Proceedings recorded by mechanical stenography,
         transcript produced by computer.
25


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                       FEDERAL OFFICIAL COURT REPORTER
                       333 Lomas Boulevard, Northwest
                       Albuquerque, New Mexico  87102

1    Reported by:

2         JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
          333 Lomas Boulevard, Northwest
3         Albuquerque, New Mexico  87102
          Phone:  (505)348-2209
4         Email:  Julie_Goehl@nmcourt.fed.us

5

6                      I N D E X

7                                              PAGE

8    PRELIMINARY MATTERS                          3

9    WITNESS FOR THE PLAINTIFF:

10     CHASE FOSTER

11       Direct Examination by Mr. Nayback        12

12       Cross-Examination by Mr. Coberly         44

13       Cross-Examination (Continued) by Mr. Coberly   116

14       Redirect Examination by Mr. Nayback      123

15       Recross-Examination by Mr. Coberly       126

16   WITNESS FOR THE DEFENSE:

17     CHARLES ROBERT HONTS

18       Direct Examination by Mr. Coberly        128

19       Cross-Examination by Mr. Nayback         198

20

21                   EXHIBITS ADMITTED

22                                              PAGE

23   Defendant's Exhibits W, X, Y, and Z         11

24   Government's Exhibits 15 and 16             27

25   Defendant's Exhibit U                       112


              JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                   FEDERAL OFFICIAL COURT REPORTER
                   333 Lomas Boulevard, Northwest
                   Albuquerque, New Mexico  87102

```
 1          REDACTED MOTION TO SUPPRESS STATEMENTS, VOLUME 2

 2                 (Court in session at 9:05 a.m.)

 3             COURTROOM DEPUTY CAROL WALKER:  All rise.

 4                 Hear ye, hear ye, hear ye.  The United States

 5     District Court for the District of New Mexico is now in

 6     session, the Honorable M. Christina Armijo, Chief United

 7     States District Judge, presiding.

 8                 God save these United States and this Honorable

 9     Court.

10             THE COURT:  You may be seated.  Good morning.

11             MR. NAYBACK:  Good morning, Your Honor.

12             MR. COBERLY:  Good morning, Your Honor.

13             MS. MEASE:  Good morning.

14             THE COURT:  Good morning.  We convene this

15     morning, or reconvene I guess is the word, in the case of

16     United States v. Jamaico Tennison, this matter being on

17     the Court's criminal docket, 15-CR-212.

18                 May I have appearances, please, from counsel.

19             MR. NAYBACK:  Good morning, Your Honor.  Kyle

20     Nayback on behalf of the United States, and with me is my

21     colleague, Sarah Mease.

22             MS. MEASE:  Good morning, Your Honor.

23             THE COURT:  Good morning.

24             MR. COBERLY:  Good morning, Your Honor.  Todd

25     Coberly on behalf of Jamaico Tennison, who is present
```

1    here, along with Dr. Charles Honts.  Sitting at counsel

2    table with me, as well, is my paralegal, Lily Hofstra.

3              THE COURT:  Okay.  Good morning to you.

4              This is a continuation of a hearing that

5    commenced on -- let me see when the last date was here.

6    Carol, can you give me the date on that?  12/11/15?

7              MR. NAYBACK:  Yes, Judge.

8              THE COURT:  It's been a while.  That's what I've

9    got.  It seems like a long time, but a relatively short

10   time.

11             So let us continue here.

12             MR. NAYBACK:  Thank you, Your Honor.  Before the

13   United States calls Special Agent Chase Foster, I want to

14   tender to the Court two additional exhibits, if I may?

15             THE COURT:  You may.

16             MR. NAYBACK:  Thank you, Your Honor.

17             MR. COBERLY:  Your Honor, I would like actually

18   to object to these being tendered to the Court.  I can

19   explain why.

20             THE COURT:  Go ahead.

21             MR. COBERLY:  Your Honor --

22             THE COURT:  First of all, what I've been handed

23   is Government's Exhibit 15 and Government's Exhibit 16.

24             MR. NAYBACK:  Your Honor, if I can explain the

25   nature of these two exhibits?

1              What's called into question by defense is the

2      scoring.  This all boils down to the scoring of Jamaico

3      Tennison's single polygraph examination that was

4      administered by Special Agent Sullivan.  And what I have

5      tendered to the Court in Exhibits 15 and 16 are simply

6      screen shots of an algorithm that, both upon information

7      and belief, Dr. Honts is familiar with.

8              You'll see under the big letters in bold

9      probability analysis.  You'll see that Honts is a

10     contributor to the --

11             MR. COBERLY:  Your Honor --

12             MR. NAYBACK:  Can I just explain?

13             MR. COBERLY:  Your Honor.

14             THE COURT:  Well, just tell me.  These are

15     algorithms?

16             MR. NAYBACK:  Yes, algorithms that run in

17     software to determine scoring, and it's something that our

18     witness, Mr. Foster, did on the software that both parties

19     use; and that the two exhibits, I think, can be used on

20     cross, as well, of Dr. Honts if he testifies today.

21             But I think the government should be permitted.

22     It's work that Mr. Foster did in preparation for his exam

23     today.

24             THE COURT:  Okay.  Mr. Coberly?

25             MR. NAYBACK:  Thank you.

1           MR. COBERLY:  Your Honor, this is, like I say,

2      it's really sandbagging.  I was just tendered these

3      exhibits this morning at about five or ten minutes until

4      9:00.  I noticed that they are screen shots that are

5      incomplete.  The report date from the screen shots says

6      that it was ran on December 10, 2015, which was the day

7      before the last hearing.

8           So there is no reason that the government waits

9      over a month, five minutes before this hearing, to tender

10     these incomplete exhibits.  And Mr. Nayback says "on

11     information and belief."  If it's necessary, we can get

12     Dr. Honts up on the stand right now and voir dire him.  He

13     knows nothing about this.

14          The cite to the Honts article is an article he

15     wrote back in 1988.  It comes from one paragraph.  We know

16     nothing about this algorithm or where it came from.  It's

17     incomplete.  It's late.

18          THE COURT:  All right.  Mr. Nayback?

19          MR. NAYBACK:  Well, I think Mr. Coberly can ask

20     Mr. Foster about what he ran in the Lafayette software,

21     and I think that -- I do apologize for the late

22     disclosure.  We obviously did it in preparation for this

23     examination.

24          Mr. Foster didn't end up testifying.  We recall

25     at the last hearing, we didn't get to Mr. Foster.

```
 1                    THE COURT:  I understand, but you might have
 2        disclosed it last time.
 3                    MR. NAYBACK:  Yeah, you're right, Your Honor.
 4                    THE COURT:  Not disclosed it five minutes before
 5        he was going to testify the last time.
 6                    MR. NAYBACK:  Yes, we could have.  They are
 7        single-page exhibits.  I think that would go to weight,
 8        not admissibility.  I would ask the Court to exercise its
 9        discretion and leniency in the Rules of Evidence.  And I
10        don't see -- if the exhibits are either incomplete in Dr.
11        Honts' or Mr. Coberly's mind, that can come out through
12        the examination of Dr. Honts.  His name is attached to the
13        algorithm.  Mr. Foster is familiar with it.  Dr. Honts,
14        upon information and belief, is familiar with the
15        Lafayette software.  That is what he used to open the raw
16        data.
17                    And these go to the heart of the matter, Your
18        Honor, which is whether by various scoring methods --
19        you've seen by now that Dr. Honts uses different scoring
20        methods than Mr. Foster.  This is a third way to score, a
21        third or more way to score, which is an algorithm.  And so
22        it's just another piece of the puzzle, and the United
23        States would ask that they be admitted, and that the
24        Court, after cross-examination, can afford the weight,
25        just like a jury would, can afford the weight to the
```

1    exhibit that it sees fit.

2              But since they are single-page documents, since

3    the expert is here, we gave them before the hearing this

4    morning, the United States -- it's not a -- they are two

5    single-page exhibits that don't take a long time to

6    digest.

7              So I would ask the Court for leniency.  I do

8    apologize.  Clearly, it was made in preparation.  There

9    was a lot going on, on December 11, and this was an

10   oversight on my part, not on Mrs. Mease's, but on my part.

11             Thank you, Your Honor.

12             MR. COBERLY:  If the Court will look on the

13   right-hand side of these exhibits, you'll see a scroll bar

14   and you'll notice that it's at the top.  We don't know

15   what was below there, if you scroll down.  It's not a

16   complete screen shot.  It was disclosed late.

17             The government is already going to be presenting

18   testimony from Mr. Foster regarding two algorithms that he

19   ran, and you will it hear from him, and he's going to say

20   that according to those algorithms, it showed deception

21   indicated.  This is a third.  It's redundant, it's late,

22   and it's incomplete.

23             MR. NAYBACK:  Your Honor, briefly?

24             If the Court is so inclined not to allow the

25   government's exhibit, I still think that Mr. Foster can

1    testify that he ran the algorithm within the Lafayette

2    software in two different methods, and that both times

3    Jamaico Tennison showed deception indicated, which is

4    another word for failing the polygraph examination.

5            THE COURT:  How do you intend to use these

6    today?

7            MR. NAYBACK:  Simply to, with Mr. Foster, to

8    help explain his use of the Lafayette software.  This is

9    -- I don't disagree with Mr. Coberly that this is somewhat

10   of a belts and suspenders, but there is a dispute, as you

11   know, Your Honor, about different scoring methods and

12   whether Jamaico Tennison failed this exam.

13           This is yet another piece of evidence that's not

14   difficult to digest, that Mr. Foster can be cross-examined

15   on, and the results can be questioned by Mr. Coberly.

16           THE COURT:  The Court will take the matter under

17   advisement, but I will expect that you not take lightly

18   your responsibility to lay a proper foundation.

19           MR. NAYBACK:  Thank you, Your Honor.  I will.

20           THE COURT:  I take it under advisement.

21           MR. NAYBACK:  Thank you.  I intend to do so.

22           With that, no other housekeeping matters by the

23   United States.  We're prepared to move forward with direct

24   examination of Chase Foster.

25           THE COURT:  All right.

1             MR. NAYBACK:  May it please the Court.  I'll

2     proceed when the Court is ready.

3             THE COURT:  You may proceed.

4             MR. NAYBACK:  Thank you.  The United States

5     calls Chase Foster.

6             THE COURT:  Mr. Coberly?

7             MR. COBERLY:  Well, just a minute, please.  If

8     we're going to do housekeeping, I would like to go ahead

9     and tender -- I do have a couple of additional exhibits.

10    Mr. Nayback has agreed.  I move to have them admitted.

11    It's W, X, Y, and Z.

12            THE COURT:  Let me see them.

13            MR. COBERLY:  They are W, X, Y, and Z.  Your

14    Honor, do you have the exhibit binder from the last

15    hearing?  I have another copy.

16            THE COURT:  Which one are you referring to?

17            MR. COBERLY:  It would be the Defendant's

18    Exhibits tabbed A through V.

19            THE COURT:  I have the binder.

20            MR. COBERLY:  Okay.

21            THE COURT:  But what are you asking about?

22            MR. COBERLY:  Well, I've got four more exhibits

23    here.

24            THE COURT:  Okay.

25            MR. COBERLY:  W, X, Y, and Z.

1                    THE COURT:  All right.

2                    MR. COBERLY:  I don't think the government is

3    objecting.  What W is, is the Federal Psychophysiological

4    Detection of Deception Examiner Handbook that Mr. Nayback

5    referred me to in the last hearing.

6                    Exhibit X is the FBI Polygraph Examiner Manual

7    that, as the Court recalls, Mr. Nayback referred this to

8    me.  It's a redacted version.  It's a public version.

9                    And Exhibits Y and Z are Dr. Honts' score charts

10   which were disclosed to the government last month.

11                   THE COURT:  All right.  Any objection?

12                   MR. NAYBACK:  No objection, Your Honor.

13                   THE COURT:  All right.  Exhibits W, X, Y, and Z

14   are admitted.

15                   MR. COBERLY:  Thank you, Your Honor.  If I may?

16                   THE COURT:  And tell me again what W is.

17                   MR. COBERLY:  W is a Federal Psychophysiological

18   Detection of Deception Examiner Handbook.  As I understand

19   it, it's the federal government's overall handbook for

20   polygraph examinations.

21                   THE COURT:  Okay.  Exhibits W, X, Y, and Z are

22   admitted.

23                   MR. COBERLY:  Thank you, Your Honor.

24                   (Defendant's Exhibits W, X, Y, and Z admitted

25                   into evidence.)

```
 1                    THE COURT:  All right.  Please call your
 2     witness.
 3                    MR. NAYBACK:  Thank you, Your Honor.  The United
 4     States calls Supervisory Special Agent Chase Foster to the
 5     stand.
 6                    COURTROOM DEPUTY CAROL WALKER:  Please raise
 7     your right hand.  You do solemnly swear that your
 8     testimony in this matter shall be the truth, the whole
 9     truth, and nothing but the truth, so help you God?
10                    THE WITNESS:  I do.
11                    COURTROOM DEPUTY CAROL WALKER:  Please be
12     seated.  Please state your name and spell your last name
13     for the record.
14                    THE WITNESS:  My name is Chase, C-H-A-S-E,
15     Foster, F-O-S-T-E-R.
16                          CHASE FOSTER,
17          after having been first duly sworn under oath,
18          was questioned and testified as follows:
19                          DIRECT EXAMINATION
20     BY MR. NAYBACK:
21     Q.   Sir, for whom do you work?
22     A.   I am a Supervisory Special Agent of the Federal
23     Bureau of Investigation.
24     Q.   How long have you been with the FBI?
25     A.   Twenty-nine years.
```

1    Q.   Where do you currently work?

2    A.   I am assigned to the FBI Polygraph Unit, but detailed

3    to the National Center for Credibility Assessment, which is

4    at Fort Jackson, South Carolina.

5    Q.   Okay.  Prior to working at -- so do you refer to that

6    as the NCCA or NCCA?

7    A.   Correct.

8    Q.   Prior to working at NCCA, where did you work?

9    A.   I was at the FBI Polygraph Unit at FBI Headquarters,

10   Washington, D.C.

11   Q.   Okay.  And before you were in Washington, D.C., at

12   the Polygraph Unit, where were you assigned?

13   A.   I was at Quantico, Virginia, at the Critical Incident

14   Response Group as their primary legal advisor.

15   Q.   Okay.  Are you a lawyer, as well?

16   A.   I am, South Carolina Bar.

17   Q.   Okay.  Do you have any experience teaching ethics at

18   the FBI Academy?

19   A.   Yes.  Prior to being assigned to the Critical

20   Incident Response Group as their legal advisor, I was an

21   ethics instructor at the FBI Academy.

22   Q.   Do you also teach ethics at the NCCA?

23   A.   I do.  That is part of my duties there.

24   Q.   Okay.  Were you ever in the Birmingham division of

25   the FBI?

1      A.    Yes, I've been assigned to field investigations,
2   Birmingham division, as well as the San Diego division.
3      Q.    What kinds of crimes did you investigate, Special
4   Agent Foster?
5      A.    Primarily violent crime; bank robberies; kidnapping;
6   extortion; street gang task force.  And during my assignment
7   in the Birmingham division, also a variety of other matters;
8   civil rights; white collar.
9           But my background is primarily violent crime.
10     Q.    Thank you, sir.  Did you serve a stint at the General
11   Counsel's Office at the FBI?
12     A.    I did.
13     Q.    Can you describe that experience?
14     A.    I was assigned to the General Counsel's Office at FBI
15   Headquarters after serving in the San Diego division.  I was
16   assigned to the DNA Legal Assistance Unit.
17     Q.    And back in 1987, where did you start your career as
18   an FBI agent?
19     A.    I was assigned from the Academy to my first office,
20   San Diego, California.
21     Q.    Okay.  Can you briefly describe your educational
22   background for the Court?
23     A.    I have a bachelor of science in civil engineering
24   from Clemson University, 1983; and then a juris doctor,
25   University of South Carolina, in 1986.

1   Q.   Thank you, sir.  Can you describe in a little bit
2   more detail what you do for the NCCA currently?
3   A.   I am a polygraph laboratory instructor, where I
4   provide hands-on instruction to polygraph students in the
5   administration and operation of polygraph instrument, as
6   well as critiquing their exams and, as I mentioned, also the
7   ethics instructor.
8   Q.   Okay.  You have administered polygraph examinations,
9   yourself, have you not?
10   A.   I have.  I still do.
11   Q.   How many?
12   A.   Approximately 500.
13   Q.   Okay.  And you also teach new FBI agents how to
14   administer polygraphs; is that right?
15   A.   Yes.  Not only FBI students at the school, but
16   students from any of the other federal organizations who
17   have polygraph programs.
18   Q.   And you are anticipating my next question, but can
19   you describe for the Court what the NCCA -- what other
20   agencies send detailees to the NCCA?
21   A.   It is the sole polygraph school for the federal
22   government; so therefore, any federal agency with a
23   polygraph program must send their examiners to NCCA.
24   Q.   Describe how many federal agencies or which federal
25   agencies send folks, or as many as you can recall.

1    A.   Right.  Really, any federal agency you might can

2    think of, whether it is within the intelligence community or

3    federal law enforcement; so therefore, FBI, Secret Service,

4    DEA, ATF, CIA, DIA, NSA.

5              Any federal agency with a polygraph program

6    participates in the school.

7    Q.   Okay.  And do all of those agencies use polygraphs in

8    law enforcement work?

9    A.   Certainly law enforcement, as well as national

10   security.

11   Q.   Okay.

12   A.   So some agencies do not have a law enforcement

13   mandate.  The FBI has both.  But law enforcement and

14   national security matters.

15   Q.   So polygraphs are used in counterintelligence and

16   espionage type cases?

17   A.   Yes, criminal matters, counterintelligence,

18   counterterrorism, screening of applicants, as well as

19   screening of on-board employees.

20   Q.   So just to clarify, the FBI and these other agencies

21   use polygraphs to --

22              MR. COBERLY:  Objection; leading.

23              MR. NAYBACK:  Okay.

24              THE COURT:  Overruled.

25              MR. NAYBACK:  Thank you, Your Honor.


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                FEDERAL OFFICIAL COURT REPORTER
                333 Lomas Boulevard, Northwest
                Albuquerque, New Mexico  87102

1      Q.    These agencies use polygraphs to screen applicants

2      and new employees; is that right?

3      A.    Correct.  Every applicant must successfully complete

4      a polygraph examination in order to proceed through the

5      hiring process.

6      Q.    Can you describe what a polygraph machine tests for,

7      physiologically speaking?

8      A.    It is a recording device for the examinee's

9      physiology, so it monitors changes in heart rate and blood

10     pressure, sweat gland activity, as well as respiration.

11     Q.    And do you train new students at the NCCA how to

12     hand-score polygraph data?

13     A.    Yes.  Once the data is collected, it then must be

14     evaluated for indications of deception or no deception, and

15     that is done through a process of hand-scoring through

16     physiological reactions that are present on the polygraph

17     charts.

18     Q.    And does the FBI use a certain software to manage

19     that raw data?

20     A.    Yes.  The FBI presently uses the Lafayette polygraph

21     instrument, Lafayette software, which is run on a laptop

22     computer.

23     Q.    Okay.  How many polygraphs have you reviewed at NCCA?

24     A.    At NCCA, part of my duties training students there, I

25     have done quality control review of over 2,000 polygraph

1    exams.

2    Q.    So you are familiar with the quality control

3    procedures employed by NCCA and the FBI?

4    A.    Yes.

5    Q.    Can you describe for the Court, after an FBI agent in

6    Albuquerque administers a polygraph examination, who

7    reviews their scoring?

8    A.    The examination is then sent, in the case of the

9    Albuquerque division, is then sent to the polygraph manager

10   for the South Central Region.  That polygraph manager would

11   review the questions, the charts, the scoring, the report,

12   and then render the final opinion for that exam.

13   Q.    Okay.  So every polygraph exam administered by the

14   FBI is reviewed by a supervisory special agent; is that

15   correct?

16   A.    Correct.

17   Q.    The same title that you have?

18   A.    Correct.

19   Q.    You teach those regional managers?

20   A.    I have trained some of them, yes.  I have been in the

21   program long enough to have trained several of our current

22   regional managers.

23   Q.    Have you ever served as regional manager?

24   A.    I have.  I have conducted quality review while at FBI

25   Headquarters.  I've reviewed approximately 315 FBI exams.

1    Q.   Thank you.

2             MR. NAYBACK:  Your Honor, at this time I move

3    the Court to recognize Chase Foster as an expert in

4    polygraph examination, scoring, and quality assurance,

5    with an ability to testify and give opinions about the

6    polygraph given to defendant Jamaico Tennison, as well as

7    defense expert Honts' report in this case.

8             THE COURT:  Do you wish to voir dire the

9    witness, Mr. Coberly?

10            MR. COBERLY:  No, Your Honor.

11            THE COURT:  I do accept him as proffered here.

12   He is recognized as an expert.

13            MR. NAYBACK:  Thank you, Your Honor.

14   Q.   (By Mr. Nayback)  Special Agent Foster, before coming

15   here today, did you review the materials in this case?

16   A.   I did.  I reviewed Special Agent Sullivan's polygraph

17   charts, her questions, her scoring, as well as the report of

18   Dr. Honts.

19   Q.   Okay.  And did you have an opportunity to look

20   closely at the raw data and what Special Agent Sullivan

21   did when she scored that data?

22   A.   Yes.  That was the first step of the process, was to

23   review the polygraph charts that she collected.

24   Q.   And was it your opinion that she administered a fair

25   and accurate polygraph examination?

1     A.   Yes.  After reviewing the charts, the questions that

2     were asked, my opinion is that it was a valid exam.

3     Q.   Okay.  And did you also look at the raw data,

4     yourself, and hand-score it, yourself?

5     A.   I did.  Prior to reviewing Special Agent Sullivan's

6     scores, I scored the charts independently, myself,

7     hand-scored them.

8     Q.   And so you didn't look at how Special Agent Sullivan

9     hand-scored the exam before you did?

10    A.   That's correct.  That is well understood within the

11    quality control environment, that the QC reviewer should not

12    look at the examiner's scores before scoring the charts,

13    himself.

14    Q.   And so as a part of the quality control process, did

15    you also then look at Special Agent Sullivan's scores

16    afterwards?

17    A.   Correct.

18    Q.   Were there variations between the two?

19    A.   There -- we did have variations at individual

20    interpretations of various physiological reactions over the

21    course of the three charts.

22    Q.   In your opinion, were they significant differences?

23    A.   No, they were not significant, in that we did not

24    have any contradictions.  I did not have a plus where she

25    had a minus; nor did she have a minus where I had a plus.

1    Q.   Can I just ask you, maybe for the Court's

2    edification, can you describe what a plus and what a minus

3    represents?

4    A.   A minus would be indicative of deception, that the

5    physiological reaction at the relevant question is greater

6    than the physiological reaction at a comparison question.  A

7    plus would be indicative of no deception, in that the

8    physiological reaction at a relevant question is less than

9    the reaction at a comparison question.

10   Q.   Thank you.  Special Agent Foster, do I have it right

11   that when a special agent or a defense expert is

12   hand-scoring raw data from a polygraph, that there is some

13   level of human subjective interpretation?

14   A.   Absolutely.  It's been described as an art, as well

15   as a science, so certainly within the arts component there

16   is human subjectivity.

17   Q.   Okay.  So hypothetically, if we have a new case and a

18   new polygraph next week and you and Special Agent Sullivan

19   and Dr. Honts all hand-score it, would it surprise you if

20   all three scores were varied somewhat?

21   A.   It would not surprise me.  That would be expected, to

22   have slight variations in scoring individual reactions.

23   Q.   Other than -- so let me ask you this:  At the NCCA,

24   what scoring systems do you use?

25   A.   We use the Federal Three-Position Scale, the Federal

1    Seven-Position Scale, and also Global Analysis, which does

2    not involve numerical scoring.

3         Q.   Are there other ways to score a polygraph exam, other

4         than hand-scoring it and running it through a scoring

5         methodology?

6         A.   In addition to hand-scoring, there are computerized

7    algorithms that will interpret the polygraph charts and

8    render an opinion of deception, no deception, or

9    inconclusive.

10        Q.   So can you tell me how many polygraph scoring methods

11        there are?  Let's start with the hand-scoring method and

12        then scoring systems.

13        A.   As far as hand-scoring, as I mentioned, there is the

14   Federal Three-Position Scale, the Federal Seven-Position

15   Scale, Global Analysis; and then two methods that are not

16   used at the polygraph school, the Utah Method and the

17   Empirical Scoring System.

18        Q.   If I'm correct, the Utah and the Empirical Scoring

19        System are the scoring methods that Dr. Honts used; is

20        that correct?

21        A.   That is correct.

22        Q.   Those are not endorsed by the NCCA, are they?

23        A.   They are not endorsed, nor taught at the school.

24        Q.   Why not?

25        A.   Those methods increase the likelihood that the

1    polygraph charts of a deceptive individual could be

2    evaluated as being indicative of no deception, and in

3    matters of national security and serious criminal cases,

4    that's unacceptable.

5        Q.   What does "inconclusive" mean to you, Special Agent

6        Foster, as a test result?

7        A.   The test result of inconclusive is possible with

8    hand-scoring as well as the computerized algorithms.

9    Essentially, it means that the scores are not negative

10   enough to be indicative of deception nor positive enough to

11   be indicative of no deception; and therefore, render an

12   opinion of inconclusive, also known as no opinion.

13       Q.   And you reviewed Dr. Honts' reports that he tendered

14       in this case, correct?

15       A.   Yes, I have.

16       Q.   What scoring methods did he use?

17       A.   He utilized the Utah Method and the Empirical Scoring

18   System.

19       Q.   What were his results?

20       A.   Under both methods, his result is inconclusive.  I'm

21   not sure if he referred to it as inconclusives or no

22   opinion.

23       Q.   Okay.

24       A.   But same difference.

25       Q.   Not that the defendant -- what is it, the other

1    category?

2    A.    The other possibilities would have been deception

3    indicated or no deception indicated.

4    Q.    Okay.

5    A.    But his opinion under both methods was no opinion or

6    inconclusive.

7    Q.    Okay.  Are you familiar with the Lafayette software

8    used to manage the polygraph testing employed by the FBI?

9    A.    I am.  I've used it for many years.

10   Q.    Are there other software systems used by the FBI, or

11   is it just Lafayette?

12   A.    I was initially trained on the Axciton System, but

13   eventually our program transitioned completely to Lafayette.

14   So there's the Lafayette Instrument Company, Axciton,

15   Limestone, and Stoelting.

16   Q.    Are you trained by someone at Lafayette, or by some

17   other individuals, as to how to use their software?

18   A.    Yeah, I was trained on the Lafayette System at FBI

19   Headquarters when we -- when I transitioned from Axciton to

20   Lafayette, so I was trained by individuals who had been

21   trained by Lafayette.

22   Q.    And how long had they been using that software, Mr.

23   Foster?

24   A.    Let's see.  In my almost ten years in the polygraph

25   program, I have used Lafayette for seven years.

1    Q.   Okay.  Are you familiar with any algorithms that are

2    installed on the Lafayette software system?

3    A.   Yes.  The Lafayette polygraph software contains two

4    computerized scoring algorithms.  One is PolyScore, which

5    was produced by Johns Hopkins Applied Physics Laboratory,

6    and the other is the Objective Scoring System-3.

7    Q.   Okay.  So can you describe for the Court, if you can,

8    how the algorithm works, versus hand-scoring and using the

9    Federal Three-Position Scale?

10   A.   Hand-scoring involves the examiner reviewing the

11   physiological reactions at the relevant questions, and then

12   comparing those by sight to the physiological reactions at

13   the comparison questions, and then rendering a score at each

14   reaction of plus, minus, or zero.

15            On the other hand, the computer algorithm

16   compares the reactions mathematically, with very little

17   human input.

18   Q.   Okay.  So did you run Mr. Tennison's raw data through

19   the algorithm on the Lafayette software?

20   A.   I did.  After hand-scoring the charts, I then

21   utilized the computerized algorithms, both PolyScore and

22   Objective Scoring System-3, and the algorithm concluded that

23   deception was indicated.

24            MR. NAYBACK:  Approach the witness?

25            THE COURT:  You may.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1              MR. NAYBACK:  Thank you.  You have copies,
 2      right, Todd?
 3              MR. COBERLY:  Yes.
 4      Q.   (By Mr. Nayback)  I'm showing you what has been
 5      marked for identification as Government's Exhibits 15 and
 6      16.  Will you look at both of those, and when you're done
 7      looking at them -- take your time -- tell me when you're
 8      done.
 9      A.   Yes, I recognize them.
10      Q.   And Government's Exhibit 15, sir, what is that?
11      A.   This is a screen shot of one of the computerized
12      algorithms.  As I mentioned, there are two algorithms within
13      Lafayette software, PolyScore and OSS-3, Objective Scoring
14      System-3.
15      Q.   Yes.
16      A.   Within OSS-3 there are several methods that can be
17      selected.  This Probability Analysis Method is contained
18      within the OSS-3 algorithm.  And once the Probability
19      Analysis Method is selected, you then must indicate which
20      format is being utilized.
21              There are various polygraph testing formats, and
22      you must indicate whether it is the Zone format or the
23      MGQT format.
24      Q.   So in Government's 15, which format was used?
25      A.   Government's 15 is the Probability Analysis Method
```

1    for the MGQT format.

2        Q.   And Government's Exhibit 16?  Which method was used?

3        A.   It is the Probability Analysis Method for the Zone

4    format.

5             MR. NAYBACK:  Your Honor, at this time I move

6    Government's Exhibits 15 and 16.

7             THE COURT:  All right.  Do you wish to comment

8    on this?

9             MR. COBERLY:  Same objections as before, Your

10   Honor.

11            THE COURT:  Put it up on the screen, Mr.

12   Nayback.

13            MR. NAYBACK:  Thank you.

14            MR. COBERLY:  Your Honor, we'll withdraw the

15   objection.

16            THE COURT:  All right.  Is your tender to both

17   Exhibits 15 and 16?

18            MR. NAYBACK:  It is, Your Honor.

19            THE COURT:  Just give me a moment here.

20            MR. NAYBACK:  Of course, Your Honor.

21            THE COURT:  Just give me a moment.

22            All right.  There being no objection, I do admit

23   Exhibits 15 and 16.

24            (Government's Exhibits 15 and 16 admitted into

25            evidence.)

1          MR. NAYBACK:  Thank you, Your Honor.

2          THE COURT:  Tendered by the government.  All

3     right.  Let us continue.

4          MR. NAYBACK:  Thank you.

5     Q.   (By Mr. Nayback)  Special Agent Foster, the result on

6     both 15 and 16, what were those?

7     A.   The result on both is significant reactions.

8     Q.   Okay.  What does significant reactions mean in the

9     polygraph nomenclature?

10    A.   The significant reactions conclusion applies to

11    questions 7R and 5R, and it would be synonymous with

12    deception indicated at the physiological reactions to both

13    of those questions.

14    Q.   And is there any percentage chance affiliated with

15    that likelihood?

16    A.   It would take someone with more knowledge of

17    statistics than I to evaluate the statistics provided within

18    this method.  I could -- I am familiar with the statistics

19    provided under the Objective Scoring System-3.

20    Q.   And what were those?

21    A.   The OSS-3 concluded that there is a less than .1

22    percent chance that the reactions were created by a truthful

23    individual.

24    Q.   Okay.  What was -- in both Government's 15 and 16,

25    what is the relevant question 7R?

1    A.    If I may refer to my report?

2    Q.    If you could just refer to Government's Exhibit 15?

3    A.    Oh, I see.  I'm sorry.

4    Q.    And 16?

5    A.    I did not see they're listed at the lower edge of the

6    report.

7    Q.    That's fine, sir.

8    A.    Question 7R is, "Have you ever touched K.'s vaginal

9    area for sexual reasons?"

10   Q.    Okay.  And 5R?

11   A.    5R is, "Have you ever touched K.'s vagina over her

12   clothing?"

13   Q.    And there were significant reactions as to both

14   questions when you ran this algorithm; is that correct?

15   A.    That is correct.  It does list the result

16   independently for 7R and for 5R, and both are indicated as

17   significant response.

18   Q.    Okay.  Now, changing subjects, you're familiar with

19   the scoring methods that Dr. Honts used in this case,

20   correct?

21   A.    I am.

22   Q.    The Utah and the ESS, correct?

23   A.    Correct.

24   Q.    Did you have a chance to run your hand-scores,

25   Special Agent Foster, through the Utah and the ESS?

1      A.    I did, yes.  I scored the charts using the

2    Three-Position Scale -- the Federal Three-Position Scale,

3    the Federal Seven-Position Scale, as well as the Utah Method

4    and ESS.

5      Q.    Let's talk about the Utah Method.  What were your

6      results when you ran your hand-scores through the Utah

7      Method?

8      A.    My result was deception indicated.

9      Q.    And with regard to the ESS, the other test that Dr.

10      Honts used, how did your hand-scores result when you ran

11      it through the ESS System?

12      A.    My result under ESS was deception indicated.

13      Q.    Okay.  Let's talk about the Utah Scoring Method.  Are

14      there scoring methods that are supposed to be used in a

15      certain format?

16      A.    Yes.  The Utah Method is to be used with the Utah

17    Zone format.

18      Q.    And the Utah Zone format is what Dr. Honts used to

19      score this polygraph data; is that correct?

20      A.    I am perplexed by that, in that the Utah Zone format

21    utilizes three relevant questions.  The test administered by

22    Special Agent Sullivan utilized only two relevant questions.

23    So I am unsure as to how he is applying the Utah Scoring

24    System to a test that is not the Utah format.

25      Q.    Okay.

1     A.   But for the sake of argument, I did apply the Utah

2     scoring thresholds to my scores, and the result was

3     deception indicated.

4     Q.   Okay.

5     A.   For the sake of argument.

6     Q.   Did you prepare a report for this case?

7     A.   I did.

8     Q.   Okay.  Let's talk first about the FBI Modified

9     General Question Test.  Can you describe that for me?

10    A.   The FBI Modified General Question Test, also known as

11    the FBI MGQT, is a variation of the Air Force MGQT which is

12    taught at NCCA.

13    Q.   Okay.  Is that a federally approved comparison

14    question test?

15    A.   It is, as the FBI polygraph program, like all federal

16    polygraph programs, is inspected by NCCA every two years,

17    and they review our exams, formats, our scoring, our

18    policies and procedures, and it has always been approved

19    during these inspections.

20         So yes, it is federally approved.

21    Q.   And how often does that quality assurance take place?

22    A.   Every two years.

23    Q.   Okay.  Can you tell me a little bit -- backing up,

24    the NCCA is the only school for government agencies; is

25    that correct?

1    A.   That's correct, mandated by Congress to be the sole

2    federal polygraph training facility.

3    Q.   Now, are there other places where an individual can

4    go to get trained on how to perform polygraph

5    examinations?

6    A.   Yes.  There are private polygraph schools, as well as

7    one run by the Texas Department of Public Safety.

8    Q.   Okay.  Could you venture a guess as to how many of

9    those other schools are out there?

10   A.   I would guess that there are, as far as schools that

11   have been approved by the American Polygraph Association, I

12   would hazard a guess as to ten.

13   Q.   Now, can an FBI agent go to one of those schools and

14   perform polygraphs as an FBI special agent?

15   A.   No.  We have had agents who attended a private

16   polygraph school prior to joining the FBI, but once they are

17   selected for the FBI polygraph program, they then must

18   attend NCCA for the 14-week training program.

19   Q.   Okay.

20   A.   To be federally certified.

21   Q.   Now, let me ask you about the Federal Three-Position

22   Numerical Evaluation Scale.  Would you describe how it's

23   designed as far as determining deception on a polygraph

24   examinee, versus a Utah or an ESS?

25   A.   The Federal Three-Position Scale is more

1    conservative, in that it decreases the likelihood of a

2    deceptive individual being able to pass the test.

3        Q.   Okay.  And how would you characterize both the ESS

4        Method and the Utah Scoring Method, versus what the

5        federal government uses?

6        A.   The Utah Method and the ESS Method raise the bar for

7    a conclusion of deception indicated, and lower the bar for a

8    conclusion of no deception indicated.

9        Q.   Thank you.  Can we talk about, briefly -- you may

10       have seen in Dr. Honts' report, and I don't think I've

11       asked you about it yet.  What is a movement sensor device

12       as it relates to the rest of the polygraph machine?

13       A.   The movement sensor device is a cushion, a pad that

14   is placed in the seat of the polygraph exam chair, and its

15   purpose is to detect movement by the examinee.

16       Q.   And what is it attempting to detect?

17       A.   Examinees are instructed to remain perfectly still

18   during the examination; so therefore, the movement sensor

19   device is to detect examinee movement that could interfere

20   with the examination and could also likely be indicative of

21   polygraph countermeasures, a deliberate attempt on the part

22   of the examinee to defeat the test.

23       Q.   Can you describe for the Court what an individual

24       might do in order to use a countermeasure when taking a

25       polygraph examination?

1    A.   There are mental countermeasures as well as physical

2    countermeasures.  So the movement sensor device, of course,

3    is to detect physical countermeasures, which would be an

4    examinee clenching muscles in their legs or buttocks, or

5    pressing with their toes during the administration of the

6    test in order to artificially create a physiological

7    reaction as to a particular question.

8    Q.   Okay.  And a movement sensor device cannot detect

9    mental countermeasures; is that correct?

10             MR. COBERLY:  Objection; leading.

11             THE COURT:  Rephrase the question, counsel.

12             MR. NAYBACK:  Thank you.

13   Q.   You mentioned in your earlier testimony that there

14   are mental countermeasures.  Is there a device associated

15   with the polygraph machine or the MSD that can detect such

16   mental countermeasures?

17   A.   There is no device for that.  It is incumbent upon

18   the examiner to be mindful of that possibility, which should

19   exhibit itself in abnormal physiology that a trained

20   examiner would detect.

21   Q.   Does the MSD in any way affect the rest of how the

22   polygraph machine works?

23   A.   No, it does not affect any of the other components,

24   the cardiovascular component, the electrodermal activity

25   component, nor the respiratory component.  It is

1    independent.  It is an independent component of the exam.

2        Q.    So the MSD is not scored as a part of the

3    physiological responses; is that right?

4        A.    That's correct.  It is not scored numerically, as are

5    the other components of the exam.

6        Q.    What is a CV channel?

7        A.    That is the cardiovascular channel.  That would be

8    the changes in heart rate and blood pressure.

9        Q.    When you looked at Special Agent Sullivan's

10   examination of the defendant, Jamaico Tennison, did you

11   notice any irregularities that would cause you concern

12   regarding the CV channel?

13       A.    The only irregularity that I noticed in the CV

14   channel was, I believe there were some movements in the

15   cardiovascular channel at certain question presentations on

16   some of the three charts.  I could look at my report and

17   tell you exactly where.  But there was a movement, one or

18   two movements in the cardiovascular channel, which would

19   render that channel incapable of being scored at that asking

20   on that chart.

21            THE COURT:  May I ask a question here, counsel,

22   just to clarify, so I can understand?  Is the CV channel,

23   is that something that would indicate, when you talk about

24   cardiovascular channel, changes in blood pressure?  Or

25   it's heartbeats?  Or what?

```
 1                    THE WITNESS:  Your Honor, it is monitored with a
 2      standard blood pressure cuff.
 3                    THE COURT:  So that's what it is?
 4                    THE WITNESS:  It is.
 5                    THE COURT:  Okay.
 6                    THE WITNESS:  It's a cuff that's inflated on the
 7      examinee's arm, and it would detect changes in relative
 8      blood pressure and heart rate.
 9                    THE COURT:  Okay.
10                    THE WITNESS:  As questions and answers are
11      presented.
12                    THE COURT:  Got it.  All right.
13      Q.   (By Mr. Nayback)  Special Agent Foster, moving on,
14      what were relevant questions 5R and 7R in the examination
15      provided by Special Agent Sullivan?
16      A.   Question 5R, "Have you ever touched K.'s vagina over
17      her clothing?"  Question 7R, "Have you ever touched K.'s
18      vaginal area for sexual reasons?"
19      Q.   How are FBI agents trained to come up with those
20      questions with an examinee?
21      A.   Test question construction is a very crucial part of
22      the examination.  The relevant questions must pertain
23      directly to the matter under investigation; they must be
24      clear and concise; and the examinee must have an absolute
25      understand of the meaning of those questions.
```

1    Q.    Okay.  Were you present for Special Agent Sullivan's

2    testimony?

3    A.    I was.

4    Q.    Okay.  And do you recall her commenting on what she

5    did with the defendant, Jamaico Tennison, in order to

6    arrive at these questions?

7    A.    As I recall, it was part of her pre-test examination,

8    where of course the case facts are reviewed with the

9    examinee; and then the formulation or the wording of the

10   relevant questions is discussed with the examinee; and all

11   terms contained within those questions are defined for the

12   examinee.

13   Q.    How is that important for an FBI polygrapher and an

14   examinee?

15   A.    There must be no doubt between examiner and examinee

16   as to the meaning of a question or of any word within that

17   question.  That would apply to both the relevant questions

18   as well as the comparison questions.

19   Q.    And turning to that, comparison questions 4C and 6C,

20   did you find those appropriate as Special Agent

21   Sullivan --

22   A.    Yes, I did find them appropriate.  Under federal

23   standards, she has the option of using comparison questions

24   related to sexual activity, or she may use lie comparisons.

25   In this case, she chose to utilize lie comparisons, rather

1    than comparison questions dealing with sexual activity.

2        Q.    Can you tell the Court why comparison questions are

3        important when administering a polygraph examination?

4        A.    A comparison question is designed to elicit a "No"

5    answer from the examinee, but to which he is probably lying;

6    and therefore, it will generate a physiological reaction at

7    those comparison questions during the exam associated with

8    telling that probable lie.

9        Q.    Okay.  So in a context where we're talking about a

10       sexual crime against a child, did you find 4C and 6C, the

11       comparison questions, appropriate?

12       A.    I did find them appropriate, that they present a

13   clear dichotomy from the relevant issue and there could be

14   no confusion in the mind of the examinee between the

15   relevant questions and the comparison questions.

16       Q.    Moving on, Special Agent Sullivan used which scoring

17       scale?

18       A.    She used the Federal Three-Position Scale, which

19   assigns either a plus 1, a zero, or a minus 1.

20       Q.    And where is the threshold for deception indicated?

21       A.    Deception indicated under the Federal Three-Position

22   Scale is minus 3 or less total at either relevant

23   question.

24       Q.    Okay.  And what were Special Agent Sullivan's spot

25       totals at 5R and 7R?

1    A.   I know that they were minus 4 and minus 3.  I cannot

2    remember which is 5 and which is 7 without referring to my

3    report.

4    Q.   Okay.

5    A.   But one was minus 4, and the other was minus 3.

6    Q.   Are those both deception indicated?

7    A.   They are.

8    Q.   For both relevant questions?

9    A.   Yes.

10   Q.   Okay.  So can you describe how the FBI scoring, how

11        it does not utilize a grand total or a total score?  Can

12        you describe the differences?

13   A.   The federal scoring methodology for the MGQT relies

14   upon the total at each question independently.  The total --

15   the question totals are not added together to form a grand

16   total.

17             And the Utah Method and the ESS Method do

18        combine the question totals for a grand total.

19   Q.   So hypothetically, an individual taking an exam and

20        it being scored by Utah or ESS, they could fail one

21        question significantly, but then pass another question,

22        and so the entire score might be inconclusive or no

23        deception indicated?

24   A.   Yes.  It certainly could happen that the examinee has

25   a very low score at one relevant question -- minus 3, minus

1    4, minus 5, for example -- and yet has a positive score at

2    the other relevant question.

3              And under the Utah Method or ESS Method, those

4    two scores would be combined; and therefore, the positive

5    score at one relevant question would negate the negative

6    score at the other relevant question, and rather than a

7    conclusion of deception indicated, the conclusion would be

8    inconclusive.

9    Q.   Thank you.  And I'm trying not to cover old ground

10   here, but in your report you talked about the Lafayette

11   polygraph software, did you not?

12   A.   I did.

13   Q.   And that was submitted to defense counsel long ago,

14   correct?

15   A.   Yes.  The raw data was provided, and of course it had

16   access to Lafayette software.

17   Q.   Okay.  So you ran the PolyScore and Objective Scoring

18   System?

19   A.   Yes.  Those are the two computerized algorithms

20   within Lafayette software.

21   Q.   And the PolyScore for Windows, what was the result?

22   A.   The result was --

23             MR. COBERLY:  Judge, this is -- I believe it is

24   asked and answered already.

25             THE COURT:  Overruled.

1     A.    The result under PolyScore was 99 percent deception

2     indicated.

3     Q.    Okay.  And the OSS, the Objective Scoring System,

4     what was that result?

5     A.    It was significant reaction, less than .1 percent

6     that the reactions were created by a truthful individual.

7     Q.    Now, that is the same -- those are two algorithms

8     that you commented on in your report, correct?

9     A.    Correct.

10    Q.    And are those separate and apart from those used in

11    Government's Exhibits 15 and 16?

12    A.    At the time that I prepared my report, I did not

13    realize that within OSS-3 there was a drop-down menu where

14    various methods could be selected, and only after preparing

15    the report did I find this drop-down menu within OSS-3, and

16    that is when I saw and selected the Probability Analysis

17    Method that is reflected in Government's 15 and 16.

18          But if I may be clear?  When you initially --

19    when I initially ran the OSS-3, it has a default method,

20    and so that is what I initially utilized and that is what

21    produced the less than .1 percent chance of a truthful

22    individual, was the default.

23    Q.    And there's no hand-scoring involved in the OSS,

24    correct?

25    A.    There is no hand-scoring.  The examiner may -- the

1    examiner is required to select the charts that are to be

2    evaluated, and the examiner may tell the algorithm to ignore

3    certain reactions if the examiner believes those reactions

4    are invalid.

5         Q.   Okay.

6         A.   You can exclude particular channels from being

7    evaluated on particular charts.  If, for example, there was

8    a movement at that spot on that chart, you may tell the

9    algorithm to ignore that reaction.

10        Q.   And when you ran each of these algorithms that you

11        ran, did you tell the software to ignore any channels?

12        A.   I believe, yes, on one.  There was one asking of

13   question 5R was artifacted.

14        Q.   Okay.  When you hand-scored Jamaico Tennison's

15        polygraph and ran it through the federally approved

16        scoring method, what were your results?

17        A.   My results were deception indicated.

18        Q.   Okay.

19        A.   At both questions.

20        Q.   And did you carefully review Special Agent Sullivan's

21        administration of this polygraph exam with regard to

22        Jamaico Tennison?

23        A.   I did.

24        Q.   Is it your opinion, Special Agent Foster, that she

25        ran a valid examination?

1      A.    Yes.  Based upon her charts, her questions, she

2    conducted a valid exam.

3      Q.    Okay.  In your opinion, Special Agent Foster, did

4    Jamaico Tennison fail this polygraph examination?

5      A.    Yes, he failed the exam.

6      Q.    And as a result, do you agree that interrogation

7    afterwards was warranted?

8      A.    Yes.  Absolutely.  The examiner makes a decision,

9    based upon the charts collected, whether to proceed with the

10   post-test interrogation.

11            And in this case it was absolutely called for,

12   based upon those charts.

13     Q.    Thank you, Special Agent.

14            MR. NAYBACK:  Court's indulgence?  One moment?

15            THE COURT:  You may, counsel.

16            MR. NAYBACK:  I pass the witness, Your Honor.

17            THE COURT:  Let's take a 15-minute recess at

18   this point, and we will then resume.  We'll be in recess

19   for 15 minutes.

20            (Recess from 10:02 a.m. until 10:20 a.m.)

21            THE COURT:  All right.  Let us continue here.

22   You may be seated.

23            MR. COBERLY:  Thank you.

24            THE COURT:  You may proceed.

25            MR. COBERLY:  Thank you.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1                          CROSS-EXAMINATION
 2      BY MR. COBERLY:
 3      Q.   Good morning, Agent Foster.
 4      A.   Good morning.
 5      Q.   Agent Foster, you don't have any degrees in
 6      psychology, do you?
 7      A.   That is correct.
 8      Q.   You don't have any training in psychology, do you?
 9      A.   Other than that provided during my 14-week training
10      at NCCA.
11      Q.   So you don't have any college courses?
12      A.   No.  My civil engineering curriculum was not heavy in
13      psychology.
14      Q.   Have you ever written any articles or papers related
15      to polygraphy?
16      A.   No.
17      Q.   Have you ever presented any research papers related
18      to polygraphy?
19      A.   No.
20      Q.   Have you ever conducted any research related to
21      polygraphy?
22      A.   No.
23      Q.   Do you have any awards related to polygraphy?
24      A.   No.
25      Q.   Sir, what is your annual salary with the FBI?
```

1    A.    It's a Grade 14, Step 10, which is approximately

2    $140,000, I believe.

3    Q.    So you were here for Agent Sullivan's testimony,

4    right?

5    A.    Yes.

6    Q.    And you heard her testify about her receiving

7    incentive awards?

8    A.    Yes.

9    Q.    Have you ever received an incentive award?

10   A.    I have received several incentive awards, as well as

11   a quality step increase.

12   Q.    When was the most recent incentive award you

13   received?

14   A.    Let's see.  It was from the Polygraph Unit.  I would

15   say five years ago.

16   Q.    And what was that award for?

17   A.    It was -- at the time, we were sending a lot of FBI

18   agents through the school at NCCA, and my unit chief thought

19   that I had done an exceptional job in processing, selecting,

20   and training all of the FBI students during that time.

21   Q.    So have you ever received any type of award or

22   payment, above and beyond your annual salary, for work

23   that you've done on a specific criminal case?

24   A.    No.  That's forbidden under the FBI rules of

25   employment.

```
 1     Q.   Yet, you heard Agent Sullivan testify that she
 2     received $2,000 for her work in relation to a criminal
 3     case?
 4     A.   Oh, that's a cash award that that is in connection
 5   with.   That is the incentive award.   It is a cash incentive.
 6     Q.   Okay.
 7     A.   Yes, I have received cash incentive awards.
 8     Q.   For your work in relation to a specific criminal
 9     case?
10     A.   When I was a field agent, yes.   Not in relation to my
11   polygraph work in a specific case.   When I was a field
12   agent.
13     Q.   I understand.   And your last -- you were last a field
14     agent in the 1990s or something?
15     A.   Oh, let's see.   That's correct.   Birmingham division.
16     Q.   That is, then, a common occurrence within the FBI, to
17     receive cash incentive awards for agents in the field?
18     A.   That's right.   It is.   Your supervisor will submit a
19   recommendation to headquarters, headquarters reviews it,
20   they approve it.
21     Q.   So it's fair to say that your entire professional
22     career has been spent in law enforcement?
23     A.   Yes.
24     Q.   So all of the polygraphs that you've conducted -- I
25     believe you said approximately 500?
```

1      A.    Yes.

2      Q.    All of those have been in your capacity as an FBI

3      agent, correct?

4      A.    Correct.

5      Q.    And how many times have you testified in court,

6      total?

7      A.    Oh, over the course of my career, I would say a dozen

8      times.

9      Q.    And how many -- can you quantify that, trial versus a

10     suppression hearing like today?

11     A.    I would say primarily suppression hearings.  Most of

12     my cases did not go to trial.  I would say perhaps three

13     trials.

14     Q.    And your testimony was always on behalf of the

15     government in your capacity as an FBI agent?

16     A.    That's correct.

17     Q.    So I'm going to ask you briefly about your work

18     history.  I understand you worked in the Office of the

19     General Counsel back in the 1990s?

20     A.    That's correct.

21     Q.    And you were responsible for all legal matters

22     involving the FBI laboratory?

23     A.    The DNA, specifically.  DNA, primarily.

24           Occasionally I did deal with other legal matters

25     within the laboratory division, but my responsibility

1          primarily was to work with state prosecutors on the

2          admissibility of DNA evidence.

3          Q.   Did you ever -- did any of your work at the Office of

4          the General Counsel involve work at the FBI laboratory's

5          Microscopic Hair Comparison Unit?

6          A.   It did not.

7          Q.   What about moving on to when you taught ethics, from

8          1996 to 2000, right?

9          A.   Yes.

10         Q.   Did any of your instruction pertain to the ethics

11         surrounding the use of microscopic hair analysis?

12         A.   No.

13         Q.   You do know, though, that the FBI recently admitted

14         that the Microscopic Hair Unit analysis has been producing

15         flawed testimony for over 20 years, right?

16         A.   I did not know of the 20 years.  But yes, I'm aware

17    of the circumstances generally.

18         Q.   So now, if I understand correctly, you teach at what

19         used to be the Department of Defense Polygraph Institute,

20         but is now called the National Center for Credibility

21         Assessment?

22         A.   That's right.  They've gone through a couple of name

23    changes recently.

24         Q.   Okay.  And in your teaching there, do you teach your

25         students about innocent people, studies showing that

1      innocent people have confessed after being told that they

2      failed a polygraph?

3      A.    No.  My instruction does not really go into false

4   confessions.

5      Q.    Is there any instruction at the NCCA regarding false

6      confessions?

7      A.    Not that I'm aware, no.

8      Q.    In your role as an instructor at NCCA, do you teach

9      your students about the concept of false positives?

10      A.    Yes, false positives are discussed, as are false

11   negatives.

12      Q.    Can you explain to the Court what a false positive

13      is?

14      A.    A false positive would be -- in layman's terms, a

15   false positive would be an innocent person failing the test.

16   And a false negative would be a guilty person passing the

17   test.

18      Q.    You would agree with me, would you not, that false

19      positives do occur within the field of polygraphy?

20      A.    Yes, they do occur.

21      Q.    As do false negatives?

22      A.    Yes.

23      Q.    Do you recall Agent Sullivan testifying that she was

24      never trained in the concept of false positives when she

25      was trained at NCCA?

1    A.   Even though I was present in the courtroom, I do not
2    recall her stating that specifically.
3    Q.   But you do -- whether it was DODPI or NCCA, that
4    concept has been taught there?
5    A.   Oh, yes.  I attended the school in the same time
6    frame as Agent Sullivan, and I know that error rates were
7    discussed, which would be false positives, false negatives.
8    Q.   Do you recall the agent testifying that she feels
9    like her polygraphs are 100 percent accurate?
10   A.   I do recall her stating that, yes.  And I teach that.
11   Q.   You teach that polygraphs are 100 percent accurate?
12   A.   I teach that every examiner must have absolute
13   confidence in his results.
14   Q.   Even though you recognize that there are false
15   positives?
16   A.   Yes.
17   Q.   But you would -- so you certainly agree with me that
18   no matter how good an examiner is, the polygraphs are not
19   100 percent accurate?
20   A.   That is correct.
21   Q.   Yet, you teach the agents to believe that they are?
22   A.   An examiner must have confidence in his work product.
23   Q.   My question was:  You teach the examiners that they
24   believe that their results are 100 percent positive?
25   A.   I do.

1    Q.   At the NCCA, you rely -- what is the Federal

2    Physiological Detection of Deception Examiner Handbook?

3    A.   It is the manual, handbook, for federal polygraph.

4    As the National Center for Credibility Assessment is the one

5    training facility for all federal polygraph examiners, then

6    the federal handbook would be the one set of standards for

7    all federal polygraph programs.

8    Q.   So do I understand correctly that it's essentially

9    kind of like the master guidebook for the federal

10   government?

11   A.   Yes.  For the federal government polygraph programs,

12   yes.  We can't have individual agencies going off doing

13   their own thing.  They need to adhere to a standard set of

14   guidelines, which is the federal handbook.

15   Q.   So its purpose is to set forth uniform polygraph

16   procedures throughout the entire government?

17   A.   That is correct.

18   Q.   And its use is mandatory?

19   A.   Yes.  There is a statement in the federal handbook

20   that states that the purpose of the handbook is not to

21   override individual agency policy, but -- so as far as

22   mandatory, I'm not sure what that would mean.

23   Q.   What is the quality assurance program?

24   A.   The quality assurance program is contained within

25   NCCA.  It is a unit there at the school comprised of

1    individuals who conduct these biannual inspections of

2    federal polygraph programs.

3       Q.   And the FBI has a quality assurance program, right?

4       A.   It has a quality control component.  The QAP, that

5    term of art is generally restricted to the inspection

6    program at NCCA.

7       Q.   What does it mean when the federal examiner handbook

8        says that -- refers to federal agencies participating in

9        the quality assurance program?

10      A.   That the federal -- that every federal agency's

11   polygraph program will cooperate with the QAP process

12   conducted by NCCA; that it will allow the QAP individuals

13   from NCCA to come into their facility, review their exams,

14   review their manual.

15      Q.   And the FBI does that?

16      A.   Yes.

17      Q.   How --

18      A.   Yes.

19              MR. COBERLY:  Your Honor, may I approach?

20              THE COURT:  You may.

21      Q.   Sir, I'm handing you what has been marked as

22   Exhibit W.  And does that appear to be the federal

23   examiner handbook that we have just been talking about?

24      A.   Yes, it does, dated October 2, 2006.

25      Q.   If you could turn, sir, to the second page, which is

1    actually the Roman Numeral ii, the third paragraph, you

2    would agree with me that this master handbook for the

3    federal government says that this manual -- I'll quote it:

4    "This manual is mandatory for use by all of the components

5    and those federal agencies participating in the quality

6    assurance program"?

7    A.   Yes, it states that.

8    Q.   So you would agree with me, then, that it is

9    mandatory for the FBI to use this manual?

10   A.   Yes, as stated in this forward.  It also states that

11   agencies may issue supplementary instructions.

12   Q.   You are not saying the supplementary instructions can

13   contradict what's contained in the master manual, are you?

14   A.   No.

15   Q.   And while we're looking at Exhibit W, would you agree

16   with me that the Federal Psychophysiological Detection of

17   Deception Examiner Handbook is predicated on research done

18   by several experts who have written scientific articles on

19   polygraphy?

20   A.   I would not be able to answer that.

21   Q.   Sir, if you could turn to Roman Numeral vii, and

22   that's what it says, references there, and that's what I'm

23   referencing.  Do you see that?

24   A.   Yes.

25   Q.   I direct you to the fourth line down.  Would you

1      agree with me that the federal manual is predicated, in

2      part, on an article written by Dr. Honts in 1989 called

3      "Studies of the Accuracy of Security Screening Polygraph

4      Examination"?

5              It was published by the Department of Defense

6      Polygraph Institute in Fort McClellan, Alabama?

7      A.   I can tell you it is certainly listed as a reference.

8      I don't know if it's predicated upon it.  It certainly

9      refers to it.

10     Q.   Are you aware of anywhere in the manual challenging

11     any of the scientific articles listed here as references?

12     A.   I am not.

13     Q.   Sir, if you could turn to Roman Numeral viii, the

14     fifth line down, would you at least agree with me that the

15     manual references an article written by Dr. Honts in 1988

16     called "A Field Study of the Validity of the Directed Lie

17     Control Question," that was published in the Journal of

18     Police Science and Administration?

19     A.   Yes, it is listed.  This, of course, did not involve

20     directed lies, the case at hand involving Mr. Tennison.

21     Q.   Sure.  Have you read any of these articles that are

22     in the reference manual?

23     A.   No.

24     Q.   And you've been teaching and conducting polygraphs

25     for how many years?

1    A.   Teaching and conducting, nine and a half.  No, I'm

2    sorry.  Ten.

3    Q.   If I may, sir, if you could turn to the next page,

4    the second line down, would you agree with me at least

5    that the federal handbook references an article that was

6    co-authored by Dr. Honts in 1988 called "A -- Study of

7    the -- Validity of Polygraph Examinations in Criminal

8    Investigation," that was published by the National

9    Institute of Justice in Washington, D.C.?

10   A.   Yes.

11   Q.   And you have not read that article?

12   A.   No.  I have not participated in the research

13   component.

14   Q.   So would you dispute Dr. Honts' credibility as an

15   expert in the field of polygraphy?

16   A.   I would venture no opinion concerning his ability as

17   an expert.

18   Q.   Well, based on the FBI -- or excuse me -- the federal

19   handbook, would you at least agree that Dr. Honts has been

20   publishing scientific articles regarding polygraphy since

21   at least 1988?

22   A.   Yes, I would agree with that.

23   Q.   And would you agree with me that that was 16 years

24   before you were ever trained in any regard in relation to

25   polygraphy?

1      A.    That's correct.  I was -- 2004.  I was a 2004

2      graduate of the polygraph school.

3      Q.    We talked that the federal handbook is, I guess, the

4      master, if you will, the master guidebook for the federal

5      government; yet, the FBI has its own Polygraph Examiner

6      Manual, correct?

7      A.    That's correct.

8           MR. COBERLY:  May I approach, Your Honor?

9           THE COURT:  You may.

10     Q.    Sir, I've handed you what has been marked and

11     admitted as Exhibit X.  Can you explain to the Court what

12     that Exhibit X is?

13     A.    It is a redacted version of the FBI Polygraph

14     Examiner Manual.

15     Q.    Okay.  Would you agree with me that this FBI

16     Polygraph Examiner Manual sets forth policies, procedures,

17     guidelines, and formats to be followed by all FBI

18     polygraph examiners?

19     A.    That is correct.

20     Q.    But the way, I think of it as -- correct me if I'm

21     wrong -- sort of the FBI polygraph examiner's Bible?

22     A.    I would, yes.

23     Q.    Their guiding -- the document that guides them in

24     their policies and procedures?

25     A.    That's correct.

1    Q.   And so you're an FBI polygraph examiner, right?

2    A.   Yes.

3    Q.   And you teach FBI polygraph examiners how to conduct

4    polygraph exams?

5    A.   I do.

6    Q.   And so you relied on this manual in forming your

7    opinions that you've testified to here today?

8    A.   Yes.

9    Q.   As I understand it, there's essentially three phases

10   to a criminal polygraph?

11   A.   Yes.  Pre-test, in-test, and post-test are the three

12   phases.

13   Q.   In-test?  I-N test?

14   A.   Yes, in-test, in-hyphen.

15   Q.   And the pre-test component of a criminal polygraph

16   includes providing the examinee with an Advice of Rights

17   form, correct?

18   A.   Yes.  In a criminal case, yes.

19   Q.   And the Consent to Polygraph?

20   A.   Yes.

21   Q.   And do you recall -- well, do you recall Agent

22   Sullivan testifying about the FBI's policy regarding the

23   recording of polygraph examinations?

24   A.   I do.

25   Q.   And as I understand her testimony, is that she said

1    that there's an FBI policy that prohibits her from

2    recording the pre-test and the in-test portion of the

3    polygraph process?

4    A.   Correct.

5    Q.   Yes.  She admitted that there is no -- that it's

6    within her discretion whether or not to record the

7    post-polygraph, the interrogation phase?

8    A.   I know that that is up to the special agents in

9    charge of a particular FBI field division, so I'm not sure

10   what the Special Agent in Charge of Albuquerque division has

11   decided.

12   Q.   So you certainly agree with me, though, that there is

13   no blanket FBI policy prohibiting the recording of

14   interrogations post-polygraph?

15   A.   That's correct.

16   Q.   Sir, if you could take a look at Exhibit X and tell

17   me where in the FBI's manual that I can find the policy

18   that prohibits FBI examiners from recording pre-test and

19   in-test portions of the polygraph?

20   A.   It very well may not be in this manual.  I haven't --

21   there have been, of course, various versions of the manual,

22   and there are also supplemental instructions provided to

23   examiners by the head of our polygraph program.

24   Q.   Well, this was the manual that I was directed to, to

25   find online when I requested the policies and procedures

1      pertaining to the testing that Agent Sullivan did.  So

2      would you agree with me that those are the policies that

3      Agent Sullivan followed?

4      A.   This is, of course, the FBI polygraph manual.  There

5      certainly are additional instructions provided to examiners

6      from time to time by the head of our polygraph program.

7      Q.   Okay.  Are those written instructions?

8      A.   Yes.

9      Q.   Are you aware of a written instruction that you've

10     just described, instructing polygraph examiners within the

11     FBI that they are prohibited from recording pre-test and

12     in-test portions of the polygraph?

13     A.   I believe that was sent to all examiners via e-mail.

14     Q.   And when was this e-mail?

15     A.   It would have been when Robert Hilland was the unit

16     chief of the FBI polygraph program.

17     Q.   I'm not familiar with that.  So that would have

18     been --

19     A.   I can only give you a range, a possible range of

20     years.

21     Q.   Please do.

22     A.   It would have been approximately 2010.  2010.

23     Q.   So the FBI distributes nation-wide policies on

24     e-mail?

25     A.   That if -- my recollection is that the issue was

1    raised by an examiner, and subsequently the head of our

2    program, Robert Hilland, transmitted an e-mail to all

3    examiners, to instruct them to not record pre-test and

4    in-test.

5        Q.   Was that e-mail ever, I guess, formalized or codified

6        or somehow incorporated into the FBI Examiner Manual?

7        A.    The polygraph -- this Polygraph Examiner Manual that

8    was in effect at the time of Mr. Tennison's exam is no

9    longer in use.  On November 20, 2015, Policy Implementation

10   Guideline was issued to replace the Polygraph Examiner

11   Manual.

12       Q.   Okay.  So does that mean there is an entirely new

13       manual?

14       A.    Yes.  This manual had not received updates over many

15   years.  Electronic communication such as e-mails have been

16   issued, changing policy, clarifying policy.  And so as of

17   November 20, 2015, a new formalized policy was issued

18   concerning the polygraph program.

19       Q.   So this FBI manual that was in place at the time of

20       Mr. Tennison's testing, this is the manual that was in

21       place at the time, so it was 2014?

22       A.    Yes.

23       Q.   And it has -- this manual has an entire section

24       pertaining specifically to criminal -- conducting

25       polygraph examinations in criminal investigations, right?

```
 1      A.   Yes.

 2      Q.   Sir, if you could turn -- well, I've actually created

 3      these Bates numbers.  If you could turn to Bates number

 4      18.

 5      A.   Uh-huh.

 6      Q.   So this is the Chapter 9, the criminal testing we

 7      were just talking about, right?

 8      A.   Yes.

 9      Q.   And, sir, so the big white rectangle, that's been

10      redacted by the federal government, correct?

11      A.   Correct.

12      Q.   And if you notice down here, that says that is Number

13      28 of the actual manual itself, correct?

14      A.   That's right.

15      Q.   So let's turn over to Page 19, that I've marked as

16      Bates Number 19, and we see that it's Page 29, correct?

17      A.   Yes.

18      Q.   And we have more redactions up here, correct?

19      A.   Yes.

20      Q.   And then we go to Page 20 or 30, excuse me, which is

21      my 30, right?

22      A.   Yes.

23      Q.   And then we have Page 31 of the manual, which is my

24      Page 21, correct?

25      A.   Yes.
```

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1     Q.    And that's all redacted, right?

2     A.    Correct.

3     Q.    And then flipping the page, my FBI manual 22 is

4     marked Page 34 of the FBI manual, right?

5     A.    Yes.

6     Q.    So you would agree with me that there appears to be,

7     between 31 and 34, three additional pages that have been

8     redacted in full by the FBI government when sending out

9     this version of the guidelines?

10    A.    That's correct.  That is the chapter dealing with

11    foreign counterintelligence testing.

12    Q.    Well, sir, if you take a look at Chapter 10, that's

13    the portion dealing with foreign counterintelligence

14    testing, correct?

15    A.    Chapter 10, yes.

16    Q.    And Chapter 10 starts on Page 34, correct?

17    A.    That's correct.

18    Q.    Turning back a page, sir, we have Page 31, which is

19    still part of Chapter 9, correct?

20    A.    That is correct.  Yes.  So I'm sorry.

21    Q.    You would agree with me there is 32, 33, and 34 is

22    still part of the Chapter 9 criminal testing?

23    A.    32 and 33 would be.

24    Q.    Okay.

25    A.    Pages 32 and 33 would be dealing with Chapter 9, and

1      those are missing, and they appear to be a continuation of

2      the sample comparison questions by topic.

3      Q.    Okay.  Is it fair to say that the majority of

4      Chapter 9, pertaining to criminal testing, has been

5      redacted?

6      A.    Yes.

7      Q.    But in actuality, the page pertaining to pre-test,

8      the portion Section E pertaining to pre-test interviews

9      has not been redacted, right?

10     A.    That's correct.

11     Q.    And one of those policies here discusses the Advice

12     of Rights form, which is FD-395?

13     A.    That is correct.

14     Q.    You would agree with me that policy, this policy

15     anyway, does not say anything about the FBI not being

16     allowed to record the pre-test interview?

17     A.    That is correct.  There is no mention of recording.

18     Q.    And it also provides that the FD-395 should be --

19     well, that the examiner and the suspect should sign the

20     form, right?

21     A.    That's correct.

22     Q.    So you would agree with me that really when the FBI

23     testifies about an examinee in a criminal setting, they

24     are really suspects to a crime?

25     A.    Not necessarily.  Certainly it could be -- we test

1   victims and witnesses, as well.

2        Q.   But if you're -- generally, the majority of people

3   you're testing are actually suspects of a crime, right?

4        A.   Yes.  Fair to say, yes.

5        Q.   So the Advice of Rights form shall be signed by the

6   examiner and the suspect, right?

7        A.   Yes.

8        Q.   And when operationally feasible, it should be

9   witnessed, correct?

10       A.   Yes.  I believe there is a -- I believe the form does

11  contain a signature line for a witness.  Oh, yes.  "The form

12  should be witnessed when operationally feasible."  Yes.

13       Q.   Based on your understanding of the examination

14  conducted by Agent Sullivan of Mr. Tennison on June 11,

15  2014, it would have been operationally feasible to have

16  somebody witness the Miranda form, correct?

17       A.   I don't know.  I don't know who else was -- I'm

18  not --

19       Q.   Sir, did you not sit through the testimony on

20  December 11, 2014?

21       A.   I did.

22       Q.   Is it your -- do you recall the testimony about

23  Agent Schaeffer meeting Mr. Tennison at the door, walking

24  him back, taking him to the restroom, taking him to meet

25  Agent Sullivan, and going down the hall and sitting at a

 1    cubicle?

 2    A.    Yes.

 3              MR. NAYBACK:  Objection, Your Honor.  This calls

 4    for speculation.  The agents have testified --

 5              THE COURT:  No, no, no.  Just a minute.  To the

 6    extent it can refresh the witness' recollection, he can

 7    agree or disagree, if he remembers.  If he doesn't, I'm

 8    not going to permit him to speculate.  I think the witness

 9    knows that.

10    A.    Yes, and it has refreshed --

11              THE COURT:  Let's go ahead.

12    A.    Yes.  The case agent, yes.  I heard the case agent's

13    testimony, as well.  And yes, he was there, and it is

14    feasible that he could have witnessed the Advice of Rights.

15    You are correct.

16    Q.    And then we have the policy pertaining to the Consent

17    to Polygraph form on this FBI manual, correct?

18    A.    That's right, yes.

19    Q.    And you would agree with me, wouldn't you, that the

20    policy guiding the FBI says that, "The appropriate boxes

21    should be checked on the form to document any monitoring

22    or recording"?

23    A.    Yes.

24    Q.    You would agree with me, wouldn't you, that this FBI

25    manual explicitly recognizes that the pre-test interview

```
 1    and the testing may be monitored or recorded?

 2    A.   Yes.

 3    Q.   Switching topics a little bit, I believe you

 4    testified that in your opinion, Agent Sullivan's

 5    construction of test questions was appropriate?

 6    A.   Yes.

 7    Q.   That the relevant questions were appropriate --

 8    A.   Correct, yes.

 9    Q.   -- in your opinion?  And that the comparison

10    questions were appropriate, correct?

11    A.   Correct.

12    Q.   Okay.  And the FBI manual, if you turn, sir, turn to

13    Page Number 12, Chapter 4.  Is this the policies in place

14    in the FBI regarding construction of test questions?

15    A.   Yes.

16    Q.   And, sir, if you turn the page to -- well, first of

17    all, on 12 you see that the majority of that page is

18    redacted, correct?

19    A.   Correct.

20    Q.   We're starting with Subsection C there, question

21    types.  I don't know what that says.  We don't know, in

22    court, what that says, right?

23    A.   Correct.

24    Q.   Turning, sir, to Page 13, you would agree with me

25    where it says "Examples:" that all of the examples
```

1      provided by the FBI to its FBI examiners have been

2      redacted?

3      A.   Correct.

4      Q.   Sir, rather than painstakingly going through, if you

5      would, if you could just look at that chapter.  Would you

6      agree with me that that section, Chapter 4, is really

7      three pages, and the last page has been left out entirely?

8      A.   Yes.  Well, no.  I'm sorry.  You have Chapter 4, Page

9      12.  Chapter 4, I'm assuming, is Page 13.  So I'm sorry.

10     Let's see.  Page 14 is missing.

11     Q.   Page 14 is missing, and Page 14 would still be part

12     of Chapter 4?

13     A.   That's right.  I'm assuming it would be a

14     continuation of examples.

15     Q.   And the testimony, your testimony, your earlier

16     testimony regarding the appropriateness of Agent

17     Sullivan's test questions, you relied -- your opinion is

18     based on this chapter of the manual, correct?

19     A.   It's based upon what is taught at the school, which

20     would be incorporated into the federal handbook.

21     Q.   Okay.  You would agree with me, though, that the FBI,

22     itself, the FBI -- which I believe you agreed was the

23     Bible -- has a whole section on test question

24     construction, right?

25     A.   Yes.

 1    Q.   And you've testified here that Agent Sullivan

 2    correctly, in your opinion, constructed the test

 3    questions?

 4    A.   Correct.

 5    Q.   Yet, you won't let me see the FBI policies and

 6    procedures pertaining to the construction of test

 7    questions, will you?

 8            MR. NAYBACK:   Objection.   I don't think that's

 9    the witness' call to make, Your Honor.

10            THE COURT:   Sustained.

11    Q.   Are you aware of any public place where I can find

12    the FBI policies?

13    A.   I am not aware of that.

14    Q.   And you've testified that the FBI uses a Modified

15    General Question Test format, correct?

16    A.   Correct.

17    Q.   Sir, if you could go to the page what I've Bates

18    numbered as 16, Chapter 6 is all about the FBI Modified

19    General Question Test, correct?

20    A.   Let's see.   Oh, your Page 16?

21    Q.   Yes.

22    A.   Yes.   Correct.

23    Q.   And if you could flip to the next page or two, would

24    you agree with me that this entire section is really five

25    pages long, pertaining to the FBI Modified General

```
 1      Question Test?

 2      A.    That's right.  It would be Pages 17 through 21 of the

 3   manual, and only Page 17 is provided, which has been

 4   redacted.

 5      Q.    And your testimony was based on -- your testimony

 6      earlier was based on your understanding of how the FBI

 7      applies the Modified General Question Test, correct?

 8      A.    Correct.

 9      Q.    Sir, if I could have you take a look, flip back a

10      page or two where I Bates numbered FBI manual 14,

11      Chapter 5, test data analysis.  Do you see that?

12      A.    I do.

13      Q.    Would you agree with me that test data analysis is

14      essentially scoring, scoring the polygraphs?

15      A.    That's right.

16      Q.    And the test data analysis chapter continues on to

17      the next page, correct?

18      A.    Correct.

19      Q.    Would you agree with me that the majority of the FBI

20      manual pertaining to test data analysis has been redacted?

21      A.    Yes.

22      Q.    And that your testimony earlier today was based on

23      your training on the manual regarding test data analysis?

24      A.    Yes.

25      Q.    Sir, if you could turn to what I've Bates numbered
```

1    as -- I believe we already covered the chapter regarding

2    polygraph and criminal suspects, correct?

3    A.   We did, yes.

4    Q.   Okay.  So the FBI uses, and Jennifer Sullivan, Agent

5    Sullivan used, the FBI MGQT format, correct?

6    A.   Correct.

7    Q.   And you say that is federally approved?

8    A.   It is.

9    Q.   And she used a -- what is it?  A two relevant, two

10   comparison question test, right?

11   A.   That is right.

12   Q.   And that is also federally approved?

13   A.   Yes.

14   Q.   And you and Agent Sullivan scored using the Federal

15   Three-Position Numerical Evaluation Scale, correct?

16   A.   Correct.

17   Q.   Also federally approved?

18   A.   Yes.

19   Q.   Now, your testimony is not that "federally approved"

20   means that it's better than any other test method?

21   A.   Correct.

22   Q.   Well, is it?  Let me ask, is that your testimony?

23   A.   Well --

24   Q.   What do you mean by "federally approved"?

25   A.   That it has been evaluated by the school as being

1    valid.

2         Q.    Are you aware of the validation process?

3         A.    No.  That's not my purview.

4         Q.    Are you -- are you inferring -- do you want to infer

5    that "federally approved" means that that process is

6    better than and more reliable than other methodologies?

7         A.    I will assume so, yes.

8         Q.    Why are you assuming so, as testifying as an expert?

9         A.    They have an entire building and NCCA devoted to

10   research, full of Ph.D.s, and with all of these formats and

11   scoring methodologies available, I trust that they have

12   examined each of them and have chosen to approve others and

13   disapprove others.

14        Q.    You're speculating, right?  You don't know?

15             MR. NAYBACK:  Objection.  The question called

16   for speculation, Your Honor.

17             THE COURT:  Your response?

18             MR. COBERLY:  I did not call for speculation.

19   He said, "So I'm assuming."

20             And then I asked, "So you're assuming?  What is

21   that based on?"

22             I mean, maybe we could have the court reporter

23   read back.

24             THE COURT:  The witness can complete his answer,

25   but I would caution him not to guess or speculate about

1      what is done in that research building.  If he knows and

2      can draw upon his experience and training in that regard,

3      he can do so.

4      A.    I can only tell you that certain formats are

5      federally approved, and others are not federally approved.

6      I do not make the decision whether to approve or disapprove

7      at that facility.

8      Q.    So you're not personally aware, as an expert, of any

9      studies saying that the Three-Position Numerical

10     Evaluation Scoring Method is more reliable than other

11     methodologies?

12     A.    I am not aware of any specific research.

13     Q.    And you're not aware of any specific research saying

14     that the federally approved Three-Position Numerical

15     Evaluation Scoring Method provides less false positives or

16     more false positives or anything related to that?

17     A.    I believe it has been shown to have a higher

18     inconclusive rate.

19     Q.    Okay.  What study, as an expert -- you're testifying

20     as an expert.  What study are you relying on?

21     A.    I am relying upon what I have been taught at NCCA.

22     Q.    And did you, in being taught at NCCA, is this

23     something that an instructor told you?  Or is this based

24     on papers that you've read, scientific papers?

25     A.    It's based upon discussions that have occurred at the

1    school with the Ph.D. researchers there.

2        Q.    So is there a bunch of Ph.D.s walking around at the

3        school, doing research all the time?

4        A.    They are in a research building.  There's a research

5    staff.  There's instruction staff.  There's a quality

6    assurance staff.  There's a research staff.  So they are

7    part of the research staff at the school.  And so of course

8    we have meetings with instruction staff, research staff.

9    Questions are asked.  Why do we not use this method?  Why

10   are we using this method?

11       Q.    And they say:  That's what we do?

12       A.    Correct.  The decision has been made.

13       Q.    So are you aware of any studies that validate the

14       technique, the testing technique of using two relevant,

15       two comparison questions?

16       A.    I know that it is used in the Air Force MGQT format.

17   There is a version of the Air Force MGQT that utilizes two

18   relevant questions and two comparison questions.  It is

19   sequenced differently than the FBI MGQT.

20       Q.    I think my question was whether you are aware of any

21       studies that validate that technique, not whether anybody

22       else uses it.

23       A.    I do not know of any specific study that validates

24   the FBI MGQT.

25       Q.    Are you aware of any specific -- so are you saying

1    the FBI MGQT is the two relevant, two comparison question

2    test?

3    A.    There is a -- it can be run, and is run, as a three

4    relevant question, three comparison question format, as

5    well.

6    Q.    Why would one run a two relevant, two comparison

7    question test versus a three relevant, three comparison

8    question test?

9    A.    Simple -- a more simple case or allegation versus a

10   more complex case or allegation.

11   Q.    So your testimony is, the simpler the case, the less

12   relevant in comparison questions you need?

13   A.    For example, in the case at hand concerning Mr.

14   Tennison, there really is no secondary knowledge component,

15   unlike you might have with a bank robbery where someone

16   could have helped plan it, or they could have been the

17   get-away driver.  You could have had some sort of secondary

18   participation.  The -- the case involving Mr. Tennison is a

19   single issue involving a single individual.

20   Q.    Okay.

21   A.    So therefore, a two relevant question, two comparison

22   question format was best.

23   Q.    Why was it, in your -- what are you relying on, as an

24   expert, when you testify that for a single-issue exam, a

25   two comparison, two relevant test format is best?

1     A.   That there is no third question available dealing

2     with secondary participation.

3     Q.   So your testimony, if I understand it -- and I want

4     to make sure I understand it -- is that the purpose of a

5     third relevant question is only to test on a secondary

6     issue?

7     A.   Typically, yes.

8     Q.   Well, why do you say "typically"?

9     A.   That there would be a secondary issue such as

10    knowledge, planning, participation.

11    Q.   Okay.

12    A.   As opposed to direct involvement.  The case at hand

13    involves only direct involvement.

14    Q.   Okay.  So is it your testimony that it would be

15    improper on a single-issue test, such as the case at hand?

16    A.   Yes.

17    Q.   To run a three relevant, three comparison question

18    test?

19    A.   Yes.  That would be improper.

20    Q.   And I want to make sure I understand.  What is your

21    opinion based on?  What is that particular opinion, that

22    it being improper, what is that based on?

23    A.   It is based upon what is taught at the school and is

24    in the federal handbook.

25    Q.   So you've testified, though, that there are other

1     methodologies, scoring methodologies, right?

2     A.    Yes.

3     Q.    Okay.  And let me just -- as I understand sort of

4     generally a polygraph, there's -- I know this terminology

5     is getting thrown around a lot, but there is test question

6     formats, right?

7     A.    Right.

8     Q.    Like an MGQT or a Zone?

9     A.    Yes.

10    Q.    Then there's different test types, such as a probable

11    lie or a directed lie, right?

12    A.    Right.

13    Q.    And then there's different scoring methods, right?

14    A.    Correct.

15    Q.    So can the scoring method be used, the same scoring

16    method be used on different types of test formats?

17    A.    Some yes, some no.

18    Q.    Okay.  Which yes and which no?

19    A.    The Utah Scoring Method is for the Utah Zone format.

20    The Federal Three-Position Scale or Federal Seven-Position

21    Scale or the Empirical Scoring System can be applied to many

22    different formats.

23    Q.    I want to make sure I'm clear.  Your testimony is

24    that the Utah Scoring Method cannot be used to score a

25    federal MGQT or a Zone Comparison Test?

1    A.    That's my understanding.  Now, Utah --

2    Q.    What is your understanding based on?

3    A.    Since the Utah Zone, Utah methodology, is not taught

4    at the school and is not federally approved, then I have

5    learned of it only through attendance at polygraph

6    conferences and independent reading.

7    Q.    What independent reading have you read that supports

8    your testimony?

9    A.    It was material available at the -- at an annual

10   conference of the American Polygraph Association that I

11   attended.

12   Q.    What year?

13   A.    Oh, I've attended several.  I do not recall a

14   specific year where I first encountered the Utah Zone.

15   Q.    The Utah Zone or the Utah Scoring Method?  Or you are

16   saying --

17   A.    My understanding is, the Utah Scoring Method is for

18   the Utah Zone format, period.

19   Q.    And your understanding is based on reading something

20   at an American Polygraph Association meeting at some

21   point, but you don't recall when that was?

22   A.    That's right.  I've not devoted myself to the Utah

23   Zone, the Utah Method.  It's not taught, it's not federally

24   approved at NCCA.

25   Q.    You're testifying here as an expert, and I want to

1     make sure that I understand the foundation of your

2     knowledge.  Okay?

3     A.    Okay.

4     Q.    So where did you learn to score in the Utah Method?

5     A.    At the annual conference of the American Polygraph

6     Association.

7     Q.    The one that you can't remember the year?

8     A.    Yeah.  As I said, I have been to several.  I do not

9     have my calendar with me.  I cannot recall the specific

10    year.

11    Q.    How many times have you scored polygraph charts since

12    that conference, using the Utah Scoring Method?

13    A.    Less than ten times.

14    Q.    Why were you scoring -- in these other nine cases,

15    why were you scoring them in the Utah Method?

16              MR. NAYBACK:  Objection; relevance, Your Honor.

17              MR. COBERLY:  Your Honor, he has testified that

18    he scored in the Utah Method using the same scoring

19    methodology that Dr. Honts did, and he said, "When I used

20    the Utah Method, I came out as deception indicated."

21              I should be entitled to probe his knowledge and

22    his expertise in the Utah Scoring Method.

23              THE COURT:  If the witness recalls, I'll permit

24    it.  Overruled.

25    A.    It would be in reviewing exams conducted by other

1    defense examiners where they have submitted a report or an

2    exam based upon the Utah Zone, Utah Scoring Method, and in

3    those cases they had utilized the Utah Zone format and they

4    had utilized the Utah Scoring methodology.

5    Q.   What is the Utah Zone -- how is the Utah Zone format

6    different than the federal MGQT format?

7    A.   That it has three relevant questions, three

8    comparison questions.  None of the relevant questions are

9    fully bracketed by comparison questions.  Each relevant is

10   scored against only one adjacent comparison question.

11   Q.   Well, you're talking about two separate things.

12   You're talking about the test format, right?  Three

13   relevant, three comparison?

14   A.   Three relevant, three comparison is the format.

15   Q.   It's the format, and then the scoring methodology is

16   something separate, right?

17   A.   Yes.  The scoring methodology has -- it utilizes a

18   grand total, where the spot scores for each relevant

19   question are combined into one grand total, and then the

20   conclusion of deception indicated or no deception indicated

21   is based upon that grand total.

22   Q.   Regardless, would you agree with me that regardless

23   of the scoring methodology used, whether it's Utah,

24   Federal Three-Position, or Seven-Position, or ESS I

25   believe is the other one, correct?

1      A.    Correct.

2      Q.    That all of them are comparing a person's

3      physiological responses between the answer to or the

4      reaction to a comparison question and the reaction to a

5      relevant question?

6      A.    Yes.

7      Q.    And that the difference in the scoring methodologies

8      is -- it depends -- the number assigned depends on how

9      great the response is or how non- -- if there's a

10     non-response?

11     A.    That's right, and each of the methods has different

12     rules for whether it's a 1, 2, or 3, or a zero.

13     Q.    So you teach at the NCCA that probable -- well, what

14     Agent Sullivan did is a probable lie comparison test,

15     correct?

16     A.    Correct.

17     Q.    And you teach at NCCA that probable lie comparison

18     questions are supposed to be similar in nature, but

19     unrelated by time, place, or category to the specific

20     issue, correct?

21     A.    Yes, unless lie comparisons are utilized.

22     Q.    Okay.  But we're not -- and so that's what you're

23     saying you teach, is that unless --

24     A.    That -- if it is a theft case, you would use theft

25     comparisons.  If it is an assault case, you could use

1    hurt/harm/injure comparisons, or you may use lie

2    comparisons.

3         Q.   Well, you still have Exhibit W up there, correct?

4         Did I ever give you Exhibit W?

5         A.   I believe you did.  Yes.  Yes, you did.  I have it.

6         Q.   And Exhibit W is the master guidebook to the federal

7    government, right?

8         A.   Yes.

9         Q.   And that's not redacted, right?  That's --

10        A.   That's right.  And there may have been changes,

11   additions, since this version.  They update it periodically,

12   based upon what has changed by the curriculum review

13   committee or the federal inter-agency meetings.

14        Q.   So are you aware of any changes to this document?

15        A.   I know specifically the use of lie comparisons was

16   approved by the curriculum committee at NCCA.

17        Q.   And when was that approved?

18        A.   Let's see.  During my -- it would have been

19   approximately 2012, I believe.

20        Q.   Why was that change made?

21        A.   Several agencies, including the FBI, advocated for

22   the change.

23        Q.   Why did they advocate for the change?

24             MR. NAYBACK:  Objection; calls for speculation.

25             MR. COBERLY:  He's an expert.

1          THE COURT:  If he knows, he can answer.  But

2     again, no speculation or guessing.  And please, Mr.

3     Coberly, don't burst out.  Objections are made to the

4     Court and responses are made to the Court, please.

5          MR. COBERLY:  I understand.

6          THE COURT:  Please respect.  Go ahead.

7     A.    Lie comparisons are the most applicable to the most

8     examinees.  Due to the human condition, it is probable that

9     most human beings have lied in one or more aspects of their

10    lives, so it is a very reliable comparison question that is

11    able to be used on every examinee.

12    Q.    So what would an appropriate -- so you're saying that

13    for any type of case, you can use a standard directed lie

14    question?

15    A.    No, not directed lie.

16    Q.    I'm sorry.  A probable lie?

17    A.    Yes.

18    Q.    I want to make sure I understand this.  The

19    comparison question -- would you agree with me that in the

20    manual that we have here, Exhibit W, that it says that,

21    "The comparison question should use the same action verb

22    or similar in nature action verb as that of the relevant

23    issue"?

24    A.    Yes, that's correct.

25    Q.    And it gives an example, right?  If the issue is

1     theft or shoplifting, the action verb would be "stealing."

2     Right?

3     A.    Correct.

4     Q.    So the FBI -- or excuse me.  The federal manual

5     provides an example such as, "Before this year, did you

6     ever steal anything from someone who trusted you?"

7     Right?

8     A.    That's right.

9     Q.    So now you're saying -- your testimony is that there

10    has been a change in this policy?

11    A.    Yes.

12    Q.    Okay.  And specifically, that it now allows a lie --

13    what is the correct terminology?

14    A.    It allows for the use of a probable -- a probable lie

15    comparison dealing with lying.  So it would be a probable

16    lie lie comparison, as opposed to a probable lie theft

17    comparison or a probable lie sex comparison.  It would be a

18    probable lie lie comparison.

19    Q.    And I understand that that change was made because

20    agencies, including the FBI, advocated for that change?

21    A.    That's right.

22    Q.    Are you aware of any studies, data, analysis, to

23    support the idea that that type of comparison question is

24    more effective than the type that is in the 2006 manual?

25    A.    No.

1    Q.   Turning back to the FBI manual, Bates Number 21, the

2    manual Page 31, the sample comparison questions by topic,

3    would any of this information that we can't see here,

4    would that support your testimony now?

5    A.   That's right.  The sample comparison questions by

6    topic, it would have sample comparison questions for a theft

7    case; sample comparisons for a homicide; sample comparisons

8    for a rape; sample comparisons for embezzlement,

9    what-have-you.

10             So there would be suggested comparison

11   questions broken down by category of crime.

12   Q.   And would you agree with me that the action verb at

13   issue in this case was "sexual touching"?

14   A.   That's right.

15   Q.   At the FBI, or at the NCCA school, you train FBI

16   examiners to run three charts during a particular test,

17   correct?

18   A.   That's right.  That's the standard, three charts.

19   Q.   And why is that the standard?

20   A.   I do not know.  It has been the accepted standard

21   within polygraph certainly since I've been involved with

22   polygraphs, since 2004, three-chart test.  A fourth chart

23   may be collected, and even a fifth if circumstances dictate.

24   Q.   What circumstances dictate a fifth or a fourth?

25   A.   A fourth would typically be utilized to resolve an

1    inconclusive exam that if, after three charts, the numerical

2    scores are not indicative of deception nor indicative of

3    non-deception, that a fourth chart could be a tie-breaker,

4    if you will, to try to reach a conclusive result.  Or a

5    fourth chart might be utilized if one asking of a relevant

6    question was artifacted.

7         Q.   You would agree with me that there was a major

8         artifact in the charts run by Agent Sullivan, correct?

9         A.   Yes.  I believe chart 2, the asking of 5R was

10   artifacted.

11        Q.   So why don't you run just two charts?

12        A.   That is not the federal standard.

13        Q.   At NCCA, in your instruction to the FBI examiners,

14        you instruct them that on each chart they're supposed to

15        switch up the order of the questions, correct?

16        A.   That's right.  That's typical with an MGQT format,

17   that relevant and comparison questions and irrelevant

18   questions are rotated.

19        Q.   Why is that?

20        A.   To avoid a spot responder.

21        Q.   What is a spot responder?

22        A.   An individual may just naturally respond to the first

23   question being presented in the question string.  So, of

24   course, by rotating questions, you can be assured that their

25   reaction deals specifically with that question and not the

1    order in which it is being presented.

2        Q.   And are you talking about reaction to the first

3    question being presented, the first question of the chart

4    series?  Or the first comparison question?

5        A.   First comparison, and also first relevant question

6    being presented.  So therefore, comparison should be rotated

7    as well as relevant questions.

8        Q.   What about irrelevant?

9        A.   I personally rotate my irrelevant questions.  I do

10   not know if Agent Sullivan does this.

11       Q.   Does it matter?

12       A.   I just like to begin each of my charts with a

13   different irrelevant question, which makes it clear to the

14   examinee that the questions are in fact being rotated.  The

15   examinee, of course, is told that questions will be

16   presented in a random order.

17       Q.   So the specific testing done here, you reviewed and

18   scored the charts, right?

19       A.   Yes.

20       Q.   And that was using the same methodology as Agent

21   Sullivan?

22       A.   Yes.

23       Q.   And your testimony is that you did that before even

24   looking at the charts?

25       A.   Before looking at her score sheet, I prepared my own

1    score sheet.

2        Q.    When you were first contacted about this case to

3        review this chart, what were you told?

4        A.    I was told that Agent Sullivan had conducted a

5    polygraph exam in a case that was going to trial; and that

6    she had obtained an admission from the examinee; and that

7    that statement was going to be the subject of a suppression

8    hearing; and that the defense counsel had retained an

9    expert; and would I please review her charts and the defense

10   report, and prepare my own score sheet, and compare my

11   results to Agent Sullivan's results.

12       Q.    Did you review Dr. Honts' report before doing your

13       own independent scoring?

14       A.    No.  My first step was to open the charts and score

15   them.

16       Q.    And yet, you did know, obviously, that Agent Sullivan

17       had scored them as deception indicated?

18       A.    I certainly -- I mean, having been told that she had

19   obtained an admission, a confession that was going to be the

20   result of a suppression hearing, my natural assumption was:

21   Oh, well, the charts must have been DI, deception indicated.

22       Q.    So given that you used -- you and Agent Sullivan used

23       the same methodology?  This is the same methodology that's

24       used consistently throughout the federal government,

25       right?

1      A.    Right.

2      Q.    And this is day-in-and-day-out, FBI agents are using

3      that methodology?

4      A.    Yes.

5      Q.    So shouldn't we expect your application of the

6      methodology to be consistent, if not the same as the

7      application of Agent Sullivan?

8      A.    It should be close, yes.

9      Q.    And in this case, your ultimate conclusion was the

10     same, right?

11     A.    Our ultimate question totals were ultimately the

12    same.  We got there in different ways.

13     Q.    All right.  So for the spot total for -- as I

14     understand you doing spot totals, you total all the scores

15     for one relevant question?

16     A.    Yes.

17     Q.    Over three series?

18     A.    That would be a spot total.

19     Q.    Okay.

20     A.    And then all reaction scores for the other relevant

21    questions result in a spot total for that question.

22     Q.    And in this case, your spot total and Agent

23     Sullivan's spot total for -- I'm going to throw up

24     Defendant's Exhibit N, which has been admitted.  This is

25     your chart?

1      A.    Yes, those are my scores.

2      Q.    So we're talking here the spot totals, right?

3      A.    That's right.

4      Q.    All right.  And right here is 5R.  So your spot total

5      for 5R was negative 4, correct?

6      A.    Correct.

7      Q.    And so Agent Sullivan's spot total for 5R was

8      negative 4?

9      A.    Yes.

10     Q.    And same for 7R?  Your spot total was negative 3, and

11     Agent Sullivan's spot total for 7R was negative 3?

12     A.    Correct.

13     Q.    But like you just said, how you got there differed,

14     right?

15     A.    Yes.

16     Q.    You would agree with me, wouldn't you, that in

17     scoring three charts with two relevant questions, that

18     there's 18 individual scorings that you're making?

19     A.    That's right.

20     Q.    Assuming clean charts?

21     A.    Correct.  Uh-huh.

22     Q.    You have the pneumo, the EDA, and the cardio, right?

23     A.    Yes.

24     Q.    Two relevant questions; that's six; three charts; is

25     18.  Right?

1     A.    Correct.

2     Q.    Do you happen to have Agent Sullivan's score sheet, a

3     copy with you?

4     A.    Well, what I do have is my score sheet, and I placed

5     her scores in the corner.

6     Q.    So you can walk along with me?

7     A.    Yes.

8     Q.    Okay.

9     A.    Because I was curious, obviously, exactly where did

10    we differ.

11    Q.    Right.  Right.  Well, let's talk about that.  I'd

12    like you to explain that.  I know in Agent Sullivan's

13    score sheet, the relevant question, it's kind of

14    backwards.  You've got two columns, right?

15    A.    Yes.

16    Q.    It's not necessarily backwards; it's just different?

17    A.    That's right.

18    Q.    Okay.  And so --

19          THE COURT:  Just for the record, the exhibit

20    that you are referring to?

21          MR. COBERLY:  Yes, Your Honor.  Defendant's

22    Exhibit M as in Mary.

23          THE COURT:  Okay.  Good.  Thank you.

24    Q.    So this is Exhibit M.  So she has in the first column

25    her scores for 7R, right?

1     A.    Yes, that's right.

2     Q.    They are just reversed.  Okay.  And there is nothing

3     unusual about that?  It just depends upon how the

4     scorer --

5     A.    Right.  She placed 7R on her score sheet first.  That

6     is, I believe, the first relevant question that she asked.

7     Q.    Right.

8     A.    On chart 1.

9     Q.    Okay.  So I want to try to lay things out side by

10    side, using the two columns to the side here, so let's

11    just do it this way.  We'll put 5R and 7R, right?

12    A.    Right.

13    Q.    Okay.  And I'm going to write in red where you

14    disagree and in green where you agree.  Okay?

15    A.    All right.

16    Q.    So would you agree with me that 5R is a zero for

17    pneumo that she scored?

18    A.    Correct.

19    Q.    And you scored a negative 1, so I'll put a red zero

20    here.  7R pneumo, you guys both agreed, right?

21    A.    That's right.

22    Q.    Now, for the 5R EDA, you have a null, and she has a

23    zero.  We don't know whether she nulled that out or she

24    scored that as a zero, right?

25    A.    That's correct.  Numerically, null and zero would be

1    the same thing.

2       Q.   I'm going to put just a dash there because she had a

3    zero, right?

4       A.   Correct.

5       Q.   So then next over, you scored a negative 1, and she

6    scored a zero.  Right?

7       A.   Correct.

8       Q.   Cardio, you both scored a negative 1, 5R, the cardio?

9    And 7R, you scored a negative 1, and she scored a zero?

10      A.   Correct.

11      Q.   Chart 2, you nulled out everything?

12      A.   That's right.

13      Q.   So she has a zero there.  7R, she had a zero.  And

14   I'm sorry.  You had a zero, and she had a negative 1,

15   right?

16      A.   That's right.

17      Q.   And then the EDA for 5R, the second, Agent Sullivan

18   had a negative 1, right?

19      A.   Correct, EDA at 5R.

20      Q.   Okay.  And then you guys agree in 7R?  You agree on

21   the cardio, is a null, and then agree on a positive 1.

22           Chart 3, you tend to agree quite a bit.  You

23   have zero, zero, negative 1, negative 1, negative 1.

24   Except you do disagree.  You said a null for 7R in the

25   cardio?

1     A.    And she had a negative 1.

2     Q.    And she had a negative 1.

3     A.    Okay.

4     Q.    Would you agree with me that you and Agent Sullivan

5     disagree on these individual scores one-third of the time?

6     A.    Yes.  I was shocked to see that, quite frankly.

7     Q.    And I believe your testimony earlier was -- I want to

8     make sure I understand -- that you didn't think that that

9     was that big of an issue because the differences were

10    between zero and 1, or zero and negative 1; they weren't

11    negative 1 and positive 1?

12    A.    We no contradictions.  We had no minus versus plus,

13    or plus versus minus, so no contradictions.  They involved

14    zero versus a minus, zero versus a plus.

15    Q.    So your testimony is that the difference between a

16    zero and a negative 1, or a zero and a positive 1, is not

17    a contradiction?

18    A.    When I say contradiction, I'm referring to a plus

19    versus a minus, or a minus versus a plus.

20    Q.    Do you think your deviation with Agent Sullivan was

21    significant?

22    A.    Yes.  Certainly six out of 18 scoring spots is

23    significant.

24    Q.    Do you know, using statistical terms, the correlation

25    or the percent of the variance between the scores?  Do you

1    have any background in statistics?

2    A.   No.

3    Q.   All right.  I want to show you just briefly on the

4    charts that we looked at, at the last hearing, just I want

5    to talk about a couple of charts.

6    A.   All right.

7    Q.   Not all the scoring.

8              MR. COBERLY:  Last time, Your Honor, we provided

9    the Court with a demonstrative exhibit to look at.  Would

10   you like that?

11             THE COURT:  Yes, if I can see it.  I don't know

12   where we put it the last time.  I can't see the witness,

13   but I think I can now.  I'm fine.

14             MR. NAYBACK:  With the Court's permission, may I

15   stand?

16             THE COURT:  Oh, yes, of course.

17             MR. NAYBACK:  Thank you.

18   Q.   So let's talk about the middle chart, chart 2.

19   A.   Chart 2.  All right.

20   Q.   And I'm going to the -- here, we have got the first

21   green box, is 5C, which is the comparison question

22   number 5, right?

23   A.   It wouldn't be 5, no.  Relevants are odd.

24   Q.   Oh, I'm sorry.  6.  See, my eyes are bad.  And then

25   we have 7 relevant, and then 4 comparison, and 5 relevant,

1      right?

2      A.   Yes.

3      Q.   There's this big red spike.  I believe I talked to

4      Agent Sullivan about that.  That's an obvious artifact in

5      the cardio channel, correct?

6      A.   It is.  He twitched his finger, flexed his arm, but

7   it involved the arm on which the cuff was placed.

8      Q.   And there's also in the pneumo, the top two channels,

9      there is a big spike, too, right?

10      A.   That's correct.  It appears a deep breath was taken

11   as the question was being asked.

12      Q.   Right.  And those are, you would agree with me -- I

13      mean, those are significant artifacts?

14      A.   Yes.

15      Q.   I mean, even a layperson --

16      A.   Oh, yes.

17      Q.   -- can see that?

18      A.   That is a movement and deep breath.

19      Q.   And so that meant -- because there was 4C, 5R was the

20      next relevant question, right?

21      A.   That's right.

22      Q.   And so that means that because this comparison

23      question had these artifacts, that you cannot score the

24      5R, right?

25      A.   I cannot evaluate it numerically, but globally that

1    is a deceptive reaction at 5R.

2        Q.    So your testimony is that you cannot numerically

3    evaluate it?

4        A.    That's right.  Since the comparison question adjacent

5    to it is artifacted, I cannot evaluate it numerically.

6        Q.    Okay.

7        A.    Which is why my score sheet reflects null, null,

8    null.

9        Q.    Right.

10       A.    In all three components.

11       Q.    Right.

12       A.    I can still evaluate it globally.

13       Q.    You can still evaluate 5R globally?

14       A.    His physiology reacted significantly at the

15   presentation of 5R.

16       Q.    Okay.  And are you talking about the EDA channel?

17   The pneumo channel?

18       A.    Significant reaction in the cardio tracing, as well

19   as the EDA channel.

20       Q.    But you did not -- in your report, you didn't say

21   anything about Global Analysis, did you?

22       A.    That's right.  But you just asked me if I -- so I

23   could not evaluate it.  I could not evaluate it numerically.

24       Q.    And no reasonable polygrapher can evaluate it

25   numerically?

1    A.   That's right.

2    Q.   But Agent Sullivan did evaluate it numerically?

3    A.   She did.  Let's see.  She had a -- that's right.

4    Your green minuses are confusing me.

5    Q.   That's all right.

6    A.   She had a zero in the cardio channel; minus 1 for

7    that EDA reaction; and a zero in the pneumograph channel.

8    Q.   Okay.  I just want to look at -- I don't want to get

9    too tedious.  Let's look at the first chart, chart 1.

10   Okay.  We talked about how the questions are mixed up a

11   little bit, so let me just represent to you the first

12   comparison question is 4; the first relevant question is

13   7; the next comparison question is 6; and the final

14   relevant question is 5.  Okay?

15   A.   Okay.

16   Q.   And if you want to step down from the witness box to

17   look at it closely now?

18          THE COURT:  And you are free to do so, sir, if

19   you want to.

20          THE WITNESS:  Okay.  Thank you.

21          THE COURT:  And I was checking with my courtroom

22   deputy.  This chart has been marked as Exhibit T; is that

23   correct, Mr. Coberly?

24          MR. COBERLY:  I'm sorry, Your Honor.  Exhibit T,

25   previously admitted.

 1            THE COURT:  I wanted to clarify the record on

 2      that.  Go ahead.

 3            MR. COBERLY:  Okay.

 4      Q.   So let's look at 7, relevant question.  I believe on

 5      your score chart, you scored the EDA channel, which is the

 6      middle purple?

 7      A.   That's right.  This white line activity.

 8      Q.   You scored that as a negative 1?

 9      A.   I did.

10      Q.   Okay.  Please explain to us and the Court and me what

11      your rationale was in scoring that as a negative 1?

12      A.   All right.  In evaluating the EDA channel in 7R, I

13      will compare it to the EDA channel at 4C.  I will not

14      compare it to the EDA reaction at 6C, as this reaction is

15      not timely.  The EDA tracing is still in recovery from 7R,

16      has not returned to baseline.  As you can see, it is clearly

17      early.

18      Q.   Okay.

19      A.   So this is not a scoreable reaction at 6C.  I cannot

20      use this for evaluation purposes.  So therefore, I compare

21      the EDA reaction, which is sweat gland activity, at 7R to

22      the EDA reaction at 4C.  The reaction at 7R is greater.

23      Therefore, it receives a score of minus 1.

24      Q.   And I want to try and clarify the record.  I do this,

25      too.  When you were saying that the -- if you could use

1      the red marker.  So you're saying that the sweat gland
2      activity on comparison question number 6 was not timely?
3      A.   That's correct.
4      Q.   And if you can circle that so we just have a record
5      of it, so we make sure we're talking about the same thing.
6      Okay.  And so therefore, your rationale is -- what did you
7      mention about the recovery period?
8      A.   The tracing is still in recovery from the reaction at
9      7R.  A reaction, typically, in the recovery phase will go
10     below baseline and then will eventually return to baseline
11     or homeostasis.  So the sweat gland tracing was -- had not
12     returned to homeostasis.  It was still in recovery, which
13     prevents this reaction from being timely.
14     Q.   So is it your testimony, then, that if the sweat
15     gland activity channel was tracing downwards, you want to
16     wait until it returns to homeostasis before asking a
17     question?
18     A.   That's right.  Agent Sullivan should have waited a
19     few seconds more before presenting question 6C.  The tracing
20     was not in homeostasis.
21     Q.   So let's take a look at 4C, the EDA channel.  You
22     would agree with me, wouldn't you, that the EDA channel
23     was trending down when Agent Sullivan asked the question?
24     A.   That's right.  And that's one of the exceptions to
25     the homeostasis rule.  It's taught at the school.  It's in

1    the federal handbook for test data analysis.

2        Q.   I think that's what -- I'll take my pen back there.

3             I'm going to give you -- well, let me ask you

4    this:  Your testimony regarding the -- I think it was in

5    your report that the EDA was not timely at question 6C

6    because it had a long recovery at 7R; and therefore, you

7    couldn't score it?

8        A.   That's right.  That is why I could not evaluate the

9    EDA at question 5R.

10       Q.   In testifying to that, what are you relying on?  Do

11   you know of any specific studies, etc., that support that

12   methodology?  Or is that just what's taught?

13       A.   I just know those are the test data analysis rules as

14   taught at NCCA.

15       Q.   Would you agree with me that there's a direct

16   correlation between the quality of the data collected and

17   the interpretability of that data?

18       A.   Yes.  Beautiful charts are easy to score.

19       Q.   Would you agree with me that how an examiner asks the

20   test question affects the question and the

21   interpretability of the data collected?

22       A.   Yeah, certainly.  It should be asked in a clear

23   manner with no voice inflection or stuttering or stammering.

24   If so, if there is a problem with the presentation of the

25   question, the examiner should mark it as, you know, a PWQ,

1    poorly worded question.

2    Q.   And the examiner is able to do that on the machine?

3    They can annotate as they go along?

4    A.   Right.

5    Q.   We don't have any annotations on Agent Sullivan's

6    charts?

7    A.   I would have to look at the charts, but I don't

8    believe so.

9    Q.   We'll look at the charts here in a second.  So the

10   examiner wants to use the same tempo when asking the

11   questions?  You don't want to emphasize certain words or

12   certain questions, right?

13   A.   That's right.

14   Q.   Did you, in reviewing Agent Sullivan's work, did you

15   do any analysis regarding how well -- before I get to

16   that question, these gray bands here are questions -- at

17   the beginning of the gray band is question start time,

18   right?

19   A.   That's right.  Question onset and question offset.

20   Q.   Okay.  And I believe that at question onset, you push

21   a space bar, right?

22   A.   That's right.

23   Q.   Offset, you let go?

24   A.   That's correct.

25   Q.   And when the person answers, the examinee answers,

1    there is another bar for when they -- the timing of their

2    answer, right?

3    A.    That's right.  As the examinee answers, the examiner

4    then presses the space bar again, and that records that

5    black vertical line, which is the answer.

6    Q.    Okay.  Did you do any -- did you do any analysis on

7    Agent Sullivan, the timing of the question that Agent

8    Sullivan asked?

9    A.    I did not.

10   Q.    Regarding the movement sensor device, I believe my

11   notes of your testimony was that you agree that a movement

12   sensor device -- I mean, it's a very sensitive device,

13   right?

14   A.    It is.

15   Q.    And it will pick up physical movements?

16   A.    Yes.  It can even pick up respiration.

17   Q.    Okay.

18   A.    It's so sensitive.

19   Q.    And when that happens, you'll kind of see like a wave

20   to it?

21   A.    Yes.

22   Q.    The respirations?

23   A.    Yes, a rhythmic deviation in the movement sensor

24   tracing.

25   Q.    And we all agree that Agent Sullivan did not use a

1    movement sensor device?

2    A.    Since the tracing is present, I'm assuming -- I mean,

3    if a tracing is there, then the movement sensor device was

4    utilized.

5    Q.    Okay.  So then it would be -- would you agree with me

6    that the movement sensor device in Jamaico Tennison's case

7    was not working?

8    A.    It is perfectly flat, so I would agree that it was

9    not working.

10   Q.    I want to -- you talked about countermeasures, and I

11   believe you talked about psychological countermeasures and

12   physical countermeasures, right?

13   A.    Mental countermeasures and physical.

14   Q.    Mental?  Did I understand your testimony to be that

15   you're able to detect in the charts a person's attempt to

16   do mental countermeasures?

17   A.    Possibly.  For example, there is mental dissociation,

18   or they're counting backward in their head by 3s from 100,

19   trying not to pay attention to what the examiner is asking.

20            Very often, that will produce very unusual

21   respiratory patterns.

22   Q.    I believe your testimony regarding the movement

23   sensor device was that it detects movements that could

24   interfere with the examination, right?

25   A.    That's correct, movements that could provoke a

1    physiological reaction on the polygraph charts.

2    Q.    And those movements might mean that they were

3    attempting physical countermeasures, right?

4    A.    Correct.

5    Q.    And it might mean that there was just movement,

6    right?

7    A.    That's right.  They shifted in their seat, perhaps.

8    Q.    And you would agree with me, wouldn't you, that a

9    polygrapher that is using a motion sensor device, if they

10   saw a movement on the motion sensor device in a certain

11   time frame of irrelevant or comparison question, you might

12   not score a question because of the movement?

13   A.    That's right.

14   Q.    Regarding the polygraph, the algorithms you've

15   testified that you ran the charts through, do you recall

16   testifying about those?  The algorithms?

17   A.    Yes.  I'm sorry; did you ask me a question?

18   Q.    I'm sorry.  Did Jennifer Sullivan, Agent Sullivan,

19   did she run the test charts through the algorithms?

20   A.    No.  We don't use them.

21   Q.    "We" meaning the FBI?

22   A.    The FBI.

23   Q.    Why does the FBI not use the algorithms?

24   A.    We have found them to be too conservative.

25   Q.    Too conservative in what regard?  What does that

1    mean?

2    A.    That hand-scoring, there are -- there have been too

3    many situations where hand-scoring results in a call of

4    deception indicated; but yet, the algorithm reaches an

5    inconclusive outcome.

6    Q.    So conservative, your testimony regarding it being

7    conservative means that it's not picking up enough

8    deception indicated?

9    A.    Well, that's right.  Yes.  Yes.  That's exactly what

10   I meant.

11   Q.    And that reminds me.  I did want to clarify something

12   you testified about earlier.  The Federal Three-Position

13   methodology, scoring method, I believe you testified that

14   that was more conservative than other methodologies?

15   A.    That's right.

16   Q.    Okay.  But your testimony -- I want to make sure I'm

17   clear.  The testimony is regarding it being conservative,

18   again, is that a Three-Position will pick up more

19   deception indicated than other testing methodologies?

20   A.    That --

21   Q.    Do you want me to ask that again?

22   A.    Could you ask that again?

23   Q.    Sure.  I'm sorry.  In your view, a Three-Position

24   testing or scoring methodology will return more deception

25   indicated results?

1    A.   It would -- let me -- I'm not sure --

2    Q.   In your own words?

3    A.   Okay.  In my own words, with the Three-Position

4    Scale, someone with a Three-Position Scale, if the numerical

5    outcome is no deception indicated, then they have really

6    passed it, and if the numerical outcome is deception

7    indicated, then they have really failed it, so that there is

8    more confidence on both ends of the spectrum.

9    Q.   Okay.  That begs the question that I'm going to ask

10   is, the confidence -- so there is more -- in a

11   Three-Position, there's more DIs, deception indicated,

12   right?  And there's more NDI, non-deception indicated?

13   A.   I would say there is more inconclusives.

14   Q.   There is more inconclusives?

15   A.   Yes, there is more inconclusives.

16   Q.   Okay.  And you're saying that that makes -- that

17   necessarily means that the inconclusive -- I'm sorry --

18   the NDI and the DI results are more reliable?

19   A.   Yes.

20   Q.   Do you have any studies or research to back up that

21   testimony?

22   A.   No.

23          MR. COBERLY:  Your Honor, if I may have one

24   moment?

25          THE COURT:  You may.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    Q.   So the FBI does not have -- the FBI policy is, you

2    don't use the algorithms?

3    A.   That is correct.

4    Q.   Now, when you use the scoring algorithms, how did you

5    -- did you run the existing data through the algorithm,

6    itself?  Did you modify anything?

7    A.   No.  It's very simple within Lafayette.  You just

8    click on the score tab at the top of the screen and then

9    select either PolyScore or OSS-3, then select the charts to

10   be scored.

11   Q.   Uh-huh.

12   A.   And then exclude any reactions that you wish to

13   exclude, such as the asking of 5R on chart 2.

14   Q.   Okay.  Can you exclude particular channels within

15   certain questions?  For example, did you or can you

16   exclude the EDA channel in question 5R on chart 1, which

17   you hand-scored as null?

18   A.   You can.

19   Q.   And did you do that in this case?

20   A.   I did not.

21   Q.   What about in chart 3, question 7R, the cardio, where

22   you scored it as null?  Did you mark that as to exclude in

23   the algorithms?

24   A.   I did not.

25   Q.   Just briefly, let's look at Exhibit 15.  You would

1    agree with me, would you not, sir, that this is not --

2    this is just -- this is just a screen shot of the top

3    portion of a lengthy report, correct?

4    A.   Correct.

5    Q.   And the actual report, if we were to scroll down, it

6    would show a lot of other data that we can't see right

7    now, right?

8    A.   I believe it's mathematical calculations.  I believe.

9    Q.   Okay.  Do you have a printout of this report that's

10   the part of the report that's missing?

11   A.   I do not.

12   Q.   And, in fact, that report would show us which

13   questions you excluded, and which channels, and which

14   questions you excluded or not excluded, right?

15   A.   I am not sure.

16   Q.   Because you really don't know much about these

17   algorithms, right?

18   A.   That's right.

19   Q.   You just kind of pump data in?

20   A.   I was curious as to what the algorithms would

21   conclude.

22   Q.   Okay.

23   A.   And I satisfied my curiosity.

24   Q.   So are you relying on the results of the algorithm to

25   support your hand-score?

1      A.    No.

2      Q.    So this is for curiosity purposes?

3      A.    It's -- it's present in the software.  I chose to see

4   if it would agree or disagree with me, with hand-scoring.

5      Q.    Okay.  So do you know -- you ran through two

6   different algorithms, right?

7      A.    Correct.

8      Q.    PolyScore is the first one?

9      A.    Yes.

10     Q.    And then what's the other one?  OSS?

11     A.    OSS.

12     Q.    Do you know anything about how the PolyScore

13   algorithm was created?

14     A.    No.

15     Q.    You did reference, though, that it was created or it

16   was -- something about Johns Hopkins.  What was that?

17     A.    Yes, the attribution is given to Johns Hopkins

18   University Applied Physics Laboratory.

19     Q.    Are you aware of any controversy surrounding the

20   creation and reliability of PolyScore?

21     A.    No.

22     Q.    Within the scientific community?

23     A.    No.

24     Q.    You are intimately familiar with the Lafayette

25   machine, right?  How long have you been using it?

1    A.    Seven years, eight years.  Seven or eight years.

2    Q.    And that's the -- there's a big manual for that,

3    right?

4    A.    Yes.

5    Q.    The Lafayette user manual?

6    A.    Right.  Correct.

7    Q.    Are you familiar with that Lafayette user manual?

8    A.    Not every single aspect of it.

9    Q.    Sure.  But is that something that you would want

10   to -- you as yourself and you teaching your students at

11   the FBI -- that you would want them to adhere to the

12   requirements that are found within the manual?

13   A.    Yes.

14              MR. COBERLY:  Your Honor, may I approach?

15              THE COURT:  You may.

16   Q.    Sir, I'm handing you Exhibit U.

17              MR. COBERLY:  I don't believe this has been

18   admitted into evidence yet.

19              THE COURT:  No, I don't believe it has been,

20   counsel.

21              MR. COBERLY:  Okay.

22   Q.    I would like you to take a look at that.

23   A.    U or V?

24   Q.    I'm sorry.  I believe it's U.  Maybe my handwriting

25   is really bad.  It's the big thick two-per-page double-

1    sided.

2    A.   Yes.  Here we go.  Yes.

3    Q.   All right.  Does this appear -- would you take a

4    moment and just flip through it?

5    A.   Right.  I believe now you can click -- like most

6    manuals, with most electronic devices these days, it's

7    embedded in the software.  You can click on "Help" and

8    review the manual.

9    Q.   Okay.

10   A.   Really, a paper manual isn't utilized.

11   Q.   Right.  It's a .pdf.  So you would agree with me that

12   this is the Lafayette user manual?

13   A.   Yes.

14   Q.   And it's 363 pages?

15   A.   Correct, which is why I'm not intimately familiar

16   with every single aspect of it.

17   Q.   Right, which is why I printed it the way I printed

18   it.  Before you ran Mr. Tennison's charts through the

19   algorithms out of curiosity's sake, did you review the

20   manual regarding those algorithms?

21   A.   No.

22   Q.   Sir, if you could turn to page, what is Bates

23   numbered, as well --

24        MR. COBERLY:  First of all, Your Honor, I would

25   like to move to admit Defendant's Exhibit U.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1          THE COURT:  Any objection to the tender of

2     Exhibit U?

3          MR. NAYBACK:  No.

4          THE COURT:  It is admitted.

5          (Defendant's Exhibit U admitted into evidence.)

6     Q.   I would like you to turn, sir, to -- I had to Bates

7     number this.  It wasn't individually stamped all the way

8     through.  But 186.  Do you see where I'm at?

9     A.   Let's see.  Lafayette 186.  Yes, there with the word

10    "Warning."

11    Q.   Three exclamations marked before and after the word

12    in all caps?

13    A.   Yes.

14    Q.   Do you see where certain guidelines -- these are the

15    guidelines that are to be used before using PolyScore,

16    right?

17    A.   Yes.  That is --

18    Q.   I mean, take a look before and after.  I don't want

19    to --

20    A.   Yes.  "PolyScore imposes the following chart

21    collection requirements," Numbers 1 through 8.

22    Q.   Okay.  Now, if you would, sir -- yes, you're looking

23    at Page 185, right?  "PolyScore imposes the following

24    chart collection requirements"?

25    A.   Correct.

1    Q.   All right.  Let's look at Number 2.  These are

2    requirements for PolyScore, right?

3    A.   Yes.

4    Q.   Okay.  Number 2 says:  You must allow at least 25

5    seconds between question onsets, that being the time

6    between when you start asking a question and the time you

7    start asking the next question.  Right?

8    A.   That's right.

9    Q.   Okay.  Sir, I'm going to put this back up here.  On

10   the polygraph charts we have on Exhibit T1, at the bottom

11   is a -- it's a time chart, right?

12   A.   Yes.

13   Q.   Okay.  And as I understand it, the graph, the

14   vertical bars of the graph represent 5 seconds in time; is

15   that right?

16   A.   That's correct.

17   Q.   Sir, if you could, please, I would like you to take a

18   close look at the chart, chart 1, if you would, sir, and

19   tell the Court approximately how much time you think there

20   is between question 3I and 4C.

21   A.   May I step down?

22   Q.   Yes, please.

23   A.   Approximately 20 seconds.

24   Q.   Okay.  What about the same chart, chart 1, the time

25   between question onset of 7R and question onset of 6C?

1      A.    Fifteen seconds.

2      Q.    Chart 1, same chart, question onset time between 6C

3      and 5R?

4      A.    Twenty seconds.

5      Q.    Okay.  Now, if you could look at chart 2, question

6      onset time between question 4C and 5R?

7      A.    Eighteen seconds.

8      Q.    Okay.  Chart 3, sir, question onset time between

9      question 1I and and 6C?

10     A.    Twenty seconds.

11     Q.    Okay.  Chart 3, question onset time between 5R and

12     4C?

13     A.    Fifteen seconds.

14     Q.    Okay.  Finally, last one, chart 3, question onset

15     time between 4C and 7R?

16     A.    Eighteen seconds.

17     Q.    Okay.  Thank you, sir.  Let's go back to Exhibit U.

18           THE COURT:  I'm wondering if this is a time to

19     take a lunch break here?  We have been in session, I

20     think, a little over an hour and a half.

21           MR. COBERLY:  Sure, Your Honor.

22           THE COURT:  All right.  So we're going to recess

23     for lunch here.  Sir, I'll excuse you at this time.  Let

24     me confer with counsel here at the bench for just a

25     minute.

```
 1              (A discussion was held off the record between the
 2              Court and the attorneys.)
 3         THE COURT:  All right.  We're going to be in
 4    recess for lunch.  The Court is going to have to review
 5    some matters here, so we'll reconvene -- it is now more or
 6    less 12:15.  We'll reconvene at 1:35, an hour and 20
 7    minutes.
 8              All right.  We'll be in recess.
 9              (Recess from 12:15 p.m. until 1:35 p.m.)
10         THE COURT:  All right.  You may be seated.
11         Do you wish to address matters, preliminary
12    matter here on scheduling?  My courtroom deputy indicated
13    as much.
14         MR. NAYBACK:  Your Honor, I just did.  I asked
15    Mr. Coberly about scheduling, only because I have
16    responsibilities at the end of the day involving my
17    children.
18         THE COURT:  Let's have you approach up here.
19         MR. NAYBACK:  Oh, thank you.
20         THE COURT:  We are not on the record, Julie.
21              (A discussion was held off the record between the
22              Court and the attorneys.)
23         THE COURT:  We're going to go ahead and continue
24    here.  The Court was conferring with counsel concerning
25    scheduling, and we're going to go until 4:20 this
```

1    afternoon, then we'll recess.  We will resume and conclude

2    the matters before the Court on Wednesday, February 3,

3    2016, at 9:00 a.m., and Dr. Honts will be able to be back

4    at that time, and that's a time convenient for the

5    parties.  So let us continue.  And we'll send out another

6    notice of hearing at 9:00 on February 3.

7             All right.  Let's continue here.

8             MR. COBERLY:  Thank you, Your Honor.

9             CROSS-EXAMINATION (Continued)

10   BY MR. COBERLY:

11   Q.   Good afternoon again.  We were talking, I believe,

12   about the algorithms you ran the test scores through,

13   correct?

14   A.   Yes.

15   Q.   We were on the PolyScore algorithm.  If I could have

16   you turn back to Page 186 at the Lafayette manual.

17             MR. COBERLY:  Just a moment, Your Honor.

18   Q.   So, sir, can you see bullet point 7 there, where it

19   says that:  If there is a movement or other artifact

20   occurring during a comparison/control or relevant question

21   response, then components of the response must be dropped?

22   A.   Yes, I see that.

23   Q.   And my understanding from your testimony earlier was

24   that you, when running algorithms, you dropped all of --

25   one of the -- the relevant question that had the issue

1     with the artifact in chart 2 that affected all of the

2     components?

3     A.    Yes, the asking of 5R on chart 2.

4     Q.    Yet, there were -- there was a component in chart 1.

5     You know that, correct?

6     A.    That's correct, the EDA component on chart 1 asking

7   of question 5R.

8     Q.    Okay.  And there one in chart 3, as well,

9     correct?

10    A.    Yes, the cardio component, chart 3, question 7R.

11    Q.    And you did not drop those components from the

12    polygraph when you ran the PolyScore program?

13    A.    That's correct.

14    Q.    And because there was no movement sensor device, we

15    don't know if there were other movements that -- we just

16    don't know if there were any other movements, correct?

17    A.    That's correct.

18    Q.    Finally, sir, if you take a look at point 8 here, it

19    says:  The blood pressure cuff should not be inflated

20    beyond the diastolic pressure, typically less than 65 --

21    I'm not sure of the exact terminology.

22    A.    Millimeters of mercury.

23    Q.    Millimeters of mercury.  Thank you.  In this case, do

24    you recall from the testimony last month what the blood

25    pressure cuff was set at?

1    A.   I do not recall.  Well, I'm not here to guess, but I

2    would --

3    Q.   I don't want you to guess.

4    A.   We typically run our cuffs at greater pressure than

5    65 millimeters of mercury.

6    Q.   And what, typically, do you run them at?

7    A.   I instruct our students to typically run it at 70

8    millimeters of mercury.  But, of course, it is

9    examinee-dependent.  Sometimes more is called for; sometimes

10   less.

11                  MR. COBERLY:  May I have one moment, Your Honor?

12                  THE COURT:  You may.

13   Q.   Showing you, sir, what has already been admitted into

14   evidence as Exhibit Q, is this a standard data set that's

15   created by the Lafayette software?

16   A.   It is.

17   Q.   And this is the data set for chart 1 of Agent

18   Sullivan's testing of Jamaico Tennison, correct?

19   A.   Correct.

20   Q.   And you would agree with me that the cuff pressure

21   began at 94, correct?

22   A.   Yes.

23   Q.   Again, look at what has been previously admitted into

24   evidence as Exhibit R.  Sir, for chart 2, what was the

25   cuff pressure at the start?

1    A.    Start, 85.

2    Q.    Finally, sir, let's take a look at what has been

3    admitted as Exhibit S for chart 3.  What was the cuff

4    pressure in chart 3?

5    A.    It's 74.  And, of course, higher pressure is utilized

6    if the cuff placement is on the forearm rather than the

7    upper arm.

8    Q.    You do agree with me, don't you, sir, that the

9    requirements of running a PolyScore is that the cuff

10   pressure should not be greater than 65?

11   A.    So it states, yes.

12   Q.    Let's talk about -- so PolyScore was one of the

13   programs, right?

14   A.    That's right.

15   Q.    And the other program was OSS?

16   A.    OSS-3.

17   Q.    Okay.  And what does OSS stand for?

18   A.    Objective Scoring System.  It's copyrighted by

19   Lafayette.

20   Q.    Do you know anything about the creation of OSS-3's

21   algorithm?

22   A.    No.  I just know the attribution given.

23   Q.    Did you, before running the Tennison data through

24   OSS-3, did you review the Lafayette manual?

25   A.    No.

1    Q.   Sir, if I could have you turn to Page 192 of the

2    Lafayette manual, again we've got another three

3    exclamations "Warning" and three exclamations, correct?

4    A.   Correct.

5    Q.   And it says here:  The validity of the OSS decision

6    is a function of accuracy of the data entered and the

7    adherence to standard ZCT protocol.  Right?

8    A.   Yes.

9    Q.   ZCT stands for Zone Control Test; is that correct?

10   A.   Zone Comparison Test.

11   Q.   Zone Comparison Test.  Thank you.  Tennison's test

12   was not a Zone Comparison Test, correct?

13   A.   That's correct.

14   Q.   It was an MGQT?

15   A.   That's right.

16   Q.   Move up to bullet point 2.  And, again, it talks

17   about -- let me just highlight this here -- about the Zone

18   Comparison Test and that other question set formats have

19   not been validated using the algorithm developed by OSS.

20   Right?

21   A.   That's what it states, yes.

22   Q.   And at the very beginning of bullet point 2:  It's

23   required to have three charts, each containing three

24   relevant and three comparison questions.  Correct?

25   A.   Correct.

1    Q.    And Mr. Tennison's test was a two comparison, two

2    relevant question test, right?

3    A.    Correct.

4    Q.    And, again, in bullet point 3, I think it's very

5    similar and I won't go over it, but it talks about having

6    to drop when there's a movement or artifact, right?

7    A.    Yes.

8    Q.    So I want to be clear regarding why you ran those

9    algorithms, the tests through the algorithms.

10   A.    Because Dr. Honts had made quite an issue of having

11   access to the raw data collected during the test, and I

12   wondered why the raw data was so important, when obviously

13   he could just review the charts.  And it occurred to me

14   that, oh, he must want that raw data so that he can use the

15   scoring algorithms.

16            So I thought, let me use the scoring algorithms

17   and see what the algorithms say.

18   Q.    So it was, again, a matter of curiosity, in essence?

19   A.    Yes.

20   Q.    And so you don't want to be on record as relying on

21   the results of the scoring algorithms to support your

22   testimony today, right?

23   A.    We rely on hand-scoring, so that is right.

24   Q.    But you are relying on the FBI manual, right?

25   A.    Yes.

1       Q.    Okay.   The one that is redacted?

2       A.    That's right.

3             MR. COBERLY:   If I could have one moment, Your

4       Honor?

5             THE COURT:   You may.

6             MR. COBERLY:   I have nothing further, Judge.

7       Thank you.

8             THE COURT:   I do have a question here.   Let me

9       review my notes.   Okay.   I had to find it.   Sorry.   A lot

10      of notes here.

11            So at 10:44, Line 17, I believe you said, and I

12      want you to clarify this, that there are no blanket FBI

13      policies, or there is no blanket FBI policy which

14      prohibits an examiner from recording the pre-test and the

15      in-test portions of the polygraph; is that correct?

16            THE WITNESS:   When -- I believe when Robert

17      Hilland was the chief of the FBI polygraph program, he did

18      send out a directive that the pre-test and in-test should

19      not be recorded, because at that time there was -- there

20      certainly was increasing pressure to record post-test

21      admissions and confessions.

22            THE COURT:   Right.

23            THE WITNESS:   And so he wanted to clarify that

24      the recording was to be of the post-test only.

25            THE COURT:   And was the prohibition existing

1       during the time of the polygraph in this case?

2                   THE WITNESS:  My understanding, based on my

3       recollection of the dates, is yes.

4                   THE COURT:  With respect to these directives, I

5       take it that they are to be applied in every divisional

6       office; is that correct?

7                   THE WITNESS:  That's correct.

8                   THE COURT:  Okay.  That's my only question.

9       Anything further?

10                  MR. NAYBACK:  Briefly, Your Honor.

11                  THE COURT:  All right.

12                  MR. NAYBACK:  May it please the Court.

13                  THE COURT:  You may proceed.

14                          REDIRECT EXAMINATION

15      BY MR. NAYBACK:

16      Q.   Special Agent Foster, is your opinion testimony today

17      based on your training and experience of considerable

18      amount of years?

19      A.   Yes.

20      Q.   Prior to today's hearing, did you ever receive a

21      request from defense counsel or from the U.S. Attorney's

22      Office, any request for scientific studies or research

23      articles to support your report?

24      A.   No.

25      Q.   You reviewed Dr. Honts' hand-scores of the same

1      charts we were reviewing today, correct?

2      A.    I have.

3      Q.    Were you able to develop an opinion about Dr. Honts'

4      hand-scores?

5      A.    My --

6      Q.    Let me rephrase.  Do you have an opinion about Dr.

7      Honts' hand-scoring?

8                 MR. COBERLY:  I object, Your Honor.

9      A.    I do.

10                 MR. COBERLY:  This is not redirect.  This is --

11      I think it was covered, and it should have been covered in

12      direct if it wasn't.

13                 MR. NAYBACK:  Your Honor, I think defense

14      counsel went over this in cross-examination.

15                 THE COURT:  Overruled.

16      Q.    (By Mr. Nayback)  Can you tell me, in your opinion,

17      how he got to his conclusion that Jamaico Tennison's

18      polygraph was inconclusive?

19      A.    Upon reviewing his scores, I am baffled as to how he

20      applied his scores to the same charts that I reviewed.  We

21      have so many contradictions where there are pluses versus

22      minuses, minuses versus pluses.  I do not know how he

23      arrived at his scores.

24      Q.    So his hand-scoring would not comport with how you

25      trained polygraphers to hand-score?

1    A.    Correct.

2    Q.    Now, Mr. Coberly asked you questions about the Utah

3    Scoring Method, correct?

4    A.    Correct.

5    Q.    You testified that you picked it up at an American

6    Polygraphers Association conference; is that correct?

7    A.    That's correct.

8    Q.    Is it a complex scoring system?

9    A.    It is not particularly complex, no.

10   Q.    Okay.

11   A.    It's very straightforward.

12   Q.    So you were comfortable in picking it up and knowing

13   how it works?

14   A.    Yes.

15   Q.    Okay.  And you ran your hand-scores through the same

16   scoring system that Dr. Honts used, right?

17   A.    I did.

18   Q.    And what was your result?

19   A.    My result, applying the Utah decision thresholds to

20   my scores, resulted in deception indicated.

21            MR. NAYBACK:  Pass the witness, Your Honor.

22            THE COURT:  Anything further?

23            MR. COBERLY:  Your Honor, may I just ask some

24   follow-up on those questions?

25            THE COURT:  Following up on that.

```
 1                        RECROSS-EXAMINATION

 2      BY MR. COBERLY:

 3      Q.    Sir, how do you -- the director of the Polygraph Unit

 4      was Hillibrand or something?

 5      A.    Robert Hilland.

 6      Q.    How do you spell that?

 7      A.    H-I-L-L-A-N-D.

 8      Q.    And if I understand, prior to Director Hilland, the

 9      policy was consistent with the FBI Examiner Manual that

10      talks about you can record pre-test, in-test, post-test,

11      right?

12      A.    The manual states "may be monitored or recorded" and

13      typically it could be monitored by someone next door

14      looking, you know, a two-way mirror type situation, as

15      opposed to being recorded.

16             But there was uncertainty as to what the manual

17      meant.  Examiners were being asked to record post-test

18      interviews, and Robert Hilland sought to clarify our

19      recording policy.

20      Q.    Okay.  And approximately, and I can't -- I think it

21      was 2012?  Did I understand that correctly?

22      A.    I believe.

23      Q.    Okay.  But the policy at the time, before Director

24      Hilland set out the directive, was, it stated "or

25      recorded."  Right?
```

 1     A.    Right.   It stated "may be monitored or recorded."

 2     Q.    Okay.   And so there were agents recording pre-test,

 3     in-test, and post-test prior to 2012, correct?

 4     A.    To my knowledge, no pre-tests and in-tests were

 5     recorded.

 6     Q.    But you just testified there was confusion about

 7     whether they could or should?

 8     A.    Because the manual stated it may be monitored or

 9     recorded.   And, of course, our fear was that our pre-test

10     and in-test would end up on the Internet.

11     Q.    Okay.   After Hilland sent out the directive, the

12     directive was no pre-test, no in-test recording, right?

13     A.    Correct.

14     Q.    But that left in place agents' discretion whether to

15     record post-test interrogation?

16     A.    That's correct.

17               MR. COBERLY:   Thank you, Judge.

18               THE COURT:   All right.   Is there any further

19     need of the witness here?

20               MR. NAYBACK:   Not on behalf of the United

21     States.   Thank you.

22               THE COURT:   All right.   Sir, I do excuse you at

23     this time.

24               THE WITNESS:   Exhibits?

25               THE COURT:   Let's put them on the shelf down

1    below.

2              COURTROOM DEPUTY CAROL WALKER:  Right down here.

3    Thank you.

4              THE COURT:  You may call your next witness.

5              MR. NAYBACK:  Your Honor, as to this motion, the

6    United States respectfully rests.

7              THE COURT:  All right.  Mr. Coberly?

8              MR. COBERLY:  Your Honor, I would call Dr.

9    Charles R. Honts.

10             COURTROOM DEPUTY CAROL WALKER:  Please raise

11   your right hand.  You do solemnly swear that your

12   testimony in this matter shall be the truth, the whole

13   truth, and nothing but the truth, so help you God?

14             THE WITNESS:  I do.

15             COURTROOM DEPUTY CAROL WALKER:  Please be

16   seated.  Please state your name and spell your last name

17   for the record.

18             THE WITNESS:  Charles Robert Honts, H-O-N-T-S.

19                  CHARLES ROBERT HONTS,

20        after having been first duly sworn under oath,

21        was questioned and testified as follows:

22                  DIRECT EXAMINATION

23   BY MR. COBERLY:

24   Q.  Good afternoon, Dr. Honts.

25   A.  Good afternoon.

1     Q.    Sir, where are you employed?

2     A.    I am employed at Boise State University in Boise,

3     Idaho.

4     Q.    And in what capacity?

5     A.    I'm a full professor of psychology.

6     Q.    And what do you do as a full professor of psychology?

7     A.    I teach classes, so I have a full-time teaching load.

8     I do research.  And then I also have a contractual

9     responsibility to do service work.

10    Q.    Do you oversee graduate students?

11    A.    No.  We don't have a graduate program at Boise State,

12    but I oversee research conducted by undergraduates.

13              MR. COBERLY:  May I approach, Your Honor?

14              THE COURT:  You may.

15    Q.    Doctor, I've handed you what has been admitted as

16    Exhibit V.  Is that your resume?

17    A.    Yes.

18    Q.    Can you please tell the Court your academic training,

19          starting with bachelor's?

20    A.    Yes.  I have a bachelor of science in psychology from

21    Virginia Tech, that I received in 1974.  I also have a

22    master of science in psychology, also from Virginia Tech,

23    that I received in 1982.  And then I have a Ph.D. in

24    psychology that I received from University of Utah in 1986.

25    Q.    And what was your master's thesis.

1    A.    My master's thesis was a study of the effects of

2    countermeasures on the comparison questions asked.

3    Q.    And what about your doctorate?

4    A.    My doctorate continued that line of research and also

5    looked at the effects of countermeasures on the comparison

6    questions asked.

7    Q.    Have you held academic teaching positions --

8           MR. NAYBACK:  Excuse me.  Your Honor,

9    respectfully, the United States would stipulate to the CV

10   of Dr. Honts.  It's a lengthy CV.  We would stipulate to

11   his credentials as an expert for the limited purpose of

12   this hearing, and would reserve the right to challenge any

13   opinions he would have, should the Court allow his

14   testimony to proceed to trial.

15          But in the interest of time, I just wanted to

16   let the Court know that the United States would stipulate

17   to his credentials to testify as an expert in this area.

18          THE COURT:  Mr. Coberly?

19          MR. COBERLY:  I appreciate the offer to

20   stipulate.  However, I think it's important to the Court

21   to, you know, hear from Dr. Honts, to assess his

22   credibility, to assess --

23          THE COURT:  If you have anything you wish to

24   present that would supplement, not repeat, what is in

25   Exhibit V, you may do.

1          MR. COBERLY:  Well, not --

2          THE COURT:  So there is no reason to cover

3     everything that is in this vitae, because I'm reading it.

4          MR. COBERLY:  Okay.

5          THE COURT:  But anything you wish to certainly

6     proffer by way of further foundation, that's fine.  But

7     the government certainly does not object to the expertise

8     of your witness for this proceeding.

9          MR. COBERLY:  Would the Court allow or indulge

10    me to allow Dr. Honts to highlight just a couple of

11    articles he has written?

12         THE COURT:  Yes.  Certainly.

13         MR. COBERLY:  Okay.

14    Q.   (By Mr. Coberly)  Sir, have you held any non-academic

15    teaching jobs?

16    A.   Yes.

17    Q.   Okay.  And where have you held the teaching

18    positions?

19    A.   Well, I -- part of my duties at one time, I worked

20    with the Department of Defense Polygraph Institute, and I

21    did teach while I was there.  My job title was research team

22    leader.  But I lectured at the basic courses and also

23    advanced courses at the Polygraph Institute and then at

24    other government facilities.

25         So I've lectured at Quantico, I've lectured

1    before the Secret Service, I've lectured before the CIA,

2    and at the Air Force Advanced Trial Advocacy School at

3    Maxwell Air Force Base in Alabama.

4    Q.   The DODPI, is that the same place that we just heard

5    Agent Foster talking about that he teaches at?

6    A.   It's the parent organization.  It was originally the

7    Department of Defense Polygraph Institute, and it has gone

8    through several names, and now it's the National Center.

9    Q.   You have published many articles in peer-reviewed

10   journals.  Can you tell the Court what peer-reviewed is?

11   A.   Yes.  Peer-reviewed is a -- scientific journals have

12   their own quality control, and peer-reviewed journals, you

13   submit an article to them, and then the article is reviewed

14   by an editor and an associate editor.  They look at the

15   article, and then they send it out to other scientists who

16   have expertise in the area.  And those scientists review the

17   article for quality of methods; quality of statistical

18   analysis; do the conclusions follow from the data that are

19   presented.

20          And then in concert with the associate editor or

21   the editor of the journal, they make a decision about:

22   Does this need to be revised?  Is it okay the way it is?

23   Is it unacceptable for publication?

24          And so submitting articles in no way means that

25   they're going to be published.  The top-tiered journals in

1     psychology typically reject 85 or 90 percent of the

2     articles that are submitted to them.

3     Q.   You've presented numerous papers and spoken at

4     numerous conferences.  Can you please tell the Court a

5     couple that come to mind that sort of are in relation to

6     this case or something that's kind of tied to this case a

7     little bit?

8     A.   In 2013 at the American Psychology and Law Society

9     meeting -- the American Psychology and Law Society is a

10    division of the American Psychological Association, Division

11    41.  They hold an annual meeting where scientific papers are

12    presented.  Those are also peer-reviewed, in that not every

13    paper that is submitted gets accepted for presentation.

14         And I gave an article about the FBI's -- the

15    impact of the FBI's policy of interrogating inconclusive

16    -- people who receive inconclusive outcomes on polygraph

17    tests.

18    Q.   What was the conclusion of that study?

19    A.   The conclusion of that study was that it was

20    selectively dangerous to people who are actually innocent.

21    It puts, as I recall, four times as many innocent people at

22    risk of false confession because they're interrogated, while

23    only gaining a small percent, a few percent in actually

24    guilty people that are interrogated.

25    Q.   What law enforcement agencies have you consulted with

1       or provided training to?

2       A.   I've consulted with and provided training to many

3       agencies.  When I was working for the Department of Defense

4       Polygraph Institute, it was the entire federal government

5       including the CIA, although the CIA didn't train at the

6       Polygraph Institute at that time.  I guest lectured at the

7       CIA.

8               Since then, I've taught at the Canadian Police

9       College, which is the Canadian equivalent of the U.S.

10      government, the Department of Defense Polygraph Institute.

11      I have literally been around the world training law

12      enforcement.  I've trained law enforcement in Mexico, in

13      Columbia, in China, in the Netherlands, in Sweden, in

14      Norway.

15              THE COURT:  What do you do your training in?

16              THE WITNESS:  I've trained in a number of

17      things, polygraph being one of them, in the proper way to

18      conduct a polygraph test, and how to score polygraph

19      tests, and about countermeasures, which is my particular

20      subspecialty.  I've also done training on interrogation

21      techniques, and false confessions, and child witnesses.

22              THE COURT:  All right.

23      Q.   (By Mr. Coberly)  How many times have you been

24      qualified as an expert witness in state or federal

25      courts?

1    A.    I believe it's 117.  It would be 118.

2    Q.    Approximately how many times is that in connection

3    with polygraph techniques?

4    A.    I would say about 80 of them are in connection with

5    polygraph.

6    Q.    And what were the others in connection with?

7    A.    Interrogation; false confession; child witnesses;

8    assessing the credibility of child witnesses; eyewitness.

9    I've testified I believe twice on eyewitness issues.  And

10   I've also been qualified as an expert in statistical

11   analysis.

12   Q.    Can you please provide the Court with some overview

13   of the science -- well, is polygraph a science, or is it

14   an art?

15   A.    In my opinion, it's a science.

16   Q.    Why is that?

17   A.    Well, beginning in the 1970s, when scientists became

18   really interested in polygraph -- for a long period of time

19   there was almost no scientific research -- particularly at

20   the University of Utah, but also in other universities, the

21   focus of that research has been to remove the art from it

22   and to make it a psychological test.

23            And I believe to a great extent that we've now

24   succeeded in doing that; that it can be run in a very

25   standardized fashion and scored in an extremely

1    standardized way, and we've removed most of the art from

2    it.

3    Q.   Can you provide the Court with just a brief snapshot

4    overview of the science behind polygraphy?

5    A.   Well, there's a history of science now that goes back

6    into the 1970s, and the science has been conducted in two

7    venues.  Some of the scientific research has been done in

8    laboratory settings, and scientists would like laboratory

9    settings because we have control, and we can manipulate

10   individual variance and look at the effect of individual

11   variables; for example, scoring with one technique or

12   another, or introducing a countermeasure to some people and

13   to not others.  And so there is a body of laboratory

14   research.

15          There is also a body of field research.  The

16   field research is much more difficult to conduct because

17   we don't know with certainty who's innocent and who's

18   guilty, and so we have to look for some external criterion

19   to define who is innocent and actually who is guilty in

20   terms of actuality in the real world.

21          Studies have been based on confessions.  Studies

22   have been based on independent evidence.  A few have been

23   based on judicial verdict.  None of those are perfect.

24   The standard in the science right now seems to be

25   confession that produces new evidence as a criterion for

1        when the polygraph gets things right or not.

2                    And so we have data from both of those areas.

3        Q.    So honing in on the physiology of the polygraph, how

4        does a polygraph work in asking -- you've heard terms

5        about comparison questions, relevant questions.  Please

6        explain.

7        A.    Correct.  The polygraph monitors various indices of

8        the autonomic nervous systems.  We have two nervous systems.

9        We have the nervous system that we have direct control over,

10       the voluntary nervous system, and that controls the skeletal

11       muscles.  So that's what I'm doing as I'm talking to you, or

12       gesturing, and I have to issue commands for that system to

13       work.

14                   We have another system that runs machinery

15        inside our bodies, and so these are your heart and your

16        lungs and your blood pressure and your digestion of food

17        and the secretion of adrenal substances, and all that

18        machinery that's necessary for the body to run.

19                   The autonomic nervous system is of interest to

20       us because it is -- we are a system, so the things that we

21       think about and our psychological states have an impact on

22       our autonomic nervous system.

23                   And one of the times that we do respond is when

24       we lie, and that may be for a variety of reasons.  It may

25       be because we're afraid we're going to get caught.  But

1     fear doesn't really seem to be necessary to cause these
2     responses.  It's also much more difficult to lie than it
3     is to tell the truth.  If you're going to lie, you have to
4     remember who you're lying to; you have to control your
5     body language; you have to monitor the other person to see
6     if they're accepting the lie.
7             And so lying is, in terms of mental effort, a
8     lot of hard work.  There's a lot of cognitive load
9     associated with lying, and that cognitive load alone can
10    cause your body to change in ways that we can measure with
11    polygraph instruments.
12    Q.   And what exactly are you measuring with the polygraph
13    instruments?
14    A.   Well, with the standard polygraph instrument, we
15    typically take a measure of breathing, and so we look at air
16    moving in and out of the lungs.  That is of interest in and
17    of itself, because it does contain some information about
18    lying.  It actually is the least productive thing we
19    measure.
20            But we also measure respiration because if you
21    take a deep breath, that can cause your other
22    physiological systems to change reflexively.  We measure
23    blood pressure, usually from an inflated cuff on the upper
24    arm, and it's not -- it's not the same way that your
25    physician measures blood pressure.

1          Your physician measures blood pressure.  Your

2    physician wants to know what it is, so what's the

3    systolic, the high number, and what's the diastolic, the

4    low number.  And they put a tremendous amount of pressure

5    in the cuff, that literally occludes the large artery in

6    the arm, and then they listen for blood to start flowing

7    through the arm again.  And when that sound disappears,

8    that's the low number in the blood pressure.

9          We don't really want to do that.  All we want to

10   do is track blood pressure and see if it's steady, if it's

11   going up, or if it's going down.  And the movements upward

12   in blood pressure are the ones that are indicative of

13   deception.

14         I've heard other witnesses here mention heart

15   rate.  Well, there's actually nothing in the heart rate

16   that's of interest because none of the heart rate indices

17   are correlated with the subject.

18   Q.   And you're basing that testimony on -- are there

19   scientific publications backing that up?

20   A.   Yes, there are multiple scientific publications,

21   going back into the 1970s, that show that heart rate is not

22   a useful, dependent measure; it's not predictive.

23   Q.   And what's the third component?

24   A.   The third component is sweating on the palm of the

25   hand.  That in general is referred to as electrodermal

1    activity now.  Human beings are a little bit unique, in that

2    the sweat glands on the palms of our hands and the soles of

3    our feet respond primarily to psychological change.  The

4    sweat glands on the rest of our body respond to

5    thermoregulation.

6         But on a really hot day, the palms of your hands

7    don't sweat.  The rest of your body sweats.  Your hands

8    sweat when you're psychologically active.  And it doesn't,

9    again, have to be anxiety or fear.  Just cognitive load

10   will make your hands sweat.

11   Q.   Just generally, then, we've talked about -- you've

12   heard testimony about comparing comparison questions and

13   relevant questions.  Can you explain to the Court the

14   difference between the two types of questions and how you

15   analyze them generally?

16   A.   Yes.  Relevant questions are the questions that go

17   to the issue you're trying to resolve.  In the very first

18   polygraph test, the polygraph test that existed in the early

19   part of the 20th century and up until about 1950, they just

20   asked relevant questions:  Did you do it?  Did you kill John

21   Doe?  Did you start the fire?  Whatever.  And irrelevant

22   questions:  Is today Thursday?  Are the lights on in this

23   room?

24         And the test was not studied scientifically.  It

25   was used primarily as a predicate to interrogation.  And

1    yes, with the relevant -- and that was called the

2    relevant-irrelevant test, for obvious reasons.  It has

3    only relevant and irrelevant questions in it.  And, in

4    fact, it does an extremely good job of detecting

5    deception.

6             Almost all of the actually guilty people you

7    test, actually deceptive people you test, will respond to

8    those relevant questions because they recognize that they

9    are important; they are lying to them; they are exerting

10    mental effort; they are trying to pass the test.

11             The problem with the relevant-irrelevant is that

12    innocent people, actually innocent people, also recognize

13    that the relevant questions are important, and even though

14    they're not lying to them, they recognize they're

15    important and there's nothing, you know, no place else for

16    them to express their anxiety over being tested and a fear

17    that they may be falsely accused.

18             In the late 1940s, a man named John Reid came up

19    with the idea for a comparison question, and the idea of a

20    comparison question was to give a stimulus, a question in

21    the sequence that the innocent person would react to.

22             So it's designed to be an active element in the

23    test that evokes a response from an actually innocent

24    person.

25             And the idea is that you have to find something

1    that the actually innocent -- well, actually all of your

2    subjects -- are going to likely be lying to, and that is

3    going to look like it's a critical part of the test.

4              And so John Reid and the people who came after

5    developed a set of procedures and interview techniques for

6    how you set comparison questions, and it's extremely

7    important that the comparison question be set in a way

8    that to the innocent person, it's going to be the most

9    important item on the test.

10   Q.   Well, let's -- so the test that Jamaico Tennison took

11   was a probable lie comparison test?

12   A.   Yes.

13   Q.   It was not the relevant-irrelevant, right?

14   A.   Right.

15   Q.   So you just spoke about setting the scene or the

16   setting to ensure that a response is evoked in a

17   comparison question.  How does a polygrapher go about

18   setting that?

19   A.   Well, you go about setting that by the way you

20   introduce the question, and this is a critical part of the

21   test that has to be done properly for the test to be valid.

22   And there are different interview approaches that might be

23   taken to that.

24              One of the things that we did at the University

25   of Utah was to try to standardize that so there was less

1        art involved.  And so we came up with a ploy, I would call

2        it, for how we guided our interview and how we introduced

3        comparison questions as a character question, and so it's

4        about the person's character.

5                So if I were testing someone about the theft of

6        money, I would discuss the relevant questions with them,

7        and they're usually fairly easy:  Did you take the money

8        or didn't you?  So I would ask:  Did you take the $1,000

9        in the safe?  A very straightforward question.  And I

10       would have three or four of those.

11               And then I would say:  The kind of person who

12       stole $1,000 from the safe, that didn't happen by

13       accident.  That's something that they had to think about,

14       that they had to plan.  You don't steal $1,000 just off

15       the spur of the moment.  You probably have stolen other

16       things.  You're not the kind of person who steals money,

17       are you?

18               And in the context of a polygraph interview,

19       almost everyone will say "No" to that.

20               Then you would introduce a question and say:

21       Well, if I were to ask you before this year or during the

22       first 30 years of your life -- something to set it away

23       from today and the crime that's being investigated.  I

24       would say:  Before this year, have you ever stolen from

25       someone, anything from someone who trusted you?

1     Q.    And the answer?

2     A.    And the answer you will almost always get is "No."

3   And the reason is that the psychological environment you're

4   in leads the person to that, because they don't want to look

5   like they're the kind of person who would steal money.

6           And yet, if we -- and yet, that's an ambiguous

7     question because it's:  Ever from anyone who trusted you?

8     Who is that?  What does that include?  Well, it includes a

9     lot of things, and at the very least it induces cognitive

10     load.

11           On the face, it has validity because it looks

12     related to the relevant issue.  It's easy to present it as

13     part of the test, that I want to show you're not the kind

14     of person who steals money.  And it gives the innocent

15     person something to worry about.  And you want it to have

16     as close to equal weight to the relevant question as

17     possible.

18     Q.    And how do you get close to the equal weight of a

19     relevant question?

20     A.    Well, you focus it on similar acts in a way that

21   gives it face validity; that it looks to the person you're

22   testing like it makes sense to be in the test you're

23   running.

24     Q.    Why is it important to run -- or let me ask, how many

25     tests -- how many charts are run in a test?

1    A.    A minimum of three.

2    Q.    And why?  Is there a reason why three tests are run?

3    A.    There is.

4    Q.    Why is that?

5    A.    Research, again going back into the 1970s, found that

6    -- well, I have to set a context for this.  The polygraph is

7    a psychological test, and there is a science of testing

8    called psychometrics.  And in psychometrics, we look at a

9    couple of things that are characteristics of tests.  One of

10   those is something that scientists would call internal

11   reliability.

12            And I think it's important for me to enunciate

13   that scientists use the word "reliability" in different

14   ways than lawyers do.

15   Q.    And how?  What is the difference?

16   A.    Well, the difference is that for scientists, when we

17   use the word "reliability," we mean repeatability,

18   consistency.  And we're concerned about consistency in tests

19   in two levels.

20            One, we're concerned about an internal

21   consistency; that is, all of the things that we're scoring

22   should be measures of the same psychological construct.

23   And then we want to maximize that because test reliability

24   -- also we're going to talk about reliability of scoring,

25   but we'll probably get to that in a little bit.

1    Q.   Yes, sir.

2    A.   But in terms of constructing a test, you want all of

3    the items that evaluate to all be measures of the target

4    that you're trying to evaluate.  So, for instance, in an IQ

5    test you want the questions you're going to score to measure

6    IQ.

7              Generally speaking, the more measurements you

8    can have, the more reliability you're going to have.  Now,

9    there are practical limits on that.  But you typically

10   don't run a test with just one question, so there are no

11   one-question IQ tests.  And so you need more than one

12   occurrence of a measurement to get this consistency

13   because you could have a lot of random things that could

14   happen with just one measurement, so the more measurements

15   you have, the better.  And with any individual test, you

16   reach a point of diminishing returns.

17             So research was done in the 1970s looking at the

18   internal reliability of tests, and reliability is related

19   to accuracy.  And for scientists, when we talk about

20   accuracy, we talk about validity.

21             So reliability is necessary for validity -- in

22   fact, they have a mathematical relationship -- but it

23   doesn't guarantee validity.  So you can have tests that

24   are completely consistent, but that are not accurate.

25   Q.   So you can have tests that are reliable, but not

1    accurate?

2    A.    Exactly.  So they have to have reliability internally

3    and also scoring reliability, but they may not be accurate.

4    Q.    So the three tests, then, creates the reliability

5    that you need?

6    A.    Yes.  What we discovered, in conducting research, is

7    that we maximize internal reliability at three charts, and

8    that adding four and five doesn't help the reliability much,

9    although it may help the validity.

10   Q.    And why -- is there a reason why polygraphers mix up

11   the questions in each chart?

12   A.    Yes.

13   Q.    And what is that reason?

14   A.    The reason that we do that is that we don't want the

15   person anticipating that a particular question is going to

16   come next.  So we're going to repeat the questions three

17   times.  We don't want the person to realize that that

18   question is always going to appear in a particular spot.

19          And so typically, I rotate all of my questions

20   so that the person doesn't get a chance to learn where

21   they're going to be.

22          There is a methodology in the polygraph

23   profession about spot responders; that is, people who

24   respond at certain spots.  But to my knowledge, there is

25   no scientific evidence to support that idea.

1   Q.    What does that mean, spot responder?

2   A.    That they always respond to the first relevant

3   question or to the last relevant question.  To my knowledge,

4   there is absolutely no data to support that idea.

5           But throughout science, the idea of rotating

6   that is counterbalancing the appearance of stimuli that

7   you are presenting is a standard scientific practice.

8           And so that's why the University of Utah led in

9   doing that, in rotating questions, is it's just good

10  science because you rotate everything around.

11          So in the particular tests that I run, every

12  relevant appears next to every comparison question; then

13  you get to take advantage of that balancing of

14  performance.

15  Q.    We talked about setting up the psychology, I guess,

16  if you will, in the comparison questions.  How does the

17  acquaintance test play into that?

18  A.    The acquaintance test does a couple of things.  One,

19  it does serve as an acquaintance test.  It gives the person

20  being tested a chance to feel what it's like to have the

21  instrument on them, and experience the polygraph examiner

22  asking questions, and habituate a little bit to the context.

23          Because for most people in a criminal case, this

24  is the first time they've had this experience, and so it's

25  an odd experience to have these sensors on, to be asking

1      you questions.

2              And so it habituates you to the setting a little

3      bit, which will reduce -- empirically, we know this from

4      data, and again going back into the 1970s, that adding an

5      acquaintance test increases the accuracy of subsequent

6      comparison question tests.

7              The other thing it does, it can also take a part

8      in setting the comparison questions, because you run the

9      acquaintance test, and you tell the person that they did

10     respond to the number that they picked, and you say:  See,

11     even when you lie to something as small as this number,

12     you respond appropriately when you lie, and so it's

13     important that you be truthful to every question on the

14     test.

15             And that helps you set the comparison question.

16     Q.   Can you give the Court a brief synopsis of different

17     scoring methods?

18     A.   Yes.  The oldest scoring method is Global Analysis.

19     Global Analysis has been around since the beginning of

20     polygraph testing, which in America goes back into the

21     1920s.  And Global Analysis is very clinical.  The person

22     looks at the chart and forms subjective clinical opinions

23     about what seems to be the big response in the chart.

24             We know from scientific research, published from

25      more than one source now in peer-reviewed journals, that

1    Global Analysis does not work very well.  And in

2    particular, it is biased against actually innocent people.

3    So if you do Global Analysis, the error rate with innocent

4    people increases dramatically.

5             And so starting in the 1960s, Cleve Backster

6    actually was -- Cleve Backster is a polygraph examiner

7    who used to run a school originally in New York, and then

8    in San Diego, and came up with an idea for numerical

9    scoring.

10   Q.   And what was the first numerical scoring method?

11   A.   It was the Backster Numerical Scoring Method, which

12   was a very complicated system.  Actually, it's a system I

13   was originally trained in as a polygraph examiner.  It had a

14   very large notebook full of rules that you had to memorize.

15            But it was an advisement, because it did require

16   some measurements.  It set criteria for what was scoreable

17   and what was not.  Unfortunately, it was mostly developed

18   out of Cleve Backster's clinical experience, not from

19   science.  And then the U.S. military system, which became

20   the DODPI system, it's the acronym for the earlier

21   Polygraph Institute, it became their system, and is now

22   the National Center System, was developed from the

23   Backster system.

24            But, again, it was not developed on the basis of

25   science.  It was developed on the clinical experience of

1    people who worked at -- and before the Department of

2    Defense Polygraph Institute, there was actually the U.S.

3    Army Polygraph School which was in Fort Gordon, Georgia, I

4    believe, originally.

5    Q.   What do you mean when you talk about a clinical

6    setting versus some other research setting?

7    A.   Well, clinical -- the criteria were developed from

8    the clinical impressions of polygraph exams, so it was from

9    their experience running polygraph tests.  These are the

10   things I've seen, that I associate in my mind with lying and

11   truthfulness.  It was not based on statistical analysis.  It

12   was not based on scientific research.

13   Q.   And where does the -- you've heard testimony about

14   the Federal, whether it's Three-Position or

15   Seven-Position.  How was that developed?

16   A.   Well, the Seven-Position Scale was developed first,

17   and that came from the Backster system, which is also a

18   Seven-Position system.  The federal system was simpler.  It

19   had many fewer rules, fewer criteria than the Backster

20   system, but it was -- it was not scientifically based.

21        In the 1970s, David Raskin and his graduate

22   students -- originally Gordon Barland got his Ph.D. with

23   Raskin in the early 1970s, or the mid 1970s -- began to do

24   scientific research in the laboratory and in the field,

25   where they actually measured things from the polygraph

1      chart, so they actually measured how large the galvanic

2      electrodermal responses were.

3      Q.   So before the measuring, how were you -- how was a

4      polygrapher scoring?

5      A.   It was done by looking at the comparison question and

6      looking at the relevant question and assigning a score.  So

7      you decided -- you made a judgment, on that Seven-Point

8      Scale, which was bigger.

9      Q.   Explain what the Seven-Point Scale is.  We've heard

10     about the Three-Point Scale.  What is the Seven-Point

11     Scale?

12     A.   The Seven-Point Scale is a similar idea to the

13     Three-Point Scale, is that you look at the relevant question

14     and adjacent comparison question, and then you assign on a

15     Seven-Point Scale.  And the magnitude of the numbers -- so

16     it goes zero.  Zero means there's no difference, so there

17     could be equal responses to both, or no response to both.

18          And 1 would mean that there is a noticeable

19     difference, and one is bigger than the other.  The sign

20     indicates which is bigger.  So if the relevant is bigger,

21     it gets a minus.  If the comparison is bigger, it gets a

22     plus.  And 2 would mean there's a more dramatic

23     difference.  And 3 would mean it's an extreme difference.

24     But those were not defined in terms of measurements.

25          What the University of Utah group did was to

1     actually do statistics, so they physically measured the

2     size of responses.  Some of that can be done

3     electronically, so with calibrated polygraph instruments.

4     So this was done with laboratory instruments, not field

5     instruments.

6          You could actually measure how many ohms of

7     skin, of electrical resistance a response was due to.  You

8     could measure how many millimeters of change in blood

9     pressure occurred.  You can make measures of breathing in

10    terms of the excursion of the pen in terms of how much air

11    is going in and out of the chest.

12         So actual measurements were made of relevant

13    questions and comparison questions, and statistical

14    analyses were done to see which were actually predictive

15    of truth and deception.

16    Q.    And where did that research lead?

17    A.    That research eventually led to the University, the

18    Utah Scoring System, which is also a Seven-Point System.  It

19    is much simpler, but it also requires that you do

20    measurements.  So there are specifications in terms of

21    making measurements.  For example, in electrodermal

22    responses, there has to be a ratio of 2 to 1 before you

23    assign a score of 1.

24    Q.    We've heard about the Three-Position.  Where does the

25    Federal Three-Position come in, in the historical context?

1    A.    Well, the Three-Position Scale didn't formally exist

2    when I worked at the Polygraph Institute.  There was

3    discussion about it, so I was present for some of the early

4    brainstorming at the Polygraph Institute about it.  And the

5    reason there was discussion about it was, we had data at the

6    Polygraph Institute that there were students who had a great

7    deal of difficulty learning to use Seven-Point scales.

8              And they were extremely unreliable; that is, if

9    we compared one scorer to another, one student to another

10   -- and to be honest, it was also true of the faculty

11   there -- that if we had the instructors there score charts

12   and compared one instructor to another, their reliability

13   was not very high.

14             And so the ideas they talked about, and

15   apparently after I left the Polygraph Institute, they

16   formalized a Three-Point Scoring system, and the idea was

17   that it would be more reliable because it's so much

18   simpler.

19   Q.    And "reliable," you mean consistent?

20   A.    Consistent.

21   Q.    Okay.

22   A.    Yes.

23   Q.    Your testimony earlier today about how a Utah --

24   well, a scoring method has to be used with a certain type

25   of test; is that true?

1       A.    No.

2       Q.    Okay.

3       A.    Absolutely not.

4       Q.    Please explain the difference between testing

5       methods, or test types and scoring methods.

6       A.    Well, the scoring methods are a tool that you can

7       apply to any comparison question test.  You could score any

8       of the comparison question tests with Backster; you could

9       score any of the comparison question tests with the federal

10      system; or you could score any comparison question test with

11      the Utah System.

12            And, in fact, studies that I have done have in

13      fact done that.  In the late 1990s, I had a grant from the

14      Department of Defense Polygraph Institute to do research

15      on outside issues, and part of that study was that the

16      polygraph charts that we collected in that study were sent

17      to the Polygraph Institute.  They scored them with the

18      federal system.  I scored them, same charts, with the Utah

19      System, and then we compared the two scorings.

20      Q.    And have that study and other studies that you're

21      aware of studied the accuracy of different scoring

22      methodologies?

23      A.    Yes.

24      Q.    And what is the consensus of the scientific

25      community?

1    A.   Well, the consensus from the data, and from the

2    scientific community, is that of the hand-scoring systems,

3    the University of Utah System is the most accurate.

4    Q.   And what would then be the next -- what is the least

5    accurate?

6    A.   The least accurate is the Backster system.

7    Q.   And generally, what is the accuracy rate of the

8    scoring methodologies?

9    A.   Well, that will depend upon the technique.  And I

10   will say that the differences between the Federal

11   Seven-Point System and the Utah System are not large.

12            In the study that I referenced, Honts, Amato and

13   Gordon, and 2000 was when the report was written, the

14   differences are not large.  Most of the differences is in

15   scoring respiration, and the federal system's scoring

16   respiration was very low in reliability, and that reduced

17   their validity.

18   Q.   Please explain to the Court the purpose of the two

19   relevant, two comparison test, versus a three relevant,

20   three comparison test.

21   A.   I don't know what the purpose of a two relevant, two

22   comparison question test is.

23   Q.   Is that a typical test?

24   A.   No.

25   Q.   Why not?

 1      A.   Well, one reason is, again, the scientific research

 2    says that it has lower reliability and a lower validity.

 3    The Backster test is a two relevant, two comparison question

 4    test, and it's of much less validity than the Federal Zone

 5    or the Utah Zone.

 6            So the test, itself, because it has fewer

 7    relevant questions, has lower internal reliability, and

 8    that lower internal reliability decreases the amount of

 9    validity it can have.

10      Q.   Polygraphers in the scientific community, testing a

11    single issue, what would the standard number of comparison

12    questions and relevant questions would you use?

13      A.   A single -- a single-incident test, a single-issue

14    test would be three of each.

15      Q.   What about the test question formats?  You've heard

16    the MGQT being referenced here today, correct?

17      A.   Yes.

18      Q.   Are you aware of any studies showing the accuracy of

19    the MGQT -- the reliability and/or the validity of the

20    MGQT test format?

21      A.   Yes.

22      Q.   What do those results show?

23      A.   Generally speaking -- and there are a number of

24    tests.  I went back and went through the literature in

25    preparation for this hearing, before we had the hearing in

1    December.  My recollection is, there are about ten studies

2    published, and not all in peer-reviewed journals, but

3    inaccessible places, so the ten studies, you can easily get

4    to the data.  So they're federal grants and federal reports,

5    or they're published in peer-reviewed journals.

6              And what they tend to show is that the MGQT

7       format produces relatively low accuracy rates, and it has

8       an inherent bias against actually innocent people.

9    Q.   What does that mean, "inherent bias against actually

10      innocent people"?

11   A.   Well, if you look at the accuracy rates, they are not

12   balanced in terms of the kinds of errors that are made.  So

13   a polygraph can make two kinds of errors.  It can make a

14   false positive error, which is where an innocent person is

15   called deceptive; or it can make a false negative error,

16   which is where a guilty person is called truthful.

17             And what you see for the MGQT is an extremely

18      strong bias to find actually innocent people deceptive.

19      So there are very high false positive rates.  There's

20      also a differential inconclusive rate.

21   Q.   What does that mean?

22   A.   That many more innocent people are found

23   inconclusive, as compared to guilty people.  More guilty

24   people produce guilty results, but a substantial number of

25   innocent people produce inconclusive results.

1    Q.   So you've heard, just earlier today, Agent Foster

2    testify about MGQT is more conservative.  What do you

3    think of that?  What's your opinion of that testimony?

4    A.   I think it's -- I have no idea what he means by

5    "conservative."  It's biased, and it's biased against the

6    actually innocent.  If you -- if you look at -- and we have

7    mostly talked about errors.  But if you look at the number

8    correct, so the complement to the false positive, false

9    negative, is sensitivity.

10            So sensitivity is how many of the people you're

11    trying to -- how many of targets you're trying to find,

12    that you find.  And specificity is how many people who

13    don't have what you're trying to find are rejected.

14            So in the case of polygraph, sensitivity is the

15    percentage of guilty people you get right; and specificity

16    is the percentage of innocent people you call truthful.

17    So sensitivity would be the guilty would be called

18    deceptive.

19            And if you look at the MGQT, the specificity

20    values are extremely low.  Averaged across all the studies

21    I could find, the specificity values for the MGQT were

22    about 35 percent.  So roughly one in three actually

23    innocent people passes the MGQT.  On the guilty side, the

24    sensitivity is very high, 90-plus percent; maybe in some

25    of the studies, 95, 97 percent of the guilty people are

1    detected.  But that's at a cost, and it's a high cost,

2    that only one out of three of the innocent people is

3    cleared.

4              And that's biased.  That's what I mean by

5    biased.

6    Q.   In some of these studies that you referenced, have

7    any been conducted by the federal government?

8    A.   Most of them.

9    Q.   Okay.  And what about at the DODPI or the NCCA?

10   A.   Yes, and also at the FBI.

11   Q.   What do you know about the DODPI, the NCCA, the

12   research?  Is there a research building, or are there a

13   lot of researchers around?

14   A.   My understanding is that they do have a building.  I

15   have never been to Fort Jackson, so I have not seen their

16   current facility.  When we were at Fort McClellan, we did

17   have separate facilities.  There was a separate staff, so

18   there was a director of research.  And when I worked there,

19   there were four Ph.D.s that worked in the research division

20   and a number of other people who were clerks and assistants.

21             And to my knowledge, it hasn't run a lot from

22   that.  I'm sure they're in better facilities now than they

23   were in when I worked there, but it has always been three

24   or four Ph.Ds that worked in the research division.

25   Q.   So if I understand, one of the -- some researchers at

1    this federal institute, itself, have confirmed the studies

2    that you're talking about regarding the accuracy and

3    validity -- or excuse me -- I guess the reliability of the

4    MGQT?

5    A.    Yes.  Stewart Senter, S-E-N-T-E-R, has actually

6    published the most studies on this, and he's a Ph.D. that

7    works, as far as I know still works at the National Center.

8    Q.    Let's talk about the electronic scoring and the

9    algorithms we heard about earlier today.  Can you please

10   tell us a little -- are you aware of the development of

11   PolyScore?

12   A.    Yes.

13   Q.    Okay.  And please explain to us the background of the

14   development of that algorithm.

15   A.    PolyScore, the original contracts for PolyScore were

16   awarded when I worked at the Polygraph Institute.  There was

17   interest in algorithms because the polygraph instruments

18   were being computerized, and so it became possible for the

19   first time to have computers make a lot of measurements.

20           Prior to the late 1980s, the computers were

21   large.  The programming was really difficult to make

22   computerized measurements, and to do these algorithms, you

23   need precise measurements from the wave forms that make up

24   the polygraph charts.  And so that was just starting to

25   become possible in the late 1980s.  P.C. computers were

1      being developed that were small enough and powerful enough

2      to do that kind of computerized work.

3              The University of Utah had already developed a

4      computerized algorithm that had been published in 1988,

5      and the government wanted to find a separate research

6      effort to come up with a different algorithm.

7      Q.   And how did the algorithm actually get developed,

8      then, at Johns Hopkins?

9      A.   Well, I can't tell you that because it's never been

10     made public how they did that.  I know what statistical

11     technique they used.

12     Q.   What was that?

13     A.   It was a technique called logistic regression, which

14     is a -- we're almost into rocket science in some ways, and I

15     don't want to leave the Court -- leave everybody behind.

16             But it's a classifier.  So it looks at data, and

17     you have to tell it who's innocent and who's guilty.  And

18     then it looks at those data, and it looks for the

19     combinations of data that will produce the greatest

20     discrimination.  And it uses a statistical method call

21     logistic regression to do that, which is a non-linear

22     equation.  And all that means is that it will -- it can

23     draw lines through the data that are not straight.

24     Q.   Let me try to bring it down to Earth.  Is it fair to

25     say that essentially you take a data set, and then you

1      reverse engineer an algorithm or something to fit that

2      data set?

3      A.   Yes, that's exactly what it does.  The algorithm fits

4      those data.  And because of that, the equation that comes

5      from the algorithm -- so it produces an equation that makes

6      classifications.  The equation that comes from those kind of

7      algorithms is very intimately tied to the data that it's

8      built on.

9      Q.   And what was the feeling in the scientific community

10     regarding the development of this PolyScore?

11     A.   Well, there was a group of scientists that were

12     called in by the government to review the PolyScore effort.

13     It was led by a psychophysiologist named Stephen Porges.

14     Stephen was, and still is, one of the top scientists in the

15     world in the area psychophysiology.  He led a team of really

16     first-tier psychophysiologists to look at PolyScore, and

17     they thought that -- they wrote a very, very critical report

18     of PolyScore.

19     Q.   What was the criticism?

20     A.   The criticism was that they didn't think that there

21     were adequate data in the training set that was used to

22     build the algorithm.  They didn't think that the scientists

23     who were working on the project understood psychophysiology

24     at all.  None of them were psychophysiologists; they were

25     physicists and mathematicians.  And they took a fundamental

1      approach that the psychophysiology group disagreed with.

2      Their approach was that the problem in polygraph was a

3      signal-to-noise approach.

4      Q.   What's that?

5      A.   That there is -- that you have to -- the work that

6      they had done previously was on fitting models to the radar

7      signatures that jet airplanes give off.  So we needed an

8      easy way to tell from a distance what's an American fighter

9      and what's a Russian fighter.  This is still back before --

10     while the Cold War was still going on.

11             And they had worked extensively on recognizing

12      emitters, and the problem with the emitter is, you have a

13      signal, and the signal that an American fighter gives off

14      is always the same signal, and the signal that a Russian

15      fighter gives off, or a Russian bomber, is always the

16      same signal.

17             Your problem is, there's noise.  There's noise

18      in the atmosphere, there's noise in your equipment, and

19      you need to separate the signal from the noise.  And

20      that's what the Johns Hopkins group had been doing for

21      years.  They thought the polygraph, in the same way, that

22      there is a lie signal and they just have to separate it

23      from the noise to get it out.

24             Nobody who works in psychology or

25      psychophysiology sees the problem that way.  There is no

 1      lie signal.  There is no unique signal that occurs only

 2      with lying, and that doesn't occur in truthful people.

 3      That's why we need relevant and comparison questions.

 4      Q.   And these algorithms that were created for the

 5      PolyScore, were they based on the two relevant, two

 6      question test, or the three relevant, three question

 7      test?

 8      A.   Three relevant, three comparison question test.

 9      Q.   In this case, did you have an opportunity to review

10      the charts taken by Agent Sullivan by Jamaico Tennison?

11      A.   I did.

12      Q.   When was the first time that you reviewed the charts?

13      A.   It was in June of last year, as I recall.  I don't

14   recall the exact date.  It's on my score sheets.

15      Q.   And where was that?  Where did you have an

16      opportunity to read those charts?

17      A.   It was here in Albuquerque, at the Federal Building

18   in the FBI offices.

19      Q.   And subsequent to that, you obtained the raw data,

20      right?

21      A.   I did.

22      Q.   Why did you want to have the raw data?  Was it to run

23      it through an algorithm?

24      A.   No, it was not.  Absolutely not.  I couldn't have run

25   it through an algorithm because there is no algorithm that

1    is based on the two relevant, two comparison question MGQT,

2    so it would be completely inappropriate to apply any of the

3    existing algorithms to that test.

4              I wanted it for a couple of reasons.  One is

5    that in the FBI offices, I could only look at it on -- I

6    only had a limited period of time, and I had to look at it

7    on a very small screen on a notebook computer, and there

8    are certain things on there that would have been very

9    difficult to measure, and I just -- I wanted to have it on

10   a big screen, where I could increase the magnification and

11   decrease the magnification and look at things in different

12   ways to just confirm the scoring that I had done under

13   what I considered to be less than optimal conditions on a

14   notebook computer screen.

15             The other thing that I wanted, after I had seen

16   the charts here and came up with a score that it was

17   inconclusive, was --

18   Q.   Let me stop you there.  When did you first come up

19   with that score of inconclusive?

20   A.   I had the inconclusive score when I was at the FBI

21   offices.

22   Q.   I'm sorry.  Go ahead.

23   A.   We had talked a little bit, and one thing that I

24   thought was quite important and I wanted the scores, was to

25   be able to prepare demonstrative evidence to use in court.

1    Q.   Generally speaking, what would you say the quality of

2    the charts were of the Tennison test?

3    A.   I thought they were mediocre quality.  There were a

4    couple of things that concerned me about them.  The most

5    obvious was that the movement sensing device was either

6    absent or non-functional.

7    Q.   Okay.  Why did the absence or non-functionality of

8    the movement sensor device concern you?

9    A.   Well, movement sensor devices are important for a

10   couple of reasons.  One is that they detect movement

11   artifacts.  So there can be movements that the subject makes

12   that the examiner misses.  That's also one reason we like to

13   have the video recordings of the actual polygraph test, so

14   you can have another set -- another eye, you know, an eye

15   that doesn't blink and it's always there on the person to

16   see movements.

17        But there can be movements that even can't be

18   observed by video, that will get picked up by the movement

19   sensor.

20   Q.   If that were to happen -- I mean, why is that

21   important?

22   A.   That's important because physical movement can cause

23   artifacts in the dependent measures that you score on the

24   polygraph test, and if you don't have the movement sensor

25   there, you always have some uncertainty about whether the

1    origin of a response is from psychological activity, so is

2    it because the person is responding to that question

3    psychologically, or is it that they happened to move?

4              And so the movement sensor is yet another set of

5      eyes on the subject to detect movement artifact.

6      Q.   And if you detected a movement artifact, would that

7      affect the scoring?

8      A.   It might, depending on where it occurred.

9      Q.   What about -- was there anything about the blood

10     pressure cuff that gained your attention?

11     A.   Well, there were two things.  One is that the cuff

12     pressure was extremely high.  I had not seen a polygraph run

13     at 90-plus millimeters of mercury since we stopped using

14     analogue instruments, which would have been in the 1980s.

15     So that was surprising to me.

16              The other thing was that early in the test, it

17       looked to me as if the blood pressure was leaking.

18     Q.   At let me go ahead and pull up Exhibit T.  Are you

19       able to explain visually what you saw with the blood

20       pressure cuff?

21     A.   Yes.  On the first chart, which is at the top, if

22     you'll notice, it's --

23              THE COURT:  You can go up there and point to it

24       as long as you speak loudly so my court reporter and I can

25       hear you.

1            THE WITNESS:  Yes, Your Honor.  If you look at

2      the first chart, and it's here at the top, the tracing

3      begins here at about the middle of the chart.  There is an

4      artifact here.  I don't know whether it's a movement.  It

5      is associated with a deep breath, but there's an artifact,

6      and the blood pressure drops.  And if you'll notice, all

7      the way across the chart it keeps going farther and

8      farther until at the end of the chart, it's actually going

9      off the recorded area.  And that's a substantial loss of

10     pressure.  It's about ten millimeters of mercury, as I

11     recall.

12            And generally, that would indicate to you that

13     it is leaking.  There are other things that might cause

14     it, but generally it indicates a leak.

15     Q.   Okay.  So we had the blood pressure, itself, or the

16     pressure of the cuff, itself, right?  And then the

17     leaking?  Those were the two things?

18     A.   Yes.  And there are standard things that you're

19     supposed to do at the beginning of a chart with the blood

20     pressure cuff.  One of those is that you need to massage the

21     cuff, and that gets the air to flow evenly through the

22     bladder that's inside the cuff.

23            And then also, you should exercise the arm; that

24     is, make the arm go through movements, and that relaxes

25     the biceps muscle.  It's possible that that's what we're

1    seeing here, is just that the muscle in the subject's arm

2    is relaxing and the blood pressure is going down, but

3    that's a tremendous change for just relaxation, although

4    it's possible.

5    Q.   Regarding the --

6            THE COURT:  And let me ask, just so I understand

7    here.  You said that the cuff pressure was extremely high

8    and that you had not seen a polygraph run at 90-plus

9    millimeters?

10           THE WITNESS:  Yes, Your Honor.

11           THE COURT:  What is the significance of that?

12   The testimony so far has been that it should be above 65,

13   if I understood it, at some point.

14           THE WITNESS:  Well, that is what Mr. Foster

15   said.  The Lafayette polygraph manual, the manual that

16   comes with the instrument, says that you shouldn't run it

17   above 65.  At the University of Utah, we always --

18           THE COURT:  Okay.  I understand.  What's the

19   significance of running it too high or, as you say,

20   extremely high?

21           THE WITNESS:  It has two significant factors

22   associated with it.  One is that it's very uncomfortable.

23   If Your Honor will think about having your blood pressure

24   taken at a physician's office and how uncomfortable that

25   is when they first put the pressure on, it becomes very

1    uncomfortable over time at 90.

2              And so with the computerized instruments, you

3    can run it at much lower levels and still get accurate

4    recording.

5              THE COURT:  What's the other down side besides

6    being --

7              THE WITNESS:  The other down side is that

8    there is a relationship between cuff pressure and the size

9    of the individual pulses that we see on the polygraph

10   chart.

11             If you go above mean arterial pressure, the

12   relationship reverses, and it's a -- it's a little

13   difficult to explain that, but there are published

14   studies, Geddis and Newberg in the Journal of

15   Psychophysiology.  I don't remember the date, but it was

16   early on -- it's early 1980s, I think.  It showed that as

17   you -- the relationship to pulse amplitude and cuff

18   pressure inverts if you go above mean arterial pressure.

19             94 is probably above mean arterial pressure, and

20   so that can change how you score the charts.

21             You can't really know, because we don't take

22   systolic and diastolic blood pressure that we can measure.

23             THE COURT:  But is that possibly dependent on

24   the individual being tested?

25             THE WITNESS:  Yes.

```
1              THE COURT:  In terms of his or her physiology?
2              THE WITNESS:  That's correct.
3              THE COURT:  All right.
4              THE WITNESS:  But we can't know, and so the
5     standard practice is to run it less than 65.
6              THE COURT:  All right.  Go ahead.
7     Q.   (By Mr. Coberly)  And you've heard the testimony
8     earlier today, and maybe back in December even, about
9     changing -- well, if I move it to the forearm, I'm going
10    to run it higher than if it's on the upper bicep area,
11    right?
12    A.   Yes.
13    Q.   How many polygraphs have you taken, yourself?
14    A.   I don't know the exact number.  It's well over 2,000.
15    I would guess 2500.
16    Q.   Have you ever found it necessary to move the pressure
17    cuff from the bicep to the forearm?
18    A.   No.
19    Q.   What would be the purpose of -- speaking generally in
20    all of your experience with interrogation techniques,
21    etc., what would be the purpose of, or would there be a
22    purpose of setting -- making someone uncomfortable to take
23    a polygraph?
24    A.   Well, when I first was at the Polygraph Institute,
25    some of the old-timers there didn't like the new
```

1    computerized instruments because they said that the

2    polygraph cuff should be -- should be painful, to let people

3    know that they're taking a polygraph, and they felt that the

4    stress induced by that pain was good for the polygraph test.

5              I think that's absurd, and there certainly is no

6    data to support it.

7    Q.    Just generally, did you form an opinion regarding the

8    quality of the chart-gathering, based upon the movement

9    sensor device, the blood pressure cuff, the downtrending?

10   Did you form an opinion?

11   A.    Well, yes.

12   Q.    Regarding the acquisition?  What was your take-away

13   from that?

14   A.    Well, as I stated earlier, I think that these charts

15   are mediocre quality.  But the tests have been run.  It is

16   part of the case.  I think that it's sufficient for

17   numerical scoring, but just barely.

18   Q.    Let me ask you about the comparison questions which

19   we have heard testimony about.  In your opinion, were the

20   comparison questions in this case weak?  Were they strong?

21   What was your take-away?

22   A.    In my opinion, they are weak.

23   Q.    And why is that?

24   A.    Well, they're weak because they address the issue of

25   lying.  This is a sex case.  It's about sexual -- the

1    allegation is as to sexual touching of a young girl.  That's

2    a very powerful accusation.  It is powerful in the sense

3    that the penalties are high, and it's powerful in the sense

4    that it's socially ostracizing.

5              And if a person is wrongfully -- in my

6    experience, if a person is wrongfully accused of a crime

7    at all, and wrongfully accused of a heinous crime like

8    this, it has a tremendous impact on them.  And you need

9    very powerful comparison questions for people who have

10   been wrongfully accused of that crime, in order to capture

11   their attention and make this probable lie test work.

12   Q.   So what would a good comparison question look like,

13   and how would a polygrapher construct that?

14   A.   Well, for me -- and I've run, over the years, many

15   people in similar situations, so I've done a lot of

16   polygraph testing on sex offenders and alleged sex

17   offenders.  Actually, one of my certificates is in testing

18   sex offenders, so I've had that specialized training.

19             The kind of comparison question I would have

20   used in a case like this, if I were going to run a

21   probable lie test, would be about fantasizing about

22   things that are sexually unusual, or fantasizing about

23   inappropriate sex, or about doing sexual acts that others

24   would consider unusual, to keep it on the topic of sexual

25   acts.  Because that's what this is.  It's an allegation of

1      a sex crime, and you need something that's going to be

2      powerful to capture the actually innocent person's

3      attention.

4      Q.    So what would a hypothetical comparison question be?

5      A.    "Before this year, did you ever fantasize about

6   sexually touching someone that would be inappropriate?"

7      Q.    Let's talk generally about the timing of asking

8      questions and the tempo used in asking questions.  Can you

9      explain why it's important to have an even tempo?

10     A.    I don't know that it's as important to have an even

11  tempo as it is to meet certain minimums.  You want a certain

12  amount of time between questions in order for the person's

13  physiology to recover.  The word "homeostasis" was used

14  earlier today.  I think that's, in general, kind of a

15  reasonable concept.  But you don't want an active response

16  to be going on when you begin the next question.

17     Q.    What about the -- well, did you perform any analysis

18     regarding the timing of the asking of the questions?

19     A.    I did.

20            MR. COBERLY:  I think it's been admitted into

21     evidence, Exhibit P, Your Honor.

22            THE COURT:  Oh, let me check here.  Yes, P has

23     been admitted.  That's the timetable?

24            MR. COBERLY:  Yes.

25            THE COURT:  Yes, it's in.

1    Q.   I'm putting up on the monitor Exhibit P.  Did you

2    create this?

3    A.   I did.

4    Q.   Can you explain to the Court what this chart means?

5    What is it?

6    A.   Well, after I got the computer files and in

7    preparation for testimony in December, I spent a fair amount

8    of time looking at these charts and second-guessing my

9    scoring and making sure that I had crossed all my T's and

10   dotted all my I's and stuff to get ready for testimony, and

11   there was something about these charts that bothered me, and

12   it took me a long time to put my finger on what it was.

13         And what it was that bothered me and that it's

14   very, very unusual about these charts, is that the amount

15   of time to ask --

16   Q.   What does that mean, "time to ask"?

17   A.   Well, if you look at the chart and the gray bars that

18   go from the bottom of the chart to the top of the chart,

19   that's the amount of time the examiner spends asking the

20   question.  So Agent Sullivan testified when she began --

21         THE COURT:  Are you talking about the thickness

22   of the bars?

23         THE WITNESS:  Yes, the width.

24         THE COURT:  The width?

25         THE WITNESS:  Yes, Your Honor.

```
1                   THE COURT:  All right.
2                   THE WITNESS:  So the width is directly
3         proportionate to the amount of time it takes.
4                   THE COURT:  All right.
5         A.    And what I noticed about these charts was that the
6    comparison questions were quicker to ask than the relevant
7    questions, and that's very unusual.
8         Q.    Would you mind standing up and showing, pointing out
9         to the Court on these bars where you're -- visually show
10        us what you're talking about?
11        A.    Yes.  If you look at 4C, and just look at the width
12   of it, it's obviously quicker to ask.  It took less time to
13   ask than 7R.
14        Q.    What about the next one?
15        A.    And 6C is also obviously quicker than 7R and 5R.
16        Q.    Now, if the words or the phrasing of the question is
17        different lengths, is that going to be unusual?
18        A.    Yes.  Well, no, it's not going to be unusual, but
19   normally the comparison questions are longer.
20        Q.    Okay.  And what did you find?  What was your
21        conclusion when you analyzed the ask times?
22        A.    Well, what I thought to myself was:  Well, are in
23   fact the relevant questions longer than the comparison
24   questions?
25                   So I just initially went and looked at the word
```

1    counts.

2    Q.   And how did you --

3    A.   I just counted the words, you know, went and marked

4    them off and counted the words.  And that's shown in column

5    3 in this table.  And, in fact, the relevant questions

6    are -- relevant question 5 is nine words, and relevant

7    question 7 is ten words.  And then if you look at the

8    comparison questions, 4 is 14 words, and 6 is 15 words.

9         So the comparison questions are actually longer

10   in terms of word counts.

11   Q.   Did you do syllable count?

12   A.   And then I went and I said:  Well, perhaps the words

13   in the relevant questions are, even though they're fewer,

14   they're more complex.

15   Q.   How did you determine the syllable count?  What did

16   you do?

17   A.   Well, I used an algorithm to do that.  I started to

18   count them, and I realized that that was going to be a

19   difficult process because it depends upon pronunciation.

20   And I wanted to do it in a way that was completely

21   mechanical, and so I found a website called WordCalc.com

22   that is a standardized website that some linguist put up on

23   the Internet to do that for people, to count the number of

24   syllables in a sentence.

25        And so I ran the sentences through WordCalc.com,

1    and you can see they're approximately the same length in

2    syllable counts.

3    Q.   And how do you determine the ask times?  If we move

4    over to column 4, what is column 4 showing where it says

5    "Chart 1 Ask Time (seconds)"?

6    A.   I determined the ask times.  I adjusted -- I have a

7    very large computer screen at my home office, and I adjusted

8    the charts to where, as I recall, one of the squares equaled

9    10 -- 20 centimeters -- or millimeters, so 2 centimeters.

10   And that way I could calculate how many seconds there were,

11   because the blocks then standardized the width.

12            So I measured the number of millimeters width

13    for the columns and then converted that to time.

14   Q.   What did you find in comparing the control questions

15    -- I'm sorry -- the comparison questions to the relevant

16    questions?

17   A.   Well, you can see over in the column "Ask Time

18   Relevant Versus Comparison (average seconds)" that it took

19   6.17 seconds to ask the relevant questions, and it took 4.67

20   seconds to ask the comparisons, although the comparisons are

21   longer in terms of word count.

22   Q.   Would you consider them more complex as far as number

23    of syllables?

24   A.   Not in terms of syllables.  I mean, there is a slight

25   difference, but not as dramatic as with word count, but they

1   are approximately equal.  We give it, you know, half a

2   point, half a word there.  They're approximately equal or

3   half a syllable.  They're approximately equal, and yet

4   there's a second, more than a second.

5       Q.   If someone was speaking at the same tempo in asking

6       the relevant questions versus the comparison questions,

7       what would you expect the amount of time to take?

8       A.   I would expect them to be very similar, not

9   different.

10      Q.   After you created this chart and you did this

11      analysis, what does this tell you?

12      A.   Well, it's very puzzling.  I've never seen anything

13  like this before.  I've been looking at polygraph charts

14  since 1976, so I've looked at a lot of polygraph charts, and

15  I've never seen anything like this before.

16              And it seems to me that there are two

17      possibilities.

18      Q.   Okay.  What's the first possibility?

19      A.   Well, one possibility is that the charts are

20  deliberately mis-marked.

21      Q.   And how would that work, if they were deliberately

22      mis-marked?

23      A.   Well, it would work by you wouldn't press the space

24  bar when you began asking the question.

25      Q.   And what would the effect of that be?

1    A.    If you did that selectively on one kind of question,

2    you could alter where the scoring takes place and reduce the

3    scores to one type of question.

4    Q.    So it would affect the scoring ultimately.  Why is

5    that?  Because you look at the start time of a question?

6    A.    Right, because the start time of the question can

7    determine what you score and what you don't score.

8    Q.    And what would the other possibility be?

9    A.    Well, the other possibility would be that they were

10   asked in a different way; that different enunciation might

11   have been used.  In the profession, one of the things that

12   sometimes gets talked about is, you could stomp on one kind

13   of question and bias the test.

14   Q.    If someone wanted to do that, how would they go about

15   doing that?

16   A.    Well, you would change the way you ask the question,

17   so you could say, "Have you ever touched K.'s vagina over

18   her clothing?"

19        And for the comparison question, you could go,

20   "Before this year, did you ever lie to police to get out

21   of trouble?"

22        It's very subtle in some ways, but it could have

23   a big difference in the outcome of the test.  And that's

24   one of the reasons the standard in the profession is that

25   we need to record these things.

1    Q.   Can you please expound on that?  I mean, is that for
2    QC, quality control?
3    A.   No, that's for validation of what was done, because a
4    polygraph examiner, if they wanted to, could alter the
5    outcome of a test by doing that kind of thing, and the only
6    way you could know is to have a recording.
7              THE COURT:  Let's take a 12-minute recess.  And
8        remember, we're going to adjourn at 4:20.  We'll be in
9        recess for 12 minutes.
10             (Recess from 3:25 p.m. until 3:36 p.m.)
11             THE COURT:  Let us continue here.
12   Q.   (By Mr. Coberly)  Dr. Honts, how familiar are you
13   with the Lafayette polygraph software; with the machine, I
14   guess?
15   A.   Actually, I'm not familiar with their machinery at
16   all.  I don't use a Lafayette polygraph.  Lafayette has been
17   kind enough to me for many, many years to loan or to give me
18   the newest copies of their software, and so I'm familiar
19   with the software, but not with the machinery.
20   Q.   Are you familiar -- well, was this on a Lafayette?
21   The data that you received in this case, was it in a
22   Lafayette file?
23   A.   Yes.
24   Q.   Okay.
25   A.   It's in a Lafayette formatted file.

1    Q.   And are you familiar with how the charts are saved in

2    the file?

3    A.   Yes.

4    Q.   Are you able to look at the charts to show the times

5    that the charts were created?

6    A.   Yes.

7    Q.   Okay.  And did you do that in this case?

8    A.   I did.

9    Q.   Okay.  And generally, what did those charts tell you

10    as far as the times that the test was run?  What time of

11    day?

12    A.   They were -- the test was done in the morning.  As I

13    recall, the timing is off an hour because of Daylight

14    Savings Time.  It hadn't been reset.

15    Q.   Okay.  You heard testimony back in December regarding

16    Agent Sullivan scoring the test, and that's scored on the

17    Lafayette machine, right?

18    A.   Yes.

19    Q.   Were you able to look at the scoring sheet?  Or how

20    is the scoring sheet saved in the Lafayette program?

21    A.   The Lafayette program saves the scoring sheet in a

22    separate file within the folder.

23    Q.   And were you able to look at the time the scoring

24    sheet was created?

25    A.   There is a creation time on the file.

1    Q.   What did the creation time tell you about the scoring

2    sheet that Jennifer Sullivan created?

3    A.   The files that were sent to me indicated that the

4    score sheets had been created in the evening of that day.

5    Q.   Did you look at the score sheet, itself, on how Agent

6    Sullivan scored the polygraph?

7    A.   I did.

8    Q.   Let me pull up --

9         MR. COBERLY:  May I have a moment, Your Honor?

10        THE COURT:  You may.

11   Q.   Exhibit M.  Is that the score sheet?

12   A.   Yes.

13   Q.   And I covered this with Agent Foster, but was it

14   significant to you that Agent Sullivan had scored

15   question 5, EDA, in criminal chart 2?

16   A.   It's puzzling to me that she did.

17   Q.   Why is it puzzling?

18   A.   Well, because that zone is artifacted and shouldn't

19   be scored.

20   Q.   So you agree with Agent Foster that that entire

21   question should not be scored?

22   A.   Yes.  I didn't score it.

23   Q.   Let's talk about the other question that I asked

24   Agent Foster.  Looking at chart 1, do you recall those

25   questions?

1    A.   Yes.

2    Q.   Okay.  And what was Agent Foster's testimony

3    regarding why -- what was your understanding of Agent

4    Foster's testimony as to why he did not use 6C comparison

5    question to score the 7R relevant question?

6    A.   He said -- well, he described it as that the question

7    was asked on the recovery leg of the previous question, and

8    that it shouldn't have been asked then and it shouldn't --

9    and therefore, the comparison question shouldn't be scored.

10   Q.   And what is your professional opinion of that

11   explanation of why you would not use that comparison

12   question?

13   A.   It's puzzling to me.  I have never heard about not

14   scoring something because you're on the recovery leg, where

15   some distance in time there are other questions that are

16   asked at approximately the same point in the downward curves

17   that were scored.  So that, I don't understand.  It is a

18   very, very close call on whether that is an early response

19   or not.

20   Q.   Okay.

21   A.   And in terms of if you look at the -- maybe I should

22   come up to the chart.

23   Q.   Yes, if you could please come up.

24   A.   The issue is:  Where does this response begin?

25   Q.   And let me -- for the record, you're pointing at the

1    red circle?

2    A.    At the red circle.

3    Q.    That Agent Foster made on chart 1?

4    A.    On chart 1, question 6C.  And the issue is about

5    where the gray bar intersects the galvanic skin response.

6    When I first looked at it on the notebook computer, I

7    believed it was timely, and I scored it as timely.  It

8    doesn't make any difference in the Utah Scoring because it

9    is absolutely timely from this other inflexion that occurs

10   about three seconds into asking the question.  So you can

11   measure there.

12          Utah requires 2 to 1.  Even if I measured it

13    from the second inflection, it doesn't make the criterion

14    to score it.  So I gave that a --

15   Q.    Let me interrupt a second.  It doesn't meet the

16    criterion to score.  Do you mean it's not scoreable?  Or

17    does it mean you assigned a zero?

18   A.    No, it's absolutely scoreable.  It just scores a

19   zero, because Utah requires one be twice as large as the

20   other before you can assign a 1.  The Empirical Scoring

21   System, ESS, doesn't have that ratio requirement.  It just

22   requires just noticeable difference.

23          And if you score this as being timely, which I

24    believe it is, it is slightly bigger than 5R, and that's

25    why it gets a plus score.

1      Q.    Yet, Agent Sullivan -- excuse me -- Agent Foster

2      testified that since you can't use this as a control

3      question, you have to compare it to the 4C, and therefore

4      -- explain that.

5      A.    No, actually, I believe he didn't score.

6      Q.    We're talking about --

7      A.    Yes.  Right.  You would have to score it to 4C.

8      Q.    Right.  And by scoring it to 4C, then it gets a

9      negative, right?

10     A.    It apparently does in his system.  I don't believe it

11     would in mine.  I'd have to measure them.

12     Q.    Sir, if you could go back and take a look at the

13     Exhibit P, the ask times, and talk about what the ask time

14     is telling you regarding that specific question the way

15     it's marked on that chart.

16     A.    Well, the argument about whether that's a timely

17     response or not is tenths of a second, and the marking would

18     be critical.  I think it's scoreable just the way it is.

19     But if it was one- or two-tenths of a second quicker, or

20     that would mean one- or two-tenths of a second delayed, and

21     when Sullivan pressed the question as compared to when she

22     starting asking the question, there would be no question.

23     Q.    So let's look at Exhibit P, which is up on the screen

24     now.

25     A.    Yes.

1      Q.   The computer screen.  We're talking about chart 1,

2      6C, right?

3      A.   Yes.

4      Q.   Okay.  That's this question right here, right?

5      A.   Yes.

6      Q.   Okay.  And how many seconds did -- just using Agent

7      Sullivan's markings, how many seconds did it take?

8      A.   It took 4.33 seconds to ask it.

9      Q.   Okay.  And that's in comparison to -- well, this is

10     bracketed by 7R and -- well, compared to 7R and 5R?

11     A.   Yes.  Both of those took 6 seconds.

12     Q.   And word-count-wise and syllable-count-wise, how does

13     7R and 6C compare?

14     A.   6C is 15 words; 7R is 10; 5R is 9.  In syllables, 6C

15     and 7R are the same length, and 5R is two syllables shorter.

16     Q.   Does that make any sense to you, that it would be

17     over a second and a half less time to ask question 6C than

18     either 5R or 7R?

19     A.   None whatsoever.

20     Q.   So is it possible that the question was actually

21     started before the marking of the question?

22     A.   It's entirely possible.

23     Q.   And if that had been the case, then there would have

24     been absolutely no question that that was a timely

25     response, right?

1     A.   Yes.  And it looks like a completely normal timely

2     response.

3     Q.   We heard earlier the testimony regarding Exhibit N --

4     let me zoom this out -- which was Agent Foster's score

5     sheet, and we compared it to Agent Sullivan's scoring.

6     And there was one out of three that were different,

7     correct?

8     A.   Yes.

9     Q.   Now, what do you -- does that trouble you, concern

10    you?  What do you make of that?

11    A.   Well, it is troubling, especially with a Three-Point

12    Scoring system.  I mean, those should be very, very easy

13    decisions to make.  The difference between a zero and a

14    minus 1 on a Three-Point Scoring system is much larger than

15    the difference between, say, a minus 2 and a minus 3.

16         So, yes, it's very troubling, and it looks like

17    there's very little reliability between these two scores.

18    Q.   And reliability, you're talking about the

19    consistency?

20    A.   Consistency of scoring at the spots, yes.

21    Q.   Yet, the ultimate conclusion of Agent Sullivan and

22    Agent Foster was exactly the same in 5R and 7R, right?

23    A.   Yes.

24    Q.   Is there a way -- I'm certainly not into math, but is

25    there a way to sort of quantify or talk about generally

1    the likelihood of the difference in correlation ultimately

2    ending up with the same result?

3    A.   Yes.  And you could quantify the individual scores by

4    correlating them.

5    Q.   Can you try to explain that?

6    A.   Well, correlation is a statistic that measures

7    association, and so it measures association on a scale that

8    varies from minus 1 to plus 1.  Zero would mean that the two

9    are not related at all, that they're random numbers.  Plus 1

10   would mean that if one person gives a high, or one has a

11   high value, the other one has a high value; if one has a low

12   value, the other one has a low value.

13            As you approach a value of 1, a correlation of

14   plus 1 would mean they're identical and all in the same

15   direction.  And a correlation of minus 1 would mean

16   they're exactly the opposite all the time.

17            So I correlated these scores.

18   Q.   And what was the result of that correlation?

19   A.   My recollection is that the correlation was about .5.

20   Q.   Okay.  And explain what that meant.  What was

21   significant about a .5?  Or is there any significance

22   about a .5?

23   A.   Well, generally you expect inter-rater scoring to be

24   correlated.  Acceptable values are considered around .9.

25   Q.   Inter-rater?

1     A.   Yes.

2     Q.   You're talking about two separate scorers scoring the

3     same charts?

4     A.   Yes.  And when you start to drop down around .8, .7,

5     that is considered very poor inter-rater reliability.

6     Q.   Are you aware of -- regarding the polygraph

7     technique, that being the two relevant question, two

8     comparison question, and the scoring system, that being

9     the Federal Three-Position, are you aware of any test or

10     study showing the validation of that type of testing?

11     A.   Of the Three-Point Scoring?

12     Q.   Three-Point Scoring system using a 2C, 2R test?

13     A.   No.

14     Q.   And in your opinion, is that a valid -- is that going

15     to get valid results?

16     A.   Well --

17     Q.   I want to say "reliable," but I know that the

18     terminology is a little different there.

19     A.   What we have are a number of studies with three

20     relevant, three comparison questions, and they produce

21     extremely poor specificity.  Given that this is only two

22     relevant questions, and therefore less internal reliability,

23     it's reasonable to infer that it's going to have less

24     validity, because the reliability must be less.

25               And so it's certainly not going to be more

1        valid than the three relevant, three comparison question

2        version which, you know, has specificity or has -- yes,

3        specificities down around .3 if you get one out of three

4        correct -- I mean, you know, three out of ten correct.

5        One out of three.  I'm getting tired.

6        Q.   Do you have an opinion regarding the technique and

7        the scoring system used by Jennifer Sullivan in the

8        context of investigative settings?

9        A.   Well, the research -- there is research on that, the

10       research done by the government, itself, at the Polygraph

11       Institute, and that research consistently shows that

12       Three-Point Scoring produces a large number of

13       inconclusives, but also that it's selectively biased against

14       the actually innocent, in that it gets fewer correct and

15       more wrong.

16            And it does that for an advantage in sensitivity

17       that is in detecting the deceptive is only a few percent.

18       And that's exacerbated, when you consider that, from the

19       testimony that I've heard, that they normally interrogate

20       people who have produced inconclusive results.

21            So you're going to be looking at a situation

22       where at least two out of every three innocent people is

23       going to be interrogated.

24       Q.   Did you score Mr. Tennison's charts, yourself?

25       A.   I did.

1    Q.   And what scoring methodologies did you use in scoring

2    the charts?

3    A.   I used the Utah Scoring System, and I used the

4    Empirical Scoring System.

5    Q.   Why did you choose those two methodologies?

6    A.   They're the two hand-scoring systems with the

7    strongest scientific validation.

8    Q.   Let me put up on the screen what has been admitted

9    into evidence as Exhibit Z.  And explain to the Court what

10   this is.

11   A.   This is my score sheet, based on the Utah Scoring

12   System, and it shows 7R and 5R and the individual spots, and

13   then the totals and the total score.

14   Q.   We've heard testimony about spot scores versus total

15   scores.  Please expound on that and tell us, you know, did

16   you use a total score, and when and why.

17   A.   Well, I used the total score, and I used the total

18   score because that's what the scientific research

19   overwhelmingly shows that you should do.  One of the first

20   peer-reviewed published studies in this area was in fact

21   done by the FBI.  It was Podlesny and Truslow, published in

22   1993.

23            They looked at the MGQT test.  They scored it

24   based on total scores, versus spot scoring.  And the

25   results were dramatic, in that spot scoring -- the

1       specificity with spot scoring was about 35 percent, as I

2       recall.  It was in the 30 percents.

3       Q.    Using the Utah Scoring Method, what were the results,

4       according to you, of Mr. Tennison's chart?

5       A.    The total score is plus 1, and that's inconclusive.

6       Q.    The other method was ESS, right?

7       A.    Yes.

8       Q.    Let me show you what has been admitted as Exhibit Y,

9       put it up on the monitor here.  Now, let me put them side

10      by side.  On the left we have Exhibit Z, and on the right

11      we have Exhibit Y.  Now, these numbers are different,

12      right?

13      A.    Yes.

14      Q.    7R, just in the first quadrant there, you've got a 2

15      in the Utah Method.  You've got a 1 in the ESS method,

16      right?

17      A.    Yes.

18      Q.    And like on the Utah Method, you've got a zero, and

19      you've got a 2 in the ESS Method, right?

20      A.    Yes.

21      Q.    Okay.  And we talked about the correlation between

22      Agent Sullivan's and Agent Foster's test scoring, right?

23      A.    Yes.

24      Q.    Is that equivalent to what we're seeing here, or is

25      that different?

1      A.    No, that's different.

2      Q.    Okay.

3      A.    Because these are two different scoring systems.

4      Q.    And using the ESS Method, what were the results of

5      the data of the Tennison charts?

6      A.    Well, interestingly, the total score is still plus 1,

7      even though there are many, many more spots that are scored.

8      And the reason for that is that the ESS has a much lower

9      criterion for assigning scores than the Utah System does.

10     So on the ESS, it's simply just a noticeable difference, and

11     that's the only decision you have to make; whereas in the

12     Utah System, you have to do measurements and calculate

13     ratios for blood pressure and for the electrodermal.

14     Q.    And what does a total score of 1, using the ESS

15     Scoring Method, tell you regarding the results?

16     A.    That's also inconclusive.

17     Q.    Are you -- did you or are you able to do the

18     equivalent Three-Position Federal Scoring Method on these

19     charts?

20     A.    Well, it's -- you can.  I mean, there's an easy

21     conversion you can do.

22     Q.    Okay.  And what is that?

23     A.    And the easy conversion is to convert all the

24     electrodermal 2s to 1s.

25     Q.    And which?  Are we talking about in the Utah Method

1   or the ESS Method?

2   A.   Well, no, in the ESS Method because ESS is also a

3   Three-Position Scoring system.  It's either response present

4   or it's absent.  If it's -- if it's -- if the comparison

5   question is stronger, you get a plus 1, and if it's

6   weaker -- if the relevant question is stronger, you get a

7   minus 1, except in the electrodermal, and in the

8   electrodermal it's 2 or minus 2.

9   Q.   Why is that?

10  A.   Well, the people who developed ESS did that because

11  there's a large body of scientific research now that

12  suggests that the electrodermal system is a much more

13  powerful predictor than either respiration or cardio.  And

14  if you look at the computer models that came out of the

15  University of Utah's work, their equations give the

16  electrodermal response about twice as much weight.  And so

17  ESS decided to do that explicitly and double the scores for

18  electrodermal.

19       So this was designed -- actually, this was

20  originally called the Simplified Scoring System, which I

21  think is a better name for it, but I didn't help develop

22  it, so they picked Empirical Scoring System.  But it is

23  designed to be a very simple reliable system because the

24  scoring rules are very simple.

25  Q.   If I understand correctly, then, essentially it's the

1     same as the Federal Three-Position, except if there's a

2     noticeable difference, the EDA channel gets points of 2

3     rather than 1?

4     A.   I would say ESS is a little more liberal than the

5     federal system because you don't have to -- you don't

6     actually have to make measurements of anything.  If there's

7     a noticeable difference, it's scoreable.

8     Q.   If you were to translate the ESS scoring into Federal

9     Three-Position utilized by Agent Sullivan and Agent

10    Foster, what would the results be?

11    A.   It actually would not change.  It would still be

12    plus 1.

13    Q.   And why is that?

14    A.   Well, because if you notice, there are an equal

15    number of plus 2s and minus 2s.  And so if I change them to

16    plus 1s and minus 1s, it doesn't change the total.

17    Q.   And would the results be the same?  Inconclusive?

18    A.   It would still be inconclusive.

19    Q.   So using the Utah Method, ESS Method, or the Federal

20    Three-Position, do you have an opinion as to the ultimate

21    results of Jamaico Tennison's polygraph charts taken by

22    Agent Sullivan on June 11, 2014?

23    A.   I do.

24    Q.   What is that?

25    A.   They're inconclusive.

1    Q.   And do you hold that opinion within a reasonable

2    degree of scientific certainty?

3    A.   I do.

4              MR. COBERLY:  I pass the witness, Your Honor.

5              THE COURT:  All right.  You may cross-examine.

6                        CROSS-EXAMINATION

7    BY MR. NAYBACK:

8    Q.   Dr. Honts, you're a full-time professor at Boise

9    State University?

10   A.   I am.

11   Q.   Are you salaried there?

12   A.   I am.

13   Q.   You were talking about some contractual obligation

14   to provide service.  Is that what you testified to

15   earlier?

16   A.   Yes.

17   Q.   What is that?

18   A.   We're expected to do a service activity that can take

19   place in the university in terms of sitting on committees,

20   in serving in offices on campus as part of the university,

21   or we're also expected to do service work in the community,

22   and so do things in the community to contribute to society

23   in general.  And one of the catch words right now is

24   "community engagement."

25   Q.   But that's not your consulting business?  You don't

1       get credit for your consulting business?  That's not

2       considered service work, is it?

3       A.    It is.

4       Q.    And that's a for-profit business, isn't it?

5       A.    It is.

6       Q.    But you use that for-profit business to fulfill your

7       service obligation to the university?

8       A.    Partially, yes.  And they are completely aware of

9      that.  In fact, the rules say for-profit or not.

10      Q.    And who are Handler and Hartwig?  Are they polygraph

11      experts, too?

12      A.    Handler is.  Hartwig is a psychologist who is an

13     expert on interrogation and on deception and detection of

14     deception without polygraph.

15      Q.    Okay.  So Handler is the same type of expert, a

16      for-hire expert like you are?

17      A.    He -- he does work for hire, yes.

18      Q.    Okay.  Your website indicates that you consulted with

19      law enforcement agencies.  Can you tell me, have you ever

20      been retained by the U.S. Department of Justice?

21      A.    No.

22      Q.    Have you ever been retained by the FBI?

23      A.    Retained by them?  No.

24      Q.    And when was this -- when were you teaching at the

25      NCCA?  Back in the 1970s?

1    A.    No.   It was -- I went to NCCA in 1987 and left in the

2    early 1990s.

3    Q.    And you would agree that that's the premiere training

4    institute for polygraphers; is that right?

5    A.    Yes.

6    Q.    So other than the Canadian group that you worked for,

7    what other United States law enforcement agencies have you

8    been retained by, when you say you've worked for law

9    enforcement agencies?  Your website highlights the fact

10   that you work for law enforcement agencies, Dr. Honts.

11   I'm asking you which ones you've worked for?

12   A.    Most of -- I don't work for any of them on a salaried

13   basis.  I have consulted with them.  They're in my CV.

14   Q.    Can you go ahead and tell me which ones in the United

15   States?

16   A.    Sure.

17   Q.    You mentioned Mexico and China.

18   A.    Consultations with public agencies on Page 45:

19   Arizona Department of Public Safety; Indiana State Police;

20   Idaho Department of Health and Welfare, Family and

21   Children's Services; Inspector General of the State of Utah;

22   Inspector General of the State of Oklahoma; the Duchesne

23   County, Utah, Police Department; the Fargo, North Dakota,

24   Police Department; the Lincoln County, Wyoming, Police

25   Department.

1    Q.   Let me stop you.  Any federal agencies?

2              MR. COBERLY:  He asked the question.  The

3    witness has a right to complete his answer.

4              THE COURT:  Let him complete the answer, Mr.

5    Nayback.

6    Q.   Go ahead, Dr. Honts.

7    A.   Yes.  United States Secret Service; United States Air

8    Force Office of Special Investigations.

9    Q.   Okay.  What percentage of your consulting business is

10   consulting with defense attorneys, if you know?

11   A.   I don't know exactly, but it's in the high 90s.

12   Q.   Ninety percent or more with defense attorneys,

13   correct?

14   A.   Yes.

15   Q.   Yes?

16   A.   Yes.

17   Q.   How much do you charge per hour?

18   A.   It depends.

19   Q.   Can you give me those variations and what the charges

20   are?

21   A.   My base rate is $400 an hour, and for Public

22   Defender's Offices or appointed counsel, it's $300.

23   Q.   Is it the same for research, drafting a report, as

24   well as testifying?

25   A.   Yes.

1    Q.   What is the total dollar cap, if any, on your

2    contract in this case, if you know?

3    A.   There is no --

4              MR. COBERLY:  Your Honor, I think this is

5    getting into the --

6              THE COURT:  Yes.  I'm not going to permit that.

7              MR. NAYBACK:  Your Honor, I think the dollar

8    figure that any expert is getting for testimony in a

9    federal case is relevant to show his bias.  It has been

10   permitted in --

11             THE COURT:  The Court approves the -- this is a

12   CJA appointment, as I understand it.  The Court approves

13   the budget request, reviews the reasonableness of the

14   requested services, and to suggest that there is something

15   inappropriate with that, given what the amounts are, I

16   don't know how that can establish bias.

17             MR. NAYBACK:  Well, we're not in front of a

18   jury.

19             THE COURT:  I understand that.

20             MR. NAYBACK:  But I think the United States is

21   entitled to know how much Dr. Honts is getting for his

22   opinions.  And if the Court is ruling against us, I

23   totally accept that.  But it has been raised in other

24   courts in this courthouse, where the dollar figures on an

25   expert's contract, whether under CJA appointment or not,

1    is disclosable and relevant to bias.

2            THE COURT:  How is it relevant to bias in this

3    proceeding with respect to what's before the Court here,

4    now, today?

5            MR. NAYBACK:  It's relevant because Dr. Honts --

6            (Beeping sound.)

7            THE COURT:  What's that?

8            MR. COBERLY:  Your Honor, I'm sorry.  This is

9    Mr. Jamaico Tennison's GPS bracelet.  Do we need to

10   recharge that?

11           THE COURT:  Yes, talk to him for just a minute.

12           MR. COBERLY:  Your Honor, I guess it's telling

13   Mr. Tennison that he's not within the zone of La Posada,

14   so if Mr. Valdez contacts you --

15           THE COURT:  All right.  Let's move on.

16           MR. NAYBACK:  I apologize, Your Honor.  If Dr.

17   Honts had found that Mr. Tennison had failed the exam, he

18   would not have been hired in this case.  He has a

19   financial incentive to arrive at a different conclusion

20   than the FBI, and the financial incentive comes from the

21   contract that the Court is paying in this case, is my

22   argument.

23           MR. COBERLY:  Your Honor, perhaps -- and I'm not

24   going to concede this, but perhaps Mr. Nayback would have

25   a point if this was before a jury.  This is before the

 1      Court.  The Court approves the budget.  The Court knows

 2      the budget.  Disclosing it so that it can be used in some

 3      other proceeding, I think that's what the motivation is

 4      here.

 5                  THE COURT:  I think the witness has already

 6      testified that his base rate is $400 an hour, and for

 7      Public Defender, $300 an hour, is what he said.

 8      Q.    (By Mr. Nayback)  Dr. Honts, how many hours have you

 9      spent on this case so far?

10      A.    I don't know.

11      Q.    Can you venture a guess?  You do your own billing,

12      don't you?

13      A.    I do.  I would also note that for travel, I charge

14      $150, and I've been down here three times now.  I -- I just

15      -- I don't -- I would have to pull my invoices up and look.

16      Q.    And there's no limit on how many hours you can bill?

17      A.    No, the Court has put a ceiling on it that I assume,

18      since I'm going to have to come back, will be raised.

19      Q.    Okay.  Is it fair to say that your consulting

20      business is a multi-million-dollar business, Dr. Honts?

21      A.    I wish.  Not even close.

22      Q.    You have two partners, right?

23      A.    Yeah, and we've made exactly no dollars as a

24      partnership.  In fact, the partnership has nothing to do

25      with this.  It's going to be to train law enforcement how to

 1    do non-coercive interrogation techniques.  We're not going
 2    to do any consulting or court work at all through the
 3    partnership.
 4        Q.   You like to keep raising your work with law
 5    enforcement, but I want to make sure that your answer is
 6    still what portion -- to this question, what portion of
 7    your consulting business is dedicated to representing
 8    criminal defendants?  Ninety percent, correct?
 9        A.   I don't represent criminal defendants.  I consult
10    with defense attorneys.
11        Q.   All right.
12        A.   But yes, it's about 90 percent, but that's who calls
13    me.
14        Q.   Okay.
15        A.   I'm happy to work for the government and on the
16    prosecution.  They don't call me.
17        Q.   You were hired in another case of mine, Melvin
18    Russell.  Are you familiar with that case?
19        A.   Yes.
20        Q.   And, in fact, you do a lot of business here in New
21    Mexico, don't you?
22        A.   I do some.  It varies from time to time.  In the last
23    year, it has been busy in New Mexico.
24        Q.   Have you ever testified for defendants charged in New
25    Mexico State Court?

1     A.    Yes.

2     Q.    Okay.  And you're allowed to testify regarding

3     polygraph results --

4     A.    Yes.

5     Q.    -- that you have arrived at from giving criminal

6     defendants a polygraph examination, correct?

7     A.    And about other examiners, yes.

8     Q.    Give me an example of other examiners.

9     A.    I testified for Kari Brandenburg, the District

10    Attorney for Bernalillo County, in a homicide case, about

11    two polygraph tests that were run by Peter Pierangeli, and

12    about a polygraph test that I ran on a murder defendant, but

13    I represented the State in that case.

14    Q.    And polygraph tests and their results are admissible

15    in State Court here in New Mexico, correct?

16    A.    If you meet certain requirements.  There's an

17    evidentiary Rule 11-707, and if you meet those, they almost

18    always come in.

19    Q.    But that's not the same as the federal Daubert

20    standard, correct?

21    A.    Actually, it met the Daubert standard, and that's the

22    basis of a Rule 11-707 now.

23    Q.    Are there any other states that allow for the

24    admissibility of polygraph results at trial, Dr. Honts, to

25    your knowledge?

1    A.   Not in the way New Mexico does, no.

2    Q.   What other way would be -- I'm just asking whether

3    results are admissible at trial.

4    A.   A number of states have admitted polygraph tests on

5    an individual basis, but they don't yet have control in

6    rulings.  And you can look at my CV and see that I've

7    testified in a number of states.

8    Q.   Without looking at your CV, can you tell me which

9    states permit polygraph results at trial?

10   A.   I have testified at trial in Wyoming.  I'd have to

11   look through my CV, if that's permitted.

12   Q.   That's fine, Doctor.  You understand that polygraph

13   results are not admissible in Federal Court, correct?

14   A.   Yes.  Well, no.

15            THE COURT:  Just a minute here.  We're going to

16   be off the record here.

17            (A discussion was held off the record.)

18            MR. NAYBACK:  I'm sorry, Your Honor.  Did you

19   want me to continue?

20            THE COURT:  Yes, continue.  Ms. Goehl, would you

21   read the question that was asked before I spoke.

22            (The following testimony was read back:)

23            "QUESTION:  That's fine, Doctor.  You

24       understand that polygraph results are not

25       admissible in Federal Court, correct?

1               *"ANSWER:  Yes.  Well, no."*

2      A.    No, my understanding is that it's at the discretion

3   of individual federal judges, and it can vary.  Because the

4   only time the Supreme Court has spoken to it is in U.S. v.

5   Scheffer, a case that I was interested in and helped to

6   author an amicus brief for, and the ruling there was that

7   the Supreme Court was not going to find that you had a

8   constitutional right to admit polygraph, but they would not

9   object to courts that let it in.  And so they placed federal

10  judges in the gatekeeper role for letting polygraph in or

11  out.  And there have been admissions in Federal Court since

12  Scheffer.

13     Q.    Dr. Honts, when have you testified in Federal Court

14        as to the results of a polygraph test?

15     A.    I don't believe that I have.

16     Q.    And that's because polygraph testing doesn't meet the

17        scientific reliability standards of Daubert; isn't that

18        right?

19     A.    Absolutely not.  I don't believe that for a second.

20     Q.    Well, that's your opinion?

21     A.    That's my opinion.

22     Q.    I'm asking:  Do you have any federal case where you

23        testified or where a judge has found polygraph testing

24        meeting the Daubert standard?

25     A.    Yes, there are some.

1    Q.    Can you give me a case name, or do you have them with

2    you?

3    A.    Not where I've testified.  I know that Dr. Raskin

4    testified recently in Federal Court in Florida.  I believe a

5    polygraph was recently admitted in Federal Court in Puerto

6    Rico.  There have been polygraphs in Federal Court in

7    California.

8              So yes, there have been federal judges that have

9    found that at the trial level, that it met Daubert.

10    Q.    Can I ask you to produce those opinions to Mr.

11    Coberly, and would you be able to?

12    A.    They're not my cases.  I can try.

13    Q.    You've read those cases?

14    A.    The California cases I've read.  Those are all

15    Cordoba.

16              MR. COBERLY:  Your Honor, Mr. Nayback can do a

17    Westlaw search.

18              THE COURT:  He's following up on answers the

19    witness has given.  I think he has a right to do that.

20    Overruled.

21    Q.    I want to clarify this, Doctor, since you're offering

22    up federal opinions where courts have found that polygraph

23    testing has met the standards of Daubert.

24    A.    I believe there are.  I can't say that with

25    certainly.  I will find them if I can.

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    Q.   Well, a minute ago you were saying, it sounds like,

2    there were five at least, and now you're --

3    A.   I think there are three, at least three I know of.  I

4    recall one in Florida; I believe there is one in Puerto

5    Rico; and then there's one in California.

6    Q.   Okay.  Any in New Mexico, here, Doctor?

7    A.   Yes, actually there was one in New Mexico.  There was

8    one in Judge Vazquez's court.  Charles Daniels, Justice

9    Daniels, was the defense attorney in that case.  I testified

10   in that case.  I can give you the cite.  Give me just a

11   moment.

12   Q.   Take your time, Doctor.

13   A.   Galbreth.  U.S. v. Galbreth, Criminal Case Number

14   94-197.  It says Justice Charles Daniels was the defense

15   attorney in that case.

16   Q.   And he hired you?

17   A.   Yes, he did.

18   Q.   And you testified as to the polygraph results of a

19   defendant that took one of your polygraph exams?

20   A.   No.  He took a polygraph exam with Dr. David Raskin.

21   Dr. Raskin testified in that case also.

22   Q.   Okay.  And was there a Daubert hearing?

23   A.   There was a Daubert hearing.

24   Q.   And Judge Vazquez found that the work that you did

25   met the standards of Daubert?

1    A.    Yes, she did.

2    Q.    And would you still be willing to produce for me

3    those other federal cases?

4    A.    I'll look for them.

5    Q.    Thank you, Doctor.  I'll follow up on that.

6          The report that you wrote in this case

7    criticizes, obviously, the FBI in performing its polygraph

8    on Mr. Tennison, and in fact at one point I saw that you

9    used the words "gross incompetence."  Do you remember

10   that?

11   A.    No, but I might well have used it.

12   Q.    You realize that the polygrapher is a 20-plus-year

13   sworn law enforcement agent with the FBI?

14   A.    I do.

15   Q.    And do you think your use of hyperbole like "gross

16   incompetence," do you think that increases or decreases

17   your credibility, Doctor?

18   A.    I don't know.  If I wrote it, that's how I felt.  I

19   think it was an incompetently conducted polygraph.

20   Q.    Earlier, you were saying that there were problems or

21   mediocre problems with the charts?

22   A.    I was asked about the quality of the charts.  In my

23   opinion, anybody that would use a two relevant, two

24   comparison question MGQT, knowing that the specificity of

25   that test is 30 percent or so, it's gross incompetence.

1    Q.   Okay.

2    A.   It's general disregard for innocence.

3    Q.   And I remember you talking about that on direct

4    examination.  I think you were saying that there are ten

5    studies published that tend to show the MGQT format has an

6    inherent bias against actually innocent people.  Is that

7    your testimony?

8    A.   Yes.

9    Q.   Will you produce those for the United States?

10   A.   Absolutely.

11   Q.   And why wouldn't you attach those to your report in

12   the first instance?  Is that not your habit --

13   A.   No, it's not.

14   Q.   -- to attach studies?

15   A.   No.

16   Q.   Did you even cite them?

17   A.   No, not in the report.  Mr. Coberly has them.

18   Q.   Mr. Coberly has them?

19   A.   Yes.

20   Q.   And do you know any reason why he would withhold

21   those from the United States?

22   A.   No.

23   Q.   You also testified that Stewart -- Senate?

24   A.   Senter.

25   Q.   Senter?

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    A.   Like Center with an S.

2    Q.   He works with NCCA right now?

3    A.   Yes.

4    Q.   And he published studies that go against the MGQT.

5    Did I get your testimony right?

6    A.   Absolutely.

7    Q.   And would you provide those to me also?

8    A.   He has them.

9    Q.   Mr. Coberly has them?

10   A.   He has them.

11   Q.   Okay.  And you didn't provide those citations or

12   titles of those studies today?  You would just say there

13   were a bunch of studies that say the MGQT is an invalid

14   test?

15   A.   I could very quickly.

16   Q.   Okay.  In the chart, in Defense's T1, you were

17   describing how clearly there was a loss of pressure in the

18   cuff because the red lines go down throughout the chart.

19   Have I captured your testimony on that?

20   A.   Yes.

21   Q.   So when it stays even in chart 2, how do you explain

22   that?

23   A.   Something changed between chart 1 and chart 2.

24   Q.   It quit leaking air?

25   A.   It's possible.

1     Q.   Anything's possible, right?

2     A.   Yeah.  It's certainly possible, because there are

3   connectors between the polygraph unit and the cuff, and she

4   might have adjusted one of those and stopped the leak.  She

5   doesn't recall whether she even used an arm cuff or a wrist

6   cuff.

7     Q.   When you were talking about the standard in the

8     industry is to record the polygraphs, could I ask you,

9     what are you referring to about "the industry"?  Who are

10    you referring to?

11    A.   The polygraph profession.

12    Q.   The American Polygraph Association?

13    A.   And the Society for Testing and Materials.

14    Q.   Those are essentially defense-oriented organizations,

15   are they not?

16    A.   No.  Absolutely not.

17    Q.   Any members of NCCA, members of the American

18   Polygraph Association?

19    A.   Many.  I think probably most.

20    Q.   Is that right, Doctor?

21    A.   I think.

22    Q.   You don't know for sure?

23    A.   I don't know for sure.

24    Q.   Okay.

25         MR. NAYBACK:  Your Honor, could we break?

```
1                    THE COURT:  Yes, this is a good time to break
2        here.
3                    As noted, we are going to resume at 9:00 on
4        Wednesday, February 3rd.
5                    Is there anything we need to talk about here
6        before we adjourn?
7                    MR. NAYBACK:  Not from the United States, Your
8        Honor.
9                    MR. COBERLY:  Briefly, Your Honor.
10                   THE COURT:  Sir?  Sit down, Marshal.  Thank
11       you.
12                   MR. COBERLY:  Briefly, Your Honor.  I made this
13       request several times, and as long as now Mr. Nayback is
14       going to be requesting that I produce scientific articles
15       that Dr. Honts relied on, I would again request a copy of
16       the unredacted FBI manual as Exhibit X.  For the record,
17       I'm requesting that.
18                   And the other is, the Court did look -- well,
19       took under advisement, I guess, the e-mail, and if the
20       Court has made a ruling on that, it would help us
21       determine how we're going to proceed on the matter.
22                   THE COURT:  The parties will be notified about
23       that, counsel.
24                   As you know, we're set to adjourn for good
25       reason here at 4:20.  It is now 4:24.
```

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1              We are in recess at this time.  I do excuse you

2      until February 3rd.

3              I will have use of the bench for just a few

4      minutes.

5              (Proceedings adjourned at 4:24 p.m.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    UNITED STATES OF AMERICA

2    DISTRICT OF NEW MEXICO

3

4                    CERTIFICATE OF OFFICIAL REPORTER

5                    I, Julie Goehl, RDR, CRR, RPR, RMR,

6    New Mexico CCR #95, Federal Official Realtime Court

7    Reporter, in and for the United States District Court

8    for the District of New Mexico, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code,

10   that the foregoing is a true and correct transcript of

11   the stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15                    Dated this 30th day of January, 2016.

16

17                    _____
                      JULIE GOEHL
18                    FEDERAL OFFICIAL COURT REPORTER
                      Registered Diplomate Reporter
19                    Registered Professional Reporter
                      Registered Merit Reporter
20                    Certified Realtime Reporter
                      NM Certified Court Reporter #95
21                    333 Lomas Boulevard, Northwest
                      Albuquerque, New Mexico  87102
22                    Phone:  (505)348-2209
                      Fax:    (505)348-2215
23                    Email:  Julie_Goehl@nmcourt.fed.us

24

25


             JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
             FEDERAL OFFICIAL COURT REPORTER
             333 Lomas Boulevard, Northwest
             Albuquerque, New Mexico  87102