1                    IN THE UNITED STATES DISTRICT COURT

2                      FOR THE DISTRICT OF NEW MEXICO

3        UNITED STATES OF AMERICA,

4                        Plaintiff,

5            vs.                                    CR-15-00212 MCA

6        JAMAICO TENNISON,

7                        Defendant.

8

9                    REDACTED TRANSCRIPT OF PROCEEDINGS
                 MOTION TO SUPPRESS STATEMENTS, VOLUME 1
10            BEFORE THE HONORABLE M. CHRISTINA ARMIJO
                   CHIEF UNITED STATES DISTRICT JUDGE
11             FRIDAY, DECEMBER 11, 2015, 9:08 A.M.
                       ALBUQUERQUE, NEW MEXICO
12

13

14       FOR THE PLAINTIFF:

15            UNITED STATES ATTORNEY'S OFFICE
              District of New Mexico
16            201 Third Street, Northwest
              Suite 900
17            Albuquerque, New Mexico  87102
              BY:  MR. KYLE T. NAYBACK
18                 MS. SARAH JANE MEASE

19       FOR THE DEFENDANT:

20            COBERLY & MARTINEZ, LLLP
              Attorneys at Law
21            1322 Paseo de Peralta
              Santa Fe, New Mexico  87501
22            BY:  MR. TODD A. COBERLY

23

24            Proceedings recorded by mechanical stenography,
         transcript produced by computer.
25

                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                     FEDERAL OFFICIAL COURT REPORTER
                     333 Lomas Boulevard, Northwest
                     Albuquerque, New Mexico  87102

1    Reported by:

2         JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
          333 Lomas Boulevard, Northwest
3         Albuquerque, New Mexico  87102
          Phone:  (505)348-2209
4         Email:  Julie_Goehl@nmcourt.fed.us

5

6                    I N D E X

7                                                    PAGE

8    PRELIMINARY MATTERS                               3

9    OPENING STATEMENT BY MR. NAYBACK                  10

10   OPENING STATEMENT BY MR. COBERLY                  14

11   WITNESSES FOR THE PLAINTIFF:

12    MATTHEW SCHAEFFER

13      Direct Examination by Ms. Mease               21

14      Cross-Examination by Mr. Coberly              37

15    JENNIFER SULLIVAN

16      Direct Examination by Ms. Mease               65

17      Cross-Examination by Mr. Coberly              97

18      Cross-Examination (Continued) by Mr. Coberly  139

19      Redirect Examination by Ms. Mease             181

20

21                  EXHIBITS ADMITTED

22   Government's Exhibits 1 through 13                21

23   Defendant's Exhibits A, B, H, I, J, K, L, M, N,

24   O, P, Q, R, S, T, and V                          40

25   Defendant's Exhibit C                            45


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                FEDERAL OFFICIAL COURT REPORTER
                333 Lomas Boulevard, Northwest
                Albuquerque, New Mexico  87102

```
 1              REDACTED MOTION TO SUPPRESS STATEMENTS, VOLUME 1

 2                     (Court in session at 9:08 a.m.)

 3              COURTROOM DEPUTY CAROL WALKER:  All rise.

 4              Hear ye, hear ye, hear ye.  The United States

 5      District Court for the District of New Mexico is now in

 6      session, the Honorable M. Christina Armijo, Chief United

 7      States District Judge, presiding.

 8              God save these United States and this Honorable

 9      Court.

10              THE COURT:  Good afternoon, counsel.

11              MS. MEASE:  Good morning.

12              MR. NAYBACK:  Good morning.

13              MR. COBERLY:  Good morning.

14              THE COURT:  You may be seated.  All right.  Just

15      give me a moment here.

16              We convene this morning in the case of United

17      States v. Jamaico -- am I pronouncing that correctly?

18              MR. COBERLY:  It is Jamaico.

19              THE COURT:  Jamaico Tennison, this being on the

20      Court's criminal docket, 15-CR-212.

21              May I have appearances, please, from counsel.

22              MR. NAYBACK:  Good morning, Your Honor.  Kyle

23      Nayback on behalf of the United States.  And with me at

24      counsel table is my colleague, Sarah Mease.

25              MS. MEASE:  Good morning, Your Honor.
```

```
 1                THE COURT:  Good morning, counsel.

 2                MR. COBERLY:  Good morning, Your Honor.  Todd

 3      Coberly on behalf of Jamaico Tennison, who is present here.

 4      And sitting next to me is our expert, Dr. Charles Honts.

 5      And with the Court's permission, I would ask that my

 6      paralegal, Lily Hofstra, sit at counsel table at least

 7      through the morning.

 8                THE COURT:  That's fine.

 9                MR. COBERLY:  Thank you, Your Honor.

10                THE COURT:  Yes.  Thank you.  Good morning to

11      all.

12                MR. NAYBACK:  Good morning.

13                THE COURT:  All right.  We are here on the

14      defendant's motion to suppress statements made on June 11,

15      2014, and some related other issues that have been raised

16      in this case.

17                How do the parties intend to proceed here?

18                MR. NAYBACK:  Your Honor, thank you.

19                This morning, we have -- of course, it's the

20      United States' burden on this motion, and the United States

21      has Special Agent Matt Schaeffer, who was originally the

22      lead case agent on this case, ready outside of the

23      courtroom, ready to testify.

24                The individual who conducted the polygraph

25      examination in this case, Your Honor, is Special Agent
```

1      Jennifer Sullivan.  She is also available to testify.

2                 And finally, we have an expert witness, a short

3      examination I would imagine.  His name is Chase Foster.

4                 All three are present today, and the United

5      States is ready to move forward.

6                 THE COURT:  All right.  And just give me a moment

7      here.

8                 And Mr. Foster is the subject of the motion to

9      exclude his testimony?

10                MR. NAYBACK:  He is.

11                THE COURT:  All right.  And what order do you

12     intend to call your witnesses?

13                MR. NAYBACK:  Special Agent Schaeffer; Special

14     Agent Sullivan; and Mr. Chase Foster.

15                THE COURT:  Okay.  Mr. Coberly?

16                MR. COBERLY:  Thank you, Your Honor.

17                My witnesses, this afternoon I assume, Your

18     Honor, will be --

19                THE COURT:  This morning.  Long day already.

20                MR. COBERLY:  Yes, Your Honor.

21                THE COURT:  Okay.  Go ahead.

22                MR. COBERLY:  Dr. Charles Honts, who has flown in

23     from Idaho to be present.

24                THE COURT:  Yes.

25                MR. COBERLY:  Ms. Dorothea Tennison may or may

1    not testify.  She is Mr. Tennison's common-law wife.

2                And then we'll leave it up to the end of the day

3    to see if my client is going to testify or not.

4                Regarding Mr. Foster, I did file that motion a

5    little over a week ago, and I think it's pretty

6    straightforward.  But my position is, you know, this is

7    about Agent Sullivan's methodology that she used in

8    conducting the polygraph.

9                And Agent Sullivan, I know the Court is familiar

10   with her.  She has testified in this district numerous

11   times.  She is the polygrapher for New Mexico, and I think

12   she is perfectly well qualified to testify about her

13   methodology.  And I believe that Mr. Foster is really just

14   redundant, given the amount of time we have here today.

15   That's why I was asking to exclude him.

16               To the extent the Court would like to hear from

17   Mr. Foster, I have no problem with that.  I would ask,

18   though, that some of the policies and protocols that he has

19   relied on in his disclosure that we received a while back

20   be disclosed to us, and I think I'm entitled to them,

21   either under Rule 705, after cross-examination, or even

22   under 26.2, as essentially a Jencks statement, a statement

23   that Mr. Foster has adopted.

24               THE COURT:  Mr. Nayback?

25               MR. NAYBACK:  Yes, Your Honor.  I don't agree

1    with Mr. Coberly.  I think since the defense is attacking

2    the quality of the polygraph examination conducted in this

3    case, as well as the scoring, Mr. Foster is well versed in

4    quality control and quality assurance.  He is -- he has

5    worked for the National Center for Credibility Assessment

6    and has been a long-time faculty member there.  He is well

7    qualified.  And I think that would help the Court in

8    reaching its decision.

9              As to the discovery request, Your Honor, I

10   apologize.  This was filed just last week, and I'm starting

11   a trial in front of Judge Vazquez on Monday.  I didn't have

12   adequate time to respond, Your Honor, but I was able to

13   identify our position anyway, at least vis-a-vis the

14   government, as to on Page 5 of Mr. Coberly's motion is the

15   discovery request.  Again, this was, I believe, filed last

16   Friday.

17             THE COURT:  It was filed on the 3rd.

18             MR. NAYBACK:  Okay.  So it's the FBI -- as to

19   Number 1, that is a manual that is classified as secret,

20   Your Honor.

21             THE COURT:  This is the one entitled "Procedures/

22   protocols pertaining" --

23             MR. NAYBACK:  I don't believe it's entitled that

24   by the FBI.

25             THE COURT:  No, no.  We're referencing Page 5.

1           MR. NAYBACK:  Yes.

2           THE COURT:  Go ahead.

3           MR. NAYBACK:  Yes.  A redacted version of this

4    manual is available on the Internet.

5           As to Number 2, Your Honor, that is contained in

6    the federal handbook -- and I can have Mr. Foster explain

7    this, as well -- also available on the Internet.

8           Item Number 3, the request relates to the federal

9    three-position scoring method, and that's online in the

10   federal handbook, as discussed above.  Also, the NCCA, the

11   National Center for Credibility Assessment, the test data

12   analysis manual is also online, Your Honor.  It's a public

13   document.

14          As to the request in Number 4, the procedures and

15   protocols followed by FBI polygraphers, that is in the

16   federal handbook, online.

17          Number 5, as to the first part of the question,

18   Your Honor, protocols pertaining to comparison questions to

19   be used by FBI polygraph examiners, again, that's in the

20   federal handbook, online.  The second part of the request

21   says, "including a list of all 'federally approved'

22   comparison questions."  That's not in existence.  That

23   simply doesn't exist.

24          And then, finally, Number 6 is also contained in

25   the federal handbook, available online.

    1              So I guess the Court would have to make a cut
    2       just on Number 1.  That is a classified secret document,
    3       Your Honor.  But, again, a redacted version is available on
    4       the Internet.
    5              Thank you.
    6              THE COURT:  All right.  Do you want to respond
    7       any further, Mr. Coberly?
    8              MR. COBERLY:  Briefly, Your Honor.  I don't think
    9       the fact that there might be something available online
   10       satisfies the dictates of Rule 26.2.
   11              Regarding there being the classified and secret,
   12       I guess I'm somewhat troubled by if someone is going to
   13       come in here and say, "Oh, I used this methodology, it's
   14       federally approved, but I can't tell you about it because
   15       it's secret," I just am very troubled by that, and I guess
   16       if Mr. Foster is going to rely on that, perhaps the Court
   17       could review the pertinent portions in camera and determine
   18       what should be disclosed.
   19              And I could -- I'm more than happy to abide by
   20       any protective orders that the Court would like to enter.
   21              THE COURT:  The Court will take that under
   22       advisement.  I'll complete my notes here.  Just give me a
   23       moment.  Do the parties wish an opportunity for a brief
   24       opening statement before we call the first witness in the
   25       case?

1           MR. NAYBACK:  Yes, Your Honor.

2           THE COURT:  All right.  Mr. Coberly, do you want

3    to go first?  It's your motion.  It matters not.  The Court

4    is going to consider everything.

5           MR. NAYBACK:  Well, I think --

6           MR. COBERLY:  Since Mr. Nayback has the burden at

7    this time --

8           MR. NAYBACK:  I apologize for standing up too

9    quickly, Your Honor.

10          THE COURT:  All right.  Go ahead, Mr. Nayback.

11          MR. NAYBACK:  Your Honor, the issue before the

12   Court is whether Mr. Tennison's statement confessing to

13   child sex abuse was given voluntarily to the FBI.

14          The United States issued a response on August

15   26th of 2015, and it was right around that date that Mr.

16   Coberly received Chase Foster's report and curriculum

17   vitae.  It wasn't until just on the 3rd of this month,

18   December, that we received this discovery request.

19          We don't believe that the motion to exclude or

20   the discovery request was timely filed, so we ask the Court

21   to allow Mr. Foster to testify.

22          Secondly, the Court asked counsel to look over

23   the document of Blythe v. Fatkin, a Tenth Circuit case, and

24   I wanted to briefly address that since the Court asked for

25   commentary on that.

1          We don't believe that Mr. Tennison -- that his

2     right to counsel attached, nor do we believe he ever

3     unequivocally requested an attorney, Your Honor.  The

4     United States' position is that Mr. Tennison clearly was

5     not charged with a crime at the time of the polygraph.  And

6     as the Court well knows, the Sixth Amendment right to

7     counsel does not attach until the initiation of adversary

8     judicial criminal proceedings.  That is what the Tenth

9     Circuit found in this case.

10          Secondly, I think the Court will note from the

11    transcripts it's about to receive that Mr. Tennison never

12    requested an attorney.  At most, he requested whether one

13    will be appointed to him.  In addition, he at least alleged

14    that he had an attorney.  Of course, Mr. Coberly wasn't in

15    the case at that time; he was not yet appointed.

16          So it's not clear if Mr. Tennison ever had

17    counsel, but what is clear from the transcripts is that he

18    never asked for one.

19          Secondly, this interview, Your Honor, was not a

20    custodial interrogation and certainly was not -- he did not

21    have a right to have counsel present because of that.

22          THE COURT:  Does the fact that he was under some

23    form of supervision make any difference?

24          MR. NAYBACK:  No, Your Honor.  He -- he

25    voluntarily went to the FBI office.  He signed a waiver of

1    his Miranda, of his right to counsel.  He agreed to take a

2    polygraph, and then gave a recorded statement confessing.

3    The fact that he might have been under some supervision at

4    the time, at least in counsel's mind, does not affect his

5    right to counsel.

6          Mr. Tennison told Sullivan, Special Agent

7    Sullivan, "I just want to get this over with," and signed

8    waivers to proceed by polygraph and his right to counsel.

9          He did not clearly and unequivocally request an

10   attorney, and for that reason, we don't think that his

11   right to counsel attached at that point.

12         Secondly, Your Honor, I have a concern about this

13   hearing, in that we're going to get into the minutiae of

14   polygraph data, scoring, when I don't think that's

15   particularly relevant and I don't think it will be

16   admissible at trial.

17         Mr. Coberly is correct that one small portion of

18   whether Mr. Tennison's statement was voluntary was whether

19   the FBI told him that he had failed a polygraph

20   examination, when he in fact had passed it.  And I think

21   what you're going to hear today is that the FBI found that

22   deception was indicated; Special Agent Sullivan scored it

23   and found that deception was indicated.

24         And then the defense is going to put up an

25   expert, Dr. Honts, who is going to say that he scored it

JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    differently and found that the test result was

2    inconclusive.

3          But I think all of -- both experts and the agents

4    will testify, Your Honor, that scoring of a polygraph is

5    somewhat subjective; that three polygraphers can look at

6    the raw physiological data from a defendant and score it

7    differently.  It's subject to interpretation.

8          And so the United States' position is that that's

9    fine if there's another expert who looks at some data and

10   scores it differently.  It doesn't mean that the FBI did it

11   wrong.

12         And so Mr. Coberly and I were talking about this

13   this morning and thinking, goodness, this could be, given

14   how much information we have in the form of exhibits and

15   expert testimony, this could easily be a two-day

16   suppression hearing.  I just don't think that's necessary.

17   And I don't know the end goal of defense counsel, but I

18   can't imagine the Court being able to make a cut as to

19   whether one polygrapher scored it right or one polygrapher

20   scored it wrong.

21         So at the end of the day, I hope that the Court

22   looks to the criteria for a voluntary statement.  We

23   believe that the Court will agree with the United States

24   that Mr. Tennison waived his right to counsel.  He's an

25   educated individual, he wasn't lied to, and he gave a

 1      statement confessing, and we're going to ask that that

 2      statement be admitted at trial.

 3              Thank you, Your Honor.

 4              THE COURT:  Thank you, Mr. Nayback.

 5              MR. NAYBACK:  Yes.

 6              THE COURT:  All right.  Mr. Coberly?

 7              MR. COBERLY:  Thank you, Your Honor.

 8              And I apologize.  I just realized that I do

 9      have Ms. Tennison in the courtroom, so maybe if we're

10      going to invoke the Rule, I'll ask her to go ahead and

11      step out.

12              THE COURT:  Yes.

13              MR. COBERLY:  So go ahead and step out, Ms.

14      Tennison.

15              THE COURT:  Thank you.

16              MR. COBERLY:  Ms. Spencer.  Excuse me.  And I

17      would ask that Dr. Honts, since he's my expert --

18              THE COURT:  He's your expert.  He may remain in

19      the courtroom of course.

20              MR. COBERLY:  Thank you, Your Honor.

21              Regarding the Court's minute order filed earlier

22      this week regarding Blythe, I want to make something very

23      clear from the get-go.  We're not asserting that Mr.

24      Tennison had a Sixth Amendment right to counsel.  This

25      falls under the Fifth Amendment.

1              And the two issues are, under the Fifth

2      Amendment:  Did he have rights to a Miranda warnings; and

3      if so, did he voluntarily waive them or was it an

4      involuntary waiver?  Second, regardless of whether Miranda

5      attached pursuant to a custodial interrogation, the issue

6      -- I think the main issue for the Court is -- well, I'm not

7      going to say that.  The second issue for the Court is:  Was

8      Mr. Tennison's statement that he provided to Agent

9      Sullivan, and subsequently to both Agent Sullivan and Agent

10     Schaeffer, was that voluntary?

11             Regarding Blythe, I think Blythe is essentially a

12     replica of Wyrick, the United States Supreme Court case,

13     1982.  And in that case, Wyrick held that a person does not

14     have a -- does not necessarily have a right to Miranda

15     warnings during a polygraph.

16             Now, subsequently, the Ninth Circuit in Gillyard

17     explained that Wyrick did not create a per se rule.  They

18     established four factors the courts are to determine

19     whether waiver of rights in a polygraph setting was

20     voluntary.

21             The Gillyard case discussed -- let me just pull

22     this up.  The Gillyard -- the four factors were:  Who

23     initiated the polygraph?  In Blythe, it was agreed to by

24     the defense counsel and the government.  In our case, the

25     Court will hear that Mr. Tennison was essentially badgered

1        into taking this polygraph.

2                The second factor is:  Did the defendant have the

3        benefit of counsel?  And I think there is going to be a

4        clear factual dispute as to whether Mr. Tennison invoked

5        his right and asked for counsel.

6                The third factor is:  Did the consent form -- and

7        the Court will see that Mr. Tennison was provided a consent

8        to polygraph form, and right after that, an Advice of

9        Rights form.

10               The key question in the polygraph setting in

11       Gillyard, and subsequently followed by a District of Idaho

12       case that I cited, the Vaile case, V-A-I-L-E, is:  Did the

13       Miranda waiver form reference the fact that there was going

14       to be a post-polygraph interrogation, or was it essentially

15       linked to the consent to take a polygraph?

16               The fourth factor, the fourth and final factor,

17       is whether the same officer conducted the post-polygraph

18       interrogation.  And I think the Court is going to see that,

19       yes, Agent Sullivan did continue with the post-polygraph

20       interrogation, but the tenor of the encounter changed

21       dramatically.

22               There is another issue even if the Court

23       determines -- wait a second.  Well, let me step back.  In

24       the Vaile -- let me reference the Vaile case really

25       quickly.

1              In the Vaile case, Section B1 discusses five

2      factors that are relevant to determining whether a

3      defendant is in custody, particularly in a context of a

4      polygraph.  I won't go through them here, but those are the

5      five factors that Vaile referenced.

6              The second issue is even -- let's assume for a

7      moment that there was no custody for Miranda purposes.

8      It's going to be very, very clear to the Court that Mr.

9      Tennison was provided with a Miranda waiver form.

10             And I would refer the Court to a Tenth Circuit

11     case, United States v. Bautista, which is 145 F.3d 1140.

12     And Bautista cites to an Eleventh Circuit case, Tukes v.

13     Dugger, which is 911 F.2d 508.  And Bautista set forth in

14     no uncertain terms that, look, even assuming that the

15     person is not in custody for purposes of Miranda, if the

16     agents give someone a Miranda waiver form and that person

17     invokes their right to counsel, the government can't hide

18     behind the fact that, well, he wasn't in custody.

19             The pertinent quote, Page 115, "If the

20     authorities are free to tell a suspect that he has the

21     right to appointed counsel, but could, while continuing to

22     interrogate him, refuse to provide such counsel on the

23     grounds that the suspect was not actually in custody, the

24     suspect would be led to believe that no request for counsel

25     would be honored."

```
 1              And there's a line of cases that follow Bautista.
 2    Most pertinent, I think, is United States v. Mees, M-E-E-S,
 3    an Eastern District of Missouri case.  It's unpublished.
 4    It is 2009 WL 1657420.  It's a 2009 case.  And the
 5    pertinent quote from there is, "When police have informed a
 6    suspect of his Miranda rights and the suspect clearly
 7    invokes one of those rights, the Court believes that the
 8    police must honor that right irrespective of the actual
 9    custodial situation."  And they cite Bautista for that
10    proposition.
11              And the District Court in that case went ahead to
12    suppress all statements after the defendant had requested
13    counsel.
14              The other case is U.S. v. Ilonzo, I-L-O-N-Z-O,
15    Northern District of Georgia.  It's a very recent case,
16    October 2015, and the cite is 2015 WL 5827598.
17              THE COURT:  Give me the name of the case again.
18              MR. COBERLY:  Ilonzo, I-L-O-N-Z-O.
19              THE COURT:  Okay.
20              MR. COBERLY:  And Ilonzo, I guess it's star 26,
21    right at the end of star 26, is the relevant portion.
22              These cases also stand for the proposition that
23    in determining whether a person is in custody for purposes
24    of Miranda rights, that you do -- one of the factors that
25    you look at is:  Was a Miranda waiver provided?
```

```
 1              So the fact that there was a Miranda waiver here

 2       in this case goes to two elements:

 3              One.  Yes, I think he was in custody.

 4              Two.  Even if he wasn't, he exercised his right

 5       to ask for an attorney after he was told, "You'll be

 6       provided an attorney if you want one," and he was not

 7       provided that attorney.

 8              That's the Miranda portion.

 9              The Fifth Amendment due process is essentially --

10       I know the Court is very familiar with it, but was the

11       circumstances of the statement so coercive that the will

12       was overborne.

13              And I think the Court will hear today throughout

14       the evidence that the nature of the custodial -- well, the

15       nature of the interrogation, whether it was custodial or

16       not, was so coercive, through the use of a polygraph that

17       was a faulty polygraph that was not scored correctly, and

18       that the whole purpose was to obtain a confession, and when

19       Mr. Tennison was told that he lied, that had such a great

20       impact on him that he felt he had no way out but to provide

21       some sort of statement.

22              Thank you, Your Honor.

23              THE COURT:  All right.  Let's have the first

24       witness called.

25              MR. NAYBACK:  Thank you, Your Honor.
```

1              The United States calls Special Agent Matthew

2      Schaeffer.  My co-counsel, Sarah Mease, is grabbing him

3      now.

4              COURTROOM DEPUTY CAROL WALKER:  Right up here,

5      sir.

6              Please raise your right hand.  You do solemnly

7      swear that your testimony in this matter shall be the

8      truth, the whole truth, and nothing but the truth, so help

9      you God?

10             THE WITNESS:  I do.

11             COURTROOM DEPUTY CAROL WALKER:  Please be seated.

12     Please state your name and spell your last name for the

13     record.

14             THE WITNESS:  Matthew Schaeffer.  M-A-T-T-H-E-W

15     S-C-H-A-E-F-F-E-R.

16             THE COURT:  You may proceed.

17             MS. MEASE:  Thank you, Your Honor.  As a

18     preliminary matter, I would just move at this time to admit

19     all of the government's exhibits, which would be Exhibits

20     1 through 13, that have been provided both to defense

21     counsel and the Court.

22             THE COURT:  Is there any objection to the tender

23     here, Mr. Coberly?

24             MR. COBERLY:  No, Your Honor.

25             THE COURT:  All right.  Exhibits 1 through, on my

 1      list in the binder, Exhibits 1 through 13, are admitted.

 2              MS. MEASE:  Thank you, Your Honor.

 3              (Government's Exhibits 1 through 13 admitted into

 4              evidence.)

 5                      MATTHEW SCHAEFFER

 6      after having been first duly sworn under oath,

 7      was questioned and testified as follows:

 8                      DIRECT EXAMINATION

 9  BY MS. MEASE:

10  Q.    Agent Schaeffer, where are you employed?

11  A.    The FBI.

12  Q.    How long have you been with the FBI?

13  A.    Since July of 2009.

14  Q.    And what specifically do you do for the FBI?

15  A.    Currently, I investigate domestic terrorism

16  violations.  But at the time of this incident, I was

17  assigned to Indian Country in Gallup, New Mexico, and I

18  investigated violent crimes and sexual assaults on the

19  Navajo Indian Reservation in New Mexico.

20  Q.    How long did you work in that capacity?

21  A.    Three years.

22  Q.    Did you have any law enforcement experience prior to

23  joining the FBI?

24  A.    Five years as a patrol officer in York, Pennsylvania.

25  Q.    So in total, how many years of law enforcement

1     experience do you have?

2     A.    About 11 and a half or so.

3     Q.    You just a moment ago referenced this investigation.

4     Are you familiar with an individual by the name of Jamaico

5     Tennison?

6     A.    I am.

7     Q.    Do you see that individual in court today?

8     A.    I do.

9     Q.    Can you please identify him by where he's seated and

10    an article of clothing that he's wearing?

11    A.    He's seated at the defense counsel, at the table,

12    wearing black.

13          MS. MEASE:  Your Honor, I ask -- I'm sorry.

14    A.    Black button-down shirt.

15          MS. MEASE:  I ask that the record reflect that

16    the witness has identified the defendant.

17          THE COURT:  It's noted.

18    Q.    Agent Schaeffer, were you the lead case agent for this

19    investigation?

20    A.    I was.

21    Q.    And can you just very briefly describe the nature of

22    this investigation?

23    A.    Yes.  I was originally notified about this case by a

24    tribal criminal investigator.  The notification came,

25    actually, on Easter Sunday of 2014, and I was advised that

 1      there was an alleged sexual contact that took place, with

 2      Jamaico Tennison being the subject and "K.C." being the

 3      victim, which allegedly occurred on April 19th of 2014.  It

 4      would have been the Friday before Easter of 2014.

 5      Q.   And did you, as part of your investigation, have the

 6      victim forensically interviewed?

 7      A.   I did.

 8      Q.   Also as part of your investigation, did you attempt to

 9      make contact with the defendant?

10      A.   I did.

11      Q.   And what was your -- what were your initial attempts

12      to make contact with him?

13      A.   Initially, I went out to his residence.  He wasn't

14      home, but I left a business card with his brother, with my

15      contact information, and requested that his brother relay

16      to Jamaico that he give me a call at his earliest

17      convenience.

18      Q.   Do you recall what day you arrived at his house and

19      left your card?

20      A.   I think it was May 14th of 2014.

21      Q.   Was it the same day that you ended up speaking to him

22      in person?

23      A.   It was.

24      Q.   Would that have been May 15, 2014?

25      A.   Sorry.  Yes.  2014.

1    Q.   But just to be clear, that all happened on the same

2    day?

3    A.   It did.  It was -- I was at his residence earlier in

4    the day, earlier in the morning, late morning, I think; and

5    then Mr. Tennison ended up contacting me later that

6    afternoon.

7    Q.   Okay.  And he contacted you in person?  Or over the

8    phone?

9    A.   Over the phone.

10   Q.   Do you recall the content of that phone conversation

11   you had with the defendant?

12   A.   He asked me -- he asked me why I stopped out at the

13   trailer.  I said I needed to interview him about an

14   incident that had taken place.  He asked me -- I remember

15   he asked me if he needed an attorney to come with him, and

16   I advised him that he really didn't need one but it wasn't

17   my, you know, my place to advise him either way, that he

18   could, you know, bring one with if he wanted to.

19   Q.   When you contacted him and asked him to come in,

20   what's the purpose of this interview at this particular

21   time in the investigation?

22   A.   Basically, to get a statement from him regarding -- in

23   relation to the -- or the accusations in the report filed

24   by the parent of "K.C.," and then also attached to that

25   report was the SANE interview of "K.C."  And then -- well,

1    actually, by that time we had forensically interviewed

2    "K.," as well.

3    Q.   When the defendant asked -- I'm sorry.  I think you

4    said he asked whether he needed to have a lawyer present?

5    A.   He did.

6    Q.   Okay.  Now, you stated that you said, "No, it's up to

7    you to make that determination," something to that effect?

8    A.   Correct.

9    Q.   Now, is this a common scenario for you, to try to make

10   contact with a target of an investigation to arrange an

11   interview?

12   A.   It is.

13   Q.   Is it common for those individuals to say -- to ask

14   you whether or not they need a lawyer present?

15   A.   It is.

16   Q.   And what is your practice for how you respond to that

17   question?

18   A.   I advise them that it's their -- they're not required

19   to have one and that -- I mean, it's totally up to them if

20   they want to have an attorney present; that they won't be

21   appointed one during the interview.

22   Q.   Sorry.  That they will not?

23   A.   They will not be appointed one.

24   Q.   But you do advise them it's their decision?

25   A.   Correct.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    Q.   Now, you stated that the same day, Mr. Tennison

2    arrived to speak with you in person?

3    A.   Correct.

4    Q.   When he arrived, was he -- now, this was at the Gallup

5    FBI office?

6    A.   Yes, it was.

7    Q.   Okay.  Did he -- was he under arrest at the time that

8    he arrived?

9    A.   No.

10   Q.   What was your interaction with the defendant when he

11   arrived, prior to starting the interview?

12   A.   I mean, I asked him how he was doing.  I signed him in

13   at the, you know, the front desk in the office there.  And,

14   I mean, when I sat him down -- I took him back to the

15   interview room, you know.  When we sat down in the

16   interview room, I told him, you know, that he was free to

17   leave at any time; if at any point he just wanted to end

18   the interview, he could do that, he could just walk out the

19   door if he wanted to; and I confirmed with him that he was

20   there voluntarily.

21   Q.   Did the defendant state that he was there voluntarily?

22   Well, let me --

23   A.   I think according to the transcript, I said that he

24   was there voluntarily, and he agreed.

25   Q.   Did he indicate that he understood that he could -- he

 1     didn't have to sit and talk to you?

 2     A.   He did.

 3     Q.   And he could leave if he wanted to?

 4     A.   He did.

 5     Q.   How would you describe your tone throughout this

 6     initial explanation of why he was there?

 7     A.   I mean, just normal conversation.  I wasn't aggressive

 8     or anything like that.

 9     Q.   Did you record this interview?

10     A.   I did.

11     Q.   And have you reviewed the transcript of the recording

12     of the interview?

13     A.   I have.

14     Q.   And does that appear to accurately depict the

15     recording?

16     A.   It does.

17     Q.   I just want to go over a couple of the details from

18     the interview in the transcript.

19              THE COURT:  You're referring to Exhibit 2?

20              MS. MEASE:  Yes, Your Honor, this is Government's

21     Exhibit 2.

22     Q.   Okay.  And to clarify, you told him on the recording,

23     while the recording was on, that he was free to leave at

24     any time, correct?

25     A.   Correct.

```
 1   Q.   Throughout this interview, did the defendant make what
 2   you would characterize as an admission to you about any of
 3   the allegations?
 4   A.   No.
 5   Q.   Initially when you started the interview, he said,
 6   basically, he was surprised about all this and he thought
 7   that the victim was lying, correct?
 8   A.   Correct.
 9   Q.   Did you sort of push him on some of the facts of the
10   case and some of the details of your investigation?
11   A.   I did.
12   Q.   And you didn't just accept his initial explanation
13   that the victim was lying?
14   A.   No.
15             MR. COBERLY:  I object to the leading questions.
16             THE COURT:  Agreed.  Sustained.  Rephrase your
17   question.
18   Q.   (By Ms. Mease)  As the interview progressed, why did
19   you -- you said earlier that you sort of began to push him.
20   Why did you start pushing him on some of the details?
21   A.   A couple different reasons.  Typically, in my
22   experience, when, you know, interviewing potential subjects
23   in investigations, typically the first answer isn't the
24   truthful answer.  Also, based on the evidence that I had, I
25   had physical evidence indicating that, you know, that the
```

1     victim was touched, you know, on her private area.

2            So I was -- I wanted to make sure that the answer

3     he was giving me was actually the truth, as opposed to just

4     a lie.

5     Q.   How would you describe the tone of the interview

6     towards the very end?

7     A.   Mr. Tennison was very agitated.  He actually ended the

8     interview by getting up and walking out of the door or out

9     of the interview room.

10    Q.   Now, leading up to him walking out, did you discuss

11    the possibility of the defendant taking a polygraph

12    examination?

13    A.   I did.

14    Q.   How did that come up?

15    A.   I just asked him if he would take a polygraph to

16    determine whether or not he was being truthful about what

17    he was saying about the incident, and he agreed.

18    Q.   Did you have to ask him a couple different times?  Or

19    do you recall how that happened?

20    A.   No, I believe -- I believe I asked him only once, and

21    he agreed to take the test.

22    Q.   Now, when he agreed to take the test, was this on the

23    recording?  You said he left and walked down the hall.

24    When, in relation to that incident, did he agree to take

25    the polygraph?

```
 1    A.   Prior to leaving the interview room and walking down

 2    the hall.

 3    Q.   Did you follow him down the hall?

 4    A.   I did.

 5    Q.   And why did you follow him?

 6    A.   Because he was -- at that point, he was considered a

 7    visitor in FBI space, and all visitors in FBI space have to

 8    be escorted.  Also, he was agitated at that point, so I

 9    wanted to make sure that he didn't pose a safety risk to --

10    there are other employees that he would have had access to

11    in that building, that are considered support employees,

12    and I just wanted to make sure that he didn't pose a risk

13    to any of those employees.

14         And then also, I needed to get a contact phone

15    number for him so I could actually call him to schedule a

16    polygraph test.

17    Q.   As you were following him down the hall, were you

18    continuing to ask him questions about your investigation

19    and the offense?

20    A.   No.

21    Q.   As you were escorting him out of the building, did you

22    have any conversation with him about an attorney?  Do you

23    recall any conversation?

24    A.   No.

25    Q.   At any point in the hall or on the way out, did the
```

1    defendant say something to the effect of he wanted an

2    attorney or he was invoking his Fifth Amendment rights?

3    A.    No.  I recall him saying that he didn't want to answer

4    any more questions, but I don't recall him saying anything

5    about wanting an attorney.

6    Q.    Was his common-law wife present when you escorted him

7    out?

8    A.    She was.  She was in the waiting area, in the

9    vestibule.

10   Q.    Did you have any conversation with her about whether

11   or not Mr. Tennison was requesting an attorney?

12   A.    No.  She -- the only conversation I had with her was,

13   she became very belligerent, and I actually ended up having

14   to ask her to leave the building.

15   Q.    After they left, did you have any contact with the

16   defendant in an attempt to schedule the polygraph?

17   A.    I did.

18   Q.    How did you make contact with him?

19   A.    Via telephone.

20   Q.    Do you have any idea how many times you called him?

21   A.    I -- I don't exactly.  I'm thinking it was around

22   three.

23   Q.    Now, when you were -- so you called him, you think,

24   approximately three times.  Did you actually speak with him

25   on the phone, or were there messages?  I'm just trying to

1    understand what kind of contact you had with him.

2    A.   Well, I'm almost positive -- I'm not 100 percent sure,

3    but I'm almost positive that he didn't have a voice mailbox

4    set up, so I had to call a couple of times before I

5    actually ended up talking to him.

6    Q.   Now, when you talked to him on the phone, what was the

7    tone of your voice and the tone of the conversation?

8    A.   Just normal.  I mean, I wasn't aggressive with him

9    over the phone.

10   Q.   And why were you keeping a normal tone on the phone?

11   A.   Well, I mean, because I wanted him to come in to take

12   a polygraph and -- I mean, I didn't want to -- I didn't

13   want to be aggressive with him over the phone because, you

14   know, I wanted to establish some kind of rapport with him

15   so that he would come back into the office to be

16   interviewed.

17   Q.   Did you ever indicate that he was required to come in?

18   A.   No.

19   Q.   Did he, during these phone conversations, ever ask if

20   he needed to have a lawyer present for this polygraph?

21   A.   He -- yeah.  I mean, kind of like the first interview,

22   he asked me if he needed an attorney.  And the same thing.

23   I told him, you know, he wasn't required to have one, but

24   if he wanted to bring one or he wanted to contact one and

25   bring one along, I mean, that was fine, that was totally up

1        to him to decide.

2                    THE COURT:  Was this over the phone when you

3        talked to him?

4                    THE WITNESS:  It was over the phone, yes.

5                    THE COURT:  All right.  Go ahead.

6        Q.   At some point did the defendant -- well, did you and

7        the defendant agree on a schedule, a date for the

8        polygraph?

9        A.   Yes.

10       Q.   And what date was that?

11       A.   June 11th of 2015.

12       Q.   Sorry?  2014?

13       A.   Of 2014.  Sorry.

14       Q.   Now, you do not conduct these polygraphs, correct?

15       A.   I do not.

16       Q.   Who is the FBI polygrapher?

17       A.   For the Albuquerque division, it's Jennifer Sullivan.

18       Q.   When Mr. Tennison arrived -- now, was this at the

19       Gallup office again?

20       A.   It was.

21       Q.   When he arrived, did he express to you -- before he

22       went in to Jennifer Sullivan, did he say anything about

23       having any reservations about taking a polygraph?

24       A.   No.

25       Q.   Did he at any time indicate that he did not want to be

1    there or that he felt he was forced to be there?

2    A.   No.

3    Q.   When you met him for the polygraph, were you wearing a

4    uniform, or did you have your gun or badge visible?

5    A.   No.  I was in my typical -- if I'm not in a suit, my

6    typical work outfit is a polo shirt, untucked to cover my

7    badge and gun, and a pair of like cargo-style pants.

8              THE COURT:  What kind?  What did you say?

9              THE WITNESS:  Cargo-style pants, like with the

10   pockets on the side.

11             THE COURT:  Okay.

12             MS. MEASE:  Sorry, Your Honor.

13   Q.   (By Ms. Mease)  Did you take the defendant to Special

14   Agent Sullivan for the examination?

15   A.   Yes, ultimately I did.  When he first came into the

16   office, it's typical procedure that I take him to the

17   restroom and I instruct him to wash his hands, because from

18   what I'm told, that can affect the sensors on the

19   polygraph machine.  So then once that's done, then I escort

20   him into the polygraph room with Ms. Sullivan or Agent

21   Sullivan.

22   Q.   And at this particular -- on this particular date,

23   what room did you use as the polygraph room?

24   A.   It was the second floor supervisor's room, just

25   because the normal conference room that we usually conduct

```
 1    the polygraphs in was unavailable that day.
 2    Q.    Okay.  And you said "supervisor's room."  Is this like
 3    an office or some other room?
 4    A.    Yeah, supervisor's office.  It's -- I mean, it's its
 5    own office.  I mean, the door is able to be closed and all
 6    that kind of stuff, so there's privacy in there.
 7    Q.    Now, did you leave the defendant with Special Agent
 8    Sullivan?
 9    A.    I did.
10    Q.    And where did you go?
11    A.    To my cubicle.
12    Q.    And how far away, approximately, is that from where
13    the polygraph was being conducted?
14    A.    Like three cubicles down the hall.
15    Q.    And did you wait -- do you typically wait there while
16    the polygraph is being completed?
17    A.    Yes.
18    Q.    Do you recall approximately what time the defendant
19    arrived at the Gallup FBI office?
20    A.    I don't recall the exact time.  I want to say it was
21    about maybe 9:30-ish.
22    Q.    When you -- after you left the defendant with Special
23    Agent Sullivan, at some point were you called back into the
24    office?
25    A.    Yes.
```

1    Q.   And did you have the occasion to speak with Mr.

2    Tennison again?

3    A.   I did.

4    Q.   Do you know what time you started that recording?

5    A.   I would have to -- I would have to either view the

6    transcript or listen to the actual recording to get the

7    time stamp for the exact time.

8         MS. MEASE:   With the Court's permission, I'll

9    show you Government's Exhibit 11, which is the transcript

10   of the recording at Page 2.  Is that coming up on your

11   screen?

12        COURTROOM DEPUTY CAROL WALKER:   Not yet.

13        THE WITNESS:   Yes.

14   Q.   Does that --

15   A.   Approximately 11:26 a.m.

16   Q.   What time -- do you recall what time you ended the

17   interview?

18   A.   Again, I don't recall the exact time without --

19   Q.   I'll show you Page 28 of Government's Exhibit 11.

20   A.   It was approximately 11:53 a.m.

21   Q.   So the defendant was present in the FBI office from

22   about 9:30 until 11:53 -- well, until the conclusion of the

23   interview?

24   A.   Yeah.  I mean, and then there's a couple minutes until

25   he's signed out and escorted out of the building, but yeah.

1             MS. MEASE:  One second, Your Honor?  Your Honor,

2     I have no further questions at this time.

3             THE COURT:  All right.  You may cross-examine.

4                      CROSS-EXAMINATION

5     BY MR. COBERLY:

6     Q.   Good morning, Agent.

7     A.   Good morning.

8     Q.   Let me ask first, sir, did you testify at the grand

9     jury?

10    A.   Yes.

11            MR. COBERLY:  Your Honor, I would ask under Rule

12    26.2 for production of Agent Schaeffer's statements.

13            MR. NAYBACK:  Your Honor, I apologize.  I

14    don't -- I don't have those now.  This is the first request

15    we're getting.  That was an oversight strictly on my part.

16    I can call my office immediately in order to get the

17    transcript.

18            THE COURT:  Okay.

19            MR. NAYBACK:  Thank you.

20    Q.   (By Mr. Coberly)  Sir, when you went by Mr. Tennison's

21    house on May 15th, you left a card, right?  And you gave it

22    to his brother, Jonah?

23    A.   Yeah.

24    Q.   Leading up to that, you had testified earlier that you

25    were notified by the tribal criminal investigator?

 1    A.   That's correct.

 2    Q.   Who is that?

 3    A.   Benjamin Yazzie.

 4    Q.   Okay.  And what did you and Mr. Yazzie talk about?

 5         MS. MEASE:  Your Honor, I'm going to object.  I

 6    believe this calls for hearsay.

 7         MR. COBERLY:  Your Honor, this is a suppression

 8    hearing.  The Rules of Evidence for hearsay don't apply.

 9         THE COURT:  Overruled.

10    Q.   Go ahead and answer, sir.

11    A.   He advised me of the case that was reported.  He said

12    that on -- yeah, it was Easter Sunday, so it would have

13    been -- what? -- April 21st of 2014 that he received

14    notification from the SANE nurse in Albuquerque that the

15    child was brought in for an exam for an assault that

16    happened on April 19th of 2014.

17    Q.   And is it possible you got the dates wrong?  Was it

18    April 18th that this allegedly happened?

19    A.   It could have been.  Yeah, I may have.

20    Q.   Friday the 18th, I believe, and Sunday, Easter Sunday,

21    was the 20th?

22    A.   Okay.  Yeah.

23    Q.   Is that right?

24    A.   Yeah.  I would have to -- like I said, I could look at

25    a calendar to really verify but, yeah, I might have mixed

```
 1          up the dates.

 2                  MR. COBERLY:  Your Honor, I'm sorry.  I forgot

 3          my housekeeping matter here.  I would ask the Court

 4          permission to go ahead and move for admission of Defense

 5          Exhibits A through V.

 6                  THE COURT:  Is there any objection here, counsel?

 7                  MS. MEASE:  These are defense counsel's

 8          transcripts, correct, Mr. Coberly?

 9                  MR. COBERLY:  Yes.

10                  THE COURT:  I have what has been provided to the

11          Court here in the binder, A through V.  Did you say

12          Exhibits A through letter V?

13                  MR. COBERLY:  Yes, Your Honor.

14                  THE COURT:  So it's everything?

15                  MR. COBERLY:  V as in Victor.

16                  THE COURT:  It's Mr. Honts' CV, it's score

17          sheets, it's various charts, it's correspondence, it's a

18          diagram, A through V in the binder?

19                  MS. MEASE:  The government is going to object to

20          the admission of some of these exhibits.  I don't know if

21          you want to --

22                  THE COURT:  What is not objected to?

23                  MS. MEASE:  A, B, H, I, J through T.

24                  THE COURT:  I'm sorry?

25                  MS. MEASE:  And then J through letter T.
```

```
1              MR. COBERLY:  These are not objected to?

2              MS. MEASE:  And V.  Sorry.  I'm objecting --

3              THE COURT:  Hold on a minute here.  Let me check

4   my real-time.  The government does not object to A, B, H,

5   I, J, K, L, M, N, O, P, Q, R, S, and T; is that correct?

6              MS. MEASE:  And V.

7              THE COURT:  Not T?

8              MS. MEASE:  T and V.

9              THE COURT:  All right.  You don't object.  So

10  your objections, then, are to C, D, E, F, G, and U?

11             MS. MEASE:  Correct, Your Honor.

12             THE COURT:  All right.  I will admit those that

13  are not objected to at this time.  You may proceed, Mr.

14  Coberly.  We're not admitting all of them.

15             MR. COBERLY:  I understand.

16             THE COURT:  Yes.

17             (Defendant's Exhibits A, B, H, I, J, K, L, M, N,

18             O, P, Q, R, S, T, and V admitted into evidence.)

19  Q.   (By Mr. Coberly)  So I'm sorry, sir.  Refresh my

20  memory.  What did Mr. Yazzie tell you?

21  A.   He told me about the case that had been reported to

22  him by the SANE nurse in Albuquerque who had examined

23  "K.C."

24  Q.   Did Mr. Yazzie tell you about the investigation he did

25  with Officer Etsitty from the Navajo Police Department?
```

1     A.   No.

2     Q.   You did ultimately obtain those documents, did you

3     not?

4     A.   I did.

5          MR. COBERLY:  Your Honor, I would ask to show the

6     document that I just referenced, which is Exhibit F, which

7     I understand the government is objecting to, that it

8     appears that Mr. Agent Schaeffer has reviewed that.

9          THE COURT:  You need to make a proper tender if

10    this matter is not in evidence here, counsel, and that is

11    what you need to do.

12         MR. COBERLY:  May I approach, Your Honor?

13         THE COURT:  You may.

14    Q.   Sir, I have handed you a document, Exhibit F.  Do you

15    recognize that document?

16    A.   Yes.  It's the incident report from Crownpoint P.D.

17    Q.   And you reviewed that, right, and you put that in your

18    files?

19    A.   Yes.

20    Q.   When did you receive that document?

21    A.   It took me a while to actually get it from

22    Investigator Yazzie.  I don't recall the exact date, but it

23    was -- it was a substantial amount of time after the actual

24    incident.  Oh, I guess it was approved on February 23rd of

25    2015.

1          Like I said, I don't recall the exact date that I

2     received it, but it would have been sometime after that.

3          MR. COBERLY:  Your Honor, I move to show it to

4     the Court.  I mean, it has been part of -- this is not

5     going before the jury.  Hearsay is allowed.  I don't

6     understand what the objection is.

7          THE COURT:  What purpose does this serve?

8          MR. COBERLY:  I'm sorry, Your Honor?

9          THE COURT:  What purpose does this serve?

10          MR. COBERLY:  The purpose is to show the

11     differing statements that the alleged victim made.

12          THE COURT:  And to whom were these statements

13     made?

14          MR. COBERLY:  Initially to Officer Etsitty, then

15     Officer Yazzie then relayed the case to Agent Schaeffer --

16     relayed the case to Agent Sullivan.

17          THE COURT:  Let me hear from the government here.

18          MS. MEASE:  Your Honor, the government's position

19     is that, first of all, this is not the appropriate witness

20     to lay the foundation for this document.  Second, the

21     government is unclear as to the relevance of the victim's

22     different statements for the purposes that we're here for

23     today.  I think that that would be appropriate at trial,

24     but this is running the risk of turning into an actual

25     trial on all the issues of the case.

1            THE COURT:  Well, my question here is whether

2     or not -- and I don't know up to this point -- whether or

3     not any of the information contained in this exhibit,

4     Exhibit F, was considered by Agent Sullivan.  Can you

5     answer that?

6            MS. MEASE:  I know she looked at the video of the

7     forensic interview.  I do not know if she looked at this

8     particular document.  I know she reviewed the case

9     materials.

10            THE COURT:  I'm going to withhold a ruling on

11     Exhibit F until I hear her testimony, so we're not going to

12     get into this at this point.  Go ahead.

13            MR. COBERLY:  Thank you, Your Honor.

14            THE COURT:  All right.

15     Q.   (By Mr. Coberly)  So before going over to Mr.

16     Tennison's house on May 15, 2015, you had reviewed the

17     forensic interview?

18     A.   I did.

19     Q.   The videotape?

20     A.   I did.

21            MR. COBERLY:  May I approach, Your Honor?

22            THE COURT:  You may.

23     Q.   Sir, I've handed you a document labeled Exhibit C, and

24     if you could take a moment and look at that and read a

25     little bit.

1      A.   Do you want me to look for something in particular?

2      Q.   Do you recognize that?  Does that appear to be a

3      transcript of the interview that you reviewed?

4      A.   Yes.

5      Q.   Okay.

6           MR. COBERLY:  Your Honor, I move for the

7      admission of Exhibit C.

8           THE COURT:  Any objection?

9           MS. MEASE:  Your Honor, I have an objection

10     because -- for the same reasons I stated earlier.  I don't

11     know what relevance that is for this particular witness.  I

12     do think it might be relevant for Agent Sullivan, because

13     she reviewed that.  But for our purposes here, I think

14     we're getting a little off track.

15          MR. COBERLY:  Your Honor?

16          THE COURT:  Just a minute.  How is this relevant

17     here, counsel?

18          MR. COBERLY:  It's relevant because Agent

19     Schaeffer reviewed this document, or reviewed this

20     videotape, before talking to Mr. Tennison the very first

21     time.  And during the initial encounter, he referenced

22     things that came up in this interview.

23          THE COURT:  And I take it you don't disagree with

24     what has just been said?

25          THE WITNESS:  No.

```
1                    THE COURT:  Yes, I think it is relevant.
2       Overruled.  Let's continue.  It's admitted.
3                    MR. COBERLY:  Thank you, Your Honor.
4                    (Defendant's Exhibit C admitted into evidence.)
5       Q.   (By Mr. Coberly)  So Mr. Tennison returned your call
6       that same day, right?
7       A.   He did.
8       Q.   And he asked you whether he needed a lawyer, right?
9       A.   He did.
10      Q.   And you said, "No, you don't really need one," right?
11      A.   Yes, and then I followed that up with if he wanted to
12      get an attorney, it was up to him; that I couldn't advise
13      him either way.
14      Q.   Sure.  But you just testified, and you testified
15      earlier, you said, "No"?  You told him, "No," he does not
16      need an attorney, right?
17      A.   I didn't say, "No."  I said, "No, not really."
18      Q.   Okay.  So you said -- excuse me.  My question is:
19      You told him, "No, not really," right?
20      A.   Yeah.
21      Q.   So from the very first encounter with Mr. Tennison,
22      you knew that he was inquiring about the need for an
23      attorney, right?
24      A.   Yes.
25      Q.   And your testimony is that you tell them it's not
```

1     required?

2     A.     Yes.

3     Q.     So Mr. Tennison came by your office later, right?

4     A.     He did.

5     Q.     And at that point, you suspected him of

6     inappropriately touching "K.C.," correct?

7     A.     Yes.

8     Q.     So you told him, though, that your job is to find out

9     the truth, right?

10    A.     Correct.

11    Q.     So when he said -- when he told you his initial

12    statement, which was, "I did not touch K.C.," you did not

13    believe him, right?

14    A.     No.

15    Q.     So you began to interrogate him, right?

16    A.     Yes.

17    Q.     You initially told Mr. Tennison that -- well, let's

18    put it this way.  You played nice, right?  You wanted to

19    build a rapport?

20    A.     Sure.

21    Q.     And you tell him, "Hey, I'm just here to hear your

22    side of the story," right?

23    A.     Correct.

24    Q.     And when he doesn't give you the answer you're

25    expecting, you transition into interrogation mode, right?

1    A.   Well, it's not necessarily that.  It's not the answer

2    I'm expecting.  It's -- it's so -- I'm trying to make a

3    determination whether or not -- I'm trying to make a

4    determination whether or not what he's telling me lines up

5    with the facts that I have to that point.

6    Q.   Okay.  And the facts you have at this point are

7    reviewing the forensic interview?

8    A.   Correct.

9    Q.   And you reviewed the SANE exam, right?

10   A.   I didn't review the SANE exam because it wasn't

11   available to review at that time; but I spoke with the SANE

12   nurse who did the examination, and she advised me of her

13   findings.

14   Q.   And what were her findings?

15   A.   She advised that there was -- there was evidence

16   indicated on "K.C.'s" person that she had like a vaginal

17   injury.

18   Q.   She told you --

19   A.   I guess that's a bad way to word it.  Like she

20   advised that she observed an injury on "K.C.'s" vaginal

21   area.

22   Q.   And your testimony is, she used the term "injury"?

23   A.   "Injury," "abrasion," something like that, yeah.

24   Q.   How about "multiple excoriated areas"?

25   A.   Well, that was -- that was actually on the -- like the

1    report.  But when I had the conversation with her, the

2    conversation I had with her prior to the interview with

3    Jamaica was over the phone, and it was more in like

4    layman's terms.  I don't remember exactly how she worded

5    it, but it wasn't -- it wasn't in medical terms.  You know

6    what I mean?  Because I don't understand medical terms.

7    Q.    Based on that, you told Jamaico that you had physical

8    evidence that "K." was touched, right?

9    A.    Yes.

10   Q.    But you didn't really know for a fact whether the

11   abrasions were caused by touching, right?

12   A.    No.

13   Q.    And you told Mr. Tennison that, "This issue is not

14   going to go away if you say no, nothing happened," right?

15   A.    That's correct.

16   Q.    You told him, "Hey, I'm on you.  This isn't going to

17   go away"?

18   A.    Well, I didn't say that.

19   Q.    You told him the process was going to be long and

20   drawn out, right?

21   A.    Yeah.

22   Q.    And then you told him, "Well, hey, but I'm not putting

23   you in my crosshairs or anything?"  Do you recall saying

24   that?

25   A.    Putting him in my crosshairs?  No, I didn't say that.

```
 1                    MR. COBERLY:  I'm sorry.  How do I clear the
 2        screen?
 3                    COURTROOM DEPUTY CAROL WALKER:  Did you get it?
 4                    MR. COBERLY:  I apologize.
 5                    THE COURT:  That's the reason you need to be here
 6        at 8:00.  We were here at 8:00, and you weren't.  So please
 7        take advantage and be on time.  That way, we don't have to
 8        worry about learning in the courtroom.
 9                    MR. COBERLY:  Yes, Your Honor.
10        Q.   (By Mr. Coberly)  Sir, I'm showing you what has been
11        marked as Defense Exhibit A, which is a transcript of the
12        interview.  And if I could refer you to Page 16.
13                    THE COURT:  Let's reference the exhibit, if you
14        would.
15                    MR. COBERLY:  I'm sorry, Your Honor.  It's
16        Defense Exhibit A.
17                    THE COURT:  All right.  Go ahead.
18                    MR. COBERLY:  It's looking better.  Keep trying?
19                    COURTROOM DEPUTY CAROL WALKER:  You have to zoom
20        out probably, Mr. Coberly.  Give it a chance to focus.
21                    MR. COBERLY:  Okay.  Thank you.  I'm sorry.
22        Q.   (By Mr. Coberly)  Starting at Line 7, sir, do you see
23        that, where you say, "Like -- I'm not, like, putting you in
24        my cross hairs, you know what I mean, and all that kind of
25        stuff?"
```

1     A.    Yes.

2     Q.    Right?  Really, you were putting him in your

3     crosshairs, right?

4     A.    No.  I told him I wasn't.

5     Q.    Well, he was a suspect, right?

6     A.    He was a suspect.

7     Q.    And you didn't have any other suspects, right?

8     A.    Not at that time, no.

9     Q.    Did you ever have any other suspects?

10    A.    No.

11    Q.    And Mr. Tennison around this point started getting a

12    little upset with you, right?

13    A.    I can't remember exactly when he started getting

14    upset.  I mean, I would have to listen to the recording,

15    but at some point during the interview he did start to get

16    upset.

17    Q.    And he gets upset, frankly, because he feels like

18    you're starting to accuse him of lying, right?

19    A.    I don't know why he got upset.

20    Q.    Well, you --

21    A.    I can't speak for Mr. Tennison.

22    Q.    You started telling him, "Well, hey, if you touched

23    K., that's okay, if it was an accident," right?

24    A.    I told him that, yeah.

25    Q.    If we could turn to Page 18, starting on Line 12, even

1    though you have gotten his side of the story, you started

2    telling him, hey, "If I don't have your side of the story

3    with this, do you undestand what's going to happen?"

4            And he says, "Yeah, we go through a long process

5    of --"

6            And then you say, "Yeah, this case isn't going to

7    go away," right?

8    A.   Right.

9    Q.   You accused Mr. Tennison of making up an alibi.  Do

10   you recall that?

11   A.   I did.

12   Q.   And the alibi you accused him of making up was that he

13   was having -- that his wife had told him, "How is that

14   possible?  I was up with my infant all night long."

15           Right?

16   A.   Now, wait.  Say that again.

17   Q.   The alibi you were accusing him of making up was his

18   wife, right, his common-law wife?

19   A.   Correct.

20   Q.   And what Mr. Tennison had told you is that when he

21   initially learned of this information about "K.," his

22   common-law wife said, "How is that possible?  I was up with

23   the infant all night."

24           Right?

25   A.   I didn't take it as she said it.  I took it as he said

1    that, you know, it couldn't have happened because she was

2    up all night with the infant.  I mean, it's kind of the

3    same thing, but --

4    Q.   Okay.  Well, towards the end of this interview, the

5    bottom of Page 22, you still are just saying, Line 17, "No,

6    you're not telling me like it is because if you were

7    telling me like it is, we'd be farther along right now."

8         Right?

9    A.   Yes.

10   Q.   And you tell him that you're positive something

11   happened and you're positive that Jamaico did it, right?

12   A.   I didn't say I was positive something happened.

13   Q.   Well, let's take a look at Page 23, immediately after

14   that.  You say, "Okay?  I know something happened because I

15   have the evidence that something happened, and a

16   four-year-old girl is not going to sit there repeatedly

17   saying, you know, that Jamaico touched me"?

18   A.   Yes.

19   Q.   You're not saying that you were trying to imply to

20   Jamaico, "Hey, I'm just trying to figure out who did this

21   to K.," right?

22   A.   No, I told him what the four-year-old told me.

23   Q.   And then he gets upset and he starts thinking that

24   you're trying to put words in his mouth, right?

25   A.   Yeah, it looks like that's what happened at that point

```
 1    in the interview.

 2    Q.    Page 24?

 3    A.    Yeah.

 4    Q.    Line 15, "I didn't do nothing like that, sir.  You're

 5    just trying to put words in my mouth, man."

 6          And then you're like, "No, I'm not trying to put

 7    words in your mouth.  I'm trying to get to the bottom of"

 8    -- of this.

 9          You were confronted again with this evidence that

10    you have, right?

11    A.    Correct.

12    Q.    And then Page 25, Lines 7 and 8, Mr. Tennison is

13    really getting upset here?  He's like, "This is wrong, man,

14    that you just are really putting words in my mouth, man."

15          Right?

16    A.    Correct.

17    Q.    And then he -- at that point, he gets up and he

18    leaves, right?

19    A.    Shortly after that, yes.

20    Q.    And you had asked him at that point, "Hey, do you mind

21    taking a polygraph?"

22          Right?

23    A.    Correct.

24    Q.    And he said, "Yeah, I'm cool with that"?

25    A.    Correct.
```

1   Q.   And then you followed him out, right?

2   A.   I did.

3   Q.   And you spent two minutes with him out in the lobby,

4   right?

5   A.   Well, I wasn't timing it but, yeah, one, two minutes,

6   something like that.

7   Q.   Does that sound about right?

8   A.   Yeah.

9   Q.   And you talked to Dorothea at that time, as well?

10  A.   I did.

11  Q.   And Mr. Tennison at that time repeated -- well, he

12  told you, "I don't want to talk to you without a lawyer

13  anymore," right?

14  A.   I -- like I said in earlier testimony, I don't recall

15  him saying he didn't want to talk to me without a lawyer.

16  I recall him saying that he didn't want to answer any more

17  questions.

18  Q.   And you've testified before that he may have said, "I

19  plead the Fifth," right?

20  A.   I don't recall whether he said that or not.

21  Q.   I understand that.  My testimony is -- I'm sorry.  My

22  question is:  You have testified before that he said --

23  that he may have said, "I plead the Fifth," right?

24  A.   Yes, he may have said it.  But like I said, I don't

25  remember either way.

1    Q.   Well, at one point at the very beginning of this

2    interview with Mr. Tennison, you told him that your job was

3    to interview everyone involved, right?

4    A.   Correct.

5    Q.   And you had talked to "K.," correct?

6    A.   Correct.

7    Q.   Her parents?

8    A.   Correct.

9    Q.   You talked to the SANE nurse?

10   A.   Correct.

11   Q.   You had talked to Mr. Yazzie, Officer Yazzie?

12   A.   Correct.

13   Q.   Yet, you never -- you never went and tried to talk to

14   Mrs. Spencer, did you, Dorothea?

15   A.   I attempted to talk to her over the phone to get a

16   gauge as to if she would talk to me or not.  And all my

17   interactions with Dorothea, she was not very cooperative,

18   so I never -- I never requested a formal interview with

19   her, no.

20   Q.   When did you make that request?  When did you talk to

21   her?

22   A.   What request are you talking about?

23   Q.   Well, you said when you -- you talked to her on the

24   phone?  Is that your testimony?

25   A.   Yes.

1     Q.   When was that?

2     A.   I don't recall the exact date.

3     Q.   And you didn't document that in any type of report or

4     anything?

5     A.   No, because I didn't -- I didn't ask her any questions

6     about the incident.   My -- my interaction with her after

7     that interview with Jamaico was to schedule -- no, wait.

8     No, that was after the polygraph interview, was to schedule

9     a time and a place for the -- to forensically interview the

10    children, the other children, to determine whether or not

11    they were in an unsafe environment.

12    Q.   That was July 1st, right?

13    A.   When the interviews took place.

14    Q.   And we're talking now about the May 15th interview,

15    right, with Jamaico?

16    A.   Yes.

17    Q.   You had not tried to contact Dorothea to determine

18    what happened that night, as of May 15th, right?

19    A.   I did not, no.   I mean, I had tried to schedule an

20    interview, and the reason I didn't is because all my

21    interactions with her were -- they weren't good.

22    Q.   Well, when was your first interaction with her?

23    A.   I don't recall.

24    Q.   Could it have been the --

25    A.   It may have been that -- it may have been that day of

1      the interview with Jamaico.

2      Q.   Right.  And she knew --

3      A.   I think, yeah, actually, I think it was.

4      Q.   And she knew at that point, from your interaction with

5      Jamaico, that you were accusing Jamaico of inappropriately

6      touching "K.," right?

7      A.   Correct.

8      Q.   You never went to Dorothea and said, "Hey, I want to

9      get your side of the story here.  Were you up all night

10     with the baby?"

11     A.   I didn't.

12     Q.   So you next contacted Mr. Tennison in June, right?

13     A.   I think so.  I can't remember the exact times and

14     dates when I called him to try to schedule the polygraph.

15     Q.   Well, that contact was by phone, right?

16     A.   It was.

17     Q.   And I'm a little unclear from your prior testimony.

18     Is it your testimony that you talked to Jamaico three

19     times?

20     A.   I think it was three times.  I don't know the exact

21     number, but I think it was three times.

22     Q.   So you did talk to him several times?

23     A.   Several times, yes.

24     Q.   And that was -- the purpose was to set up --

25     A.   Well, actually, I don't know if I talked to him

```
1     several times.  Like I said, when I called, I think -- I
2     think one or two of those calls went to the message that,
3     you know, this voice mailbox or this subscriber's voice
4     mailbox is not set up yet.
5              So I don't -- I don't think I talked to him all
6     three times.
7     Q.   Okay.  So I want to make sure I understand now your
8     testimony.  Your testimony now is, "I called three times,
9     but I only talked to him once"?
10    A.   I don't remember how many times I talked to him.
11    Q.   Okay.  You did talk to him?
12    A.   I said that before.
13    Q.   Well, you recall -- you certainly recall talking to
14    him about setting up the polygraph?
15    A.   Oh, yeah.  Yeah.
16    Q.   And you certainly recall Mr. Tennison saying, "Hey,
17    this is not a good time"?  Do you recall that?
18    A.   Yes, because he was visiting his brother in the
19    hospital.
20    Q.   Well, he told you, "My brother had a coma," right?
21    "He's in a coma"?
22    A.   I don't recall him saying he was in a coma.  I recall
23    him saying he was in the hospital with, you know, like a
24    medical emergency, but I don't -- I don't recall the exact
25    -- I don't recall the exact medical problem that he had.
```

```
1     Q.   And he wasn't happy about you calling him.  Fair to
2     say?
3     A.   No.
4     Q.   No?  No, he wasn't happy about you calling?
5     A.   He wasn't happy about me calling him, no.
6     Q.   And, again, he asked you if he needed an attorney,
7     right?
8     A.   He did.
9     Q.   And, again, you told him "No," right?
10    A.   I don't remember my exact words, but the way I --
11    because I get that question a lot with other people that I
12    interview, and I always tell them something to the effect
13    that, "Yeah, an attorney is not required, but if you want
14    to get one, that's up to you.  I can't advise you either
15    way."
16    Q.   Mr. Tennison told you, "This is not a good time; I
17    don't want to do this now."  Why did you keep calling him
18    back?
19    A.   Because I wanted to schedule a time for him, a good
20    time for him to come in.
21    Q.   Because you wanted him to come in so you could get a
22    confession, right?
23    A.   No.  I wanted to -- I wanted him to come in so I
24    could get the truth as to what happened with this whole
25    incident.
```

1    Q.   So why didn't you just say, "Hey, you know what, Mr.

2    Tennison, whenever is a good time and you want to do this,

3    why don't you call me back"?

4    A.   I could have said that, but I didn't.

5    Q.   Why?

6    A.   I don't know.  Because I was trying to get him

7    scheduled to come in.

8    Q.   Even though you know he was concerned about whether he

9    needed an attorney or not?

10   A.   I mean, I don't know if he was concerned about it or

11   not.  He asked me if he did, and that's the response I gave

12   him.

13   Q.   When Mr. Tennison showed up at your office on June

14   11th, he was again with Dorothea, right?

15   A.   I don't recall if he came in with Dorothea or not.

16   Q.   You don't recall Dorothea?

17   A.   I want to say he came alone, but I could be wrong.

18   Like I said, I don't remember whether or not he came with

19   her.

20   Q.   So you don't recall Dorothea wanting to come back into

21   the polygraph room?

22   A.   No, I don't remember that.

23   Q.   In your standard practice, you've done a lot of

24   polygraphs with Agent Sullivan, right?

25   A.   Correct.

1   Q.   And the standard practice is, she goes into the room,

2   right, and does her polygraph, right?

3   A.   Yes.

4   Q.   And then if she gets the confession, she comes back

5   out and gets you, right?

6   A.   Correct.

7   Q.   And you come back in with a tape-recorder, right?

8   A.   Correct.

9   Q.   And you memorialize it somehow, right?

10  A.   Correct.

11  Q.   And that's because you know that Agent Sullivan

12  doesn't record any of her interrogation with the suspect,

13  right?

14  A.   That's correct.

15  Q.   And you know that Agent Sullivan, during this process,

16  showed Jamaico part of the forensic interview with "K."?

17  A.   I don't know if she did.

18          MS. MEASE:   I object.  I believe that calls for

19  speculation.

20          THE COURT:   No the question is, does he know.  I

21  will not allow him to speculate, but if he knows, he can

22  answer it.  If he doesn't, you don't speculate.  The

23  question can be asked.  Can you answer that?

24  A.   I don't know if she showed it to him or not.

25          THE COURT:   Okay.  Let's move on.

1           MR. COBERLY:  One moment, Your Honor?  Nothing

2     further, Your Honor.

3           THE COURT:  I do have a question here, Agent.

4           THE WITNESS:  Sure.

5           THE COURT:  It's referencing real-time, although

6     this topic has been covered through many questions here.

7     But there was one instance where you said, in answer to the

8     question, and I'm looking at 9:54, Line 25.

9           The question was:

10          *"QUESTION:  Did he, during these*

11     *phone conversations, ever ask if he needed to*

12     *have a lawyer present for this polygraph?"*

13          And you responded:

14          *"ANSWER:  He -- yeah.  I mean, kind*

15     *of like the first interview, he asked me if he*

16     *needed an attorney.  And the same thing.  I*

17     *told him, you know, he wasn't required to have*

18     *one, but if he wanted to bring one or he wanted*

19     *to contact one and bring one along, I mean,*

20     *that was fine, that was totally up to him to*

21     *decide."*

22          So, you know, when you use the phrase or the term

23     "He wasn't required to have one," when you said that to

24     him, what exactly do you mean by that?  Because it seems to

25     me there's different context there.

1          When you're telling somebody it's not required,

2     is it not required for your benefit, for example?  Or is it

3     not required for his benefit?

4               THE WITNESS:  No, basically --

5               THE COURT:  What are you trying to convey there?

6               THE WITNESS:  That it's not required under

7     Miranda.

8               THE COURT:  Okay.

9               THE WITNESS:  Because he's not in custody.

10               THE COURT:  Okay.  In light of my questions, any

11     follow-up on this particular point?  If not, we're going to

12     take a recess here.

13               MR. COBERLY:  No, Your Honor.

14               MS. MEASE:  No, Your Honor.

15               THE COURT:  All right.  Let's take a 15-minute

16     recess.  Again, these clocks are never in sync, but 15

17     minutes from the clock in the courtroom here, which I

18     believe is at 10:34.

19               We'll be in recess.

20               COURTROOM DEPUTY CAROL WALKER:  All rise.

21               (Recess from 10:34 a.m. until 10:56 p.m.)

22               THE COURT:  All right.  You may be seated.

23               Let us continue here in just a moment.  It has

24     been brought to my attention and I have observed that there

25     is counsel in the courtroom who is using an iPhone or

```
1    e-mail.  Is that you, Ms. Honeycutt?  Have you been using

2    an electronic device?

3              MS. MORGAN HONEYCUTT:  I've been checking my

4    e-mail, Judge.

5              THE COURT:  Yeah.  We don't do that in the

6    courtroom.  There's a sign, and perhaps you need to go out

7    and read it.  All electronic devices need to be secured in

8    a briefcase or a purse, turned off.  So I'm going to ask

9    that you do so at this time, make it totally invisible.

10   There is no e-mail-checking in the courtroom allowed, ever.

11   All right?

12             Let us proceed.  You may call your next witness.

13             MS. MEASE:  Your Honor, the United States calls

14   Special Agent Jennifer Sullivan.

15             COURTROOM DEPUTY CAROL WALKER:  Please raise your

16   right hand.  You do solemnly swear that your testimony in

17   this matter shall be the truth, the whole truth, and

18   nothing but the truth, so help you God?

19             THE WITNESS:  I do.

20             COURTROOM DEPUTY CAROL WALKER:  Please be seated.

21   Please state your name and spell your last name for the

22   record.

23             THE WITNESS:  Jennifer Sullivan.

24   S-U-L-L-I-V-A-N.

25
```

```
 1                          JENNIFER SULLIVAN
 2              after having been first duly sworn under oath,
 3              was questioned and testified as follows:
 4                          DIRECT EXAMINATION
 5      BY MS. MEASE:
 6      Q.   Where are you currently employed, Agent Sullivan?
 7      A.   Federal Bureau of Investigation.
 8      Q.   How long have you been with the FBI?
 9      A.   Twenty-six years.
10      Q.   Do you have law enforcement experience prior to that?
11      A.   I do.
12      Q.   And how long was that experience?
13      A.   Seven years.
14      Q.   And what was that experience?
15      A.   I was a police officer and detective at Chandler,
16      Arizona, Police Department.
17      Q.   What are your primary duties with the FBI?
18      A.   I'm a full-time polygraph examiner.
19      Q.   How long have you worked in that capacity?
20      A.   Ten years.
21      Q.   Can you briefly describe your educational background?
22      A.   I have a bachelor's in criminal justice from Western
23      Illinois University, and a master's in public
24      administration from Arizona State University.
25      Q.   For your job with the Arizona police department as
```

1    well as the FBI, did you attend law enforcement training

2    academies?

3    A.    I did.

4    Q.    You said you have been a polygrapher for ten years?

5    A.    Yes.

6    Q.    Have you received any specialized training in order to

7    conduct polygraph examinations?

8    A.    I have.

9    Q.    And can you please describe that for the Court?

10   A.    I attended a four-month training at Department of

11   Defense Polygraph Institute in Columbia, South Carolina, in

12   the summer and fall of 2005.  And since then, I've probably

13   attended three or four continuing education classes every

14   other year since then.

15   Q.    Did you receive a certificate for completing the

16   training through the Department of Defense?

17   A.    I did.

18   Q.    How many polygraphs, approximately, have you

19   administered to date?

20   A.    Almost 1700.

21   Q.    And do you have any idea of how many of those are for

22   criminal investigations?

23   A.    I don't.  I would say at least 45 to 55 percent.

24   Q.    Do you work solely for the FBI?

25   A.    I do.

1    Q.   And does your job keep you in New Mexico?

2    A.   It does, or I travel.  If I'm not as busy I'd like to

3    be, I might travel to other cities to assist with

4    polygraphs with the FBI.

5    Q.   When you're in New Mexico, do you conduct polygraphs

6    all over the state?

7    A.   I do.

8    Q.   Does that include for offenses that occurred on Indian

9    reservations?

10   A.   Yes.

11   Q.   So have you encountered individuals with different

12   backgrounds and ethnicities, including Native Americans?

13   A.   Yes.

14   Q.   I want to talk a little bit about sort of the basic

15   procedure for criminal polygraphs.  Now, I asked you

16   earlier about how many you -- what percentage you've done

17   for criminal investigations.  Why is a polygraph used as an

18   investigative tool?

19   A.   That's exactly it.  It is an investigative tool.  We

20   just use that to further our investigations.  If we -- for

21   an example, hypothetical example, if we have a case

22   involving three or four people that may have been involved

23   in committing the offense, if we polygraph them and we

24   think three people were truthful and one person showed

25   indications of deception, we would focus more resources on

1    that person.

2    Q.    When you're called in to conduct a polygraph, are you

3    generally the case agent?

4    A.    No.

5    Q.    Okay.  What capacity are you brought in for?

6    A.    So I'm just brought in to assist.

7    Q.    When you prepare to conduct a polygraph, what types of

8    information about the case do you review prior to actually

9    conducting the interview and the polygraph?

10   A.    Right.  So now, in this type of case, we have a system

11   inside our FBI data system where each criminal offense, all

12   the work that is done on each case is submitted into this

13   electronic system.  So when an agent calls me for polygraph

14   assistance, he can give me the file number, and I can go

15   into his entire case, read everything that he has done so

16   far, everything about the case, learn about the victims and

17   the subjects and the incident, and I can pull out what I

18   want or just review them, make notes.

19           I also ask for as much information on the person

20   they're asking me to polygraph, such as previous criminal

21   histories, maybe previous criminal incidents that I can

22   read about.

23           In cases like this, I ask for the forensic

24   evidence.  I like to look at the medical records.  I like

25   to look at the videos from the forensic interviews if

1     there's children or any other victims that they have

2     forensic interviews of.  I also like to know the dynamics

3     of the household, where possibly the offense took place, so

4     I ask for photographs of people who live in the house so I

5     can kind of get an idea of how many adults, how many

6     children.

7           I just try to learn as much as I can about the

8     case as possible.

9     Q.   And why?  Why is that?

10    A.   Well, so that when I'm conducting my interview, either

11    before or after the polygraph, one, I don't want to seem

12    like I don't know what I'm talking about; and two, when the

13    person I'm interviewing starts naming other people in the

14    household, I can kind of do a visual on who they are.  In

15    fact, I have the pictures of people in the household with

16    me so we can identify who's all in the house.

17          Sometimes the people I polygraph like to point

18    their fingers at other people in the house are doing

19    things, so I like to be able to identify who they're

20    talking about.

21    Q.   So still just generally speaking, what equipment do

22    you typically use when you conduct the actual polygraph?

23    A.   Right.  So I have a laptop with me that contains the

24    polygraph software.  Then I have a box called a DAS box,

25    and it has connectors on it that would connect to the

1    components that I'm going to put on the person's body,

2    that's going to feed the information about their physiology

3    into my laptop.  That helps me monitor and record what

4    their body is doing internally when they're answering

5    questions.

6              And that's about it, besides the case file that I

7    compile.

8    Q.   Do you use finger plates or blood pressure cuffs?

9    A.   I do.  So there's four different components that I

10   bring to the polygraph:  Two pneumograph tubes which go on

11   the chest for the breathing pattern; and then there's

12   finger plates that go on their hands; and then a blood

13   pressure cuff that goes on, on their arm.

14   Q.   Are you familiar with what's referred to as an MSD

15   that they sit on to detect movement?

16   A.   Like a movement sensor pad?  I am.

17   Q.   Do you utilize that for criminal investigations?

18   A.   Sometimes I do; sometimes I don't.

19   Q.   And what's the purpose of that movement detection?

20   A.   Well, if they're sitting on the pad and they're moving

21   and I can't see that they're physically moving, the pad

22   will send a recording into my laptop and tell me that

23   they're moving, because the pad underneath their buttocks

24   is getting some movement pressure from it.

25   Q.   And for a polygraph examination, why is movement

1      important?  What's the purpose of that particular device?

2      A.   Well, we use it to try to detect if there's any

3      countermeasures during the polygraph.

4      Q.   What is a countermeasure?

5      A.   A countermeasure is when the person taking the

6      polygraph, a lot of times they have read a lot of research

7      online about what they can do internally, or at least kind

8      of covertly during the polygraph, such as maybe tapping

9      their toes inside their shoes or tightening their sphincter

10     muscles inside their clothing or even tightening some of

11     their other fingers.  You know, like if their hands are

12     flat on their knees and I can't really see if they're doing

13     any tightening or pressure, these movement sensors can help

14     me with kind of the subliminal movements that their body

15     might be doing.

16     Q.   And you refer to that as a countermeasure.  Is that

17     something that an individual might do to sort of trick the

18     actual instruments?

19     A.   Right.

20     Q.   Okay.  Now, you said you don't always use that for

21     criminal investigations?

22     A.   Correct.

23     Q.   And why is that?

24     A.   Sometimes when I arrive out to the location and I'm

25     unpacking my equipment and I set everything up, sometimes I

1    have the pad.  I only have one pad, and so I use the pad in

2    town, in my office in Albuquerque.  But then I have a

3    second set of all the rest of the equipment that I take out

4    to the location, so I may not have that movement sensor pad

5    with me.

6            And in criminal cases, what I've noticed is a lot

7    of times I think we get a lot of countermeasures from

8    people who do a lot of research on the Internet to learn

9    what they should have their body doing to try to beat the

10   polygraph.  And out in the remote areas where I'm doing the

11   testing -- I mean, I don't know for a fact, but sometimes I

12   wonder if they've gone to that extent, to get on the

13   Internet and learn how to conduct countermeasures.

14   Q.   After you conduct a polygraph examination, what sorts

15   of documents -- do you do some report or something to

16   memorialize your findings?

17   A.   Right.  So I complete -- and it's called an FD -- I

18   don't have the number, 498, I think.  And then I compile

19   that with two documents that I have the person sign before

20   the polygraph.  And then that completes my documentation as

21   a package, and I send that with the polygraph raw data to

22   the archives.

23   Q.   And does somebody review every polygraph that you

24   conduct?

25   A.   They do.

1    Q.   Over the course of your experience, I think you said

2    1700 polygraphs, have you had individuals who have passed

3    polygraph exams?

4    A.   I have.

5    Q.   And after they passed, were you able to clear them of

6    any wrongdoing?

7    A.   Well, what I do is, I just advise the case agent that

8    they passed.  And so I don't do any, you know, closing the

9    cases or anything like that.  I just tell the case agent

10   that I'm not seeing indicators of deception and possibly

11   this person is not involved.

12   Q.   Do you typically interview individuals after the

13   polygraph is over?

14   A.   I do.

15   Q.   If an individual passed the polygraph, would you

16   typically conduct an interview after that?

17   A.   I would, a short interview.  Because during my

18   polygraph, there are a couple of questions that we use as

19   comparison questions, which we call them probable lie

20   questions.  So we know that there's a couple of questions

21   during the testing that they're probably not being honest

22   about, so I might have a discussion with them about that.

23        I can't tell them that they were completely

24   truthful during the testing because there was a probability

25   that they lied on two of the questions.

1    Q.   So you have scored some individuals who have passed.

2    Have you scored individuals who have failed polygraphs?

3    A.   I have.

4    Q.   And then if an individual fails a polygraph, do you

5    proceed to conduct an interrogation?

6    A.   I do.

7    Q.   Have you ever scored an individual that had maybe what

8    you would just determine to be an inconclusive result?

9    A.   Sure.

10   Q.   And what do you do if you have an inconclusive result?

11   A.   Well, an inconclusive result, in my opinion, doesn't

12   convince me that we've got complete honesty during the

13   relevant questions, but I'm not completely convinced that

14   I've got complete deception.

15        So if I don't see complete honesty, there

16   probably is a chance, in my opinion, that they're

17   withholding information or slightly less deceptive than a

18   clear-cut deceptive exam, so I would still confront them

19   about the testing and conduct an interrogation.

20   Q.   Are you familiar with an individual by the name of

21   Jamaico Tennison?

22   A.   I am.

23   Q.   And were you the lead case agent, or were you just

24   brought in to do a polygraph on this case?

25   A.   Just brought in for the polygraph.

1     Q.   I want to direct your attention to June 11th of 2014.

2     Did you administer a polygraph to the defendant on that

3     day?

4     A.   I did.

5     Q.   So I want to go over some of the specifics of that.

6     Do you recall if -- you do recall your first interaction

7     when the defendant was brought to you in the FBI building?

8     A.   So I conducted the polygraph in Gallup, which is a

9     remote office of the FBI; it's not our main office.  So I

10    drove out to Gallup to conduct the polygraph, and we

11    conducted the polygraph in a supervisor's suite on the

12    second floor.

13           And I don't have a clear recollection of the

14    exact introduction with Mr. Tennison, but what normally

15    happens when I'm conducting a polygraph is that the case

16    agent brings the subject in from the lobby and brings them

17    to my location and introduces them to me.

18    Q.   When you meet a target of an investigation for the

19    first time, do you wear a uniform or a badge or a weapon of

20    any kind?

21    A.   No.

22    Q.   Do you pay attention to what type of environment you

23    choose for the testing room?

24    A.   I do.

25    Q.   Do you recall where this test was conducted?

1   A.   Right.  It was on the second floor in the supervisor's

2   office.

3   Q.   And was this, in your opinion, an appropriate location

4   for this test?

5   A.   Yes.

6   Q.   Okay.  Prior to starting to speak with the defendant,

7   do you know if he was offered the restroom or asked if he

8   needed any water?

9   A.   Well, before I conduct any polygraph, whether it would

10  be a criminal polygraph or an applicant polygraph or even

11  on-board employees, I always ask that the person in this

12  case, the subject of the investigation, be escorted to the

13  bathroom so that they could not only use the bathroom to

14  relieve themselves, but also to wash their hands with soap

15  and water and dry them, because I'm going to put equipment

16  on their hands and I don't want any chance of any type of

17  chemical on there.

18        So I know that he used the bathroom.

19  Q.   When you first began speaking with the defendant, did

20  you notice whether there were any language barriers or

21  whether he appeared to be under the influence of anything?

22  A.   No, I did not notice.

23  Q.   Did he ever -- well, let me back up.  When you first

24  start to speak with an individual -- and let's just talk

25  specifically about Mr. Tennison in this case -- what's your

1    first thing that you accomplish when you first begin?

2    A.   Well, in this case with Mr. Tennison, I had the

3    personal history sheet up on the polygraph screen, so when

4    he was escorted up to that office, we sat down and

5    completed the personal history sheet, which is where I ask

6    for the name, which I already have.  I just want to

7    validate that I have it spelled right.  I want to make sure

8    I'm pronouncing that right.  I usually have the birthday,

9    Social Security number, things like that entered, because I

10   can take that off the initial report.

11        And then there's a variety of questions that I

12   ask him, and we work on it together so that I can get kind

13   of an idea if he's competent enough to take the test or not

14   that day.

15   Q.   And I'm going to show you Government's Exhibit 6.

16   That should come up on your screen.  Is this the results of

17   the examine and the information that you took?

18   A.   It is.

19   Q.   Were you able to obtain whether he had any educational

20   background?

21   A.   High school education and some college hours.

22   Q.   After you obtain his personal history, what do you do

23   next?

24   A.   Then we brought up a consent form, and that came up on

25   the screen, as well.  And on the consent form, I read to

1    him what his polygraph rights are, and then I ask him to

2    read the waiver to me before we sign the form to continue

3    on to the next one.

4    Q.   And I'm going to put Government's Exhibit 5 up on the

5    screen for you.  Specifically, what are a defendant's

6    rights when you go over this consent form with him?

7    A.   "You have the right to refuse to take the polygraph

8    test.  If you agree to take the polygraph test, you have

9    the right to stop the test at any time.  If you agree to

10   take the polygraph test, you have the right to refuse to

11   answer any individual question."

12   Q.   Now, when you're going over the rights, do you let the

13   defendant read this to himself?  Do you read it out loud?

14   What's your practice?

15   A.   I read it out loud, the rights.

16   Q.   And did Mr. Tennison indicate that he understood his

17   rights with regard to the polygraph?

18   A.   Right.  He then read the waiver and the consent form

19   out loud to me, and then he signed it.

20   Q.   After you obtained his consent, what is your next

21   step?

22   A.   Then I brought up the Miranda form and went over that

23   with him, the Advice of Rights.

24   Q.   And specifically Government's Exhibit 4, did you again

25   read this out loud to him?  Or did he read it to himself?

1     A.   I read it out loud to him until the consent portion,

2     and asked him to read that out loud to me.

3     Q.   And specifically the rights listed in Government's

4     Exhibit 4 under the heading "Your Rights," can you read

5     those, please?

6     A.   "Before we ask you any questions" -- what I do is, I

7     revise that when I'm reading that, so I say, "Before I ask

8     you any questions," because obviously I'm the only person

9     in the room -- "you must understand your rights.  You have

10    the right to remain silent.  Anything you say can be used

11    against you in court.  You have the right to talk to a

12    lawyer for advice before I ask you any questions.  You have

13    the right to have a lawyer with you during questioning.  If

14    you cannot afford a lawyer, one will be appointed for you

15    before any questioning if you wish.  If you decide to

16    answer questions now without a lawyer present, you have the

17    right to stop answering at any time."

18    Q.   Did the defendant read the consent out loud and then

19    sign this Advice of Rights form?

20    A.   He did.

21    Q.   Did the defendant at any time during this portion of

22    your discussion with him indicate that he wanted to have a

23    lawyer present?

24    A.   He asked me if we appointed -- if we were going to

25    appoint him a lawyer.

 1    Q.    And what was your response to that?

 2    A.    I said, "We don't appoint lawyers."

 3    Q.    Was there any further discussion on that topic?

 4    A.    I think -- I think I even expounded on that and said,

 5    "Do you have a lawyer?  Or do you want to have a lawyer

 6    here?  If you do, you know, we can -- you can go get him or

 7    we can stop this."

 8          And then he said something like, "No, I just want

 9    to get this over with right now."

10    Q.    After you have done what I'll collectively refer to as

11    these as the consent forms, did you go ahead and have an

12    interview with the defendant prior to the actual polygraph

13    examination?

14    A.    I did.

15    Q.    And what's the purpose of that interview?

16    A.    Well, the purpose of that interview is for me to --

17    one, I do a good evaluation on our communication back and

18    forth in addition to the forms we just signed; but two, I

19    come to these polygraphs completely objective.  I mean, I

20    am versed on what the accusations are and what the FBI has

21    collected as far as evidence or interviews, but this is the

22    time for me to sit back and basically get the side of the

23    story from the person taking the test.

24    Q.    Now, is any of this, your pre-test, what we call the

25    pre-test interview, the actual test, and your post-test

1      interview, is any of this recorded?

2      A.    No.

3      Q.    And why is that?

4      A.    FBI policy is not allowing us right now to do any

5      pre-test recording or in-test recording during the

6      polygraph.

7      Q.    So during the pre-test interview, did you go over the

8      actual facts of the case and sort of the nature of the

9      investigation?

10     A.    We did.

11     Q.    And did the defendant make any admissions to you

12     during that time?

13     A.    No, he did not make any admissions.  He told me about

14     the visit of the victim coming over to the house and what

15     they did that night, as far as making Easter eggs and

16     playing tag, where they slept.  And he told me about the

17     people in the house, how many kids, and how old they were.

18            But he did not make any admissions as to doing

19     any offending.

20     Q.    After you have gone over the pre-test interview with

21     the defendant, do you move into the testing phase?

22     A.    I do.

23     Q.    And what specifically do you do?  Well, we'll just

24     talk about this defendant specifically.  How do you explain

25     what's happening with the different equipment you're using,

1    things like that?

2    A.   Right.  So most of the people that I polygraph have

3    never had a polygraph before, so I explain what each

4    component is going to tell me, that I put on their body.

5          And in his case, I explained the two pneumograph

6    tubes and I'm going to put one on the top of his chest up

7    around his lungs, one down on his stomach.  Both of the

8    breathing tubes are going to tell me about his breathing

9    pattern, normal breathing pattern, in and out every couple

10   of seconds.

11         I'm going to put two finger plates on one of his

12   hands, one on his ring finger, one on his forefinger, and

13   the breathing plates are going to tell me what his internal

14   sweat gland activity is doing during the testing.

15         And then I'm going to put a blood pressure cuff

16   on one of his arms, and the blood pressure cuff is going to

17   feed information into my laptop and tell me when his blood

18   pressure is rising or falling.  I tell him I don't read

19   blood pressure; I just watch adrenaline flow.

20   Q.   During this phase when you were explaining everything,

21   was Mr. Tennison given the opportunity to ask questions?

22   A.   Sure.

23   Q.   Now, after you've explained everything, do you go

24   ahead and attach all of the equipment and begin the

25   polygraph?

1    A.   I do.  And I also explain that for every polygraph I

2    conduct, I want to do a practice test to make sure the

3    equipment is working well and to let the person taking the

4    test get used to wearing the equipment, get used to my

5    voice, get used to my cadence of questioning.

6         So I conducted a practice test, which is also

7    known as an acquaintance test.  And so I put the equipment

8    on him, and I asked him to pick a number between 3 and 8.

9    And he picked a number.  I asked him to tell me "No" every

10   time I asked him a question during the practice test, and

11   he would tell me "No."  And at some point during the

12   practice test he would be directed to lie when he said "No"

13   to one of the answers because I would be asking him if he

14   wrote that number.

15        And that gives me an idea -- and I tell the

16   person that, and I told him that.  That gives me an idea of

17   what his internal physiology does when he is being

18   completely truthful; then when he approaches a lie; tells a

19   lie; and finishes after the lie; and then what his body

20   does again when he goes back to answering questions

21   truthful.

22   Q.   After the practice test, did you conduct the

23   polygraph?

24   A.   I did.

25   Q.   And what specific questions -- well, let me back up.

1      You used what are called control questions and relevant?

2      Or comparison questions and relevant questions, correct?

3      A.   Comparison questions, relevant questions, and

4      irrelevant questions.

5      Q.   Okay.  What were the relevant questions?

6      A.   The relevant questions were, "Did you ever touch K.'s

7      vagina over her clothing?"

8      Q.   And that was one question?

9      A.   Yes.

10     Q.   Do you recall the second relevant question?

11     A.   "Did you ever touch K.'s vaginal area for sexual

12     arousal?"  Maybe.  I'm not sure exactly.  I'm going to have

13     to refer to my documents.  "Sexual reasons?"

14     Q.   Let me just show you.  Would your report contain the

15     actual phrasing of the questioning?

16     A.   It does.

17     Q.   I'm showing you Government's Exhibit 88.

18     A.   Right.  "Sexual reasons."

19          THE COURT:  Is this Exhibit 9?

20          MS. MEASE:  I'm sorry.  I said the discovery

21     page.  This is Government's Exhibit 9, correct, Your Honor.

22          THE COURT:  Yes.

23     Q.   (By Ms. Mease)  And then I'm at the bottom of the page

24     where there's a bullet point A and B.

25     A.   Right.

1      Q.   Are those the two relevant questions?

2      A.   Yes.

3      Q.   How did you decide to use the specific word "vagina?"

4      A.   I asked him if he knows what area.  We talked about

5      anatomy of men and women, and I asked him what he calls the

6      specific area, the vaginal area, and he called it "vagina."

7      Q.   Was that conversation held during the pre-test

8      interview?

9      A.   It was.

10     Q.   And is that your practice, to use whatever word the

11     defendant -- use words that are comfortable with the

12     defendant, in developing your questions?

13     A.   It is.

14     Q.   Did you develop these questions ahead of time?

15     A.   I did not.

16     Q.   So they're developed using the information you gather

17     during the pre-test interview?

18     A.   Exactly.

19     Q.   Were you able to score the results of this polygraph

20     examination?

21     A.   I did.

22     Q.   And what was your conclusion?

23     A.   My conclusion was that there were obvious indicators

24     of deception when he was responding to the relevant

25     questions, causing the polygraph to be classified as a

1     failed polygraph.

2     Q.   Now, typically do you inform the examinee of your

3     results?

4     A.   Yes, I do.  Uh-huh.

5     Q.   And do you recall specifically what you told the

6     defendant at the end of this test?

7     A.   I don't have any clear recall, but when I see -- I did

8     review the polygraph charts the other day, and when I see

9     charts so strongly and significantly responsive, I probably

10    said he failed the test miserably.

11    Q.   Is that a phrase that you have used before, "failed

12    miserably"?

13    A.   I have.

14    Q.   And at this point after you've completed the polygraph

15    and you've indicated your results to the examinee, what's

16    going on now?  What is your -- what's the next phase of

17    this interaction?

18    A.   So with Mr. Tennison, when I told him that he had

19    failed the test miserably, I offered to show him what his

20    physiology did as he answered the different questions

21    during the testing.  So I showed him his responses on each

22    of the charts as I was asking him the questions, and so I

23    showed him what his body does, the difference with the

24    physiology when he answers the questions about, "Did you

25    ever touch K.'s vagina or her vaginal area?" in comparison

 1    with, "Are the lights on in the room?"  An irrelevant.  Or

 2    "Is the door closed?"  An irrelevant.

 3            So he could see that his physiology significantly

 4    changed when he answered the relevant questions versus the

 5    ones that we knew were completely truthful.

 6    Q.   And did you confront him with that information?

 7    A.   I did.

 8    Q.   And what was his response?

 9    A.   Well, he eventually told me that he was sorry that he

10    had lied; and that he had touched "K."; and that he was

11    sorry that he called her a liar; and walked me through what

12    happened that night at his house in his bedroom.

13    Q.   Eventually, did you write out a letter which is

14    Government's Exhibit 7?

15    A.   I did.

16    Q.   And how did that come about?

17    A.   Well, Mr. Tennison told me that he was sorry about

18    what happened to "K."  He felt awful about it.  He loves

19    her like he loves his own daughters.  He told me he was

20    drunk.  He told me he was horny.  I really do think that he

21    was genuinely sorry, and so I suggested and mentioned that

22    sometimes people feel better if they write an apology

23    letter.

24    Q.   Is this your handwriting or the defendant's

25    handwriting?

1      A.    It's mine.

2      Q.    How did you end up writing this?

3      A.    After we talked about writing an apology letter, he

4    said he was ashamed of his writing and asked me if I would

5    write it for him.

6      Q.    Did he dictate this to you?

7      A.    He did.

8      Q.    I notice at the bottom, it's time stamped at 11:17

9    a.m.?

10     A.    Correct.

11     Q.    That would have been when it was completed?

12     A.    Yes.

13     Q.    And I'm going to talk to you about time again in a

14   little bit, but first, Government's Exhibit 8.  Is this

15   something that was produced during your interview with the

16   defendant?

17     A.    Yes.

18     Q.    Now, was this produced before the letter or after the

19   letter?

20     A.    This is before the letter.

21     Q.    And what is being memorialized here in this diagram?

22     A.    Right.  So Mr. Tennison told me that "K." was

23   truthful about him touching her, and so I asked him to draw

24   the bedroom out for me because I couldn't quite understand

25   what he was telling me about how all the kids were laying

1        together, how he would have access to her.

2                So he drew the big square and made the smaller

3        circles where there's like five -- you can see there's five

4        or six squares in the middle that are blacked out.  Those

5        are children's names.  So he drew circles, and then I wrote

6        in each child's name because he could remember exactly

7        where each child was laying.

8                And then he showed me on the bed, and I drew

9        pillows there.  He showed me where he was sleeping, which

10       would be Jameson (sic) for the "J," and then "D" for

11       Dorothea, his wife.  And then there's a little -- in

12       between there, I drew a little pillow like for the baby,

13       Jameson (sic) Junior.

14               And then the scratching over to the left of the

15       "J" pillow was where he told me that "K." had gotten up

16       and came over and sat next to him down on the floor, and he

17       had slid down on the floor, and that's where he touched

18       her.

19       Q.   You just briefly used the name "Jameson."  Is it

20       Jamaico?

21       A.   Jamaico.  I'm sorry.

22       Q.   So this scratching here is your indication to show the

23       defendant's description of how the victim moved over to the

24       bed?

25       A.   Yes.

1    Q.   Did the defendant provide information that was

2    consistent to you, that appeared to be consistent with the

3    information you had read in the case file?

4    A.   Almost exactly.

5    Q.   Now, was there any new detail that the defendant

6    provided, that you had not previously been made aware of?

7    A.   Right.  So when he told me that she was -- what he

8    told me was that he woke up between 2:00 and 3:00 in the

9    morning and saw that she was awake, still watching TV.  So

10   he whispered for her to come over to his side of the bed

11   and lay down on the floor.  He slid down to the floor next

12   to her.

13             He told me that he was fussing with the back of

14   her pajama pants, and then started touching the front, over

15   her pajamas, over her vaginal area.  He told me he got

16   aroused.  He told me he was drunk.  He told me he was

17   horny.

18             And I asked him, once he became aroused, what did

19   he do.  It's my experience that -- and he also said he had

20   an erection, so he got aroused, got an erection.  I asked

21   him what he did, and as he was fondling "K.," she told him

22   to stop, so she went back to -- he said he stopped, and she

23   went back to where she was sleeping.  And he woke up his

24   girlfriend, Dorothea, and told her to go into the bathroom,

25   and he said he went into the bathroom and they had sex on

1    the bathroom counter.

2    Q.   Was that information that was contained anywhere in

3    the case file?

4    A.   No.

5    Q.   That was new information that was provided by the

6    defendant?

7    A.   Yes.

8    Q.   Did you create a report to document the content of

9    your interview with the defendant?

10   A.   I did.

11   Q.   And is that meant to be a summary of the interview, or

12   is it meant to contain every word that was spoken?

13   A.   It's a summary.

14   Q.   And in that interview, did you summarize his

15   confession?

16   A.   I did.

17   Q.   I'm sorry.  In that report, did you summarize his

18   confession?  After this happened, I want to talk briefly

19   about sort of the time frame.  Do you know what time you

20   started your pre-test information with him?

21   A.   Right.  The personal history form I documented at 9:37

22   a.m.

23   Q.   And how long did it take you after that to do the

24   consent form and the Advice of Rights form?

25   A.   I think like ten minutes.

1    Q.   Do you know what time you started the practice test?

2    A.   I think 55 minutes later.

3    Q.   Fifty-five minutes later?  Okay.

4    A.   From the time we filled out the personal history form,

5    I think it was just short of an hour.

6    Q.   So approximately 10:30?

7    A.   Sure.

8    Q.   So in an hour, you did the history, the forms, and

9    that brief interview where you went over the allegations

10   and things like that?

11   A.   Right, and the equipment.

12   Q.   And the equipment?

13   A.   And the explanation for the polygraph concept, how it

14   works.

15   Q.   How many charts did you complete with him?

16   A.   I did the practice test, and then we did three

17   separate charts with the same questions.

18   Q.   Do you know what time you actually finished all three

19   charts?

20   A.   I think 100 -- I did the math.  It's like 100 minutes

21   that I was with him, total.

22   Q.   Okay.

23   A.   So I would think about -- I think it was about 20

24   minutes for the testing.  So I can't tell you the exact

25   time, but I figured 20 minutes for the testing after we

1      started the practice test.

2      Q.   After you started the practice test?

3      A.   Uh-huh.

4      Q.   So from 10:30 to 10:50, approximately, 20 minutes?

5      A.   Exactly.

6      Q.   So you said you showed him the results and then you

7      moved into an interrogation?

8      A.   I did.

9      Q.   Now, the letter was time stamped, Government's Exhibit

10     Number 7, at 11:17?

11     A.   Yes.

12     Q.   So is it fair to say that from approximately 10:50 to

13     11:17, that was when the defendant confessed?

14     A.   Yes.

15     Q.   And in that time, you also created Government's

16     Exhibit 8?

17     A.   Right.

18          THE COURT:  Excuse me.  Who created Exhibit 8?

19          THE WITNESS:  We both did.

20          THE COURT:  You both did?

21          THE WITNESS:  Yes, ma'am.

22          THE COURT:  Go ahead.

23     Q.   (By Ms. Mease)  At some point did you go to get Agent

24     Schaeffer?

25     A.   Right.  So after he -- after we wrote, or I guess I

1    wrote and he signed the apology letter, then I told him,

2    "I'm going to step out and find Matt Schaeffer."  And so I

3    stepped out, and Matt and I returned probably -- I don't

4    know -- eight or nine minutes later.  I briefed Matt on

5    what had happened during the room, inside the room, and

6    then Matt and I came back, and Matt brought his recorder.

7    Q.   Okay.  And then Government's Exhibit 11, which is the

8    recording, indicates that you started that interview at

9    11:26, so it took you maybe a little under ten minutes to

10   get resituated after the letter and bring that back in?

11   A.   That's correct.

12   Q.   Were you present for this entire interview with Agent

13   Schaeffer?

14   A.   I was.

15   Q.   Now, what's the purpose of that interview after he has

16   confessed to you during the exam?  What's the purpose of

17   the interview with Agent Schaeffer?

18   A.   Right.  So he's the case agent.  So I could do a

19   couple of things.  I could come out of that interrogation,

20   and I could tell Matt everything that Jamaico said.  Or

21   Matt, since he knows the case more in-depth than I do, he's

22   going to probably have more questions, and maybe even the

23   same questions but in more detail.  He might ask him.

24        So it's my -- routinely, I bring the case agent

25   back in so the entire confession can be recited back to the

1    case agent, and he can audio-record it if he wants to, and

2    he could ask as many other questions that he might want to,

3    that I might not be aware of.

4    Q.   Have you reviewed this transcript?

5    A.   I have.

6    Q.   Government's Exhibit 11?

7    A.   Yes.

8    Q.   Now, it appears that you, at the beginning, start

9    going through things with the defendant like -- I'm going

10   to put this up here.  This is Government's Exhibit 11,

11   Page 2.  Can you see that okay?

12   A.   I do.

13   Q.   You started asking questions on Line 13, "Have I

14   disrespected you?"  Line 15, "Have I threatened you?"

15   Line 17, "Made any promises?"

16        What's the purpose of that?

17   A.   Well, since I'm not authorized to do any recording

18   during the polygraph, I want to make sure that the case

19   agent and anybody else who learns about this case is aware

20   of how the defendant, or any other defendant, is treated in

21   a situation during the polygraph without the recording.  So

22   I like to go over my behavior on tape so that we can make

23   it aware.

24   Q.   And did the defendant provide -- did the information

25   he provided during this recorded interview, was it

1    consistent with what he told you after the polygraph

2    examination?

3    A.    It was.

4    Q.    And did you also memorialize the conversation you had

5    about whether or not he wanted to have an attorney present?

6    A.    We did.  We covered that.

7              MS. MEASE:  May I have a moment, Your Honor?

8              THE COURT:  You may.

9              MS. MEASE:  Your Honor, no further questions at

10   this time.

11             THE COURT:  Let me have counsel approach here for

12   just a minute.

13             (A discussion was held off the record between the

14             Court and counsel.)

15             THE COURT:  All right.  We'll continue here in

16   just a second.  We're just checking on something.  That

17   might be taking some time from my short lunch hour that I

18   promised.  Just give us a minute.  Let us continue here,

19   counsel.

20             We're going to take a recess probably at about

21   12:30, unless one is needed sooner; sometimes we've gone a

22   little bit long.  But that's my plan, to take a lunch break

23   right about 12:30.

24             Let us continue.  Go ahead.

25             MR. COBERLY:  Thank you, Your Honor.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

```
 1                         CROSS-EXAMINATION
 2    BY MR. COBERLY:
 3    Q.    Good morning, Agent Sullivan.
 4    A.    Good morning.
 5    Q.    You testified earlier about taking 1700 polygraphs in
 6    your career?
 7    A.    Yes.
 8    Q.    How many, on average, would you say you're doing a
 9    month these days?
10    A.    It's kind of feast and famine.  So sometimes I might
11    do 20 a month; sometimes I might do six.
12    Q.    Okay.  And so the polygraph that you took of Mr.
13    Tennison, that happened in June of 2014, right?
14    A.    Correct.
15    Q.    A year and a half ago?
16    A.    Correct.
17    Q.    Eighteen months?
18    A.    Right.
19    Q.    Fair to say, then, you've done at least 150 to 200
20    polygraphs since then?
21    A.    Right.  I actually keep track of the numbers, but I
22    just don't know what yesterday -- I did a polygraph
23    yesterday.  I don't know the exact number on that.
24    Q.    Sure.  Would it be fair to say that in the past year
25    and a half, you've done 150 to 200 polygraphs?
```

```
 1      A.    I don't know.

 2      Q.    You have no idea?

 3      A.    I have no idea.

 4      Q.    You just testified that sometimes it's 20 a month;

 5      sometimes it's six a month?

 6      A.    Right.  Last week I did six in Chicago; the week

 7      before, I can't tell you if I did two or if I did six.  I

 8      don't know.  If I knew to bring the log, I could have.

 9      Q.    Is it fair to say that you've done a lot of polygraphs

10      since you polygraphed Mr. Tennison?

11      A.    Right.  I just don't know the number.

12      Q.    Okay.  Yet, today you're able to recall precisely what

13      happened when you polygraphed Mr. Tennison, right?

14      A.    Right.  I defer to my reports for a reminder.

15      Q.    Because you didn't record any of that, right?

16      A.    I did not.

17      Q.    Ma'am, do you have any degrees in psychology?

18      A.    I don't.

19      Q.    Do you have any college level course work in

20      psychology?

21      A.    I do.

22      Q.    What's that?

23      A.    I just have a minor in sociology and psychology,

24      undergraduate.

25      Q.    When was that?
```

1    A.    1979 to 1982.

2    Q.    Have you received any awards related to polygraph,

3    polygraphy?

4    A.    Awards?

5    Q.    Awards.

6    A.    I get -- I just recently got several incentive awards

7    for some polygraph work that I did.  Is that what you mean?

8    Q.    Tell us, what's an incentive reward?

9    A.    Well, $2,000, about a month and a half ago, for a case

10   that I assisted with involving polygraph.

11   Q.    Tell us about that.  How did you assist in that?

12   A.    Right.  So we had a defendant down in Alamo, New

13   Mexico, who had raped a 14-year-old girl, and the Navajo

14   police took the report, and they called me to help them

15   with the polygraph.

16         And during my briefing with that, I learned that

17   there was an incident that happened actually in 2006 with

18   the same subject, and then in 1991.  So when I polygraphed

19   him, he confessed to raping the 14-year-old gal; the gal

20   who was 16 in 2006; and then he confessed to sexually

21   assaulting both of his nieces in 1991.

22   Q.    And when did you take that polygraph?

23   A.    That was last August.

24   Q.    August of 2014?

25   A.    Right.

1    Q.   When did you receive the incentive award?

2    A.   About a month ago.

3    Q.   You received $2,000?

4    A.   I did.

5    Q.   Any other incentive awards in the past five years?

6    A.   I got a second one for the same case about a week

7    later, for $300, and a call from the Director of the FBI.

8    Q.   Congratulating you on getting that confession?

9    A.   He did.

10   Q.   Congratulations.

11   A.   Thank you.

12   Q.   What professional organizations do you belong to?

13            THE COURT:  May I interrupt here and ask a

14   question?

15            MR. COBERLY:  Yes, Your Honor.

16            THE COURT:  Because this is related to what you

17   may have been asking.  In your profession over the years,

18   any recognitions?

19            THE WITNESS:  Right.  Several incentive awards

20   over the last 26 years.  The FBI just provides incentive

21   awards.  They're monetary.  Some were -- the ones I just

22   talked about were polygraph-related.  Other ones in the

23   past were case-related as far as convictions and things

24   like that.  I just don't know exactly how many over the

25   years.

1            THE COURT:  Yes.  That's fine.

2            THE WITNESS:  Thank you.

3    Q.   (By Mr. Coberly)  Let me follow up briefly on that.

4    If you hadn't obtained a confession, you wouldn't have

5    received the $2,000, right?

6    A.   Well, he was convicted, and so it was actually granted

7    directly to me for obtaining the confession, but then for

8    the casework as well.

9    Q.   Right.  After the conviction?

10   A.   Right.

11   Q.   So if he hadn't been convicted, you would not have

12   received the $2,000?

13   A.   I don't make that decision.

14   Q.   All right.  But you did receive the $2,000 for your

15   work in assisting in the case, right?

16            MS. MEASE:  Your Honor, I would object.  Asked

17   and answered.

18            THE COURT:  Sustained.

19   Q.   (By Mr. Coberly)  Have you ever written any articles

20   or papers related to polygraphy?

21   A.   I have not.

22   Q.   Have you ever presented any research papers related to

23   polygraphy?

24   A.   No.

25   Q.   Have you ever conducted any independent research on

1   polygraphy?

2   A.   I have not.

3   Q.   Do you ever read any research papers related to

4   polygraphy?

5   A.   I don't.

6   Q.   Now, you've received training in interrogation

7   techniques, right?

8   A.   I have.

9   Q.   And that's beginning as a police officer, right?

10   A.   Correct.

11   Q.   Starting in 1982?

12   A.   Correct.

13   Q.   And you've received training in interrogation

14   techniques at the FBI, right?

15   A.   I have.

16   Q.   And at the Department of Defense polygraphy school in

17   2005, you received additional training in interrogation

18   techniques?

19   A.   I did.  Uh-huh.

20   Q.   So it's fair to say you're a trained interrogator?

21   A.   Fair to say.

22   Q.   In your training related to polygraphy, have you ever

23   learned about innocent people confessing after they've been

24   told that they failed a polygraph?

25   A.   I've heard about it.  I've never met one.

```
 1     Q.   And where did you hear about it?

 2          MS. MEASE:  Your Honor, I'm going to object at

 3     this time.  I believe that we have tendered her as a fact

 4     witness, and this is getting into sort of expert-related

 5     questions, where she just provided the information about

 6     this particular polygraph and her interpretation of the

 7     data.

 8          But he never -- Mr. Coberly didn't object to her

 9     as, you know, a fact witness.  I think that's just getting

10     a little attenuated at this point.

11          THE COURT:  Well, I'm going to sustain the

12     objection, but for slightly different grounds.  I mean,

13     we've all heard about something somewhere.  How many layers

14     of recollection or hearsay representation becomes reliable?

15     I don't know how relevant it is, Mr. Coberly, so I'm going

16     to sustain the objection here.

17          MR. COBERLY:  May I rephrase?

18          THE COURT:  Unless there is firsthand knowledge

19     here by this witness.  She said it has not occurred, in her

20     experience.  Okay.

21     Q.   (By Mr. Coberly)  In your schooling, did you receive

22     training in the concept of false positives?

23     A.   I did not.

24     Q.   So in your training, you've never learned about

25     innocent people taking a polygraph and the outcome was
```

1     deception indicated, right?

2              MS. MEASE:  Your Honor, again I'm going to object

3     to relevance.

4              THE COURT:  She can answer the question.

5     A.   The answer is:  No, I have not in any training.

6     Q.   So have you been trained on the statistical rate of

7     error in polygraphs?

8     A.   I have not.

9     Q.   So in your mind, your polygraphs, at least, are 100

10    percent accurate?

11    A.   I feel like they are.

12    Q.   What's the purpose of an acquaintance test?

13    A.   Acquaintance test is for -- there are several

14    purposes -- for the person taking the test to get used to

15    wearing the equipment.  I can adjust it, put it on them.

16    During the testing I can see how it fits on them, in case I

17    need to make any adjustments.

18              I also want to make sure the equipment is

19    functioning properly, so I'm able to look at my screen and

20    watch and make sure I see all the different parameters that

21    cross my screen like they should be.

22              It gives the person taking the test a chance to

23    hear my voice; how often I ask a question; what the cadence

24    is; what order the questions are; how many seconds in

25    between, not that they would keep track but just sort of

1      the time limit between questions.

2                  Also, the acquaintance test, for me, as the

3      examiner, is to have -- is direct them to lie during the

4      acquaintance test so I can see what their internal

5      physiology looks like when they were truthful, when they

6      answered the directed lie, and then when they go back to

7      being truthful, so I can get kind of a head start on what

8      their physiology does when they lie.

9      Q.   And it's correct that you then show those results to

10     the person you're examining, right?

11     A.   Sometimes I do; sometimes I don't.

12     Q.   And in this case, you did?

13     A.   I don't recall.

14     Q.   Do you recall testifying in United States v. Dyson in

15     front of Judge Vazquez?

16     A.   Yes.

17     Q.   January of 2014?  Do you recall Judge Vazquez saying,

18     "The scoring is critical.  Obviously, the polygrapher has a

19     great deal to do with the validity of the results"?

20     A.   If you're reading from the transcript, if she said

21     that, then I can only say that she said it.  I don't have a

22     recall on that exactly, of the conversation.

23     Q.   Fair enough.  Well, do you agree with that statement?

24     A.   Can you repeat it for me?

25     Q.   Sure.  "The scoring is critical.  Obviously, the

 1     polygrapher has a great deal to do with the validity of the

 2     results."

 3     A.   As far as determining what the scoring is, I would

 4     agree with that.

 5     Q.   And to do the scoring, I mean, you attempt to get as

 6     clean a chart as possible, right?

 7     A.   Sure.

 8     Q.   Meaning you don't want any artifacts in there?

 9     A.   Correct.  Correct.

10     Q.   Can you explain what an artifact is?

11     A.   An artifact would be if somebody is yawning or sighing

12     or coughing during the testing.

13     Q.   Moving?

14     A.   Moving.

15     Q.   Twitching?

16     A.   Twitching.  Talking.

17     Q.   Let me jump back to this case in particular.  You

18     testified that this happened on the second floor, I

19     believe, in the Gallup office?

20     A.   Correct.

21     Q.   The supervisor's office?

22     A.   Correct.

23     Q.   Are there any windows in that office?

24     A.   There are.

25     Q.   Okay.  And do they face to the outside?

1     A.   Sure.

2     Q.   Are there any like observation mirrors?

3     A.   No.

4     Q.   Two-way observation?

5     A.   Not to my knowledge.

6     Q.   Are there any cameras set up to record what's going on

7     in there?

8     A.   No.

9     Q.   You would agree with me, wouldn't you, that to get

10    valid results on your polygraphs, it's important to get

11    clean charts?

12    A.   I agree with that.

13    Q.   And when you begin a polygraph, you want the person to

14    be as relaxed as possible, right?

15    A.   In the chair, you mean?

16    Q.   Or in general?

17    A.   Sure.

18    Q.   I mean, taking the polygraph.  And in your experience,

19    if a person has outside issues that they're worried about,

20    that could have a huge impact on the results of the

21    polygraph?

22    A.   It could distract them, sure.

23    Q.   And you wouldn't intentionally do something to cause

24    the anxiety level to rise, right?

25    A.   No, I wouldn't.

1    Q.   Part of ensuring that you're going to get clean charts

2    is to ensure that all of your equipment is in good working

3    order, right?

4    A.   Correct.

5    Q.   And if something was broken, you wouldn't do the test,

6    right?

7    A.   If the equipment wasn't functioning, I would not do

8    the test.

9    Q.   You would reschedule it?

10   A.   I would reschedule it.

11   Q.   That's because you wouldn't want to give -- well, the

12   malfunctioning equipment wouldn't give you an accurate

13   chart, right?

14   A.   Right.  I need to be able to score the charts, and if

15   the charts aren't there for the equipment, it's pretty much

16   a moot point.

17   Q.   And it wouldn't be fair to the person you're

18   examining, either?

19   A.   I wouldn't even consider it.

20   Q.   All right.  So in this case, you talked some about the

21   equipment, the laptop you mentioned, and the polygraph

22   software is in the laptop?

23   A.   Yes.

24   Q.   So it's not a separate machine?  It's part of just the

25   software of like a Windows machine or something?

```
1     A.   Sure.

2     Q.   And that's the Lafayette software?

3     A.   Right.

4     Q.   And there's two pneumograph tubes, right?

5     A.   Right.

6     Q.   One goes around the top of your chest?

7     A.   Right.

8     Q.   And one goes around what?  Is it your belly?

9     A.   On the abdomen.  Uh-huh.

10    Q.   And then there's two electric general sensors?

11    A.   Right.  Finger plates is the common term.

12    Q.   Finger plates?

13    A.   Yes.

14    Q.   And a blood pressure cuff?

15    A.   Right.

16    Q.   And do you put that on a person's upper arm?

17    A.   Sometimes I move it.

18    Q.   Okay.

19    A.   I start with the upper arm, and if I -- and sometimes

20    if the person is muscular, especially a male, sometimes I

21    move it down to the forearm.

22    Q.   That equipment, would you agree with me it's a little

23    awkward to have all that equipment on you?

24    A.   I think it's really awkward.

25    Q.   And you want the person to be comfortable though,
```

1      right?

2      A.    Right.

3      Q.    In your experience as a polygrapher, you know that if

4      the pressure cuff is -- it can be painful if it's too

5      tight, right?

6      A.    I've had six polygraphs.  I wouldn't call it painful.

7      I would call it a discomfort, for sure.

8      Q.    I'm not talking about in a normal polygraph.  I'm

9      talking about in -- well, in a normal polygraph, you

10     typically want the pressure below the person's systolic

11     blood pressure, right?

12     A.    I guess, technically.  I actually just have a mark on

13     my gauge and I just put it to that mark every time, on

14     every person.

15     Q.    And what's the mark on your gauge?

16     A.    At 70.

17     Q.    70?

18     A.    Right.

19     Q.    70?  What is that?  Milligrams?

20     A.    I don't really know.

21     Q.    Okay.  And 70 is pretty uncomfortable, right?

22     A.    Oh, 1700 tests, nobody has -- you know, nobody has

23     done a whole lot of complaining.

24     Q.    And so you always do that at 70?  Well, in this test,

25     in Mr. Tennison's first polygraph, you set his blood

1       pressure cuff at 94, right?

2       A.   I have no idea.

3       Q.   Let me show you Defendant's Exhibit Q.  Right up here

4       where it says "cuff pressure," this is from -- this is

5       taken from your charts, right?

6       A.   I don't know where you got this.

7       Q.   Well, why don't you take a look at this.  Do you

8       recognize this?

9       A.   I don't think I've seen this.

10      Q.   You're telling the Court you've never seen this?

11      A.   Yes.  I'm not saying it's not on the -- from -- taken

12      out of the program.  I'm just saying I've never pulled this

13      up and looked at it.

14      Q.   Okay.  Is this something that looks like a polygraph

15      file that's saved in your computer?

16      A.   Yeah, probably so.  Uh-huh.

17      Q.   And it says "Jamaico Tennison" on the top, right?

18      A.   Right.

19      Q.   6-11-2014, right?

20      A.   Right.

21      Q.   That's the date you took Tennison's polygraph, right?

22      A.   Right.

23      Q.   So would you agree with me that this is the -- this

24      shows the gain settings for the polygraph?

25      A.   I totally agree with you.  I'm just saying I haven't

1     seen it.

2     Q.    Would you agree with me that it says that the cuff

3     pressure starts at 94?

4     A.    I see that.

5     Q.    So you would agree with me that that is accurate,

6     right?  Your cuff pressure on Jamaico Tennison, on your

7     first chart, was at 94 milligrams?

8     A.    If that's what the documentation says, right.

9     Q.    And you're not disputing the documentation?

10    A.    I am not.

11    Q.    94 milligrams for a period of time is pretty painful?

12    A.    I don't -- I don't know.

13    Q.    Okay.  I show you what is marked as Defendant's

14    Exhibit R, that has been admitted, Criminal Chart 2.  Would

15    you dispute that this is -- would you dispute me if I

16    represent that this is the gain settings and the cuff

17    pressure from Mr. Tennison's polygraph test you took?

18    A.    I would not.

19    Q.    Chart Number 2, right?

20    A.    I would not dispute it.

21    Q.    And it's for Chart Number 2, right?

22    A.    Sure.

23    Q.    And the cuff pressure there was starting at 85

24    milligrams, right?

25    A.    Okay.

1    Q.   So if I understand your testimony, because you always

2    do it at 70, this is an abnormal test for you, right?

3    A.   Well, when I move the cuff to the upper -- when I go

4    from the upper arm down to the forearm, I put it at 90.

5    Q.   So where did you put the cuff?

6    A.   Right.  I don't know.

7    Q.   You don't know?

8    A.   I don't know.

9    Q.   Did you create any document that shows where you

10   placed the cuff?

11   A.   I don't have a recall on which part of his arm the

12   cuff was on.

13   Q.   Why would you place it on the lower part of a person,

14   as opposed to the upper part?

15   A.   Because when I start to do the practice test -- do you

16   have the practice test numbers?

17   Q.   I don't have an exhibit with the practice test on it.

18   A.   Sometimes on the practice test, if I'm not able to

19   really see where the cardio is as clearly as I want it,

20   I'll move the cuff.  And so in this case, I don't recall if

21   I moved the cuff down to the forearm; but when I do, I put

22   it right around 90.

23   Q.   You testified, before I showed you this, that you

24   always set it at 70.

25   A.   I do, but in the upper arm.

1    Q.    Uh-huh.  Now, if the pressure is uncomfortable, if

2    someone is uncomfortable during the test, they might

3    twitch, right?

4    A.    Correct.

5    Q.    Which would create an artifact, right?

6    A.    Correct.

7    Q.    And if an artifact occurred in your testing during or

8    right after a comparison of a relevant question, you

9    wouldn't score that question, right?

10   A.    If it was within a response window, right.

11   Q.    Right.  Because that wouldn't be fair to the examinee?

12   A.    Correct.

13   Q.    Now, this fourth piece of equipment that you talked

14   about earlier is this motion sensor device, right?

15   A.    Right.

16   Q.    And the purpose of that device is to see if a person

17   is making any movements during the test, right?

18   A.    Right.

19   Q.    That are not discernible to your eye, right?

20   A.    Right.

21   Q.    I mean, you might be looking at someone and they might

22   make a movement, say, tighten their sphincter muscles, and

23   you wouldn't know that?

24   A.    I wouldn't know that.

25   Q.    Or you might be looking at your charts when you're

1    scoring, when you're doing the exam, and you're focused on

2    your charts, and you might not see if someone moved, right?

3    A.   Exactly.

4    Q.   But yet, the movement sensor device, that's a very

5    sensitive piece of equipment, right?

6    A.   Pretty helpful.

7    Q.   It will pick it up?

8    A.   You hope so.

9    Q.   Well, a movement sensor device will often pick up

10   heartbeats, right?

11   A.   I don't know.

12   Q.   You've never experienced that?

13   A.   You mean a heartbeat?

14   Q.   Someone's blood pulse, a pulse, you can see in a

15   movement sensor device sometimes?

16   A.   When I look at the movement sensor device and I see

17   movement, I really am -- I'm not personally trained on

18   exactly knowing what part of their body that I can't see

19   initiated my movement sensor reaction.

20   Q.   Okay.  So in a movement sensor device, when you have

21   that hooked up, is it like -- is it a flat line, and then

22   there's a jump?  Or is there continuous sort of movement,

23   and then if there's a big movement --

24   A.   Right.  So --

25   Q.   Let me finish.  I'm sorry.  If there's a big movement,

 1    then it will be like a spike?

 2    A.    Right.  Just like you just said.

 3    Q.    Okay.  Similar to an artifact, if you were using your

 4    movement sensor device and you saw a movement spike during

 5    or near a comparison or relevant question, you wouldn't use

 6    that question for scoring purposes?

 7    A.    Ask me that again.

 8    Q.    Similar to how we just said about the artifact, say

 9    like a muscle twitch or something?

10    A.    Or a deep, deep breath.

11    Q.    Deep breath, sure.  You said, you know, if that

12    happened during a comparison or a relevant question, or

13    within the certain time frame afterwards, you wouldn't use

14    that question as a scoring question?

15    A.    Well, if the deep breath happened after the relevant

16    question, like, you know, five, ten seconds after they've

17    already responded, I would still use the relevant.  I would

18    still score the relevant response.

19    Q.    Okay.  But there is a certain time frame, right, that

20    if an artifact occurs within a certain time frame of the

21    question being asked, it would be inappropriate to use that

22    question as a scoring question?

23    A.    That's correct.

24    Q.    And similar to that, with the movement sensor device,

25    if you're using a movement sensor device and you see a bump

1      on the movement sensor device during or soon after within a

2      certain time frame of a relevant or comparison question,

3      you wouldn't use that for scoring?

4      A.   Correct.

5      Q.   And that's because to deliver a fair test, a person

6      has to sit as still as he possibly can, right?

7      A.   Correct.

8      Q.   If the person is moving, you can't deliver a fair

9      test?

10     A.   Correct.

11     Q.   I'm going to show you what is marked as Exhibit T in

12     our --

13               MR. COBERLY:  I don't know how to do this here.

14               MR. NAYBACK:  We can move.

15     Q.   This is Exhibit T, which had been admitted into

16     evidence as a defense exhibit.  These are the Jamaico

17     Tennison polygraph charts that you took.  Any reason to

18     dispute that?

19     A.   No, I'm sure there isn't.

20     Q.   I'm going to mark this, since it's demonstrative, I'm

21     putting Exhibit T1 on there.

22               So can you explain to the Court what these lines

23     are?  They're tracings, right?

24     A.   Sure.

25     Q.   Okay.  Let's start at the bottom.  What's this red

1    kind of wavy spiked line?

2    A.    So that's the blood pressure.

3    Q.    And that's what's on the arm?

4    A.    On the arm.

5    Q.    What is this purple line here, this wavy purple line?

6    A.    That's the responses for internal sweat gland

7    activity.

8    Q.    Okay.  And what are these blue lines here?

9    A.    That's the breathing pattern, the upper and lower.

10   Q.    What is upper and lower?

11   A.    Pneumograph test.

12   Q.    So, for instance, on here would you consider this an

13   artifact, this spike that happens between 3I and 4C?

14   A.    Well, there is no question being asked at that time,

15   so I wouldn't have called that an artifact, because it's

16   way after the question before and way before the next

17   question.

18   Q.    I'm not talking about would you score it or not.  I'm

19   just asking, is it an artifact that's not -- it's an

20   artifact of the chart, right?

21   A.    Right.  I just don't technically call it an artifact

22   because the artifact -- the word "artifact" is only

23   included in the scoring.

24   Q.    Okay.  I'm going to circle this.  Would you agree with

25   me that --

```
1                    THE COURT:  Could you make some reference to the
2       actual printed exhibits, Mr. Coberly?
3                    MR. COBERLY:  Sure, Your Honor.
4                    THE COURT:  Your printed exhibits, Exhibit T,
5       have page numbers.  Could you refer to those by page
6       numbers so that I can follow?
7                    MR. COBERLY:  Sure, Your Honor.
8                    THE COURT:  And when you point to something
9       there, talk about whether it's Page 2 or 4 or whichever,
10      Page 5.
11                   MR. COBERLY:  For the Court's reference, the
12      first three pages are the Chart 1, you can see at the
13      bottom.  The second three is Chart 2.  So when I make a
14      reference, I'll say, "Chart 1, Page X."
15      Q.   (By Mr. Coberly)  So in these exhibits here, it's
16      Chart 1, Page 2, on the left-hand side, there's this little
17      spike here, right?
18      A.   Right.
19      Q.   And that's caused by -- that's not a normal just
20      resting, relaxed tracing?
21      A.   Correct.
22      Q.   It's caused by movement?
23      A.   Sure.
24                   THE COURT:  So what does that correspond to,
25      counsel?
```

1          MR. COBERLY:  I'm sorry, Your Honor.  That's the

2    Criminal Chart 1, Page 2 of 3.

3          THE COURT:  So it's Page 2 of 3.  All right.  Go

4    ahead.

5          MR. COBERLY:  Yes.

6          THE COURT:  Actually, that doesn't look like what

7    I've got as Page 2 of 3.  That's my point.  Unless I can --

8          MR. COBERLY:  The bottom is Criminal Chart 1.

9          THE COURT:  Yes.

10          MR. COBERLY:  And so what --

11          THE COURT:  All right.  You are telling me the

12    first thing on the top there is -- are you looking at

13    different pages or just one page there?

14          MR. COBERLY:  The way this works, Your Honor,

15    these are printed in landscape format.

16          THE COURT:  Okay.  So I'm looking at your exhibit

17    book, and I'm looking at Page 2 of 3.  So is that exhibit

18    page, the entire board there, Page 2 of 3?

19          MR. COBERLY:  This is Page 1 of 3, 2 of 3, and

20    3 of 3, Your Honor.

21          THE COURT:  Aha.  So where is Page 2 of 3?  What

22    are the parameters of that?  Just show me with your hands.

23          MR. COBERLY:  Sure.  We can start right here, and

24    go to right here.  Perhaps, Your Honor, I do have other

25    charts.  Maybe, it might be easier if I --

1          THE COURT:  All right.  This is what I have as

2     Page 2 of 3.

3          MR. COBERLY:  Right.

4          THE COURT:  Okay.  Go ahead.

5          MR. COBERLY:  Your Honor, would it be for the

6     Court's convenience --

7          THE COURT:  Yes, it would.  All right.  I can see

8     it.  Go ahead.

9     Q.   (By Mr. Coberly)  Okay.  So that is a movement of some

10    sort?

11    A.   Correct.

12    Q.   And right here, I'm looking at the second chart, the

13    middle chart here.  Kind of on the right-hand side, there's

14    a very, very drastic spike, right?

15    A.   Right.

16    Q.   Right after 4C, correct?

17    A.   If that's what the number is there.  I can't read that

18    from here.

19    Q.   4C and 5R?

20    A.   Sure.

21    Q.   I'll circle that.  Now, ma'am, why don't we talk about

22    what a comparison question is and a relevant question is.

23    A.   Do you want me to -- okay.  Sure.

24          THE COURT:  And you need to speak up because I'm

25    having trouble hearing you.  Either move the mic closer or

1    get closer to the mic.

2              MR. COBERLY:  Thank you, Your Honor.

3              THE COURT:  All right.

4    A.   So in this format, the comparison questions are

5    probable lie questions, two questions that I asked him that

6    I suspected he would probably lie at when he answered them.

7    And then I asked two relevant questions which I would

8    expect he would be completely truthful about, hopefully,

9    when he answers them.  Or maybe not.  I'm not sure.

10             So in the probable lie, assuming that he is

11   probably going to lie, I would score what his reaction

12   would be when he answers the probable lie question, and

13   compare that to how his physiology answered the relevant

14   question.

15   Q.   Okay.  So here in the middle chart, Chart 2, this big

16   spike that I've circled, that spike occurs right after 4C,

17   correct?

18   A.   Right.

19   Q.   And before 5R, right?

20   A.   Okay.

21   Q.   So you wouldn't score 5R, right?

22   A.   Well, I wouldn't score the cardio, for sure.  The

23   cardio is the blood pressure.

24   Q.   Right.

25   A.   So I might -- I mean, I don't know what my scores are.

```
 1     If you have my scores, you can show me.
 2     Q.   Well, why don't you tell me.  I mean, would you score
 3     that?  Would you use -- 5R, would you score the cardio?
 4     Would you score the electrodermal?  Would you score the
 5     pneumograph?
 6     A.   Right.  I don't think I would score the cardio.  With
 7     the other three, it also looks like he took a deep breath
 8     maybe.  You see how the breath is?  So that's a -- what is
 9     that?  A control question?
10     Q.   This is a control question.
11     A.   Right.
12     Q.   And this is a relevant question.
13     A.   Right.  So I would have assumed that the reactions are
14     maybe even from the deep breath, as well, so I probably
15     would have just zeroed out the scoring on that.
16     Q.   Now, one of the lines, the markings here we haven't
17     talked about is the movement sensor device, right?
18     A.   Right.
19     Q.   And that's this red line at the top of the charts,
20     correct?
21     A.   Right.
22     Q.   This flat line?
23     A.   Right.
24     Q.   And that's because either the movement sensor device
25     wasn't working or it wasn't hooked up right?
```

1      A.    Right.

2      Q.    So you don't know whether Mr. Tennison made any unseen

3      movements during this test, do you?

4      A.    I don't.

5      Q.    And you testified just a minute ago that to give a

6      fair test, you need to make sure that the person is sitting

7      very still?

8      A.    As still as they can, right.

9      Q.    And if you saw any movement during or right after a

10     comparison or relevant question, you wouldn't have scored

11     it, right?

12     A.    If I saw any movement during or after a relevant

13     question, I wouldn't score it, right.

14     Q.    Can you explain to the Court now what these gray

15     vertical bands are?

16     A.    Right.  So the gray towers, as I refer to them, that's

17     the length of time of me asking the question.

18     Q.    So moving from left to right horizontally, we're

19     essentially going through time, right?

20     A.    We are.

21     Q.    And if you see there on the bottom of your charts, you

22     start at zero to 10 seconds, right?  And you end up at 3

23     minutes, 20 seconds, on the first chart?

24     A.    Okay.

25     Q.    And so the gray -- the beginning of a gray band is

1    where you start the question, right?

2    A.    Right.

3    Q.    And you notate that by pushing a button on your

4    computer, right?

5    A.    Space bar.

6    Q.    Space bar.  And you hold it down until the end of the

7    question, right?

8    A.    I do.

9    Q.    And you release it.  And then the next little black

10   vertical bar next to the gray bar is the answer to the

11   question, right?

12   A.    Correct.

13   Q.    And as the Court is looking at this, the green boxes

14   at the bottom, you have green or -- white boxes, green

15   boxes, and red boxes, right?

16   A.    I do.

17   Q.    And the white boxes are irrelevant questions, right?

18   A.    I think the sacrifice irrelevant question has a white

19   box on it, too.

20   Q.    Okay.  But the green boxes are the comparison

21   questions, right?

22   A.    Yes.

23   Q.    And the red boxes are the relevant questions?

24   A.    They are.

25   Q.    And I believe you testified that you compare the

1     relevant questions to the irrelevant questions in your

2     scoring?

3     A.    The comparison questions to the relevant.

4     Q.    Okay.  So you would agree with me that the irrelevant

5     questions are -- they're irrelevant?  They're meaningless?

6     A.    Right.  I don't use them for scoring.  I think I

7     mentioned earlier that when I showed the charts to the

8     defendant, I showed him what the irrelevant reactions

9     looked like.

10    Q.    And to score a polygraph, it's important that you

11    accurately capture the beginning and the ending of a

12    question, right?

13    A.    The best you can.

14    Q.    Right.  Because you're measuring -- you're actually

15    not measuring responses to their answers, right?  Let me

16    put it another way.  Actually, what you are actually

17    measuring are the physiological responses of somebody,

18    right?

19    A.    Right.

20    Q.    And the physiological responses that the person

21    exhibits begin when the question is asked, right?

22    A.    Right.

23    Q.    It's not when the answer happens?

24    A.    No, it happens all the way through.

25    Q.    All right.  So as they are hearing a question, they're

1    starting to get -- they know the question is, oh, if

2    they're going to be deceptive, they're getting a little

3    anxious or something and their body is reacting to that

4    question, right?

5    A.   That's what I think.  Right.

6    Q.   And it's important when you're asking the questions,

7    whether it's irrelevant, comparison, or relevant, that your

8    tone of voice remains the same, right?

9    A.   Right.

10   Q.   And you don't -- and your emphasis remains the same,

11   right?

12   A.   Correct.

13   Q.   Because it wouldn't be fair to someone to emphasize

14   certain words over others, right?

15   A.   Correct.

16   Q.   And it wouldn't be fair to somebody, say, to ask a

17   question really fast; then the next question, ask it really

18   slow?

19   A.   Right.  I mean, I don't do that, so I don't think of

20   it like that.

21   Q.   Well, it wouldn't be fair to do that, right?

22   A.   Right.  It would be inconsistent.

23   Q.   I'm going to move this a little closer so you can see,

24   but if you could, ma'am, I would like you to take a look,

25   just bare eyes like that, and looking at the comparison

```
 1      questions, the length of the comparison questions to the

 2      length of the relevant questions.

 3      A.    Okay.

 4            THE COURT:  And if you can't see it, you're free

 5      to get off the podium.

 6            THE WITNESS:  I'm doing pretty good.

 7            THE COURT:  That's fine.

 8      Q.    (By Mr. Coberly)  Would it be fair to say that it

 9      appears the control questions are shorter?  They didn't

10      last as long as the relevant questions, right?

11      A.    It would be fair to say.

12      Q.    That's pretty obvious in the charts, just seeing the

13      bands are narrower, right?

14      A.    Sure.

15      Q.    So this major artifact that we talked about in

16      Question 2, you said you would zero that out, right?

17      A.    You mean in Chart 2?

18      Q.    Yes.  For 5R?  Because it's 4C, 5R, right?

19      A.    Right.

20      Q.    Is that correct?

21      A.    Yes.  I said, "Right."

22      Q.    I'm showing you what is marked as Defense Exhibit M.

23      Do you recognize this?

24            MS. MEASE:  Your Honor, I'm going to object at

25      this point.  I think that --
```

```
 1                THE COURT:  What is the objection?

 2                MS. MEASE:  The objection is that I think that

 3      this is trying to get into an area that is irrelevant.

 4      Agent Sullivan has testified her findings, and now she's

 5      gone over all the charts.  The scoring is just something

 6      that I think is turning this into sort of a mini trial on

 7      polygraphs, where Mr. Nayback said at the beginning, every

 8      polygrapher is going to be somewhat subjective.

 9                And I think to the ultimate issue Mr. Coberly is

10      making that, you know, her comment that he failed, I mean,

11      that's her interpretation.

12                MR. COBERLY:  Your Honor, I --

13                THE COURT:  Let her finish, Mr. Coberly.

14                MS. MEASE:  I believe that's her interpretation.

15      That's what she testified to.  I don't think we need to get

16      into the score sheets, and I think we've gone farther than

17      we need to go on the charts.  I don't think --

18                THE COURT:  The score sheets are in evidence.

19      Objection overruled.

20      Q.   (By Mr. Coberly)  Ma'am, do you recognize Exhibit M?

21      A.   I do.

22      Q.   What is Exhibit M?

23      A.   Exhibit M is my score sheet.

24      Q.   Explain to the Court, please -- I didn't mean to zoom

25      that out.  How do you -- what do these numbers mean?
```

1    A.    Right.  So these are the scoring numbers that I put on

2    each parameter to determine the scoring.

3    Q.    Okay.  Okay.  So we've got Criminal Chart 1, Criminal

4    Chart 2, Criminal Chart 3, right?

5    A.    Yes.

6    Q.    Then we've got pneumo, which is the breathing, right?

7    A.    Right.

8    Q.    EDA, which is the sweat gland activity, right?

9    A.    Right.

10   Q.    Cardio is the blood pressure, heart rate?

11   A.    Right.

12   Q.    7R.  So you're giving a score -- you're scoring the

13   relevant questions, right?

14   A.    Right.

15   Q.    And what range of scores do you assign?  Is it plus 5

16   to negative 5?  What's the range you use?

17   A.    Well, each parameter can have a minus or a plus.  So

18   on the relevants, you could have a minus, on the cardio,

19   which is the blood pressure, a minus, and on the internal

20   sweat gland activity, and a minus on each of the

21   pneumograph tubes.

22         So on each chart you can have a minus 4 if you

23   wanted to apply a minus to each parameter.

24   Q.    What is a spot analysis?

25   A.    Spot analysis is basically the scoring of a particular

1        spot on the chart.  Right.  So if we were comparing the

2        cardio, one question to the cardio to the other.

3        Q.   Do I understand it correctly that for any of these

4        charts, let's say Chart 1, there's going to be six

5        different spot analysis done, right?

6        A.   Ask me again.

7        Q.   Well, for any given chart, there's six different

8        places where you can place a score, right?  You've got

9        three for the seventh relevant question, and three for the

10       fifth relevant question, right?

11       A.   Well, four for each.

12       Q.   And how do you get four?

13       A.   Well, I would score either one of the pneumos and then

14       come up with one score, so that would be one.  And then one

15       for the cardio, and then one for the sweat gland activity.

16       So three total.  But I thought you were talking about what

17       I was looking at across the screen.

18       Q.   I understand.  So they can be either negative or

19       positive, but how much?  Can they go positive 1?  Positive

20       2?  Positive 3?

21       A.   Right.

22       Q.   So what's the threshold for you?

23       A.   Right.  It's a 3.  Three-point scoring.

24       Q.   So you can go from plus 3 --

25       A.   Per chart.

1     Q.   Okay.  Let's talk about per score.  Let me make this

2     easy.  5R, Criminal Chart 1, cardio, you gave a negative 1,

3     right?

4     A.   Right.

5     Q.   Would you have given a -- if the chart showed you,

6     would you be able to assign it a negative 2?

7     A.   No.

8     Q.   Okay.  So negative 1 is the lowest you can go, right?

9     A.   Right.  Or the highest.  Right.

10    Q.   Okay.  And positive 1?

11    A.   Right.

12    Q.   And then if I understand your scoring method, you

13    subtotal right here and right here, the questions for the

14    seventh relevant question, right, and the fifth relevant

15    question, right?

16    A.   Correct.

17    Q.   And if either one of those are negative 3 or less than

18    negative 3, you've determined that the person has failed

19    the polygraph, right?

20    A.   Right.  We call it more than negative 3, which would

21    be -- I know what you're saying.  But yes.  Negative 3 is

22    the minimum for the failing.  If we wanted -- that's our

23    scoring threshold, if you will.

24    Q.   Now, I've heard the term repeatedly "failed the

25    polygraph."  But in polygraphs, you don't actually fail?

1     There is no such thing as failing a polygraph, right?

2     A.   Right.  So we could say deceptive.

3     Q.   All right.  So it's either deception indicated,

4     inconclusive, or no deception indicated, right?

5     A.   Correct.

6     Q.   Those are the correct polygraphy terms?

7     A.   Sure.

8     Q.   So you've testified that you wouldn't have scored the

9     5R on Chart 2, right?

10    A.   The cardio and the breathing.

11    Q.   Okay.  So in your opinion, it was fine to score the

12    electrodermal, right?

13    A.   Well, here is what happened.  You see the deep breath,

14    and so the deep breath pulls the body and causes, if you

15    will, the change in the physiology.  But still, in that

16    spot at the sweat gland activity, no matter how big a deep

17    breath he took, his reaction with his sweat gland activity

18    didn't even come close to his reaction in the relevant.

19    That's why I scored the relevant.

20    Q.   Agent Foster; is he your boss?

21    A.   He is not.

22    Q.   Does he train you?

23    A.   He does.

24    Q.   Okay.  Would it surprise you that Mr. Foster, Agent

25    Foster, zeroed all of those out?

1     A.   It would not surprise me.

2     Q.   Now, when you're scoring -- when you score the

3     chart -- let me get this out of your way a little bit.

4          When you're scoring the chart, you do that right

5     at the completion of the test, right?

6     A.   At the chart, right.

7     Q.   I'm sorry?

8     A.   At the completion of the chart.

9     Q.   Okay.  Completion of the chart.  And you score that

10    chart on a computer, right?

11    A.   I do.

12    Q.   And it basically creates a file like the one that

13    we're seeing here, right?

14    A.   Exactly.

15    Q.   And that's electronically stored in your laptop?

16    A.   It is.

17    Q.   In a certain file, right?

18    A.   Right.

19    Q.   Along with the personal biosheets, right?

20    A.   Right.

21    Q.   And the charts?

22    A.   Yes.

23    Q.   The consent form and the Advice of Rights form?

24    A.   Right.

25    Q.   All of that is locked in electronically, right?

1    A.   Right.

2    Q.   With the date and time that you created that file,

3    right?

4    A.   Right.

5    Q.   So you created three charts, right?

6    A.   Yep.

7    Q.   Why did you create three charts?

8    A.   Well, we have to create three charts minimum.

9    Q.   Why?

10   A.   Because I'm trained to do so.  That's what they told

11   us.

12   Q.   You don't know why?  You don't know the underlying

13   reason for doing three charts?

14   A.   I don't.

15   Q.   And you switch up the relevant questions in each

16   chart, right?

17   A.   I do.

18   Q.   Why?

19   A.   That's how I was trained.

20   Q.   So you don't know the reasoning behind the training on

21   why you're switching up the relevant questions, right?

22   A.   I didn't ask a lot of questions in the training.

23   Q.   Relevant questions in this, I think we've covered,

24   pertain to vaginal touching, right?

25   A.   Correct.

1    Q.   What were the comparison questions?

2    A.   One was whether or not he had ever lied to the people

3    at the Post -- I think the Post Office, because he was

4    formerly employed at the U.S. Post Office.  And the other

5    one was before this year, had he ever lied to law

6    enforcement or lied to police to get out of trouble,

7    something like that.

8    Q.   It seems that you like to follow your training, right?

9    A.   I try to do the best I can.

10   Q.   And you were trained when you create a comparison

11   question, the comparison question should be similar in

12   nature to the relevant question, right?

13   A.   Yeah.  Like lying.  That's why I ask those questions.

14   Q.   So the matter under the investigation, though, was the

15   inappropriate touching of a child, right?

16   A.   Right.

17   Q.   And so you're saying that lying to the police or to

18   the Post Office is similar in nature to touching a child?

19   A.   Right.  So our options in my training with the FBI is,

20   I can make a -- I can do the -- make the control questions

21   to either be similar type of violent crime, type of sex

22   crime questions, or lie questions.  It's up to the

23   discretion the examiner.

24   Q.   What is a zone comparison test?

25   A.   I'm not even able to tell you that, actually, because

1     I'm sure I was taught that ten years ago, but I'm not able

2     to give you a clear definition of that.

3     Q.   Okay.  What about a mixed general question test?

4     A.   I'm not able to give you a clear technical definition

5     of that.

6     Q.   But for Jamaico Tennison, you did a zone test, right?

7     A.   I don't -- no.  I mean, I would assume if I sat back

8     and looked it up to see what the technical title of it is,

9     if you're telling me I did, then that would be it.

10    Q.   Well, I don't want to tell you anything.  When you

11    score a chart in the Lafayette machine, you can either use

12    the zone score chart, right?

13    A.   Right.  So here's what I do in the Lafayette machine.

14    I do so many polygraphs, that we -- I know that this is the

15    exact type of polygraph that I'm going to conduct in a

16    criminal polygraph, so I know I'm going to have two

17    relevants, I know I'm going to have two comparisons, I know

18    I'm going to have three irrelevants, and I know I'm going

19    to have a sacrifice irrelevant.

20         As far as the correct terminology or exactly

21    where I learned it, I can't give you accurate exact answers

22    to that because I don't -- I don't want to be quoted on

23    that.  But as far as these being the criminal exams that

24    I'm authorized to administer, I am.

25    Q.   So this is two comparison, two relevant question test?

1    A.   Right.

2    Q.   Why did you pick a two comparison, two relevant?

3    A.   That's what I use.  That's what we use for all

4    criminal exams.  I mean, that's what I used.  I think there

5    are some other options.  This is what I'm authorized to

6    use.

7    Q.   Do you know, through your training, why it is that

8    you're --

9    A.   No.  And there's all different tests and I could

10   probably know a lot more about all the different options

11   that in polygraph research people use for testing.  I just

12   don't.

13   Q.   Well, at the top of Exhibit M right here, it says

14   "zone," right?

15   A.   Sure.

16   Q.   And you chose to score it as a zone test, right?

17   A.   Right.  I would call this just a criminal test scoring

18   specific issue.  But if it's referred to as "zone," I just

19   don't use the word "zone" in my lingo.

20   Q.   "Specific issue" meaning you're looking up one issue?

21   A.   Right.

22   Q.   Not multiple issues?

23   A.   Right.

24   Q.   The one issue here is:  Did Jamaico Tennison

25   inappropriately touch "K.C."?

 1    A.    Vaginal area.

 2    Q.    Vaginal area?

 3    A.    Right.

 4          MR. COBERLY:  I don't want to -- I'm about ready

 5    to move into a new line of questioning, Your Honor.

 6          THE COURT:  Yes, and it's past 12:30.  What I

 7    said to counsel when we conferred at the bench earlier,

 8    we're going to quit this afternoon at right about 3:00, so

 9    I want to make as best use as I can of the time.

10          So let's take a 45-minute lunch break at this

11    time.  All right.  We'll be in recess for 45 minutes.

12          COURTROOM DEPUTY CAROL WALKER:  All rise.

13          (Recess from 12:37 p.m. until 1:30 p.m.)

14          COURTROOM DEPUTY CAROL WALKER:  All rise.

15          THE COURT:  You may be seated.  Let us continue

16    here.

17               CROSS-EXAMINATION (Continued)

18    BY MR. COBERLY:

19    Q.    Good afternoon again, Agent.  One thing I don't think

20    I quite got clear, are you a member of any professional

21    organizations?

22    A.    American Polygraph Association.

23    Q.    And when did you become a member of that organization?

24    A.    I think maybe two or three years ago.

25    Q.    Any others?

1     A.    No, sir.

2     Q.    I think you used the term that the person you're

3     polygraphing is considered the "examinee"?

4     A.    Right.  I don't know that I used it today, but I do

5     use that, right.

6     Q.    But in reality, when they come in, in a criminal case,

7     and you're polygraphing them, they're suspected of a crime,

8     right?

9     A.    They're accused.

10    Q.    They're accused?

11    A.    Somebody is accused, right.

12    Q.    So is there a difference between being accused and

13    suspected of?

14    A.    No.  Right.

15    Q.    So they are a suspect?

16    A.    Sure.

17    Q.    And in this case, Agent Schaeffer contacted you

18    because he didn't believe that Mr. Tennison was telling the

19    truth to him, right?

20    A.    Right.

21    Q.    Obviously, if Agent Schaeffer believed that Mr.

22    Tennison was telling the truth, you would not have

23    polygraphed Mr. Tennison?

24    A.    Mr. Schaeffer would have to tell you if he would call

25    me or not, whether he believed him or not.

 1    Q.    In your view, if the suspect doesn't pass the
 2    polygraph, then your goal then is to obtain the confession,
 3    right?
 4    A.    I want to know why he's not being truthful.
 5    Q.    So if a suspect doesn't pass the polygraph, your goal
 6    then is to obtain a confession?
 7    A.    Sure.  I mean, a confession would be great.  But I
 8    think earlier you described not so much failed and passed,
 9    but deceptive or nondeceptive.  And so if I see that the
10    examinee shows indications of being deceptive, then I want
11    to know what is it that they're thinking of during the
12    testing that would cause that deceptive indications.
13    Q.    And your goal in learning that information is to gain
14    a confession?
15    A.    Right.  If it sorts out to a confession, that is
16    great.
17    Q.    That's your goal, right?
18    A.    I don't make goals every day.  My goal is to conduct a
19    fair test and determine whether or not there's truthfulness
20    or untruthfulness during the testing.
21            MR. COBERLY:  May I approach the witness, Your
22    Honor?
23            THE COURT:  You may.
24    Q.    Ma'am, I'm handing you a binder with tabs of some of
25    your prior testimony in this Court.  Do you recall

1     testifying in a case United States v. Yazzie?

2     A.    I've testified in a couple of Yazzie cases.

3     Q.    Okay.  If I can have you turn to Tab 5a, please.  And

4     if I could have you turn to Page -- well, if you could look

5     at the front cover, this is a transcript of United States

6     v. Pauline Yazzie, November 21, 2011, a motion to suppress

7     statements.  Do you recall that hearing in front of Judge

8     Johnson?

9     A.    I recall a hearing.  I don't recall the details.

10    Q.    If I could have you turn to Page 95 of that

11    transcript, ma'am, Line 10.

12          The question was, to you:  "And so you started

13    this with the interrogation with the goal of getting her

14    confession, didn't you?"

15          And your answer was:  "I did, once I saw the

16    charts, right."

17          Right?

18    A.    Yes.

19    Q.    And that's what you did in this case, right?

20    A.    Right.  Once I saw the charts and I knew there was

21    indicatives of deception, I want to find out what's causing

22    the deception.  Hopefully, it's a confession to the crime.

23    Q.    And your goal is to obtain the confession, right?

24    A.    Okay, if you want to say that, sure.

25    Q.    No, I don't want to say that.

1    A.   Well, we've covered it three times.  But my goal is to

2    determine what's causing the indicators of deception.  If

3    it turns out that it's a confession, then it's an

4    explanation to me.

5    Q.   Ma'am, in the same transcript, if you turn to

6    transcript Page 108, at the very bottom, Line 25.

7             The question was:

8             "QUESTION:  At the start of the

9        interrogation, you were going to get a

10       confession.

11            "ANSWER:  My plan was that's every

12       investigator's goal, right, to get a confession

13       to the crime that they're working on."

14   A.   Right.  In the context, it's after the polygraph

15   charts are reviewed.

16   Q.   And in your view, when you review your polygraph

17   charts and you score them, and it comes out deception

18   indicated, you believe that they're lying to you, right?

19   A.   I believe they're lying to me, right.

20   Q.   And that's because you've testified you believe your

21   skills are 100 percent accurate, right?

22   A.   I said I'd like to believe that they were, right.

23   Q.   No, ma'am.  I believe you testified that you believe

24   that your accuracy rate is 100 percent, before lunch.

25   A.   My accuracy rate on the testing?  On the scoring?  On

```
1    exactly what part?
2    Q.   On the scoring, when you score someone as deception
3    indicated, you testified before lunch, did you not, that
4    your error rate is 100 percent?
5              THE WITNESS:  Could we go back and check that
6    transcript?
7              THE COURT:  I'll ask the court reporter to --
8              THE WITNESS:  Because I don't recall saying
9    anything --
10             THE COURT:  Hold it a minute.  Hold it a minute.
11             THE WITNESS:  Okay.  I'm sorry.
12             THE COURT:  I will ask the court reporter to do
13   that.
14             (The following testimony was read back:)
15             "QUESTION:  So in your mind, your
16         polygraphs, at least, are 100 percent accurate?
17             "ANSWER:  I feel like they are."
18             THE COURT REPORTER:  Should I search further?
19             MR. COBERLY:  I think that's fine.
20   Q.   (By Mr. Coberly)  After you score the test and it
21   comes up in your mind deception indicated, you believe that
22   the suspect is lying to you?
23   A.   I do.
24   Q.   And so you start interrogating the person with the
25   intent of obtaining a confession, right?
```

1    A.   I do.

2    Q.   I'm not sure if you did in this case earlier, but

3    you've testified before in this courtroom that you tell the

4    suspect initially that you're simply the polygrapher,

5    right, you're not the investigator?

6    A.   Is that a question?

7    Q.   It is a question.

8    A.   I do tell them that.

9    Q.   But you testified earlier today that the polygraph is

10   an investigative tool, right?

11   A.   Correct.

12   Q.   Certainly when you start interrogating a suspect,

13   you're acting now as an investigator, right?

14   A.   Right.

15   Q.   You're not acting as the polygrapher anymore?

16   A.   Right.  After I've -- when I start the interrogation

17   and I've concluded the charts are deceptive, I am

18   investigating now.

19   Q.   And when you're interrogating someone, you're drawing

20   on all of your 30-plus years of training in interrogation,

21   right?

22   A.   I am.

23   Q.   You are confronting that person, right?

24   A.   Yep.

25   Q.   Challenging them?

```
 1    A.    Yep.

 2    Q.    It can be pretty heated sometimes?

 3    A.    It can.

 4    Q.    And you tell the person flat out, "I don't believe

 5    you," right?

 6    A.    I do.

 7    Q.    You repeatedly tell them that you think they are

 8    lying?

 9    A.    I do.

10    Q.    You repeatedly tell them that you think -- or not that

11    you think.  You repeatedly tell them, "Look, you failed the

12    polygraph"?

13    A.    Right.

14    Q.    And you use adverbs like "miserably" or "you miserably

15    failed"?

16    A.    Right.

17    Q.    "Blatantly"?

18    A.    "Obvious."

19    Q.    "Obviously."  And you did that in this case, right?

20    A.    I did.

21    Q.    And in cases like this case involving child sex

22    crimes, you tell the suspect that in your experience, you

23    have never seen young girls making this stuff up?

24    A.    That's correct.

25    Q.    And you did that in this case, right?
```

1     A.   I did.

2     Q.   And you actually show the suspect where on the chart

3     you say that they failed miserably, right?

4     A.   I probably did.

5     Q.   And you probably did that in this case, right?

6     A.   I would assume.

7     Q.   And you tell people that it's a crime to lie to a

8     federal agent, right?

9     A.   I have told people that.

10    Q.   And you did that in this case, right?

11    A.   I don't recall if I did or not.

12    Q.   Well, we don't know because you didn't record that,

13    right?

14    A.   That's right.

15    Q.   So you very well may have said that, right?

16    A.   I could have.

17    Q.   You testified earlier, though, that when you start out

18    with the polygraph, you come in completely objective?

19    A.   Right.

20    Q.   And you tell the person -- and you believe that?

21    A.   I do.

22    Q.   And you tell the person that your job is solely to

23    collect information from them and determine whether they're

24    being truthful or not, right?

25    A.   Correct.

1    Q.   So you will tell them, "Hey, if you're going to fail a

2    polygraph, I'm going to lay into you and interrogate you

3    about this"?

4    A.   No, I don't tell them that.

5    Q.   But in every case such as this, or a criminal case,

6    you tell the case agent like Agent Schaeffer, "Hey, look,

7    if I get the confession, I'm going to call you back in,"

8    right?

9    A.   Right.  If there's more information that he needs to

10   be aware of, certainly I'm going to call him back in.

11   Q.   Well, what if there's not more information that he

12   needs to be aware of?

13   A.   Right.  So if they pass the test, I'm going to come

14   out and say, "I don't think this is your guy."

15   Q.   Right.  If you get a confession, you're going to call

16   the agent back in, right?

17   A.   Right.

18   Q.   And part of the purpose of that is so that the agent

19   can record and memorialize that confession, right?

20   A.   Correct.

21   Q.   Right?

22   A.   I said, "Correct."

23   Q.   Okay.  I'm sorry.  We must be talking over each other,

24   ma'am.  And you did that in this case, right?

25   A.   Right.

1    Q.   And if you get the confession, you tell suspects

2    you're going to call the case agent back in now, and you

3    tell them that, that they need to repeat the confession to

4    the case agent to show cooperation, right?

5    A.   Right.

6    Q.   And you did that in this case?

7    A.   I probably did.

8    Q.   Isn't it true, ma'am, that pretty much immediately --

9    well, let me stop here for a second.  I just want to make

10   sure that the Court is clear as to the different phases

11   we've been talking about, about the polygraph.  And as I

12   understand it -- please correct me if I'm wrong -- the

13   initial phase is the pre-polygraph interview?

14   A.   Right.  We call it a pre-test.

15   Q.   Pre-test?

16   A.   Uh-huh.

17   Q.   Okay.  And then the second phase would be the

18   polygraph testing, itself?

19   A.   Right.

20   Q.   And then if you determine that the charts are

21   deceptive, then you transition into the interrogation

22   phase, right?

23   A.   Correct.

24   Q.   So I'm going to be referring to that as the

25   post-polygraph.

1    A.   Post-test.

2    Q.   Post what?

3    A.   We just call it the post-test.

4    Q.   Okay.  So during the pre-polygraph interview, though,

5    where you're being objective, the truth is, you immediately

6    begin assessing that person to determine whether you think

7    they're telling the truth or not, right?

8    A.   I do.  I'm watching a lot of body language.

9    Q.   And tell us, what kind of body language are you

10   looking at?

11   A.   Demeanor; defensiveness; I've seen a lot of people

12   come in with their head hanging; you know, sad eyes; kind

13   of guilty-looking facial expressions or guilty eyes.  I've

14   seen people come in very defensive, puffed up.

15        So I really want to pay attention to see what the

16   body language does when they come into the room.

17   Q.   Certainly one of them would be lack of eye contact.

18   Do you make an assessment on that?

19   A.   Sure.

20   Q.   And you are doing that even before you take the

21   polygraph, right?

22   A.   Yep.  Uh-huh.

23   Q.   And you've been trained somehow in making those

24   assessments?

25   A.   I think everybody does that.  In their first meeting

1    with anybody, I think every single person who meets

2    somebody else kind of takes the first impression and kind

3    of makes the decision, just a brief decision in their head,

4    on what kind of person they're talking to.  I have had some

5    training on external body language, but I think I probably

6    did a pretty good job of doing some perceptions way before

7    I got into police work.

8    Q.    But since you've been involved in police work, you

9    believe you've received some specialized training in that

10   technique?

11   A.    Yeah.  I've been to some classes where they talked

12   about external body language.

13   Q.    So in any of these classes, did they talk about how

14   some of those traits you just discussed might be a sign of

15   depression?

16   A.    I -- I don't know that I've been taught that the signs

17   indicate depression, but in my personal view it looks like

18   people are depressed sometimes when they come in, sure.

19   Q.    Are you trained in determining whether someone is

20   acting a certain way because they're depressed or because

21   they're guilty?

22   A.    Right.  I didn't receive any formal expert type

23   training, but just some perceptive training.  I don't

24   really know the difference, if they're depressed it's

25   because they're guilty or not.  I'm just seeing that it's

1    not like a really happy day if they appear depressed.

2    Q.   Have you been trained in assessing whether a person

3    exhibiting certain traits might be due to cultural

4    differences?

5    A.   I haven't had any formal training on cultural

6    differences of depressed appearances, no.

7    Q.   No, I'm not talking about depressed appearance.  I'm

8    just talking about generally how people of different

9    cultures might present themselves differently to other

10   cultures.

11   A.   No, I haven't.

12   Q.   And you know that Mr. Tennison is a full-blooded

13   Navajo, right?

14   A.   I do.

15   Q.   And you've testified before that you don't believe

16   that there's any cultural differences between Navajos and

17   non-Native Americans in the way they present themselves,

18   right?

19   A.   I think the testimony you're talking about was in one

20   of the cases where the question was about a cultural

21   diversity between me and a defendant.  And she was

22   educated, I was educated; she spoke English, I spoke

23   English.  So I didn't feel during that pre-test that we had

24   any -- I hadn't, I guess, picked up on any cultural

25   deficiencies or differences during my contact with her.

1    Q.   Well, in your experience, your experience or training,

2    do you believe that Native Americans, Navajos in

3    particular, might present themselves differently than a

4    non-Native American might?

5    A.   I guess they could, like any other race or ethnicity.

6    I haven't ever gone to any training nor have I ever heard

7    of any training where we split up all the different ethnic

8    backgrounds and give specific training on every different

9    type of ethnicity or race.

10   Q.   Did you ever receive any training about Navajos,

11   certain Navajos considering eye contact to be rude?

12   A.   I didn't.  I haven't.

13   Q.   And you have been working among the Navajo people for

14   a long time, right?

15   A.   I have.

16   Q.   How long?

17   A.   Well, since I was a police officer.  Thirty-three

18   years, I guess.

19   Q.   So I think it's pretty well established you don't

20   record your polygraph examinations, right?

21   A.   That's established.

22   Q.   And that's apparently because that's against FBI

23   policy, right?

24   A.   Yep.

25   Q.   And that policy covers the pre-test interview, right?

1    A.    That's correct.

2    Q.    Where you're gathering the biological information,

3    correct?

4    A.    Correct.

5    Q.    And you're defining the relevant terms, right?

6    A.    Correct.

7    Q.    So I believe you testified earlier that you had a

8    discussion with Mr. Tennison about the meaning of "vagina"?

9    A.    Right.  Well, he used the word "vagina."  I used the

10   word "vagina."  I felt pretty safe we both knew what

11   "vagina" meant.

12   Q.    But in forming the relevant question, you guys

13   discussed that term, right?

14   A.    Right.  I remember asking him, "Do you know why you're

15   here?"  I ask everybody that.  "Do you know why you're

16   here?  Do you know what you're being accused of?"

17         And I believe he's the one that told me that he

18   was being accused of touching "K.'s" vagina outside.

19   Q.    And you are able to remember that in your mind, right

20   now, from a year and a half ago, having done hundreds of

21   polygraphs in the meantime?

22   A.    Right.  So I just reviewed the transcripts of our

23   interview with Mr. Tennison, and in the transcripts there

24   was a reminder of a lot of the discussion that he and I had

25   that weren't recorded.

1  Q.   Was there a reminder about a discussion of the term

2  "vagina"?

3  A.   No, but we used "vagina."   In fact, in one of the

4  transcripts, his statement used the word "vagina," so that

5  certainly reminded me that he was comfortable using the

6  word "vagina."

7  Q.   Is it safe to say you don't know, sitting here right

8  now, precisely what Mr. Tennison said to you, right?

9  A.   Not verbatim, no, absolutely not.

10  Q.   And you don't know what you said to Mr. Tennison

11  verbatim, right?

12  A.   I can't.   No.

13  Q.   We don't know the tenor of your voice, right?

14  A.   Right.

15  Q.   Or of Mr. Tennison's voice?

16  A.   Right.

17  Q.   Recording certainly would have preserved that, right?

18  A.   Surely.

19  Q.   We talked earlier about conducting the polygraph and

20  how important it was to ask the questions evenly, right?

21  A.   Sure.

22  Q.   The speed, pitch, tenor, right?

23  A.   Consistent.

24  Q.   Not emphasizing certain words over others, right?

25  A.   Right.

1    Q.   And we don't know -- would you agree with me that a

2    recording of that would be the best evidence of that?

3    A.   I would agree that if we had a recording right now, we

4    would hear Mr. Tennison talking about touching "K."  So

5    right now, in my opinion, the recording would be great.

6    But I wasn't able to record.

7    Q.   No, I'm talking about the recording of you.

8    A.   We had an exchange, so if a recording was going on, we

9    would hear both of us, right?

10   Q.   And you didn't make that recording, right?

11   A.   I couldn't make that recording.

12   Q.   But the software in the Lafayette polygraph allowed

13   you to do that, right?

14   A.   Right.  We're not able to record.

15   Q.   You are not allowed to, according to -- pursuant to

16   FBI policy, right?

17   A.   You've got it.

18   Q.   You mentioned earlier that you want the suspect to be

19   as comfortable as possible before taking the test, right?

20   A.   Sure.

21   Q.   And you think it would make a person uncomfortable if

22   they thought they were being monitored?

23   A.   I've had people monitored before.  I don't know that

24   it would make them feel uncomfortable, depending on the

25   person.  I don't -- I didn't -- I haven't asked every

1    single person I test if it would make them feel

2    uncomfortable.

3    Q.   Ma'am, let me refer you back again to the same

4    transcript, Tab 5a, the bottom of Page 24.  There's a long

5    answer, and you're talking about whether there's -- I'll

6    just read it:

7              "ANSWER:  I'm not going to audio or

8         videotape the polygraph, nor am I certain that

9         somebody's going to be -- to my knowledge,

10        there's not going to be anybody standing at

11        that window the whole time.  So I advised her

12        that I don't have any plans to record or have

13        this polygraph monitored."

14             Did I read that correctly?

15   A.   I don't have it.  If you want me to look at it.

16   Q.   Yes, I would like you to follow along.

17   A.   Sure.  Tell me again the tab, please.

18   Q.   It's 5a.

19   A.   And the page again?

20   Q.   24.  And actually, let's start up at Line -- you could

21   start at Line 11 and review that down to Line 25.

22   A.   Okay.

23   Q.   And you're talking about in the pre-polygraph portion,

24   advising them whether they're going to be monitored or not,

25   right?

1      A.    Sure.

2      Q.    And there's a question there, starting on Line 25,

3      going to the next page:

4                  "QUESTION:  Okay.  And why do you

5          explain that?"

6                  And your answer is:

7                  "ANSWER:  We just do it to be fair to

8          the people so they can -- so they can be a

9          little more relaxed, not thinking they're being

10         watched by 50 people."

11     A.    Right.

12     Q.    Right?  So you don't want people to be uncomfortable

13     by thinking that they're being monitor and recorded,

14     right?

15     A.    Well, I think this is completely out of context.  This

16     was about why is the statement on the form about advising

17     them whether or not I know if there's going to be audio or

18     video recording.  And so I'm explaining that that document

19     includes those choices for me to mark, whether I know

20     there's going to be a recording device or not.  Then I

21     would mark it and I would explain to them whether I know

22     people are going to be watching or not.

23                Does that make sense?

24     Q.    That makes sense.

25     A.    So I think that's what that's in connection to.

1    Q.   Right.

2    A.   Okay.

3    Q.   I get that.  And it's also saying that you believe you

4    want people to be relaxed and not think that they're being

5    monitored or recorded, right?

6    A.   Right.  In this case, if 50 people were staring

7    through a two-way window, I think both of us would feel

8    very self-conscious.

9    Q.   And in this case, we've already established there

10   wasn't any type of two-way mirror, right?

11   A.   Right.

12   Q.   And there was no recording or observation device,

13   right?

14   A.   Correct.

15   Q.   Showing you Exhibit I, ma'am, starting under -- this

16   is the Consent to Interview, Consent to Polygraph form, I

17   guess is what it's colloquially called.  Under Waiver and

18   Consent, did I read this correctly where it says, the

19   second paragraph, "I understand that the polygraph

20   examination may be monitored or recorded," right?

21   A.   Correct.  Uh-huh.

22   Q.   But in this case, it wasn't going to be monitored or

23   recorded?

24   A.   Right.  It says it could be.

25   Q.   But you knew it wasn't going to be?

```
1    A.   Right.  So when I'm in a room that it doesn't have

2    those, like any recording devices, I'll say to them right

3    then, "And in this room, I have no knowledge of any

4    recording devices at all."

5              If I'm in a room where I know there's a two-way

6    window or there is a camera, I let them know, "Over there

7    in the corner is a camera."

8    Q.   All right.  And in this case, there was no camera?

9    A.   Yeah.  Right.

10   Q.   There was no two-way mirror?

11   A.   Right.

12   Q.   Yet, you're telling them it can be monitored or

13   recorded?

14   A.   Right.  It's a standard form, that it could be.

15   Q.   Ma'am, in Yazzie, in the case you just read, you

16   checked that it will not be monitored or recorded?

17   A.   Right.  I think we discussed it in Yazzie, that the

18   box was checked wrong.  It could be monitored or recorded.

19   I just didn't know of anybody that was going to be watching

20   it.

21   Q.   You're not really paying attention to what you're

22   putting there, are you?

23   A.   Are you talking about this case?  Or in Yazzie?

24   Q.   In this case.

25   A.   Are you telling me that there was a mistake on the
```

1    form in this case?  Is that what you said?

2    Q.   Let me ask you about your review of this case.  So

3    when, just generally speaking, a case agent calls you, you

4    have access to the files in the -- was it an FBI I-drive or

5    internal system or something?

6    A.   Internal system.

7    Q.   And you've testified before that sometimes a case

8    agent will send you a synopsis, kind of a write-up of what

9    the case is about, right?

10   A.   Sure.

11   Q.   Did that happen in this case?

12   A.   He sent me a couple of e-mails telling me a little

13   more information, that there was some medical records that

14   showed some forensic evidence, I guess, and a forensic

15   interview that was out there that he was going to forward

16   to me.

17   Q.   Do you have those e-mails?

18   A.   I do not.

19   Q.   I'm sorry?

20   A.   I do not.

21   Q.   But they are preserved, right?  This is the FBI.

22   A.   I mean, I don't preserve the e-mails.  I delete every

23   time the thing tells me to delete my e-mails, they're going

24   to run out, but I don't know where they go.  I'm sure you

25   could get them if you wanted them.

1          MR. COBERLY:  Your Honor, at this time, as well

2     as the outstanding grand jury transcript for Agent

3     Schaeffer, I'll be asking for, under 26.2, Agent

4     Schaeffer's statements to Agent Sullivan regarding the

5     facts of the case.

6          THE COURT:  Put that in a motion.

7     Q.   What specifically did you review in this case?

8     A.   So my specific recollection when I reviewed the case

9     for this testimony was, there was a forensic interview.  I

10    made notes about -- I mean, I knew that there was an

11    abrasive, like a mark, I think, a medical -- some medical

12    evidence.  And in the file was an interview of Mr.

13    Tennison.  And in the file was an interview of "K.'s" mom.

14    And there was a criminal history of Mr. Tennison.  And

15    there was also, I know, on the e-mail there was a note that

16    he -- there was an FBI case before that, when he was a

17    juvenile.

18    Q.   And you choose what you want to read and print it off

19    and put it in a folder, right?

20    A.   Correct.

21    Q.   Do you still have that folder?

22    A.   No.

23    Q.   When was the last time you reviewed that folder?

24    A.   When was the last time I reviewed it?

25    Q.   Yes.

1   A.   I don't know.  I know we had looked to see.  I know

2   that I went into the archives to pull the report and these

3   documents, but as far as anything else, I can go back into

4   the system and re-read the case.

5   Q.   Is it fair to say, though, that after you reviewed all

6   of those materials, you thought you had a pretty good idea

7   of what had happened?

8   A.   Right.  Plus I probably talked to him on the phone a

9   few times.

10   Q.   Right.  And you had a pretty good idea of what "K."

11   had said, right, the child?

12   A.   I did.

13   Q.   And that was in large part from reviewing the April

14   25th forensic interview?

15   A.   Correct.

16   Q.   And I believe in that interview, "K." alleged that

17   Mr. Tennison had touched her while she was laying on the

18   floor, right?

19   A.   Right.

20   Q.   And she had alleged or said some reference to that

21   Mr. Tennison was on the bed at that time, right?

22   A.   I don't recall exactly what she said.

23   Q.   You knew, from the review of that forensic interview

24   and other materials, that that evening "K." had been

25   sleeping on the floor amongst her cousins, right?

```
1    A.   Right.

2    Q.   And I think there were six kids on the floor, right?

3    A.   I can look at the -- I mean, if you want to bring back

4    up the diagram.  I know there's at least five.

5    Q.   Five or six, right?

6    A.   Right.

7    Q.   There was a lot.  Do you recall putting in your report

8    that the mother of "K.," Karen, who is Dorothea's sister,

9    confronted Mr. Tennison about molesting "K."?

10   A.   I do.

11   Q.   Where did you get that?

12   A.   I don't know where I got that, so probably from --

13   maybe from Matt.  I'm not sure.  Or I could have got it

14   even from Mr. Tennison.  I don't recall where I got that.

15   Q.   But that didn't actually happen, did it?

16   A.   I don't know.

17   Q.   But you put it in your report, that it did happen?

18   A.   Are you telling me that it didn't happen?

19   Q.   Do you know?

20   A.   Well, I don't know now, 17 months later.  But at the

21   time, I got it from somewhere, so I put it in my report.

22   Q.   So you didn't review any of the underlying Navajo

23   police reports?

24   A.   Oh, wait a minute.  Do you have Karen's interview?

25   Q.   Karen's interview?
```

    1    A.   Right.  She was interviewed by the FBI.  Do you have
    2    that?
    3    Q.   I don't have that.  I would like that.
    4    A.   Oh.  I think in there that she says that she accused
    5    Mr. Tennison.
    6    Q.   Are you talking about an actual recorded interview?
    7    A.   No.  I don't know if it was recorded.
    8    Q.   Are you talking about a 302?
    9    A.   I feel like there is one, or maybe a conversation from
   10    Matt saying that she told him that.  In fact, I know
   11    there's a 302, if you don't have one.
   12    Q.   I've got one.  I'm not sure I have a clean copy,
   13    but --
   14         MR. COBERLY:  May I have a moment, Your Honor?  I
   15    may have that.
   16         THE COURT:  You may.  Go ahead, counsel.
   17         MR. COBERLY:  Thank you, Your Honor.  May I
   18    approach, Your Honor?
   19         THE COURT:  You may.
   20    Q.   (By Mr. Coberly)  Handing you Defendant's Exhibit W, I
   21    apologize for the highlighting and my scribblings, but does
   22    that appear to be the 302 you're referencing?
   23    A.   I don't know if it's this exact one.  I don't know if
   24    there's more than one interview with Karen Chester.
   25    Q.   Does that 302 say anything about Karen Chester

1    confronting Mr. Tennison?

2    A.   Right.  I don't see that.  So Matt might have told me

3    that she confronted him.  I don't know where I got that.

4    Q.   Thank you.  Did you have an opportunity to review any

5    of the original Navajo police reports?

6    A.   I don't recall if I did or not.

7    Q.   Hypothetically, if there was something in there that

8    was inconsistent, that was in the forensic interview, would

9    that be a cause for concern?

10            MS. MEASE:  Your Honor, I'm going to object.  I

11   think that calls for speculation.

12            THE COURT:  Sustained.

13   Q.   When a person first comes in and you give them that

14   overview of the polygraph process, right -- and I believe

15   maybe I came across this in another case, but my

16   understanding is, you kind of tell them the steps from the

17   get-go, like, "This is what's going to happen.  We're going

18   to do this, and going to do that."  Right?

19   A.   Yeah, I think I'm supposed to.  I don't know if I did

20   in this case walk him through everything that we're going

21   to do.  Sometimes I just go right into a conversation.

22   Like I know that when we sat down, we had the personal

23   history sheet up, so we sat together and filled that in.  I

24   don't know exactly if I went through the overview steps of

25   what's next, what's next.

1    Q.   Uh-huh.  Let me put back -- this is the Consent to

2    Polygraph again.  So in this form, where it says "Your

3    Rights," there's three sentences, right?

4    A.   Sure.

5    Q.   And all of those are your rights pertaining to this

6    polygraph test, right?

7    A.   The examinee's rights.

8    Q.   I'm sorry?

9    A.   For the person taking the test.

10   Q.   And then the Waiver and Consent part there, it says

11   that the person voluntarily agrees to be examined by means

12   of the polygraph during this interview, right?

13   A.   You mean at the "With the above understanding" part?

14   Q.   The first sentence -- actually, it would be the second

15   sentence under Waiver and Consent.

16   A.   The second sentence, "I voluntarily agree to be

17   examined by means of the polygraph during the interview."

18   Right.

19   Q.   And ultimately, it ends with the person agreeing to

20   submit to a polygraph examination, right?

21   A.   Uh-huh.

22   Q.   And then immediately after that, you provide them with

23   the Advice of Rights form, right?

24   A.   I do.

25   Q.   It's kind of the standard Miranda waiver form, right?

1    A.   Right.

2    Q.   I'm sorry?  Maybe I didn't hear you.

3    A.   Right.

4    Q.   I didn't hear you.  I'm sorry.  And you ask the

5    suspect to sign this form if they still agree to take the

6    polygraph, right?

7    A.   You mean at the Miranda?  You mean at the Miranda

8    form?

9    Q.   Yes.

10   A.   I just have them read the consent when they get done,

11   after I've read them their rights, and then I ask them to

12   sign the form.

13   Q.   If they still agree to take the polygraph?

14   A.   That's not what I -- I don't say -- I don't know if I

15   say that language exactly, "If you still agree to take the

16   polygraph, I need you to sign the form."  The whole point

17   of the form is to make sure they understand their rights,

18   and then they sign their name, letting me know they

19   understand their rights.

20   Q.   Ma'am, do you recall testifying in the case United

21   States v. Dyson, a motion to suppress in January of 2014?

22   A.   I do.

23   Q.   If I could have you turn to Tab 2a in the binder

24   there, Page 46.  Let me know when you get there.  Are you

25   there?

1    A.   Sure.  Uh-huh.

2    Q.   Line 19, you testified in that case:  "But I -- I say

3    to everybody, If you're a U.S. citizen, you have

4    constitutional rights.  I'm going to read this form to you.

5    I want you to understand the form, and then I'm going to

6    have you sign the form if you still agree to the

7    polygraph."

8         Right?

9    A.   Right.

10   Q.   And you do that in every case?

11   A.   Right.  We cover the form before the polygraph, right.

12   Q.   You don't provide -- after you go through the

13   polygraph testing and you switch to the interrogation mode,

14   you don't provide any of your suspects with new Miranda

15   waiver forms, do you?

16   A.   I do not.

17        MR. COBERLY:  One moment.  I need to grab a

18   transcript.

19   Q.   This Advice of Rights form, I'm going to read this

20   verbatim.  All right?

21        It says, "You have the right to have a lawyer

22   with you during questioning."  Right?

23   A.   Right.

24   Q.   And then it says, verbatim, "If you cannot afford a

25   lawyer, one will be appointed for you before any

1     questioning if you wish"?

2     A.   Correct.

3     Q.   And this is the Advice of Rights form that you

4     provided to Mr. Tennison, right?

5     A.   Correct.

6     Q.   And that Mr. Tennison signed?

7     A.   Right.

8     Q.   And in this case, Mr. Tennison asked to have a lawyer

9     appointed, didn't he?

10    A.   He said, "Will you appoint me a lawyer?"

11    Q.   My question was:  Did he ask to have a lawyer

12    appointed?

13    A.   I took the question directed like am I doing the

14    appointing.

15    Q.   I'm sorry?

16    A.   I took his question as far as like does the FBI do the

17    appointing of the lawyers, when he said, "Do you appoint me

18    a lawyer?"

19    Q.   Well, you read that, that he wanted a lawyer, right?

20    A.   No, I didn't read that, that he wanted a lawyer,

21    because he could have said, "I wanted a lawyer."  Right?

22    Q.   He asked you, "Will you appoint me a lawyer?"  Right?

23    A.   "Do you guys appoint lawyers?"

24    Q.   And you said, "No, we don't"?

25    A.   I said, "No, I don't appoint, do the appointments."

1    Q.   And he asked you, "Don't I need a lawyer present?"

2    Right?

3    A.   I don't recall him saying, "Don't I need a lawyer

4    present?"  Is that in a transcript?

5            MS. MEASE:  Your Honor, I'm going to object and

6    ask that the transcript be read verbatim.

7            MR. COBERLY:  That's a problem, Your Honor.  We

8    don't --

9            THE COURT:  Hold on a minute.  Do you have the

10   transcript?

11           MR. COBERLY:  We don't have the transcript

12   because there's no recording.

13           THE COURT:  Okay.  Well, then I think you're

14   bound by the witness' answers, Mr. Coberly.

15           MR. COBERLY:  I just asked her -- I understand.

16           My question was, "Didn't he say that?"  And she

17   said, "No."

18           THE COURT:  All right.  Let's move on.

19           MR. COBERLY:  All right.

20   Q.   (By Mr. Coberly)  And we don't know precisely what was

21   said because there's no recording, right?

22   A.   Right.

23   Q.   But you certainly told him, "Hey, we don't appoint

24   lawyers."  Right?

25   A.   Right.  I don't appoint lawyers.


                JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                    FEDERAL OFFICIAL COURT REPORTER
                    333 Lomas Boulevard, Northwest
                    Albuquerque, New Mexico  87102

1    Q.   But this Miranda form that he signed said:  If you

2    want one, you'll have one appointed?

3    A.   Right.  And he said, "Will you appoint a lawyer?"  And

4    I said, "I don't appoint the lawyers."  And then we had a

5    discussion about whether he wanted a lawyer, and then he

6    said, "No, I just want to get this over with."

7    Q.   Well --

8    A.   I think we had that on transcript.

9    Q.   So what we have on transcript is your relaying to

10   Agent Schaeffer what was said between you and Jamaico

11   Tennison when it wasn't recorded, right?

12   A.   Right.  And then Schaeffer asked Mr. Tennison if that

13   was true, and he said, "Yes."

14   Q.   You ask a lot of leading questions in your

15   interrogations, don't you?

16   A.   Kind of like testimony.

17   Q.   Kind of is.  So let's take a look at Defendant's

18   Exhibit B, which is a transcript that we've been talking

19   about, or at least the transcript with you and Agent

20   Schaeffer and Mr. Tennison, right?

21   A.   Right.

22   Q.   And starting on Line 8 -- or no, excuse me.  Starting

23   on Line 5, you say, "And at one point he said will I get a

24   lawyer appointed for me.  And I said we don't appoint

25   lawyers."  Right?

```
 1              And then Mr. Tennison says, "I said do I need my

 2    lawyer present."

 3              And then you have this discussion about the

 4    lawyer.  And then through leading questions, Mr. Tennison

 5    says:  Yeah, I had a lawyer.

 6              Right?

 7    A.   And you said -- do you want me to read it?

 8    Q.   Let's go to Line 20, where you say -- and this is at

 9    the very end of this long process, right?

10    A.   Right.

11    Q.   You say, "Okay.  Did you want to call your lawyer

12    before this?"  Right?

13              And Mr. Tennison says, "Yeah, I did but you

14    didn't give me a chance to."

15              And then you respond by saying, "No, no, no.

16    From your house?  You knew you were coming in today."

17    Right?

18    A.   Right.

19    Q.   But you didn't say, "No, no, no, Mr. Tennison, I never

20    said that"?

21    A.   Right.  Right, I didn't say that.  We have that

22    recorded.  I said, "No, no, no.  From your house?  You knew

23    you were coming in today."

24    Q.   And "from your house" meant "You had a chance to call

25    your lawyer from your house," right?
```

1    A.   Sure.  And I think the next page clears that up.

2    Q.   "Yeah."

3         And then -- because he has already said he wanted

4    to get this over with, right?

5    A.   Right.  So he could have brought his lawyer in,

6    because he said he had one, and he didn't bring one with

7    him.  And then he repeats that he just wanted to get it

8    over with.

9    Q.   But he had asked you at the beginning, when you were

10   going over the Advice of Rights form, to have a lawyer

11   appointed, right?  And you said, "We don't appoint

12   lawyers"?

13   A.   He said, "Will you" -- or "Will you" -- "Are you guys

14   going to appoint a lawyer for me?"  And I said, "I don't

15   appoint lawyers."

16   Q.   So I want the record to be clear.  This is what --

17   this transcript is what you're recounting to Agent

18   Schaeffer over two hours after you've actually had this

19   discussion with Mr. Tennison?

20   A.   Right.  Both of us are, myself and Mr. Tennison.

21   Q.   And we don't have a record of what was actually said

22   about the lawyer, right?

23   A.   Right.  We covered that.

24   Q.   And you don't record that because of the FBI policy,

25   right?

1    A.    Right.

2    Q.    And the purpose of that policy --

3          MS. MEASE:  Your Honor, objection; asked and

4    answered numerous times.

5          THE COURT:  It has been, Mr. Coberly.  Sustained.

6    Let's move on.

7    Q.    (By Mr. Coberly)  The purpose of the policy is so

8    that polygraph techniques are not exposed to the public,

9    right?

10   A.    Correct.

11   Q.    But you don't think by recording someone going over an

12   Advice of Rights form somehow exposes FBI secrets, do you?

13         MS. MEASE:  Your Honor, objection.  I don't think

14   -- one, asked and answered; and two, this calls for

15   speculation on her part.

16         THE COURT:  She can answer the question if she

17   understands it.

18   A.    I understand the question, but I don't make the policy

19   in the FBI.  And so I'm instructed to deliver the polygraph

20   a certain way and to comply by policy, and that's what I

21   do.

22   Q.    So when you were having this conversation later on

23   with Agent Schaeffer, you knew it was being recorded,

24   right?

25   A.    You mean --

1     Q.    Your conversation with Agent Schaeffer?

2     A.    Right.  Sure.

3     Q.    And you knew that that recording could end up like

4     here today, in a suppression hearing, right?

5     A.    Sure.

6     Q.    Or a trial?  So you're trying to make a record, right?

7     A.    We are.

8     Q.    I'm putting on the monitor Defense Exhibit L, and it's

9     marked differently by the government.  You talked about

10    this in your direct exam, right?

11    A.    Yes.

12    Q.    This is, I guess, what you call an apology letter?

13    A.    Right.

14    Q.    One of your techniques that you use in interrogation

15    is to lock a person in by having them write a letter,

16    right?

17    A.    I think it's a good way.  Right.

18    Q.    And you know, I mean, through all your years of

19    30-plus years of law enforcement, that a written confession

20    by a suspect is pretty damning evidence in front of a jury,

21    right?

22    A.    I think it's good evidence.

23    Q.    And you know, when you're writing this letter or

24    you're having the person write the letter, that you've not

25    been recording your interactions with that person, right?

1      A.    Right.

2      Q.    And in this case, I believe you testified that Mr.

3      Tennison actually didn't write this letter, right?

4      A.    Correct.

5      Q.    And your testimony was because Mr. Tennison was

6      ashamed of his writing?

7      A.    I think he was uncomfortable with his writing skills.

8      I don't know if "ashamed" is the right word, if he said he

9      was ashamed.  I think in my report, I don't know that I

10     used "ashamed," but somehow I described it.  I feel that's

11     a little closer to what he said.

12     Q.    And you testified earlier that he dictated the letter

13     to you, right?

14     A.    Right.

15     Q.    And so these are his words, right?

16     A.    They are.

17     Q.    So your testimony is that Jamaico Tennison says,

18     "Sorry for what I did.  I was intoxicated when I touched

19     you," that those are his exact words?

20     A.    They are.

21     Q.    You have this top part there, "I have ask the agent to

22     write this for me."  Do you see that?

23     A.    I do.

24     Q.    You told Mr. Tennison to write that, right?

25     A.    I asked him to write it.

1      Q.   You told him to, right?

2      A.   I asked him to.  If you want to call it "told," okay,

3      but I asked him to.

4      Q.   In the recording with Agent Schaeffer, at the end of

5      this, do you recall asking Mr. Tennison whether you had

6      made any promises to him?

7      A.   I do.

8      Q.   And his response was, "Yes," that, "I won't go to

9      jail."  Right?

10     A.   Right.

11     Q.   And that was at the very beginning of this interview,

12     right?

13     A.   Right.

14     Q.   Showing you again Exhibit B, you go through:

15              "Have I disrespected you?"

16              "No."

17              "Have I threatened you?"

18              "No."

19              "Made any promises?"

20              "Yes."

21              "What promises?"

22              "I won't go to jail."

23              And then you respond, "No, I said I didn't know

24     if you'd go to jail, but I don't -- I don't make that

25     decision," and you make an explanation.


                    JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
                        FEDERAL OFFICIAL COURT REPORTER
                        333 Lomas Boulevard, Northwest
                        Albuquerque, New Mexico  87102

1                   So you're disputing there what Mr. Tennison said,

2        right?

3        A.    I am.

4        Q.    And we don't know the exchange that actually occurred

5        between the two of you, right?

6        A.    No, we don't, because it wasn't recorded.

7                   MR. COBERLY:  May I have one moment, Your Honor?

8                   THE COURT:  You may.

9        Q.    (By Mr. Coberly)  Ma'am, you certainly recall the

10       Bundy case, right?

11       A.    I know that I was in trial on the Bundy case.  You'll

12       have to remind me the details.

13       Q.    I believe there was a motion to suppress hearing in

14       front of Judge Armijo.  Do you remember that?

15       A.    Could be.  Uh-huh.

16       Q.    Do you remember that?

17       A.    I don't recall the details, no.

18       Q.    Well, you've testified before in other hearings that

19       you've reviewed the Bundy case, right?

20       A.    I have.

21       Q.    And do you recall Judge Armijo stating in that

22       opinion:

23                   "But if the United States fails to record

24       interrogations, it must bear the consequence in cases such

25       as the present, where the actual words employed by the

1    participants, their tone of voice, and their body language

2    are necessary factors in the Court's voluntariness

3    analysis."

4            Do you recall reading that?

5            MS. MEASE:  Your Honor, I'm going to object to

6    the relevance of reading the judge's comments and having

7    all this.

8            MR. COBERLY:  I'll tie it up.

9            THE COURT:  The witness can comment on that.

10   A.   Well, I'm sure I read it when it came out.  I wouldn't

11   be able to repeat it verbatim back to you.

12   Q.   Sure.  And that opinion came out over a couple of

13   years ago, right?

14   A.   Right.

15   Q.   Yet, you still don't record polygraph interrogations?

16   A.   I don't.

17   Q.   And the truth is, though, Agent, that the policy that

18   you have been referring to, I believe you testified at the

19   very beginning of this hearing that policy only applies to

20   the pre-test interview and the testing, right?

21   A.   Right.

22   Q.   It does not apply to the post-polygraph interrogation?

23   A.   It does not.

24   Q.   That's in your discretion?

25   A.   It totally is.

1    Q.   And you totally decided not to record the

2    interrogation of Mr. Tennison, right?

3    A.   I did.

4    Q.   Even though you had the discretion to do that?

5    A.   You're right.

6    Q.   The FBI didn't prohibit you from doing that, did it?

7    A.   No, sir.

8              MR. COBERLY:  Nothing further, Your Honor.

9              THE COURT:  Is there any further need of the

10   witness here?

11             MS. MEASE:  Your Honor, I have a couple of

12   questions on redirect if it's okay with the Court.

13             THE COURT:  You may proceed.

14                     REDIRECT EXAMINATION

15   BY MS. MEASE:

16   Q.   Agent Sullivan, throughout the interview, the recorded

17   interview on June 11, 2014, is it a fair characterization

18   to say that the defendant was agreeing with your recitation

19   of the facts that he provided during the post-test

20   interview?

21   A.   It is.

22   Q.   I want to direct your attention to Government's

23   Exhibit 11, Page 10, and there's a highlighted portion

24   there.

25             Specifically on Line 8, you stated:

1           "But what you told me was that you were getting

2     erect and when you were touching her and rubbing her, you

3     thought about having sex with her, but she said --"

4           And on Line 11 the defendant interrupts you and

5     says, "No, I didn't say that."

6           Do you recall that exchange?

7     A.   I do.

8     Q.   So the defendant corrected you when you were

9     confronting him with some of the facts from the post-test

10    interview?

11    A.   Correct.

12    Q.   That he said no, he didn't say that?

13    A.   Correct.

14    Q.   And you accepted his answer?

15    A.   Correct.

16    Q.   So while the defendant was agreeing with a lot of your

17    characterizations of these statements that he made, he was

18    not just blindly agreeing with everything?

19    A.   No.  In fact, I thought there were a couple of times

20    that he spoke back and tried to clarify a couple of things

21    and there was an exchange, more so than just a one-word

22    answer.

23    Q.   And just to continue on in that questioning on Page

24    10, after you accepted his answer, when he said, "No, I

25    didn't say that," he clarified what he said?

1   A.   Correct.

2   Q.   By saying, "I just -- you know, I was drunk.  I caught

3   myself doing wrong things, so I stopped"?

4   A.   Correct.

5            MS. MEASE:  Your Honor, I don't have any further

6   questions.

7            THE COURT:  All right.  Is there any further need

8   of the witness here?

9            MS. MEASE:  Not from the government, Your Honor.

10            THE COURT:  Any further need?

11            MR. COBERLY:  Not from the defense.

12            THE COURT:  All right.  I do excuse you at this

13   time.  Thank you.

14            And the government may call its next witness.

15            MR. NAYBACK:  The United States calls Chase

16   Foster.

17            THE COURT:  Let me confer with counsel here for

18   just a moment.

19            (A discussion was held off the record between the

20            Court and counsel.)

21            THE COURT:  We're back on the record in this

22   case.

23            The next witness for the government is Chase

24   Foster, and the parties had been alerted earlier that the

25   Court would adjourn at 3:00.  It's now approximately 20

1    minutes until 3:00, and I think the parties prefer that we

2    not interrupt his testimony because the examination will go

3    beyond 20 minutes, certainly, by the government, and then

4    of course the cross-examination.

5            So I'm going to recess at this time, but I'm

6    asking the attorneys, Mr. Nayback, Mr. Coberly, as soon as

7    you're able to do so, give to Mrs. Walker, my courtroom

8    deputy, your dates of availability that relate to your

9    witnesses, your experts, government, defendant, so there's

10   no question.  We're going to reset this matter, and it

11   looks like we may need a full day, and I will look at the

12   calendar for that.

13           And I will set this absolutely as soon as I am

14   able to get those dates and will look at our calendar.

15   We'll set it sooner than later.  All right?

16           Now, is there anything further to come before the

17   Court at this time with respect to this matter?

18           MR. NAYBACK:  Not on behalf of the United States,

19   Your Honor.

20           MR. COBERLY:  Your Honor, just on behalf of Mr.

21   Tennison, regarding the Jencks or the 26.2, I didn't hear

22   the Court's ruling.

23           THE COURT:  What you need to do is make a motion

24   in writing, file a motion.

25           MR. COBERLY:  Okay.


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1              THE COURT:  There were two things you raised

2      there.

3              MR. COBERLY:  Thank you, Your Honor.

4              THE COURT:  Okay.  And perhaps you can meet and

5      confer and get it resolved.  I don't know.  But please file

6      a formal motion on that with the proper citation to

7      authority.

8              All right.  There being nothing further, we're

9      going to stand in recess as to this matter.  I'm going to

10     have the need of the bench for just a little bit, so you

11     are all free to leave.

12             Thank you.  Have a good rest of the day.

13             MR. NAYBACK:  Thank you, Your Honor.  You, too.

14             (Proceedings adjourned at 2:41 p.m.)

15

16

17

18

19

20

21

22

23

24

25


JULIE GOEHL, RDR, CRR, RPR, RMR, NM CCR #95
FEDERAL OFFICIAL COURT REPORTER
333 Lomas Boulevard, Northwest
Albuquerque, New Mexico  87102

1    UNITED STATES OF AMERICA

2    DISTRICT OF NEW MEXICO

3

4                    CERTIFICATE OF OFFICIAL REPORTER

5                    I, Julie Goehl, RDR, CRR, RPR, RMR,

6    New Mexico CCR #95, Federal Official Realtime Court

7    Reporter, in and for the United States District Court

8    for the District of New Mexico, do hereby certify that

9    pursuant to Section 753, Title 28, United States Code,

10   that the foregoing is a true and correct transcript of

11   the stenographically reported proceedings held in the

12   above-entitled matter and that the transcript page

13   format is in conformance with the regulations of the

14   Judicial Conference of the United States.

15                    Dated this 27th day of December, 2015.

16

17                    _____

                      JULIE GOEHL
18                    FEDERAL OFFICIAL COURT REPORTER
                      Registered Diplomate Reporter
19                    Registered Professional Reporter
                      Registered Merit Reporter
20                    Certified Realtime Reporter
                      NM Certified Court Reporter #95
21                    333 Lomas Boulevard, Northwest
                      Albuquerque, New Mexico  87102
22                    Phone:  (505)348-2209
                      Fax:    (505)348-2215
23                    Email:  Julie_Goehl@nmcourt.fed.us

24

25