IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                                                                     Crim. No. 15-212 MCA

JAMAICO TENNISON,

        Defendant.

## ORDER SUPPRESSING EVIDENCE

        This case is before the Court upon Defendant's *Motion to Suppress Statements Made on June 11, 2014*. [Doc. 50]  The Court has considered the written submissions of the parties, the record in this case, the evidence adduced at the evidentiary hearing on Defendant's motion, and the applicable law, and is otherwise fully advised.

**Background**

        Defendant is charged with improper sexual contact with K.C., the (then) four-year-old niece of Defendant's common-law wife.  The improper touching is alleged to have occurred during the evening of April 18-19, 2014, during a sleep-over at Defendant's home on the Navajo Reservation.  On Sunday, April 20, 2014, K.C. told her mother that Defendant had touched her private area through her pajamas.  K.C.'s mother took K.C. to an Albuquerque hospital for a SANE examination.  The SANE examiner reported observing abraded or excoriated areas on K.C.'s vagina. The findings were reported to tribal police, who conducted the initial investigation.  During an April 25, 2014 forensic

interview, K.C. told the interviewer that Defendant had touched her "pee-pee" through her pajamas with his hand.  The investigation subsequently was turned over to the FBI.

During the morning of June 11, 2014, Defendant appeared at the FBI's Gallup office.  Defendant previously had agreed to submit to a polygraph examination.  The case agent, Special Agent Matthew Schaeffer, greeted Defendant.  SA Schaeffer introduced Defendant to the polygrapher, Special Agent Jennifer Sullivan.  Defendant and SA Sullivan retired to an unoccupied office.  SA Sullivan and Defendant reviewed standard consent and advice of rights forms.  The advice of rights form tracked *Miranda*, including under the heading "YOUR RIGHTS" recitals that "[y]ou have the right to have a lawyer with you during questioning" and "[i]f you cannot afford a lawyer, one will be appointed for you before any questioning if you wish."  SA Sullivan read aloud the statements set out under "YOUR RIGHTS," including the recitals regarding the right to a lawyer. Defendant, who lacked the means to retain a lawyer, asked SA Sullivan "will you appoint me a lawyer?" SA Sullivan responded "we don't appoint lawyers."

Defendant agreed to go ahead with the polygraph examination, "just to get this over with right now."  During the pre-test and the polygraph examination proper, Defendant did not make any incriminating admissions. SA Sullivan showed the polygraph charts to Defendant, telling him that he had "failed miserably."  Consistent with her standard practice, and as she testified at hearing during cross examination, once SA Sullivan decided that Defendant's charts showed deception, she abandoned any pretense of being a neutral examiner and openly assumed the role of investigator.  She became challenging

and confrontational.  Defendant "eventually"[1] admitted that he had touched K.C.  At SA Sullivan's suggestion, Defendant agreed to write an apology letter.  SA Sullivan actually wrote the letter, proposing statements which Defendant adopted.   Neither the pre-test, the polygraph examination proper, or the post-test interrogation was recorded.

 SA Sullivan left the interview room to confer with SA Schaeffer for a few minutes.  She and SA Schaeffer returned to the interview room for further interrogation.  During this final interrogation, Defendant made further incriminating statements.  This final interrogation was recorded.

**Discussion**

Given that SA Sullivan had just reviewed the advice of rights form with Defendant, a reasonable law enforcement officer in her place would have understood Defendant's question, "Will you appoint me a lawyer?" as an unequivocal request for appointed counsel as referred to in the advice of rights form.  A reasonable person in Defendant's position would have understood SA Sullivan's response, "We don't appoint lawyers," as a denial of that request.

The Court need not decide the fact intensive question of whether Defendant was in custody when he confessed to touching K.C. If Defendant was in custody, his *Miranda* rights had attached.  If he was not yet in custody, he nevertheless was entitled to appointed counsel as recited in the advice of rights form:

---

[1] It is not clear how long Defendant was interrogated prior to confessing.  The consent form gives the time as 9:42 a.m. and the advice of rights form gives the time as 9:47 a.m.  The Court assumes that these forms were executed rather early on in the pre-test.  The apology letter gives the time as 11:17 a.m.  The recording of the final interrogation during which SA Matthews was present gives the time that it began as approximately 11:26 a.m.

> If the authorities are free to tell a suspect that he has the right to appointed counsel, but could, while continuing to interrogate him, refuse to provide such counsel on the grounds that the suspect was not actually in custody, the suspect would be led to believe that no request for counsel would be honored. "The coercive effect of continued interrogation would thus be greatly increased because the suspect would believe that the police 'promises' to provide the suspect's constitutional rights were untrustworthy, and that the police would continue to violate those rights as they wished, regardless of assurances to the contrary." We do not suggest that a person can invoke his *Miranda* rights anticipatorily in any situation, i.e., in a context other than custodial interrogation, as the [Supreme] Court cautioned in *McNeil* [*v. Wisconsin*, 501 U.S. 171 (1991)]. *However, law enforcement officers are not free to give the Miranda warning and then blatantly ignore a suspects' attempt to invoke any right thereunder.*

*United States v. Bautista*, 145 F.3d 1140, 1050-51 (10th Cir. 1998) (citations omitted) (emphasis added). SA Sullivan's conduct clearly conflicted with our Court of Appeals' admonition that "law enforcement officers are not free to give the *Miranda* warning and then blatantly ignore a suspect's attempt to invoke any right thereunder."

The United States argues that Defendant waived his right to appointed counsel, when, after SA told him that "we don't appoint lawyers," he proceeded with the polygraph examination. The United States overlooks the fact that this alleged waiver was itself uncounseled precisely because of SA Sullivan's dismissive response to Defendant's request for appointed counsel. Defendant's case is easily distinguished from *Wyrick v. Fields*, 459 U.S. 42 (1982), where the defendant made the decision to submit to a polygraph examination only after consulting with retained and appointed counsel. Such is not the fact pattern presented here.

A waiver of the right to counsel must be knowing and intelligent. *Edwards v. Arizona*, 451 U.S. 477, 484 (1981). The Court finds that SA Sullivan's statements to

Defendant—-[i]f you cannot afford a lawyer, one will be appointed for you before any questioning if you wish" and "we don't appoint lawyers" — were inconsistent and confusing, interfering with Defendant's ability to reach "a full awareness of the nature of the right being waived." *Bautista*, 145 F.3d at 1150.  Without an understanding of his right, Defendant could not have knowingly and intelligently waived his right to appointed counsel.   The Court concludes that all of the statements made by Defendant subsequent to his request for appointed counsel were obtained as the result of SA Sullivan's violation of Defendant's *Miranda* right to counsel, and therefore are inadmissible in the United States' case-in-chief.  *Bautista*, 145 F.3d at 1147-48.

In the alternative, the Court concludes that the United States has not met its burden of demonstrating that Defendant's confession was voluntary.  In ruling on the voluntariness of a confession, the Court applies well-established principles:

> The Government bears the burden of showing, by a preponderance of the evidence, that a Confession is voluntary. The question th[e] court must resolve is whether
>
>> the confession [is] the produce of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.
>
> Further, "[w]hen the government obtains incriminating statements through acts, threats, or promises, which cause the defendant's will to be overborne, it violates the defendant's Fifth Amendment rights and the statements are inadmissible at trial as evidence of guilt." Th[e] court determines the voluntariness of a confession based upon the totality of the circumstances, considering 'both the characteristics of the accused and the details of the interrogation."

5

*United States v. Lopez*, 437 F.3d 1059, 1063 (10th Cir. 2006) (citations omitted).

SA Sullivan's interrogation of Defendant on June 11, 2014 was tainted by the denial of Defendant's request for appointed counsel. Defendant impressed the Court as intelligent and fluent in English, but relatively uniformed as to his constitutional rights. Defendant justifiably would have been confused by SA Sullivan's response that "we don't appoint lawyers."  Defendant's case presents the scenario described by our Court of Appeals in which the interrogating officer's denial of appointed counsel suggests to the subject that his constitutional rights do not matter, thereby greatly increasing the coerciveness of any subsequent interrogation.

**The polygraph exam**

The Court and the parties spent a considerable amount of time and effort addressing the validity of the results of the polygraph examination conducted by SA Sullivan on June 11, 2014. SA Sullivan conducted a polygraph examination that was valid under the FBI's in-house protocols. Although SA Sullivan is an experienced polygrapher, she demonstrated little understanding of, or interest in, the underlying theory. The FBI employs a three-point scoring system, knowing that it enhances sensitivity at the expense of specificity. SA Sullivan uses this standard FBI format because it is what she is authorized to use. She believes that her polygraphs are 100% accurate. In fact, from the testimony adduced at trial, due to the high sensitivity and low specificity of the FBI format, an innocent person has about a one-in-three chance of being classified as non-deceptive. The likelihood that innocent subjects will be subjected to post-test interrogation is heightened by SA Sullivan's practice of interrogating any

subject whose scores are inconclusive, not merely those subjects whose charts are scored as deceptive.  Moreover, the Court does not find the single study of the two comparison-two relevant questions format cited by the United States [Gov't Ex. 17] as conclusive of the validity of the two comparison-two relevant questions format.  Based upon the testimony adduced at hearing, the Court is left with the impression that as used by SA Sullivan in Defendant's case, the polygraph examination was employed to ratchet up the emotional pressure in anticipation of the inevitable interrogation of Defendant.

      The equipment used by Agent Sullivan was capable of making an audio recording.  Pursuant to FBI policy, Agent Sullivan did not record the pre-test or the polygraph examination proper, and for reasons of her own, did not record the post-test interrogation.  Under the circumstances of this case, the absence of a recording of the interrogation, which would have permitted the Court to hear the actual words and the tones of voice of the participants, constitutes a failure of proof as to whether SA Sullivan conducted her interrogation within Fifth Amendment bounds.  *See United States v. Bundy*, 966 F. Supp. 2d 1180, 1186 (D.N.M. 2013).

      The Court further concludes that the taint of the initial confession was not sufficiently dissipated before the final interrogation, which began a few minutes after the unrecorded post-test interrogation.  Accordingly, the statements made by Defendant during the final recorded interrogation were the fruit of the involuntary unrecorded confession.  *See Lopez*, 437 F.3d at 1066.

      **WHEREFORE, IT HEREBY IS ORDERED** that *Defendant's Motion to Suppress Statements Made on June 11, 2014* [Doc. 50] is **granted**.

**So ordered this 9th day of June, 2016.**

_____
M. CHRISTINA ARMIJO
Chief United States District Judge